IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

GREGORY HARTMANN
CLERK OF COURTS
HAMILTON COUNTY, OH

2004 APR 22 P 1: 21

FILED

| | |
|---|---|
| State of Ohio, | ) |
|    Plaintiff-Respondent | ) |
| | ) Case No.: B 925607 |
| vs. | ) |
| | ) JUDGE BETH MYERS |
| Michael Bies, | ) |
|    Defendant-Petitioner | ) |

### MICHAEL BIES RENEWED MOTION FOR SUMMARY JUDGMENT AS TO THE THIRD CAUSE OF ACTION

Michael Bies respectfully renews his Motion for Summary Judgment which he filed on August 15, 2003, and which this Court denied on April 5, 2003. A memorandum of law is attached and incorporated herein.

Respectfully submitted,

S. SCOTT HAYNES / 0059586
Hallowes, Allen & Haynes
6445 E. Livingston Avenue
Reynoldsburg, Ohio 43068
E-Mail: Scott@CentralOhioLaw.com
Telephone: (64) 868-0009
Facsimile: (614) 868-0029

And
DAVID H. BODIKER - 0016590
Ohio Public Defender

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215-2998
Telephone: (614) 466-5394
Facsimile: (614) 728-3670
COUNSEL FOR MICHAEL BIES



D58819251



EXHIBIT 2

## MEMORANDUM OF LAW

I. **Introduction**

On April 15, 2004, this Court denied Michael Bies' ("Michael") Motion for Summary Judgment. In his August 15, 2003 Motion, Michael asserted that the Double Jeopardy Clause of the Fifth Amendment precluded the relitigation of the issue of his mental retardation. [Motion pp. 12-13.] When an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot be litigated between the same parties even in a future lawsuit. Ashe v. Swenson, 397 U.S. 436, 445 (1970); United States v. Patterson. In the present case, the Double Jeopardy Clause bars the relitigation of the findings made by the Court that Michael has a "69 IQ" and is "mildly/mentally retarded"; the Court of Appeals' determination that Michael has "mild mental retardation to borderline mental retardation" and the Ohio Supreme Court's finding that Michael suffers from "mild to borderline mental retardation."

This Court in its April 15, 2004 opinion did not cite to the Double Jeopardy Clause. Michael currently has pending in the Federal District Court a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. The Federal Court may some day rule on Michael's Double Jeopardy claim. Michael is required to initially present this claim to the state courts. O'Sullivan v. Boerchel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999). Failure to present the claim first to the state court would result in a denial of the claim for procedural default. Out of an abundance of caution, Michael now explicitly presents his Double Jeopardy claim again to this Court so there is no dispute this Court had the first opportunity to address the claim.[1]

---

[1] Michael incorporates here all of the arguments raised in his initial motion for summary judgment. Failure to include all of those arguments, should not be construed as waiver.

1

II.   **This Court has previously definitively decided that Michael Bies' has an IQ of 69**

On July 22, 1998, Judge Robert S. Kraft issued his findings of facts and conclusions of law in Michael's first post-conviction case. [Exhibit A]. The Assistant Prosecutor assigned to the case wrote the findings that Judge Kraft adopted without edit. Judge Kraft concluded concerning Michael's mental retardation claim:

> (1) The defendant is shown by the record to be mildly mentally retarded with an <u>IQ of about 69</u>. (Emphasis added.)

[Exhibit A.] That finding of a 69 IQ is now binding upon the Court. The prosecutor has not demonstrated that the judgment entry is not binding upon the parties or that the Court's finding was obtained through fraud.

The Court in its April 5, 2004, opinion summarized Michael's IQ scores as follows:

> The first factor to be considered by this Court is whether Mr. Bies suffers from subaverage intelligence. IQ is one of the factors considered. Regarding Mr. Bies' IQ, there is conflicting evidence in the record. On the one hand, there is evidence indicating that Mr. Bies has an IQ below 70: 1) February 6, 1985, examination shows IQ of 50: 2) September 11, 1992 report regarding NGRI comments that Dr. Winters found an IQ of 68; and, 3) 1992 NGRI report finds full scale IQ of 68 with performance IQ at 67 and verbal IQ at 70.
> On the other hand, there is evidence that Mr. Bies' IQ is over 70, thus giving rise to a rebuttable presumption that he is not mentally retarded. For example, Exhibit E to Petition to Vacate which shows an IQ of 74 in 1983. Moreover, in September 1996, Dr. Haskins found an IQ of 72. [Exhibit J to Appendix to Petition to Vacate filed September 20, 1996.]

[Opinion p. 4.]

The Court in this portion of its opinion listed most of Michael's IQ scores, with the exception of Judge Kraft's judicial finding that Michael has an IQ of 69. This score is controlling because it is a judicial finding.

The Double Jeopardy Clause bars the prosecutor from relitigating Michael's IQ score of 69.

2

### III. The Courts previously definitively determined that Michael is mildly mentally retarded.

On July 22, 1998, Judge Robert Kraft determine in an entry prepared by the prosecutor that Michael is "mildly mentally retarded." [Exhibit A]. The Court has recognized that the Hamilton County Court of Appeals and Ohio Supreme Court has made similar findings. [Opinion p.5.]

Michael has documented that the definition of mental retardation in effect at the time of his trial was the same definition that the Ohio Supreme Court adopted in Lott:

> The American Psychiatric Association's definition of mental retardation at the time of Michael's trial was as follows: (1) significantly subaverage general intellectual functioning, accompanied by (2) significant deficits or impairments in adaptive functioning, with (3) onset before the age of 18. <u>Diagnostic and Statistical Manual of Mental Disorders</u> (American Psychiatric Association, Third Edition Revised, 1987), p. 28. The American Association Of Mental Retardation had promulgated the same definition at the time of Michael's trial; 1) significantly subaverage intellectual functioning, 2) limitation in two or more adaptive skill areas, and 3) the onset before the age of eighteen. <u>Mental retardation</u> (American Association on Mental Retardation, 1992) pp. 5-6. These are the same definitions that the Ohio Supreme Court adopted in <u>Lott</u>.

[Michael Bies Post-Oral Argument Memorandum, p. 4.]

The Court suggests that the above statement "may be true . . ." [Opinion, p. 5, n.1.] However, there is no question but that the statement **is true** and the above citations confirm undeniably that the <u>Lott</u> definition of mental retardation was in effect at the time of Michael's trial.

The Court suggests several reasons that the examiners' conclusions at trial that Michael is mentally retarded and the resulting court findings may be flawed. [Opinion p. 4-5.] The Court speculated that the experts may have applied the wrong test, especially since the examiners were appointed for purposes of an insanity evaluation. [Id.] This Court's statement as to the appointment of examiners is only partially correct. The Court appointed Dr. Winter to conduct a

3

mitigation investigation for which mentally retardation was extremely relevant. [Exhibit B.] Mental retardation was a statutory mitigating factor and the statement in Dr. Winters' report that Michael was mentally retarded was not mere loose verbiage. It was, instead, an expert psychological opinion upon which the Court relied. Moreover, it is the prosecutor who should make challenges to the experts conclusory language at the time of trial. The prosecutor certainly should not have tendered an entry conceding the issue if he later hoped to successfully challenge Michael's mental retardation. Again it is important to remember that the same definition of mental retardation was in effect for <u>all</u> of the relevant times herein.

The Double Jeopardy Clause bars the prosecutor from relitigating the mental health findings of the experts. The prosecutor initially failed to challenge the findings and later embraced the findings.

IV. **Michael has demonstrated that he is entitled to summary judgment pursuant to Ohio Civ. R. 56.**

For the reasons identified herein, Michael requests this Court to grant his renewed motion for summary judgment.

Respectfully submitted,

_____
S. SCOTT HAYNES - 0059586
Hallowes, Allen & Haynes
6445 E. Livingston Avenue
Reynoldsburg, Ohio 43068
E-Mail: Scott@CentralOhioLaw.com
Telephone: (64) 868-0009
Facsimile: (614) 868-0029

And

DAVID H. BODIKER - 0016590
Ohio Public Defender

4

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215-2998
Telephone: (614) 466-5394
Facsimile: (614) 728-3670

COUNSEL FOR MICHAEL BIES

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **MICHAEL BIES RENEWED MOTION FOR SUMMARY JUDGMENT AS TO THE THIRD CAUSE OF ACTION** was sent by regular U.S. Mail to Mark E. Peipmeier, Assistant Hamilton County Prosecuting attorney, Hamilton County Prosecutor's Office, 230 E. 9th Street, Suite 4000, Cincinnati, Ohio 45202, on this 19th day of April, 2004.

S. SCOTT HAYNES - 0059586

#197143

5

COURT OF COMMON PLEAS

CRIMINAL DIVISION

HAMILTON COUNTY, OHIO

STATE OF OHIO                         :       CASE NO. B-925607

　　Plaintiff-Respondent

vs.                                           **FINDINGS OF FACT,
                                              CONCLUSIIONS OF LAW, ENTRY
MICHAEL BIES                                  DISMISSING PETITION TO
                                              VACATE**

　　Defendant-Petitioner

This matter is before the Court on the defendant's Petition to Vacate, and the State's motion for judgment pursuant to R.C. 2953.21(C). The Court determines that all issues can be resolved without an evidentiary hearing, and that therefore discovery is not appropriate.

The defendant's petition to vacate contains fifteen claims for relief, each of which will be disposed of individually.

I.　　The defendant's first claim for relief is an allegation that the court improperly relied on a victim impact statement in imposing sentence. As to this claim the Court makes the following <u>Findings of Fact</u>.

　　(1)　　The defendant was sentenced on other offenses besides

　　　　　　the aggravated murder count.

1



EXHIBIT A

ENTERED
JUL 22 1998
IMAGE 20

The Court makes the following Conclusions of Law:

(1) This claim is not supported by sufficient evidentiary documents. State v. Williams, 74 Ohio App.3d 686 (1991).

(L) Defendant's twelfth claim is that trial counsel failed to request expert assistance to challenge the state's procedures in collecting physical evidence. As to this claim, the Court makes the following Findings of Fact:

(1) Defendant makes no showing of how he was prejudiced in this regard. State v. Bradley, 42 Ohio St.3d 136 (1989).

The Court makes the following Conclusion of Law:

(1) This claim is not supported by sufficient evidentiary documents and is, therefore, rejected. State v. Williams, 74 Ohio App.3d 686 (1991).

V. The defendant's fifth claim for relief that it is cruel and unusual punishment to execute a retarded person. As to this claim, the Court makes the following Findings of Fact:

(1) The defendant is shown by the record to be mildly mentally retarded with an IQ of about 69.

The Court makes the following Conclusion of Law:

(1) As a matter of law, a mildly mentally retarded defendant may be Punished by execution. State v. Holloway, 38 Ohio St.3d 239 (1988).

9

# COURT REPORT

### CENTRAL PSYCHIATRIC CLINIC
### COURT PSYCHIATRIC CENTER

216 E. 9th Street - Fifth Floor
Cincinnati, Ohio 45202
(513) 352-3111

**CONFIDENTIAL**

NAME  Michael Bias            DATE OF BIRTH   5-9-72

DOCKET NUMBER  B92-5607       OFFENSE  Aggravated Murder with
                                       Specifications
REF. DATE  8-11-92   EVAL. DATE 10-10-92   COURT DATE  10-13-92

The Honorable J. Howard Sundermann, Jr.
Hamilton County Court of Common Pleas
Cincinnati, Ohio 45202

RE: MITIGATION

Dear Judge Sundermann:

This is in response to your court order that Michael Bias be evaluated with reference to mitigation of penalty, following his conviction on a charge of Aggravated Murder with Specifications, pursuant to Ohio Revised Code 2947.06. Michael Bias was initially interviewed by Shirley W. Leahy, ACSW, LISW, Clinical Social Worker, in the Hamilton County Criminal Justice Center (HCJC) on August 31, 1992 and September 1, 1992. Mr. Bias was further evaluated by the undersigned in the HCJC on September 8, 1992, September 10, 1992, and October 10, 1992. Evaluation was accomplished by interview and administration of the Wecshler Adult Intelligence Scale - Revised (WAIS-R) and the Bender-Gestalt. Prior to the evaluation process, Mr. Bias was made aware of nonconfidentiality limits. In addition, Mr. Bias was informed about the phases of his trial. He was specifically advised that information given in prior evaluations with regard to his mental state at the time of the alleged acts may be used as a basis for an examination regarding mitigating factors. In addition, Mr. Bias was told he had the right to talk with his attorneys to help him decide if he wished to withhold any information at any point during the evaluation procedure. An explanation statement to this effect was reviewed with Mr. Bias and clarified for him. Mr. Bias indicated his understanding of these factors, both verbally and by his signature. The following summary of my findings and conclusions is based upon: (1) the current evaluation of Michael Bias, together with psychological testing; (2) information received by Ms. Leahy in collateral contact with the defense attorney, Joe Dixon; the prosecuting attorney, Tom Longano; Mr. Bias' mother, Linda Bias;

**EXHIBIT B**

RE: MICHAEL BIAS

Bias' girlfriend, Carol Lucky; (3) review of Mr. Bias' contacts with Mental Health Services at the HCJC; (4) review of a diagnostic evaluation of Michael Bias done at the age of three years-ten months, by the Dysfunctional Child Center of the Michael Reese Hospital and Medical Center, Chicago, Illinois; and (5) review of records of the defendant's past psychiatric hospitalizations at Chicago-area hospitals (St. Mary of Nazareth, 1986; Loretto Hospital, 1986; Chicago Reed Mental Health Center/Henry Horner, Children's Center, 1988). Additional information with regard to Mr. Bias' developmental history has been requested, but not received at the time of the writing of this report. These records would include school information (Cook County Board of Education, Chicago; Edgetown School; Southern School; Victor Newman School), medical records (Susan Balverde, M.D., pediatrician, Chicago) and records of the defendant's psychiatric hospitalizations at the ages of five years old and seven years old at Ridgeway Hospital.

Relevant History: Michael Bias was born in Wisconsin and raised in Chicago as the second of his mother's three children. Mr. Bias and his younger sister are the product of a relationship between mother and a man by the name of Michael Alvin Johnson. Mr. Bias indicates the father of his older brother is in a penitentiary serving time for Murder. Mr. Bias was raised by his mother. His father disappeared from his life early on. According to Mr. Bias' mother, the father left when the defendant was one year old. The mother and father reunited one year later, but then separated permanently. The mother describes his father as abusive and violent to her. He was an alcoholic who would periodically tear up the house. Mr. Bias' mother states she remembers that once when the defendant was two and a half years old, he (the defendant) took a frying pan and hit his father over the head when the father was beating up the mother.

Information from the defendant's mother and from past psychiatric evaluations indicates Mr. Bias exhibited a good deal of anger since childhood. At the age of three years-ten months, the family pediatrician (Susan Balverde, M.D.) referred Mr. Bias to the Dysfunctional Child Center of the Michael Reese Hospital and Medical Center with the chief complaint of "violent and uncontrollable." The defendant was cursing, threatening and acting-out toward peers by that age. As he developed, he became difficult to control and the mother often had to restrain him physically. Mr. Bias' mother indicates Mr. Bias would destroy furniture. Once, he hit her and she had to call the police.

In addition to difficulty with hostility and temper, Mr. Bias apparently exhibited developmental delays from birth. He was almost a year old before he could sit up and almost two years old before he could walk. When evaluated at the Dysfunctional Child Center (see above) at the age of three years-ten months, Mr. Bias was not yet toilet trained. He had repeated illnesses (mostly pneumonia) as a child, as well as "sleeping sickness" (encephalitis). These may have resulted in developmental delays

-2-

RE:  MICHAEL BIAS

and intellectual deficiency. Mr. Bias has always been in special education classes. He was disrupting class as early as kindergarten and required special placement. Later, he was expelled from public schools and placed in "therapeutic schools", schools which deal with severe behavior problems. Mr. Bias remembers, "I'd get frustrated with my teachers. I would just blow up right away and walk out. I wouldn't go to school half the time and I missed more than I ever went." Mr. Bias also said that in one of the private schools (Victor Newman School), "They had permission to restrain you and hold you down until you could come off your anger." He remembers being restrained there "nine times, maybe more." Mr. Bias states he was expelled from Victor Newman because "this lady teacher screamed at me and I punched her in the mouth."

Mr. Bias has a history of psychiatric hospitalizations for suicidal gestures and suicidal threats. Records indicate he attempted to hurt himself as early as the age of five years old. There are two psychiatric hospitalizations at the ages of five years old and seven years old (referred to in records of later psychiatric hospitalizations), records of which, however, are not available at this time. Mr. Bias' mother states she found him trying to cut himself with scissors at an early age, and there was an episode where he threatened to jump out of a window. Mr. Bias has received a number of psychiatric diagnoses: Attention Deficit/Hyperactivity Disorder; Adjustment Disorder with Depression; Mixed Special Developmental Disorder; Adjustment Disorder with Mixed Disturbance of Emotions and Conduct; R/O Bipolar Affective Disorder; R/O Dysthymia. While the defendant's mother states he was diagnosed as having "organic dysfunction on the left side of his brain" and that diagnosis also appears in hospital records, this may refer to the presence of specific learning disabilities (developmental delays in language and reading; inability to read) since an electroencephlogram (EEG) administered to the defendant in January of 1986 did not yield abnormal results.

Michael Bias denies drug abuse. He states he drinks alcohol, but indicates he does not drink to excess. Contact with his mother, however, reveals she has seen him drink a case of beer at a time. His girlfriend, on the other hand, (Carol Lucky, mother of the defendant's oldest child), denies Mr. Bias drank on any regular basis. Mr. Bias does have three children. He has two sons, both named "Michael", one born in March of 1990 and another born in April of 1990. Mr. Bias also has a daughter. Mr. Bias was married to the mother of the second "Michael", although he was dating the mother of the older son (Carol Lucky) throughout his marriage. Mr. Bias and Ms. Lucky have lived together, on and off, for a number of years. They met when Mr. Bias was twelve years old and Ms. Lucky was fourteen years old. Ms. Lucky continues to have contact with the defendant and is supportive of him. She does state that Mr. Bias had been violent with her. She indicates the defendant "slapped me once or twice." On another occasion, she states, "He almost broke my

RE: MICHAEL BIAS

nose. He snapped when I said me and Mikey (their son) are going to leave you." Ms. Lucky states she had to go to the Emergency Room where she found Mr. Bias had fractured a bone in her face.

In terms of other relevant history, Michael Bias lists his prior criminal justice involvement as an arrest for Carrying a Concealed Weapon in Chicago, and a pending charge of Receiving Stolen Property in Indiana. He has no employment history to speak of. Mr. Bias receives Social Security (SSI) for his mental disability. He has been receiving SSI since at least the age of fourteen years old.

Psychological Functioning: Mr. Bias' mother had her first child at the age of seventeen years old. She was nineteen years old when she had Michael Bias. By the time Mrs. Bias brought Michael to the Dysfunctional Child Center of the Michael Reese Hospital and Medical Center she was a twenty-three year old, single mother, supporting herself and three children on Welfare. Those records reveal a chaotic home situation, with neglect and abuse. Michael Bias is described as a three year old child whose "clothes and body are very dirty." The home situation is described as "extremely unstable with multiple moves, a natural father who apparently was in and out of the family and has now disappeared, and a new male figure in the family for the past two years who Michael identifies as his father. Apparently there has been a good deal of violence with beating in the home, although it is not clear whether weapons have been used." The reason for the referral was "violent and uncontrollable." Most three years old are not "violent and uncontrollable." However, children who have experienced a good deal of violence often imitate the violence around them.

Mr. Bias must have been exposed to extreme chaos and violence within the home because his behavior at that young age was extraordinary and extreme: "He assaults other children and himself, often with dangerous objects such as cut glass or knives. He also has been known to attempt to choke his peers and his baby sister and himself by placing a rope around the neck and pulling. Apparently his baby sister was found cyanotic during one of these attacks. He bites himself, slaps his face...he awakens in the middle of the night and will wander, leaving the house and wander in the street...he will fly into a rage when he does not get his way when he seeks attention but frequently from very minimal precipitant causes and in his rage as he is completely unreachable. When they are over, he appears not to remember what he has done and in fact, is often surprised when he is told that he has hurt somebody." The psychiatric evaluation of three year-ten month old Michael Bias at the Dysfunctional Child Center concludes, "physical violence is inflicted on self or 'other' without apparent awareness of difference and at these times he is in danger of committing homicide or suicide without any awareness of the consequences of his acts."

Mr. Bias continued throughout his developmental years, acting out toward others and toward himself. Records of his

RE: MICHAEL BIAS

psychiatric hospitalizations at the ages of five years old and seven years old are not available. The next available record is that of a psychiatric hospitalization at St. Mary of Nazareth (Chicago) when the defendant was thirteen years old. The precipitant for the hospitalization was that Mr. Bias "took more than two swings with a knife at his brother's face. The brother protected himself with a trash lid until the mother arrived to control the patient." When his mother tried to calm him down, Mr. Bias said he was "fed up with it all" which the mother said she knew meant he was about to make a suicidal gesture. Mr. Bias' mother stated at the time that he was attending Edgetown Therapeutic School he would return home from school in a "sad" mood. He would then "sneak out of the house and roam the streets for hours." When he returned, his mother would scold him and an argument would ensue. It was at times like this that the defendant vacillated between hurting himself and hurting others. The psychiatrist doing the examination at the time notes, "Patient states when he has these moods of sadness/rage he leaves house to prevent 'hurting his family'." Hospital records at the age of thirteen years old talk about multiple fights- the defendant was in "with anyone either larger or smaller than he." The records further note, "Patient expelled from public schools past two years for disrupting classes. Mother states patient is 'slow learner and hates therapeutic school he attends this year because teacher is strict and does not allow him to take command'." Further history taken from the mother at this time includes a history of four suicide attempts. At the age of five years old, hospital records state Mr. Bias tried to jump out of a window. At the age of nine years old, he tried to poke his wrists with scissors in the bathroom. At the age of eleven years old, he tried to jump off the third floor of his uncle's house. Two psychiatric hospitalizations at Ridgeway ensued. While at Ridgeway, Mr. Bias attempted suicide again using hospital curtain ropes, but he was stopped by nurses.

At the age of fourteen years old, Mr. Bias was admitted to Loretto Hospital in Chicago "for treatment of suicide threats." The treating psychiatrist at that time notes, "Chief characteristic was his exquisite sensitivity to any kind of frustration and his rapid tendency to get enraged." When he was fifteen years old, Mr. Bias was admitted to the Chicago Reed Mental Health Center/Henry Horner's Children's Center as an emergency admission. He was referred by Loretto Hospital Emergency Room after he "allegedly threatened his mother and attempted to cut his sister's throat." Later, hospital staff seemed to agree (on the word of Mr. Bias and his mother) that he had verbally threatened, but never brandished a knife. While Mr. Bias was given a diagnosis of "depression", this was the first hospitalization to question the presence of what is called a "borderline personality disorder."

Indeed, the defendant meets most of the criteria for this disorder. Two of the hallmarks of this disorder are: (1) inappropriate, intense anger or lack of control of anger; (2)

RE: MICHAEL BIAS

recurrent suicidal threats, gestures, or behavior, or self-mutilating behavior. Mr. Bias' problems with rage are evident from the history. He also has a history of self-mutilation. Mr. Bias is known to place alcohol on his skin and set himself on fire. The mother of his oldest child, Carol Lucky, indicates that whenever Mr. Bias "got pissed off", he would put alcohol on his arm and set it on fire. She states, "He says pain doesn't bother him. He's built up so much anger, pain doesn't bother him." When asked about this, Mr. Bias indicated, "I've had so much pain in my life, physical pain doesn't bother me." In addition to setting fire on his skin, Mr. Bias states he has cut his wrists with a knife and tattooed his arms "with a sewing needle and India ink."

In addition to this chronic and severe personality disorder, the defendant has impaired intelligence. He currently tests within the range of mild mental retardation (Verbal IQ = 70; Performance IQ = 67; Full Scale IQ = 68). However, Mr. Bias appears to function within the range of borderline mental retardation. That is, he functions on a slightly higher level than test results would indicate, although all IQ scores have a band of accuracy of five points plus or minus Therefore, Mr. Bias' Verbal IQ may be stated, with confidence, to fall within the range of 65-75. The Verbal IQ = 75 is within the range of borderline mental retardation. Such a score would place the defendant somewhere within the bottom 7% of the general population his age. Ninety-three percent of the general population the defendant's age is more intellectually capable than he. In addition to an intellectual deficiency, Michael Bias is functionally illiterate. Mr. Bias doesn't think logically. He often contradicts himself and doesn't seem to grasp the total picture of his circumstances with anything but superficial understanding. As an example of the concrete and illogical way in which he thinks, Mr. Bias told me he was concerned because he had not heard anything about his pending charge of Receiving Stolen Property in Indiana. He told me, "I don't want to have to worry about that hanging over my head when I get out of prison." He was reminded he was facing the death penalty and that the charge in Indiana was insignificant in comparison with receiving the death penalty, or receiving a sentence of life in prison. Another example of the defendant's failure to grasp what is going on around him occurred when, on October 10, 1992, I asked him whether his case had yet gone to the jury, or not. Mr. Bias didn't know what I was talking about, telling me that a jury had been seated (on the first day of his trial). I again asked him whether "closing arguments" had been made in his case. He didn't know what I was talking about. It was only when I specifically asked him whether or not there was a jury somewhere, anywhere, sitting and deliberating his fate at that very moment, but the defendant was able to tell me that was not the case, and his trial would resume on October 13, 1992.

**Summary and Conclusions:** Michael Bias is a twenty year old, divorced male who was referred for evaluation of mitigation

-6-

RE: MICHAEL BIAS

of penalty, following a finding of guilt on a charge of Aggravated Murder with Specifications. Evaluation reveals a man whose psychological difficulties revolve around: (1) mild mental retardation to borderline mental retardation; (2) a chronic and severe personality disorder characterized by emotional instability, impulsivity and problems with appropriate control of anger; and (3) probable organic brain dysfunction characterized by specific learning disabilities. As outlined above, Michael Bias is the product of a chaotic upbringing. His very early years were characterized by exposure to his alcoholic father's violence. The mother did not take good care of the children since by the time she was twenty-three years old, she had three children and was a single mother on Welfare. Mr. Bias' girlfriend and the mother of his oldest child, Carol Lucky, indicates that there was a time when she and Mr. Bias lived with the defendant's mother. She states that during the course of one month when they lived with the mother, the mother brought in "thirty different guys." The initial contact of mental health and health professionals with Michael Bias when he was three years-ten months old, indicates his clothes and body were dirty. He already had a history of "multiple self-inflicted injuries, often with little acknowledgement of pain." By that time, Mr. Bias was already described as "slow and with apparent hearing loss, delayed speech and speech difficulties." Mr. Bias' verbalizations at that young age probably reflect and mirror what he was hearing in his own home. Mr. Bias was noted to throw a Raggedy Ann doll around while verbalizes threats to her: "I'm gonna beat you up." Later he said, "I kill you."

As the defendant matured, he continued to exhibit the same kinds of difficulties. He inflicted pain on himself without much acknowledgement of that pain. He also acted-out toward others. Mr. Bias has always had difficulty controlling angry impulses. He has never been able to function within the public school system, instead requiring what are called, in Chicago, "therapeutic schools." These are school settings for severely behaviorally handicapped individuals, schools which often are required to restrain the student, physically. Even under these special circumstances, Mr. Bias failed to adjust. He admits he assaulted one teacher, he constantly disrupted the class and he eventually dropped out of school.

Michael Bias has exhibited impulsive behavior throughout his lifetime. He has received multiple medications including Mellaril (a major tranquilizer), Ritalin (for symptoms of Attention Deficit/Hyperactivity Disorder), Dilantin (for a possible seizure disorder), etc. The defendant has received a number of different diagnoses with the overall picture of significant emotional dysfunction and a basic failure to succeed in any part of his life, i.e., school, vocation, personal relationships or social relationships.

RE:  MICHAEL BIAS

Thank you for referring Michael Bias to the Court Psychiatric Center. If we may be of further assistance, please do not hesitate to call at 352-3111.

Respectfully,

*Donna Winter/tm*

Donna Winter, Ph.D.
Clinical Psychologist

If testimony is required on this case, the Court Psychiatric Center will be represented by Donna Winter, Ph.D., Clinical Psychologist.

DW/tm
10-13-92

BIAS.001