## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| Michael Bies, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No.:  CV-1-00-682 |
| vs. | ) | |
| | ) | District Judge Susan J. Dlott |
| Margaret Bagley, Warden, | ) | Magistrate Judge Michael R. Merz |
| | ) | |
| Respondent. | ) | |

_____

## MICHAEL BIES' THIRD AMENDED PETITION FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

_____

S. SCOTT HAYNES #0059586
Hallowes, Allen & Haynes
6445 E. Livingston Avenue
Reynoldsburg, Ohio  43068
Telephone:  614-868-0009
Fax:  614-868-0029

And

JIM PETRO #0022096
Attorney General of Ohio

DAVID H. BODIKER #0016590
Ohio Public Defender

CAROL A. ELLENSOHN #0074598
CHARLES L. WILLE #0056444
Assistant Attorney Generals
Capital Crimes Section
30 East Broad Street, 23rd Floor
Columbus, Ohio  43215
(614) 728-7055
Fax: (614) 728-8600

RANDALL L. PORTER #0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio  43215
Telephone: (614) 466-5394
Facsimile: (614) 728-3670

COUNSEL FOR RESPONDENT

COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

I.  INTRODUCTION ........................................................................................................1

II. CONSTITUTIONAL VIOLATIONS .......................................................................10

   FIRST CLAIM FOR RELIEF:  MICHAEL BIES' CONVICTIONS
   AND SENTENCES ARE CONSTITUTIONALLY INFIRM.  THE
   TRIAL COURT ERRED WHEN IT ADMITTED MR. BIES'
   STATEMENTS BECAUSE THEY WERE NOT THE PRODUCT
   OF HIS OWN FREE WILL. United States Constitution, Fifth, Sixth,
   Eighth and Fourteenth Amendments. .........................................................................10

   SECOND   CLAIM   FOR   RELIEF:    MICHAEL   BIES'
   CONVICTIONS   AND   DEATH   SENTENCES   ARE
   CONSTITUTIONALLY   INFIRM.    THE   TRIAL   COURT
   ADMITTED CUSTODIAL STATEMENTS OF MICHAEL BIES
   WHICH WERE NOT PRECEDED BY MR. BIES KNOWINGLY,
   INTELLIGENTLY   AND   VOLUNTARILY   WAIVING   HIS
   MIRANDA RIGHTS.  United States Constitution, Fifth, Sixth, Eighth
   and Fourteenth Amendments. ....................................................................................20

   THIRD CLAIM FOR RELIEF:  MICHAEL BIES' CONVICTIONS
   AND DEATH SENTENCES ARE CONSTITUTIONALLY INFIRM
   BECAUSE THE TRIAL COURT ADMITTED CUSTODIAL
   STATEMENTS OF MICHAEL BIES WHICH WERE NOT
   PRECEDED BY MICHAEL BEING ADVISED OR HAVING
   WAIVED HIS MIRANDA RIGHTS.  United States Constitution,
   Fifth, Sixth, Eighth and Fourteenth Amendments. .....................................................24

   FOURTH   CLAIM   FOR   RELIEF:    MICHAEL   BIES'
   CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY
   INFIRM BECAUSE THE TRIAL PROSECUTORS FAILED TO
   PROVIDE DEFENSE COUNSEL WITH ALL EXCULPATORY
   EVIDENCE. United States Constitution, Sixth, Eighth and Fourteenth
   Amendments. .............................................................................................................27

   FIFTH CLAIM FOR RELIEF:  MICHAEL BIES' CONVICTIONS
   AND   SENTENCES   ARE   CONSTITUTIONALLY   INFIRM
   BECAUSE THE TRIAL PROSECUTORS KNOWINGLY USED
   FALSE TESTIMONY WHICH WAS NEITHER CORRECTED BY
   THE   TRIAL   PROSECUTORS   NOR   WAS   THE   FALSE
   TESTIMONY DISCLOSED TO TRIAL COUNSEL FOR MICHAEL
   BIES...........................................................................................................................41

SIXTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE TRIAL COUNSEL FAILED TO PROVIDE HIM WITH REASONABLE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL AND MITIGATION PHASES. United States Constitution, Sixth, Eighth and Fourteenth Amendments.........................................45

SEVENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND DEATH SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL COURT ADMITTED THIRTY-THREE SHOCKING, INFLAMMATORY AND GRUESOME PHOTOGRAPHS OF THE VICTIM WHICH HAD NEGLIGIBLE PROBATIVE VALUE. United States Constitution, Sixth, Eighth and Fourteenth Amendments.........................................72

EIGHTH CLAIM FOR RELIEF: MICHAEL BIES CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE OF THE EXTENSIVE PROSECUTORIAL MISCONDUCT WHICH OCCURRED THROUGHOUT THE TRIAL AND PENALTY PHASES. United States Constitution, Sixth, Eighth and Fourteenth Amendments. ..........................................76

NINTH CLAIM FOR RELIEF: MICHAEL BIES' DEATH SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL COURT RELIED UPON A DEATH RECOMMENDATION OF THE VICTIM'S MOTHER IN SENTENCING HIM TO DEATH. United States Constitution, Eighth and Fourteenth Amendments. .............................86

TENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM DUE TO OF THE NUMEROUS ERRORS IN THE STATE COURT'S INSTRUCTION TO THE JURY DURING THE TRIAL PHASE. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments. ..........................................................................88

ELEVENTH CLAIM FOR RELIEF: MICHAEL BIES' DEATH SENTENCE IS CONSTITUTIONALLY INFIRM DUE TO THE NUMEROUS ERRORS IN THE TRIAL COURT'S SENTENCING CHARGE. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments..........................................................................93

TWELFTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE HE WAS NOT AFFORDED THE REASONABLE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS DIRECT APPEAL OF RIGHT OT THE HAMILTON COUNTY COURT OF APPEALS. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments. .....................................................................105

THIRTEENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE HE WAS NOT AFFORDED THE REASONABLE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS DIRECT APPEAL OF RIGHT TO THE OHIO SUPREME COURT. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments..................................................111

FOURTEENTH CLAIM FOR RELIEF: MICHAEL BIES' SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE OF THE STATE COURTS' FAILURE TO CONDUCT AN ADEQUATE AND FAIR PROPORTIONALITY REVIEW OF HIS DEATH SENTENCE. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments...................................................115

FIFTEENTH CLAIM FOR RELIEF: MICHAEL BIES' SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE OHIO'S CAPITAL PUNISHMENT SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments. ........................................................120

SIXTEENTH CLAIM FOR RELIEF: MICHAEL BIES' DEATH SENTENCE IS INVALID UNDER THE FEDERAL CONSTITUTIONAL GUARANTEED OF DUE PROCESS, EQUAL PROTECTION, AND A RELIABLE SENTENCE BECAUSE EXECUTION OF THE MENTALLY RETARDED CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT. United States Constitution, Eighth and Fourteenth Amendments. ..................................................128

SEVENTEENTH CLAIM FOR RELIEF: MICHAEL BIES' EXECUTION WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS, BECAUSE HE IS NOT COMPETENT TO BE EXECUTED. MICHAEL BIES DOES NOT RATIONALLY UNDERSTAND THE CONNECTION BETWEEN HIS ACTS AND THE PUNISHMENT TO BE INFLICTED, AND AS A RESULT OF HIS MENTAL RETARDATION, BRAIN DAMAGE AND MENTAL ILLNESS. United States Constitution, Eighth and Fourteenth Amendments. ......................................130

EIGHTEENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND DEATH SENTENCES ARE INVALID UNDER THE FEDERAL CONSTITUTIONAL GUARANTEES OF DUE PROCESS, EQUAL PROTECTION, THE EFFECTIVE ASSISTANCE OF COUNSEL, A FAIR TRIBUNAL, AN IMPARTIAL JURY, AND A RELIABLE SENTENCE DUE TO THE CUMULATIVE ERRORS IN THE ADMISSION OF EVIDENCE AND INSTRUCTIONS, GROSS MISCONDUCT BY STATE OFFICIALS AND WITNESSES, AND THE SYSTEMATIC DEPRIVATION OF HIS RIGHT TO THE EFFECTIVE

ASSISTANCE OF COUNSEL.   United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments..............................................132

NINETEENTH CLAIM FOR RELIEF:   THE STATE OF OHIO IS PRECLUDED FROM CONTESTING MICHAEL BIES' MENTAL RETARDATION BECAUSE THE STATE TRIAL COURT, APPELLATE COURT AND SUPREME COURT HAVE ALREADY DETERMINED THAT HE IS MENTALLY RETARDED, AND THE STATE HAS REPEATEDLY CONCEDED THAT FACT. Fifth, Eighth and Fourteenth Amendments to the United States Constitution. ....................................................................139

III.  PRAYER FOR RELIEF ...........................................................................144

CERTIFICATE OF SERVICE ......................................................................145

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| Michael Bies, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No.:  CV-1-00-682 |
| vs. | ) | |
| | ) | District Judge Susan J. Dlott |
| Margaret Bagley, Warden, | ) | Magistrate Judge Michael R. Merz |
| | ) | |
| Respondent. | ) | |

---

## MICHAEL BIES' THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

---

Petitioner Michael Bies is currently confined on Ohio's death row in the Mansfield Correctional Institution.  His capital indictment and convictions arose in Hamilton County, Ohio.  He was sentenced to death by a judge of the Hamilton County Common Pleas Court on October 30, 1992.  Petitioner Bies, through counsel, respectfully files this petition pursuant to 28 U.S.C. § 2241 and § 2254 requesting the issuance of a writ of habeas corpus.

## I.    INTRODUCTION

### A.    Overview.

On May 12, 1992 the dead body of ten year old Aaron Raines was found in a basement of an abandoned building in Cincinnati, Ohio.  The police investigation into the death continued for nine weeks until any arrests were made.   The police initially focused their investigation upon individuals who had been seen near the vacant building on the night of the homicide or had a history of sexually preying on small boys.   The police

received at least eight reports that Roger Cordray had confessed to the homicide. Cordray lived in the building, had been seen in the vicinity of the victim near the time of his disappearance, and had injured his hands in a manner consistent with the fatal beating administered to the victim. The police also investigated Raymond Moore who was also seen around the building on the night in question and who telephoned the police to advise them that they would find his fingerprints in the basement of the vacant building. He attempted explain away the location of his prints by the fact that he was looking for the victim at approximately ten o'clock on the night in question. However the victim was not reported missing until approximately eleven o'clock. Finally the police focused their investigation on Dallas Hayes, the older brother of the victim. Hayes gave the police conflicting stories, had injured his hand at about the time of the homicide and had failed every question on two polygraph examinations concerning his brother. Hayes, four years later, pled guilty to sexually abusing a young relative.

The Cincinnati Police Department ultimately focused its investigation upon Darryl Gumm who subsequently implicated Petitioner Michael Bies in the murder. Much of the information Gumm provided the police were, according to the police, "lies" and inaccurate as to Michael. The Cincinnati Police, based upon Gumm's statements, arranged for the Kentucky State Police to arrest Michael in Hazzard, Kentucky on a warrant issued by the Indiana courts for receiving stolen property. Two experienced Cincinnati Police Detectives went to Hazzard on July 28, 1992 and began interrogating Michael for a period that spanned more than 24 hours. At the time of the initial interrogation, Michael was advised of his constitutional rights and signed a written Waiver. This would be the last time Michael was ever asked to sign a Waiver. This

extended interrogation was not recorded in its entirety. The Detectives would feed Michael information while the recorder was turned off. They then turned the recorder on and Michael regurgitated what he had been fed. This process of unrecorded feeding and recorded regurgitation lasted several hours. Based upon these statements, the Cincinnati courts faxed, the next morning, faxed to Hazzard an arrest warrant for Michael. That afternoon, the Detectives drove Michael back to Cincinnati. During the three to four hour ride, without Mirandizing him, the Detectives again interrogated Michael. Upon arriving in Cincinnati, the Detectives took Michael to the scene of the murder and videotaped yet another statement. After the visit to the crime scene, the police returned to the station where they continued to interrogate Michael. This officers did not record this session during which the detectives provided Michael with yet additional information that they wanted him to "confirm". During this last interrogation session the Detectives claimed that they finally obtained the inculpatory statement they wanted. The Detectives did not record this session.

This chapter of Michael's life is simply another in a long string of nightmares from the time Michael was conceived. During his mother's pregnancy, Michael's father beat by Michael's mother as late as seven months into the pregnancy. She nearly miscarried four times and upon his birth, he was literally black from lack of oxygen. Michael's early childhood was replete with sickness including repeated bouts of pneumonia and encephalitis. Michael was both physically and developmentally underdeveloped. He did not walk with proficiency at age two and was not toilet trained at age three. Michael never mature beyond a third to sixth grade level. As early as age five, Michael began self-mutilation including cutting his wrists and committed several suicide

attempts before the age of twelve.  Michael often talked about hearing voices, was diagnosed as retarded and sent to a therapeutic school where he was often placed in restraints for uncontrollable behavior.  His family lived in the projects of Chicago with what was described by one of his teachers as the most neglecting dysfunctional environment ever seen. During his youth, Michael saw his sister, who later committed suicide, being raped by a babysitter.  Michael was also raped by his mother and sodomized and beaten by her numerous boyfriends. On one occasion, a teacher of Michael's came to the family apartment because he had been absent from school for several days.  The teacher found Michael and his brother, while tied to chairs, being beaten with a belt by a drunken physically deformed man clad only in boxer shorts. Several of Michael's family members and social influences are in prison, including his brother's father who is serving a life sentence for murder and kidnapping.

It was this mentally retarded and dysfunctional person who the Cincinnati Detectives interrogated at length.  The Detective claims that Michael waived his constitutional rights even though he had no real ability to understand those rights.

The trial court appointed two attorneys to represent Michael.  One of them was a civil attorney who had never tried a capital case and who the trial court appointed as a favor so the attorney could obtain some "trial experience."  The prosecutors, in discovery, did not provide to defense counsel any of the information concerning the inculpatory statements made by Cordray, the sightings of Moore in the building and his efforts to explain his presence in the basement of the vacant building, or the fact that the babysitter had provided inconsistent statements to the police and failed a polygraph examination. The prosecutors did call Steven Clark to testify that Michael had confessed to him while

the two of them were together in the jail.  Clark lied about the extent of his prior criminal record invovling bank robberies and the deal the prosecution gave him to testify.   He also lied about the first date that Michael supposedly confessed to him, Michael was not even in the jail on that date and time.

Trial counsel relied upon the mentally retarded, brain damaged Michael to obtain the attendance of witnesses for the mitigation hearing.  As a result, the jury heard from only Michael and the psychologist from the Court Clinic.  The jury did not get to see the real Michael because his trial counsel failed to investigate and present even a glimpse of Michael's life.

Michael now awaits execution on Ohio's death row.

**B.     Statement of the Case**

On August 5, 1992, a Hamilton County Grand Jury indicted Petitioner Michael Bies for the murder of Aaron Raines.  Petitioner was charged with the following counts:

Count One:

> Aggravated Murder of Aaron Raines in violation of Ohio Revised Code Section 2903.01.
>
> Specification One to Count One:    That   the   offense   was committed for the purpose of escaping detection, apprehension, trial or punishment for the offenses of attempted rape or kidnapping.
>
> Specification Two and Three to Count One: That the offense was felony murder based on underlying felonies of kidnapping and attempted rape.

Count Two:

> Attempted Rape of Aaron Raines in violation of Ohio Revised Code §§ 2907.02 and 2923.02.

Count Three:

Attempted Kidnapping of Aaron Raines in violation of Ohio Revised Code § 2905.01.

On October 5, 1992, a jury trial began. On October 14, 1992, the jury returned verdicts of guilty on all counts. On October 15, 1992, the court began the mitigation phase. On October 16, 1992, the jury recommended that a death sentence be imposed. On October 30, 1992, the trial court accepted this recommendation and imposed two death sentences.

Petitioner raised twelve assignments of error in his appeal of right to the First District Court of Appeals. That Court affirmed the convictions and sentences addressing each of the claims on their merit. State v. Bies, 1994 WL 102196 (Hamilton App. March 30, 1994).

Petitioner appealed to the Supreme Court of Ohio raising twenty-four propositions of law and that Court affirmed. State v. Bies, 74 Ohio St. 3d 320, 658 N.E.2d 754 (1976). The United States Supreme Court denied certiorari. Bies v. Ohio, 517 U.S. 1238 (1996).

Petitioner filed his post-conviction petition in accordance with Ohio Revised Code Section 2953.21. Petitioner raised fifteen claims, which were supported by two volumes of exhibits. Petitioner also filed motions requesting discovery, access to the records, and expert assistance. Almost eighteen months later, the trial court dismissed the petition without ruling on any of the pending motions. State v. Bies, B-9205607 (Hamilton C.P. Feb. 13, 1998).

Petitioner filed a timely notice of appeal to the Hamilton County Court of Appeals. The Court of Appeals affirmed the judgment of the trial court. State v. Bies,

1999 WL 445692 (Hamilton C.A. June 30, 1999). The Ohio Supreme Court declined to accept jurisdiction. State v. Bies, 87 Ohio St. 3d 1440, 719 N.E. 2d 4 (1999).

On August 1, 2000, Petitioner filed his Notice of Intention to File A Habeas Corpus Petition and Motion For Appointment Of Counsel. [Docs. 2, 3.] On August 21, 2000, Michael Bies filed his initial Habeas Petition for Habeas Corpus. [Doc. 7.]

Subsequent to the filing of that initial Petition the parties agreed to discovery, and various state agencies provided counsel for Michael Bies with approximately six thousand pages of documents that none of Michael Bies' counsel had been previously provided access.

On January 17, 2001, the Court entered an Amended Scheduling Order which permitted the filing of an Amended Habeas Petition [Doc. 11]. Based upon the information received in discovery, Michael filed two Amended Habeas Petitions. [Doc. 22 and 26].

On February 19, 2002, the Court ordered that the instant proceedings be held in abeyance to permit Michael Bies to exhaust his state court remedies as to the constitutional claims first identified in the discovery ordered by this Court. [Doc. 39]. Pursuant to this Court's order, Michael Bies exhausted his newly identified constitutional claims. State v. Bies, Ham. C.P. No. B9205607 (Entry Declining to Entertain Successive Petition to Vacate); affirmed State v. Bies, 2003 WL 202177 (Jan. 31, 2003) juris. denied; State v. Bies, 99 Ohio St.3d 1413, 788 N.E.2d 648 (2003) [See Status Reports, Docs. 34-36, 41, 46, 47, 52, 54, 63, 69].

On September 6, 2002, Michael Bies moved this Court for Summary Judgment on his Sixteenth Claim for Relief. [Doc. 49]. His motion was premised upon the fact that he

was mentally retarded and therefore pursuant to <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the State of Ohio could not execute him. Michael supported his argument with the findings of the state courts, the conclusions of the psychologists appointed by the state trial court, the testimony adduced at this trial, and the conclusions of the numerous mental health experts who had examined him throughout his life.

On September 24, 2002, the Warden filed her memorandum opposing the Motion for Summary Judgment. [Doc. 50]. The Warden's pleading consisted of seven pages, three pages of which consisted of a verbatim copy of the findings made by the Ohio Supreme Court. The Warden in her pleading did not contest any of the evidence Michael submitted in support of his claim of mental retardation. The Warden failed to submit any new or contrary evidence which contested Michael's claim of mental retardation.

On December 26, 2002, the Court found that Michael's claim of mental retardation was unexhausted and therefore he must return to the state courts to present his claim. [Report and Recommendation, Doc. 53, p. 2]. The District Judge affirmed this Court's conclusion. [Doc. 57].

On May 1, 2003, Michael Bies filed his Mental Retardation Petition with the Hamilton County Common Pleas Court. On August 15, 2003, he moved that court for summary judgment. He premised the motion partially on the doctrine of collateral estoppel, the state courts had already found him to be mentally retarded and the State was barred from relitigating the issue. The trial court judge denied Michael Bies' Motion for Summary Judgment and subsequently overruled his Motion for Reconsideration, "the Court incorporates by reference its prior decision, and to the extent not specifically

stated, finds for the reasons discussed in its prior decision that the double jeopardy clause does not require summary judgment in this case." [1]

On June 14, 2004, the Court granted Michael Bies' Unopposed Motion for Discovery. [Doc. 77]. The discovery went forward despite the filing of Motions to Quash. [Doc. 81 and 82] and a Motion for *In camera* Review [Doc. 83]. The discovery and all the surrounding dispute have now been resolved. [Doc. No. 80].

On March 17, 2005, Michael Bies filed a Motion to Amend his Petition with a Nineteenth Claim for Relief alleging that the Fifth Amendment (Double Jeopardy Clause) precluded the state from relitigating the prior findings and the prosecution's prior concessions that he was mentally retarded. [Doc. 89].

On April 11, 1005, the Court granted the Motion and ordered that Michael Bies file his amended petition no later than April 18, 2005. [Doc. 92].

---

[1] [See Status Reports, Doc. 65, 69, 72, 74, 75, 79, 80, for copies of the state court pleadings concerning the Mental Retardation Petition].

## II.    CONSTITUTIONAL VIOLATIONS

**FIRST CLAIM FOR RELIEF:    MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM.    THE TRIAL COURT ERRED WHEN IT ADMITTED MR. BIES' STATEMENTS BECAUSE THEY WERE NOT THE PRODUCT OF HIS OWN FREE WILL. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

1.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

2.    Under clearly established federal law at the time of Michael's trial, the prosecution may not use the statements of the accused to prove his guilt when those statements were not the product of the accused's own free will.  In making this required analysis the Court should focus upon the methods used by the interrogating officers and the personal characteristics of the accused.  This voluntariness test exists separate from the issue of whether the interrogating officers complied with Miranda v. Arizona, 384 U.S. 436 (1966).

3.    The offense in the present case generated a substantial amount of publicity.  The young victim was killed in a very gruesome manner in a vacant building.  There were protests concerning the fact that the building had not been previously razed.  When Mr. Bies was returned to the crime scene to assist the investigating Detectives, the Detectives feared for Mr. Bies' safety because hostile crowds had gathered in a threatening manner [Tr. 865].

4.    As a result of this public pressure, the Cincinnati Police Department was under intense scrutiny to solve the homicide.  It took the police nine weeks to make an initial arrest [Tr. 842].  In that time period the police investigated over one hundred-fifty suspects [Tr. 918, 940].  The Cincinnati Police assigned some of its best officers to the

case including Lucia Guy who was a Sergeant with the Homicide Section [Tr. 915]. Detective Guy broke down in tears in front of the jury because of the enormous pressure he was under to solve the gruesomeness of the offense [Tr. 933, 1026].

5.      The investigating officers focused their investigation upon Michael Bies as a result of the arrest of Darryl Gumm for the homicide [Tr. 106, 107, 111, 845]. Gumm did not know Michael's last name [Id.].  Gumm provided the police with an inaccurate physical description of Michael [Tr. 108].  The police began interrogating Gumm July 17, 1992 at 1:03 p.m.  Six hours later the Detectives obtained two recorded statements from Gumm regarding his involvement and the alleged involvement of Michael Bies in the homicide.

6.      The police were not able to obtain a warrant for Michael based upon Gumm's statement.  The Detectives located Michael in Hazzard, Kentucky.  There was an existing warrant for Michael from Auburn County, Indiana for receiving stolen property [Tr. 155].  Two Cincinnati Detectives Seal and Guy arranged for Michael to be arrested on the Indiana charge by Hazzard Sheriff Couch and the Kentucky Highway Patrol Sergeant Sandlin [Tr. 91, 149].  Sergeant Sandlin and Sheriff Couch arrested Michael at approximately 6:30 p.m. on July 28, 1992 [Tr. 93].  Detectives Seal and Guy were present for the Kentucky arrest [Tr. 90].

7.      Michael is an individual of limited mental faculties.  He, according to the evaluation from the Hamilton County Court Clinic, had an IQ of 68 and suffers from mental retardation [Tr. 1104].  Michael has received SSI since the age of 14 because of his mental retardation [Tr. 1107].

8.    Michael suffered from brain damage [Tr. 1117].  This brain damage is connected to Michael's learning disabilities [Tr. 1136].  He was functionally illiterate; his reading skills were so poor that he could not read a two paragraph statement to the jury in the sentencing phase of his capital case [Tr. 1086].

9.    Michael, according to the state trial court's own expert was very "dense" and suffered from impaired thought patterns [Tr. 1119].  He heard voices [Tr. 1100].  He was unable to separate important facts from non-important facts, such as which case was more important, his death penalty case in the State of Ohio or his theft case in the State of Indiana.  [Tr. 1119.]

10.    The state court's own expert opined that Michael was operating at the level of  third to  sixth grade [Tr. 1104, 1116].

11.    The Detectives' interrogation strategy was to obtain a statement from Michael regardless of the manner in which the statement is made:

>    Well, our main objective is to get a statement.  If we can get a taped statement, that's better, but our main objective is to get a statement, whether it's oral or whether it's written or whether you put it on a tape, to get the person's own words as to his involvement in an offense.

[Tr. 924].

12.    Detectives Seal and Guy began their interrogation of Michael at 6:44 p.m. approximately fifteen minutes after he was arrested [Tr. 844].  The interrogation took place at Post 13 of the Kentucky Highway Patrol in Hazzard [Tr. 92].  The Detectives did not tape record the initial portion of the interview in which Michael was advised of his Miranda rights [Tr. 851].  Michael told the police that he understood his constitutional rights because he (Michael) was experienced in police work and had been an explorer

[Tr. 850].  Michael had neither been an explorer nor a policeman.  Michael told the Detective that he had completed tenth grade and was ready to enter Allen Elementary School [Defendant's Mitigation Exhibit 5, p. 2].  Simple intelligence knows an elementary school does not contain eleven grades.  Michael did not know how to spell the name "Allen"  [Id.].

13.    After Michael signed the Miranda waiver the Detectives turned on the tape recorder [Tr. 851].  Michael steadfastly denied involvement in the homicide and stated that he was only in Cincinnati when he rode the Greyhound bus to Chicago to visit his mother and he changed buses in Cincinnati [Tr. 852, 920].  He denied being in Cincinnati on the day of the homicide [Tr. 80, 884].  The Detectives asked Michael to tell them where he had been since May 1, 1992 (approximately three months earlier).  Michael stated that since May 1, 1992 he had been with his in-laws for one month and a friend for the other three months.  [Defendant's Motion to Suppress, Exhibit 5, p. 4-5]. Again, he lacked the simple intelligence to know that the time frame he provided the Detectives consisted of four months and could not possibly be accurate.

14.    The Detectives then turned off the tape recorder.  At the motion to suppress the Detective testified that Michael wanted the tape turned off because he was nervous and did not want to be interrogated by both Detectives [Tr. 99].  At the trial Detective Guy testified that he made the decision to turn off the tape recorder [Tr. 885, 921].  At the motion to suppress Detective Guy testified that he left the interrogation room while the tape was off so Mr. Bies would be less nervous [Tr. 48, 51].  The trial testimony and Detective Seal's notes do not reflect that Detective Guy ever left the room.

15.    The Detective testified that the tape recorder was turned off for thirty to forty-five minutes [Tr. 886]. However, that testimony is not supported by the physical evidence. Michael's first statement commenced at 8:48 p.m. [Tr. 848]. The statement consisted of twelve typed pages [State's Trial, Exhibit 112(A), p. 1]. The Detectives stated that it took them twenty-four minutes to obtain the twelve page statement from Michael. The tape recorder was not turned on until 8:55 p.m. [Defendant's Motion to Suppress, Exhibit 4, p. 1]. The Detectives actually turned off the recorder for an hour and forty-two minutes. The Detectives were operating on an assumption that it is a natural reaction of a guilty person to deny his guilt and that denial can be broken down over time [Tr. 937]. The Detectives attempt not to tape record statements of the Detectives confronting the arrestee that he is lying [Tr. 895].

16.    The Detectives adopt different interrogation strategies based upon the officers involved and the individual characteristics of the suspect [Tr. 895]. The Detectives implemented a strategy for interrogating Michael of giving Michael information and seeing if they could get him to confirm that information [Tr. 886, 921]. This strategy was described by Detective Guy as follows:

> After that recorded statement, we talked to him again for a period of time making him aware of the facts. That was not recorded.
> After he had given us the facts, we then made another recorded statement. And on the third one, after we had gone through the same thing we had done on the two previous ones, and we asked him to record it, he refused.

[Tr. 938].

17.    After the tape was turned off the Detectives "made Michael aware of the facts" as they knew them. The Detectives told him they knew he was in Cincinnati on the

date of the homicide and that he had arrived in the back of a pickup truck driven by the Caldwells who lived in Hazzard, Kentucky [Tr. 855, 936]. The Detectives informed Michael that they had found palm prints at the scene of the homicide but they did not provide him with any information as to whom (if anyone) the prints belonged [Tr. 98]. Detective Seal testified that during this time no one took Michael's prints. Subsequently, Detective Seal contradicted himself by testifying that Detective Guy took Michael's fingerprints [Tr. 97, 98].

18.    Detective Seal took notes during this one hour and forty-two minute gap in the tape. Detective Seal's reflects that the Detectives would "tell Michael what we know about his involvement in the offense" [Motion to Suppress, Exhibit 2, p. 2]. After telling Michael what they know about his involvement, Michael provided the Detectives with some information. The Detectives would again "educate" Michael as to additional facts of the case. Detective Seal's notes reflected "We now tell Michael more about Aaron and dates and times. Michael gives the following statements" (emphasis added). Detective Seal's notes then reflect that Michael provided them with additional information.

19.    After Michael gave the Detectives the facts they wanted the Detectives turned back on the tape recorder at 8:55 p.m. [Tr. 50, 100].

20.    The Detectives claimed to have re-Mirandized Michael prior to obtaining the second recorded statement from him that evening [Tr. 48]. In actuality, the waiver consisted of asking Michael if he understood the rights form he signed earlier to which he replied "yes I did" [Defendant's Motion to Suppress, Exhibit 5, p. 1]. Michael told the Detectives in this second recorded statement that he cannot remember the area in which the kidnapping occurred because "It's hard to describe cause I don't re-, really remember

cause he went a lot of different ways" [id. at p. 2]. Michael described a cement walkway between the two vacant buildings in question [id. at p. 6] . The walkway was a door laid between the second floors of two buildings [Tr. 580]. Michael reported that the victim lost maybe about four pints of blood [id]. The body was found in a dark basement when it was impossible to determine how much blood the victim lost. [Tr. 585.] In this second taped statement Michael conceded that he was in the vacant building, but did not admit any involvement in the kidnapping, attempted rape or fatal beating. Michael however offered to return to the crime scene with the Detectives to help refresh his recollection so he can aid the police in solving the crime [Tr. 100, 861, 925].

21.    Detective Guy called the Cincinnati Police Department the next morning to have the appropriate Cincinnati courts issue an arrest warrant for Michael based upon his statement that he was in the vacant building at the time of the homicide [Tr. 101]. At 9:51 a.m. the Court in Cincinnati faxed the arrest warrant to the Detectives in Hazzard [Tr. 102, 143].

22.    At 1:00 p.m. the Hazzard Court conducted an extradition hearing [Tr. 92]. Michael, without the benefit of counsel waived extradition to the State of Ohio. [Tr. 860]. The Indiana warrant upon which he was arrested was never pursued [Tr. 153].

23.    At 2:00 p.m. the Detectives, with Michael in custody, began the automobile trip back to Cincinnati [Tr. 100,861]. Without Mirandizing Michael, the detectives discussed the facts of the case with him during the three to four hour automobile trip Tr. 60, 149, 861].

24.    Upon arrival and after a brief stop at the Cincinnati Police Department, Michael and the two Detectives went to the crime scene. On the way to the scene

Michael discussed the offense with them.  His memory improved as he saw the vacant building [Tr. 862].  Again the officers did not Mirandize Michael.

25.     After returning to the crime scene, Michael purported to identify for the Detectives the various parts of the vacant building and what occurred during the homicide.  The Detectives videotaped Michael's statement which lasted approximately twenty minutes [Tr. 864].  On the video he made no incriminating statements as to his involvement in the fatal beating.

26.     After the Detectives turned off the videotape they claimed that Michael made some highly incriminating statements concerning the pipe that was supposedly used to beat the victim [Tr. 926].  Detective Guy stated that Michael picked up two pipes [Tr. 927].  Detective Guy testified that Michael picked up only one pipe [Tr. 866].  The Detectives did not Mirandize Michael for this unrecorded statement.

27.     Based upon this additional unrecorded statement the Detectives took Michael to the Cincinnati Police Department for further interrogation.  The interrogation started at 6:58 p.m. [Tr. 86]. The officer testified that they re-advised Michael of his rights [Tr. 49, 53].  However they did not obtain a written waiver [Tr. 70].

28.     There is a tape recorder in the interrogation room but the Detectives did not turn on the recorder [Tr. 150]. The Detectives initially testified that Michael did not want the statement to be recorded [Tr. 57, 86, 867].  However the Detectives subsequently testified that Michael was not asked about recording the statement until after he had been interrogated and made what they allege was a highly inculpatory statement [Tr. 859].  This unrecorded statement is the only time that the Detectives claim Michael admitted to sexually assaulting or beating the victim [Tr. 79].  The Detectives

adopted the same strategy they did in Kentucky by confronting Michael and giving him the answers they wanted from him. Detective Guy testified that he knew Michael was not telling the truth and repeatedly told Michael he was lying [Tr. 928-931]. The Detectives offered Michael additional facts that he had been involved in the kidnapping, rape and beating of the victim [Tr. 859, 928-931]. Detective Guy testified that he repeatedly told Michael the facts until Michael could repeat the facts as given:

> After that recorded statement, we talked to him again for a period of time making him aware of the facts. That was not recorded.
>
> After he had given us the facts, we then made another recorded statement. And on the third one, after we had gone through the same thing we had done on the two previous ones, and we asked him to record it, he refused.

[Tr. 936].

29.     After Michael purportedly made an inculpatory statement based upon the facts given to him, he was asked if he wanted to make a recorded statement and Michael refused.

30.     Michael has brain damage and mental retardation and suffers from learning disorders. Because of these mental deficiencies, as well as the desertion of his father, he is extremely susceptible to suggestion by male authority figures [Tr. 1111-1119]. He saw the police as father figures [id.].

31.     The two Detectives used trickery and coercion to obtain statements from Michael that if neither voluntary nor reliable. The Detective obtained a recorded statement and when that statement did not meet their goals they went "off the record" to suggest to Michael who functions at the level of a third to sixth grader what the "correct"

answer should be.   The Detectives took Michael to the crime scene to "refresh his memory."

32.     The trial court erred when it admitted Michael's statements which were not the product of his own free will.   Michael suffered substantial and injurious harm as a result of the admission of his involuntary statements.   The statements were highly incriminating as to his involvement in the homicide.

**SECOND CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND DEATH SENTENCES ARE CONSTITUTIONALLY INFIRM. THE TRIAL COURT ADMITTED CUSTODIAL STATEMENTS OF MICHAEL BIES WHICH WERE NOT PRECEDED BY MR. BIES KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVING HIS MIRANDA RIGHTS. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

33.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

34.    Under clearly established federal law at the time of Michael's trial, the prosecution may not use statements at trial which are the product of custodial interrogation, unless the interrogating officers advise the detainee prior to the interrogation that he has the right to remain silent and the right to have counsel present during the interrogation and the detainee knowingly, intelligently and voluntarily waives those rights.

35.    Detectives Guy and Seal of the Cincinnati Police Department intermittently interrogated Michael for a twenty-four hour time period on July 28 and July 29, 1992. This Claim for Relief focuses upon three of those interrogation sessions, the two sessions commencing in Hazzard, Kentucky at 6:44 p.m. and 8:55 p.m. and the session commencing at 6:58 p.m. the following day in Cincinnati, Ohio [Tr. 50, 86, 844].

36.    Michael, at the time of these custodial sessions, was incapable of knowingly, intelligently and voluntarily waiving his constitutional rights.

37.    Subsequent to his return to the State of Ohio, the state trial court ordered that the Court Clinic perform a psychological assessment of Michael. The state court's own examiner determined that Michael had an IQ of 68, [Winter Mitigation Report, p. 6] was mentally retarded [Tr. 1103, 1105] and had been receiving SSI since the age of 14 because of his mental retardation. [Tr. 1107.]

38.     According to the social history prepared by the trial court clinic, school officials had initially placed Michael in special education classes.  He was either removed or failed the special education classes and subsequently placed in a therapeutic school [Tr. 1099].  He was at the time of his arrest functionally illiterate [Tr. 1102, Winter NGRI Report, p. 6].

39.     According to the state trial court's own expert, Michael had brain damage which caused him to be learning disabled [Tr. 1136].  The brain damage exacerbated his mental retardation.

40.     The trial court's own expert determined that Michael's thought processes were impaired.  He heard voices [Tr. 1100].  He was very "dense" in his thought processes [Tr. 1119].  For instance, he could not remember what he told the arresting officers and he believed that his lack of recollection prevented the statements from being admitted at trial [Winter NGRI Report, p. 2].  He did not understand the trial proceedings [Tr. 1118].  According to the court's expert, Michael was functioning on the level of a third to sixth grader  [Tr. 1104, 1116].

41.     Detectives Seal and Guy began the initial interrogation of Michael at 6:44 p.m. [Tr. 844].  Michael signed a Miranda rights waiver form. All of the first interview was recorded except the waiver process [Tr. 851].   Michael reported that he had completed the tenth grade and was "gettin ready to go to Allen Elementary" school [Defendant's Motion to Suppress, Exhibit 5, p. 2].  Obviously, elementary schools do not contain the eleventh grade.  Michael could not spell the school name "Allen" [Id.]. Michael, when being advised of his Miranda rights, informed the Detectives that he

understood his rights because he was experienced in police work and had been an explorer [Tr. 850].

42.    The Detectives convened a second recorded interrogation session of Michael at approximately 8:55 p.m. [Tr. 50]. The Detectives claimed to have read Michael his Miranda rights [Tr. 48], but did not obtain a written waiver [Tr. 70]. The "reading" of these rights occurred as follows:

> Q:    Okay, this is Gary Seal. Present with me is Sergeant Guy. Also uh present with us in this interview is Michael Alvin Bies. Today's date is July the 28th. The time is 8:55 P.M. Okay, this interview will be with uh Michael Bies an' this is gonna be in reference to the incident that uh occurred in Cincinnati on the day of uh May the 11th. Okay, in front of me you see a Rights Form that uh we went over with you. You understand the Rights Form an' you signed your, the form, did you?
>
> A:    Yes I did.
>
> Q:    Okay. Just, you have to speak into this mike . . . .
>
> A:    Yes I did - - -

[Defendant's Motion to Suppress, Exhibit 4, p. 1].

43.    Approximately twenty-four hours later Detective Seal and Guy conducted another interrogation session of Michael [Tr. 658]. The Detective claims to have again re-advised Michael of his Miranda rights [Tr. 49, 53]. Michael again did not sign a written waiver [Tr. 70]. The rights waiver was not recorded by an audio tape despite the fact that there was a tape recorder in the interrogation room [Tr. 150, 939].

44.    The state trial court improperly admitted into evidence these three statements which were obtained from Michael during the interrogation sessions identified

in this Claim for Relief.  Michael, because of his mental retardation, brain damage, flawed thought processes, learning disorders and illiteracy did not knowingly and intelligently waive his Miranda rights.  A third grader, which is the level on which Michael was functioning, lacks the mental ability to exercise the necessary reasoning ability to meaningfully waive his rights.

45.    This is especially true given the fact that Detective Guy "shortcut" the waiver process once the first waiver was completed.  There was no second or third written waiver.  The Detectives merely asked Michael if he could remember the first waiver that he signed.

46.    The Warden cannot show, by proof beyond a reasonable doubt, that the admission of these inculpatory statements did not affect Michael's convictions and sentences.  The state trial court's admission of these custodial statements and evidence derived therefrom substantially and injuriously affected the process to such an extent as to render Michael's convictions and sentences fundamentally unfair.  The jury would have necessarily relied upon these inculpatory statements in deciding his guilt and appropriate sentencing.

**THIRD CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND DEATH SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL COURT ADMITTED CUSTODIAL STATEMENTS OF MICHAEL BIES WHICH WERE NOT PRECEDED BY MICHAEL BEING ADVISED OR HAVING WAIVED HIS MIRANDA RIGHTS. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

47.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

48.    Under clearly established constitutional federal law, the prosecution may not use statements at trial which are the product of custodial interrogation, unless the officers advise the detainee prior to the interrogation that he has the right to remain silent and the right to have counsel present during the interrogation.

49.    Detectives Guy and Seal of the Cincinnati Police Department intermittently interrogated Michael for a period of approximately twenty-four hours on July 28 and 29, 1992.

50.    The initial custodial interrogation occurred in Hazzard, Kentucky at the Kentucky Highway Patrol Post 13 [Tr. 92]. As a result of these interrogation sessions the Detectives were able to obtain an arrest warrant to have Michael Bies returned to the State of Ohio [Tr. 101-102]. Michael was extradited the following day at approximately 1:00 p.m. [Tr. 73, 92, 100, 860].

51.    At 2:00 p.m., immediately after the extradition hearing, the two Detectives started driving Michael back to Cincinnati [Tr. 100, 861]. The arresting Detectives testified that they arrived in Cincinnati at either 5:00 or 6:00 p.m. [Tr. 149, 861, 925]. During their three or four hour automobile trip Michael made inculpatory statements to the two Detectives [Tr. 60]. The Detectives prior to receiving the statements did not advise Michael of his Miranda rights and obtain a waiver of those rights.

52.    The Detectives took Michael to the Cincinnati Police Department for a period of five to twenty minutes immediately upon their arrival in Cincinnati [Tr. 69, 925]. They then transported Michael to the crime scene [Tr. 49]. They arrived at the crime scene at 5:30 or 5:45 p.m. [Tr. 82, 84]. On the way to the crime scene in response to the Detectives' questioning, Michael provided the Detectives with inculpatory information [Tr. 862]. Prior to obtaining this statement the Detectives did not advise Michael of his Miranda rights or obtain a waiver of these rights.

53.    Upon arrival at the crime scene the Detectives obtained a videotape of Michael reviewing the crime scene. The videotape was twenty minutes in length [Tr. 863-864]. Prior to and subsequent to the videotaping, while at the crime scene, Michael made certain inculpatory statements [Tr. 926]. The Detectives did not advise Michael of his Miranda rights or obtain a waiver of his rights prior to any of the three statements that he made at the crime scene.

54.    Detectives Guy and Seal then transported Michael back to the Cincinnati Police Department for further interrogation. During the course of the ride Michael made an additional inculpatory statement to the two Detectives [Tr. 866, 927]. The Detectives did not advise Michael of his Miranda rights or obtain a waiver of these rights prior to obtaining a custodial statement from him in the motor vehicle.

55.    The state trial court admitted the testimony of Detective Guy and Seal concerning the content of the statements identified in this Claim for Relief. The Detectives did not properly advise Michael of any Miranda rights prior to subjecting him to custodial questioning.

56.    The Warden cannot show, by proof beyond a reasonable doubt, that the admission of these inculpatory statements did not affect Michael's convictions and sentences. The trial court's admission of these custodial statements and evidence derived therefrom substantially and injuriously affected the process to such an extent as to render Michael's convictions and sentences fundamentally unfair. The jury would have relied upon these inculpatory statements in deciding his guilt and appropriate sentencing.

**FOURTH CLAIM FOR RELIEF**:  **MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL PROSECUTORS FAILED TO PROVIDE DEFENSE COUNSEL WITH ALL EXCULPATORY EVIDENCE. United States Constitution, Sixth, Eighth and Fourteenth Amendments.**

57.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

58.    It was clearly established federal constitutional law at the time of Michael Bies' trial that a trial prosecutor has the affirmative duty to timely provide to defense counsel all exculpatory evidence, that is relevant to either the trial or sentence.  That constitutional duty applies not only information in the prosecutor's file, but all information in the possession of other state agencies.

**A.    The Hamilton County Prosecutor's Office Did Not Have Adequate Controls In Place At the Time Of Michael Bies' Trial To Provide Defense Counsel With Exculpatory Evidence.**

59.    In 1992 the Hamilton County Prosecutor's Office had no guidelines to assist trial prosecutors in identifying exculpatory evidence.  The trial prosecutors did not have any training or guidance as to what constitutes exculpatory evidence.  As a result, the trial prosecutors in that Office did not have sufficient expertise to identify exculpatory evidence which should be timely provided to trial counsel.

60.    In 1992 The Hamilton County Prosecutors did not have in place a system that required the law enforcement investigating agencies to forward to the prosecutors assigned to the case all records generated during the course of the investigation of the offense in question.

61.    Instead, with respect to offenses investigated by the Cincinnati Police Department, the lead detective assigned to the investigation only provided the trial

prosecutor with a portion of the police file which was referred to as the "homicide book." The investigating officer would include in the homicide book only those documents which would assist the trial prosecutor in obtaining a conviction.

62.    As a result of the Hamilton County Prosecutor's Office failure to have implemented regulations or internal guidelines that require the transfer of all relevant files to the prosecutor's office, the trial prosecutors were precluded from making their constitutionally imposed duty to review all of the relevant police files.

63.    The Cincinnati Police Department in the present case did not transfer all of its relevant files involving Michael Bies.

64.    Two Southern District Court Judges have recently granted habeas relief in capital cases arising from Hamilton County because members of that Prosecutor's Office did not provide defense counsel with exculpatory evidence.  Zuern v. Tate, 101 F. Supp. 2d 948, 963-970 (S.D. Ohio 2000) and Jamison v. Collins, 100 F. Supp. 2d 647, 696 (S.D. Ohio 2000).

65.    At the time of Michael Bies' trial in Hamilton County, it was primarily the duty of the second prosecutor assigned to the case to respond defense counsel's requests for discovery.

66.    In Michael Bies' capital case Thomas Longano served as second chair and would have responded to discovery requests.

67.    In Darryl Gumm's case (Michael Bies' co-defendant) Mark Peipmeier served as second chair and Thomas Longano acted as the lead prosecutor.

68.    The Assistant Hamilton County Prosecutor in Zuern found to have committed the prosecutorial misconduct was Thomas Longano.  The Assistant County

Prosecutor in <u>Jamison</u> found to have committed the prosecutorial misconduct was Mark Peipmeier.

**B.    Defense Counsel for Michael Bies Made Repeated Discovery Requests Prior To Trial.**

69.    On August 8, 1992, Michael Bies moved the trial court to require the prosecutor to provide him with a Bill of Particulars.

70.    On August 31, 1992 Michael Bies moved the Court to order the prosecutors to disclose prior to trial, all of the witness statements in its possession.

71.    On September 4, 1992, Michael Bies filed an omnibus discovery motion which asked the state trial court to order the prosecutor to provide: 1) a list of its rebuttal witnesses; 2) specific types of exculpatory evidence; 3) impeachment evidence and 4) the results of any polygraph tests.

72.    The trial court did not specifically rule on any of these numerous discovery motions.  Instead the trial court summarily denied all of the defense pretrial motions relating to any topic.  [Tr. 139.]

73.    The state trial court did not journalize any of its rulings concerning the discovery motions in question.  In the State of Ohio a Motion which is not formally ruled on by the trial court is denied.

**C.    The Hamilton County Prosecutors Did Not Disclose To Defense Counsel That Other Individuals Had Confessed To The Murder For Which He Has Been Sentenced To Death.**

74.    It was clearly established federal law at the time of Michael Bies' trial that the prosecutor had an obligation to provide defense counsel with inculpatory statements made by other individuals as to the commission of the offense(s) charged in the indictment.

29

75.    In Michael Bies' case the prosecutor had actual possession or constructive possession of numerous police reports that memorialized that three other individuals had made inculpatory statements at to the homicide.

76.    The prosecutors did not provide any information in any form concerning the inculpatory statements made by these three individuals:

a.    Roger Cordray, who resided in the vacant building where the victim's body was found.  The police generated at least eight reports which memorialized that Cordray had confessed to the murder.  Cordray was seen near the victim when he was last seen alive.  Cordray's hands were injured at about the time of the homicide, injuries that would have been consistent with some of the blows administered to the victim.  Cordray discarded his shoes shortly after the homicide.  Cordray threatened one witness if she went to the police concerning him but the witness still went to the police.  One of the persons to whom Cordray confessed took the law into his own hands and physically beat Cordray to a bloody pulp.  Ricky Baker came to the rescue of Cordray and in the process Baker's jeans became soaked with Cordray's blood.  The police recovered Baker's bloody jeans.

b.    Reggie Hetzler, who approached Larry Peters at the bus stop at Fountain Square in Cincinnati.  Hetzler stated that he and his brother Steve Pence raped and killed the victim.

c.    Duffy Cody, who lived in the same neighborhood as the victim and the vacant building where the victim was found.  Cody had a history of fighting and arguing with the children in the neighborhood.  Cody approached his neighbor and stated "what would you do if someone killed your kid."  The statement was made almost

immediately after the victim's body was found and prior to the police announcement that
foul play was involved in the victim's death.

**D.    The Hamilton County Prosecutors Failed To Disclose To Defense Counsel
That There Were Other Suspects Who Were In The Area Of The Vacant
Building On The Night In Question, Some Of Whom Had A History Of
Sexually Abusing Small Boys.**

77.    It was clearly established law at the time of Michael Bies' trial that the
prosecutor's obligation to provide defense counsel with exculpatory evidence extended to
the identity and information relating to other individuals who were serious suspects
during the course of the investigation.

78.    The investigation in the present case lasted nine weeks and involved
approximately one-hundred fifty suspects who were identified, fingerprinted[2] and
interviewed prior to the charging of Gumm.[3]

79.    While the prosecutors were not constitutionally obligated to identify for
trial counsel all of the suspects, the prosecutors were constitutionally required to identify
the individuals against whom there existed substantial evidence.

80.    The investigating officers proceeded on a theory that the motive for the
homicide was sex.  As a result much of the police investigation was spent identifying
sexual offenders in the immediate geographical area of the location of the body.  The
prosecutors failed to provide any information concerning the following individuals:

a.    Garland Inman, who was a juvenile that had been previously
adjudged a delinquent for the rape of his three young male cousins.  He escaped from the
Department of Youth Services and fled to the State of Texas.  Relatives provided the

---

[2] If a suspect's prints did not match the prints found at the scene the suspect was not the focus of further
investigation.  Michael Bies' prints did not match the prints recovered at the scene.
[3] It was only after Gumm made inculpatory statements that the police investigation focused upon Michael
Bies.

investigating officers with information that he had returned to Cincinnati at the time of the homicide. The police focused many of their resources in attempts to locate Garland Inman. Those efforts included obtaining a judicially authorized telephone trap and a search warrant for a residence where he was believed to be hiding as well as the distribution of posters containing his photograph and personal data.

      b.    Claude Justice, who was an adult was often seen in the company of young males. He had been seen frequently in the vacant building in which the victim's body was found.

81.    The police investigation focused upon individuals who were seen on the evening of the homicide in or around the building where the victim's body was found. The trial prosecutors failed to provide to defense counsel with the identity and information as to the following individuals who were suspects:

      a.    Raymond Moore, who was seen around the building on the night in question and at times lived in the building. Moore himself contacted the police to inform them that his fingerprints would most likely be found in the basement where the body was discovered. He explained the presence of his fingerprints by the fact that he had attempted to locate the boy between the hours of 9:00 to 11:30 on the evening in question. However, the victim's mother did not report the victim missing until 11:30.

      b.    Luther Hatton, who was reported to be living in the building in question. Hatton was on parole at the time, having previously been incarcerated at Lucasville. He was reportedly seen at the building on the night in question, possibly around 10:00 p.m. Just prior to that time he had left a party unannounced. Either Hatton or his brother were wearing Nike shoes that evening, the brand of shoe that left the print

the police lifted in the basement.  One of the suppressed police reports indicated that Hatton was violent and may have been previously arrested for molesting children.

       c.     Carl "Junebug" Miller, who was very high on the night in question. His clothes were very filthy as if he had been crawling through a vacant building.  He was extremely nervous and told one individual he needed to leave the area immediately. A friend gave him a ride to Covington, Kentucky.  Miller did not deny, when asked by Clayton Rose, that he had been in the area of the building with the victim.  One individual told the police that he "heard that Carl Junebug went to Allen house to change shirts because it was bloody."

       82.     The police, during the course of the investigation also developed information as to other suspects who were not directly linked to the residence and which the prosecutor never provided to trial counsel:

       a.     The investigating officers, prior to fingerprinting any juveniles who were suspects, obtained a court order from the Hamilton County Juvenile Court authorizing the fingerprinting.  See O.R.C. § 2151.313.  To be entitled to a court order, the investigating officer had to demonstrate probable cause that the juvenile was involved in the homicide.  The Hamilton County Juvenile Court made probable cause determinations that the following individuals may have been involved in the homicide: Jimmy Toulbac, Adam Inman, Dwayne L. Emmons, Terry Linville, Mitchell Noble, Gregory Maynard, Leonard Swinford, Christopher Strader, George Putteet, Shane Gaskins and Harold Reidner, Jr.  These probable cause determinations or the evidence supporting the determinations were never provided to trial counsel.

b.      The police received information that the victim was at the Hippy Dip (a local business establishment) on the night in question.  A fight ensued involving the victim and Robert Shelton and Jimmy Ball and the police arrived.  Afterward Jimmy Bell gave the decedent a ride home.  Robert Ball and the security guard confirmed the presence of the decedent.

c.      Terry Linville reported to the police that he saw the victim on the night in question at about 11:00 to 11:15 p.m. in the presence of another juvenile, approximately fourteen years old.  Linville told the victim to go home and the victim with the other individual walked in the direction of the victim's residence.  The victim's mother notified the police that her son was missing approximately thirty minutes later.

**E.      The Hamilton County Prosecutors Did Not Provide Defense Counsel With Exculpatory Evidence Concerning Co-Defendant Gumm.**

83.    It was firmly established federal law at the time of Michael Bies' trial that the prosecutor's duty of disclosure extended to evidence further inculpates the co-defendant and lessens the culpability of the accused.

84.    Count 2 of the Indictment charged Michael Bies with rape of the victim and Count 3 charged him with the kidnapping of the victim that was committed in conjunction with the alleged rape.  Capital Specification 2 to Count 1 involved the Rape of the victim and Capital Specification 3 to Count 1 involving Kidnapping of the victim.

85.    In the State of Ohio, the involvement of the defendant vis-à-vis the co-defendant is a mitigating factor.  O.R.C. § 2929.04(B)(A)(6).  The rules of evidence in the sentencing phase are relaxed to permit evidence of this mitigating factor as well as any other mitigating factors.

86.     The state proceeded on the theory that one or both of the defendants tricked the victim to entering the building.  The prosecutor failed to provide trial counsel with evidence that Gumm knew the building like "the back of his hand" and had been in it "hundreds" of times.  The suppressed evidence was probative of which individual (assuming Michael Bies was involved) concocted the plan and lured the victim into the building.

87.     The state proceeded on a theory that whoever murdered the victim was motivated by a desire to have sexual relations with the young victim.  The prosecutor did not provide trial counsel with critical background information in its possession concerning Gumm.  He had an extensive history of sexual misconduct, including sexually abusing his own two small children and one of his alibi witnesses as well as having worked as a prostitute.  Gumm often committed his sexual misconduct after having been drinking.  This suppressed evidence was probative of which defendant was most culpable and deserving of the death penalty.

**F.    The Hamilton County Prosecutors Did Not Provide Defense Counsel With Impeachment Evidence.**

88.     It was clearly established federal law at the time of Michael Bies' trial that the prosecutor's constitutionally imposed duty of disclosure extended to evidence which impeached its own witnesses.  The prosecutors failed to comply with that constitutional obligation in the present case.

89.     The prosecutor's duty to disclose impeachment evidence includes prior felony convictions of witnesses and any consideration that the witness is receiving in exchange for his testimony.

90.    The prosecutor called jail house informant Steven Clark to testify against Michael Bies.  [Tr. 799-827.]  Clark claimed in very dramatic testimony that Michael Bies had made inculpatory statements to him while they were housed in the same area of the Hamilton County Justice Center.  [Tr. 805-809.]

91.    Clark testified that he had been convicted of one bank robbery [Tr. 800]. The prosecutor failed to provide defense counsel with the information that Clark had been convicted of two separate bank robberies as opposed to the one conviction to which Clark testified.

92.    Clark denied receiving any consideration in exchange for his testimony. [Tr. 801.]  The prosecutor failed to provide trial counsel with information that Clark did receive a deal in exchange for his testimony.  The prosecutor dismissed the prior specifications of violence that were attached to both of the felonies to which Clark pled guilty.  In addition, Clark received concurrent sentences.

93.    Clark testified that he had no comprehension as to the facts of those offenses to which he pled guilty [Tr. 801].  The prosecutor failed to provide to defense counsel with the confession that Clark gave to the police officer who arrested him for the offenses to which he eventually plead guilty.  Clark had a full comprehension of the facts of both offenses when he was arrested.

94.    The state called the older brother of the victim, Dallas Hayes to testify [Tr. 563].  Hayes was supposedly watching his younger brother at the time of the victim's disappearance. He testified that last saw his brother after he ate dinner at 6:00 to 7:00 [Tr. 566].  The brother also testified that the decedent never played in the vacant building where his body was found [Tr. 572].

95.    The trial prosecutors failed to provide trial counsel with the necessary police documentation to effectively cross examine Hayes.  A friend of the victim informed the police that the victim just days prior to the homicide had been playing in the vacant building.  Hayes gave the investigating officers conflicting statements as to when he had last seen the decedent alive.  These statements ranged from 7:00 to 9:00.  The police treated Hayes as a suspect, Mirandized him and subsequently administered a polygraph to him.  According to the police report "there's no doubt in Royce's [the polygraph operator's] mind that he was lying on all questions that had to do with Aaron's death."  The report went on as to Hayes "he was showing to be untruthful on all of the controlled questions on the polygraph."  The prosecutors also failed to provide defense counsel that the Crime Stoppers report had received telephone calls concerning Hayes, that Hayes had injured his hand around the time of the homicide, and that one individual reported that Hayes was resentful of the attention that his mother gave the victim.

96.    The prosecutor never provided any of this impeachment information to trial counsel.

**G.    The Hamilton County Prosecutors Did Not Provide To Defense Counsel The Evidence And Reports That Contained Information That Was Inconsistent With Its Theory Of This Case.**

97.    It was clearly established federal law at the time of Michael Bies' trial that the constitutional obligation of the prosecutor to disclose evidence extends to information and evidence that were inconsistent with the state's theory of the case.

98.    The prosecutor's theory of the case began with either Michael Bies or Darryl Gumm enticing the victim to enter the vacant building so that they could perform

a sexual act with the victim. The prosecutors urged the factual premise that the victim would not have voluntarily entered the building without being tricked or coerced.

99.   The prosecutors had actual or constructive possession of a report memorializing a statement given by David Bowlin to Detective Dave Argo of the Cincinnati Police department on May 9, 1992. On page  1 of the statement Bowlin informed the Detective that the victim was in fact in the building six days earlier playing with his friends.

100.   The state proceeded at trial on the theory that Michael Bies and/or Darryl Gumm carried the victim into the basement where they fatally beat him. This offense occurred on May 11, 1992, so the sun would have set at the latest in the middle of the evening. The building in question was vacant, so there would have been no electricity or light in the basement. The defendants would not have carried the victim into a totally dark basement. Consequently the abduction and fatal beating would have occurred earlier in the evening when the basement was still lit. This conclusion is consistent with the trial testimony of state's witness Charlotte Jean Baker who saw the defendants together in the park next to the vacant building at approximately 7:00 that evening. [Tr. 554.]

101.   The prosecutor failed to disclose to trial counsel the statements of numerous witnesses that the victim was still alive later in the night and past the time of darkness. These individuals knew the victim and it would not have been a case of mistaken identity. According to the information provided to the police the following individuals saw the victim at a time well past dark: 1) Terry Linville and Joseph Grabler,

saw the decedent at 11:00 p.m.; 2) Jennifer Jackson saw the victim at 9:45 to 10:00; and

3) Jason Mason saw the victim at 9:00 hours.

102.    If the prosecutors had timely provided this evidence to defense counsel,

then they could have impeached or called into question the prosecutor's theory of the

case.

**H.    The Cumulative Impact Of The Suppressed Evidence Undermines The
Confidence In The Jury's Verdicts In Both Phases Of The Proceedings.**

103.    The jury deliberated at the conclusion of the trial phase for eight hours.

The jury deliberated in excess of one day in the mitigation phase.  Thus neither phase of

the proceedings was a "slam dunk" for the prosecution.

104.    There was no forensic evidence linking Michael Bies to the commission of

the homicide.  His confessions were coerced and unreliable.  See First and Second Claims

for Relief.  The only other evidence consisted of Clark's testimony which was obviously

riddled with inaccuracies, lies and half truths.  The jury had problems with both Bies'

statements and Clark's testimony as evidenced by the length of their deliberations.

105.    The degree of materiality, the strength of the suppressed evidence that is

necessary for a habeas petitioner to be entitled to the relief, is dependent upon the

strength of the prosecutor's case.  The strength of the suppressed evidence was strong in

the present case.  The prosecutors failed to disclose evidence that other individuals had

confessed, that the informant received a deal and that the baby-sitter did not pass a

polygraph and gave conflicting stories.  The state's case was weak as demonstrated by

the length of the jury's deliberations in both phases.

106.    The prosecution's failure to provide trial counsel for Michael Bies with

this enormous amount of material exculpatory evidence which, if disclosed, would

violated Michael Bies' constitutional rights.  There is a reasonable probability that if all of the suppressed evidence had been disclosed the outcome of the proceedings would have been different.

**FIFTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL PROSECUTORS KNOWINGLY USED FALSE TESTIMONY WHICH WAS NEITHER CORRECTED BY THE TRIAL PROSECUTORS NOR WAS THE FALSE TESTIMONY DISCLOSED TO TRIAL COUNSEL FOR MICHAEL BIES.**

107.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

108.    It was clearly established federal law at the time of Michael Bies' trial that a prosecutor can not knowingly present false testimony to obtain a conviction.  Instead the prosecutor has a constitutionally imposed duty to either correct the false testimony himself or the make defense counsel aware of the false testimony.  It was also established federal law at the time of Michael Bies' trial that for purposes of this analysis the knowledge of one member of the prosecutor's office is imputed to all other members of the prosecutor's office.

109.    The trial prosecutors at Michael Bies' trial deliberately employed perjured testimony to obtain his conviction and death sentence.

**A.    The Hamilton County Prosecutors Knowingly Solicited False And Material Testimony From Steven Clark.**

110.    The prosecutor's called Steve Anthony Clark to testify. [Tr. 799-827] Prior to Michael Bies' trial, Clark was in the Hamilton County Jail awaiting trial on charges of gross sexual imposition and corruption of a minor.  [Tr. 802.]  Clark testified that on three different dates Michael Bies made inculpatory statements to Clark.  [Tr. 805-809.]  Clark's testimony was very dramatic; he testified that Michael Bies claimed to have "God like power" to give and take life.  [Tr. 808.]  Clark testified that he received

no benefits or consideration for his testimony other than the prosecutor promised to write a letter on his behalf to the Parole board.  [Tr. 801.]

111.    It is now clearly apparent that Clark lied in his testimony to the jury in Mr. Bies' case.

112.    Clark testified that he had one prior conviction for bank robbery in 1987. [Tr. 800.]  Clark had two convictions for bank robbery, in 1985 and 1987.

113.    Clark testified that he received consecutive sentences as a result of his guilty pleas.  [Tr. 801.] Clark received concurrent sentences.

114.    Clark testified that he did not receive any consideration for his testimony against Mr. Bies other than the prosecutor's promise to write a letter to the parole board. [Tr. 801.] Clark did receive consideration for his testimony, the prosecutor dismissed the prior specifications of violence that were attached to both of the felonies to which Clark pled guilty.

115.    Clark testified that he could not remember any of the details of the offenses of Gross Sexual Imposition and Corruption of a Minor to which he pled guilty and was sentenced.  [Tr. 810-811.]  Clark, had in fact admitted to the police knowing all of the facts concerning the charges for which he was convicted and sentenced.

116.    Clark testified that Michael Bies initially discussed the homicide with him on July 29, 1991 at 5:00 to 5:30 during the evening news.  [Tr. 805, 813.]  Detectives Seal and Guy testified that Mr. Bies was with them on July 29, 1992, from 5:00 until 8:00 p.m. [Tr. 149, 82, 84, 86, 151, 864.]

**B.    The Hamilton County Prosecutors Knowingly Solicited False And Material Testimony From Dallas Hayes.**

117.    The trial prosecutors called Dallas Hayes to testify [Tr. 563-574]. Hayes was the older brother of the victim [Tr. 564]. Hayes on the day in question was watching the victim because their mother was at work [Tr. 565-566].

118.    Hayes testified that he last saw his brother at 6:00 or 7:00 that evening. [Tr. 566-67.] However, Hayes gave the police conflicting statements as to the time he had last seen his brother.

119.    After the police confronted Hayes with the facts that Hayes had failed every question on the polygraph examination concerning his brother's death, Hayes admitted that he had been untruthful. Hayes stated that he had not seen his brother between five and seven o'clock, when his brother came home briefly for dinner and that he did not see him again for another two hours. Thus, Hayes, except for a brief period of time around 7:00 went almost four hours without seeing his brother.

120.    Hayes also testified that his brother never played in the abandoned buildings. [Tr. 572.] The prosecutor also knew that fact to be false, a friend of Aaron's told the police that just six days earlier the victim was playing in the abandoned building.

121.    The prosecutor called Hayes to testify despite a police report that included the following language: "There's no doubt in Royce's [the polygraph examiner] mind that he was lying on all questions that had to do with Aaron's death."

**C.    The Hamilton County Prosecutors Knowingly Using of False and Material Testimony Constitutes Reversible Error**

122.    The prosecutors knowingly solicited from the jail house informant and the baby-sitter testimony that they knew was false and material.

123.    The prosecutor's use of this false testimony entitles Michael Bies to a new trial because there is a reasonable likelihood that this false testimony affected the verdicts.

**SIXTH CLAIM FOR RELIEF**:  **MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE TRIAL COUNSEL FAILED TO PROVIDE HIM WITH REASONABLE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL AND MITIGATION PHASES. United States Constitution, Sixth, Eighth and Fourteenth Amendments.**

124.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

125.    Michael was represented in the trial and mitigation phases by Attorneys Timothy J. Deardorff and Joseph A. Dixon.

126.    This was Attorney Deardorff's first capital case [Tr. 1075].  He was a civil attorney [Tr. 1160].

127.    Mr. Deardorff has since been suspended from the practice of law. Cincinnati Bar Assn. V. Deardorff, 702 N.E.2d 59 (1998).  He was suspended for representing both the complainant and the defendant in a domestic violence case.  Mr. Deardorff advised the complainant to seek immunity and then lie in her testimony concerning the involvement of the defendant.  Id. at 61.

128.    As a result of the lack of adequate pre-trial preparation, skill and experience, trial counsel were not in a position to render and did not render reasonably effective assistance.  Among other things, trial counsel unreasonably failed to adequately explore and present evidence demonstrating Mr. Bies' incompetence to stand trial and other mental impairments. Trial counsel unreasonably failed to investigate their client's innocence. Counsel unreasonably failed to adequately investigate and present available mitigating evidence. Counsel performed unreasonably in a number of other areas, thereby prejudicing Michael Bies' fundamental constitutional rights and depriving him of a fair trial.

**A.      Trial counsel unreasonably failed to investigate Michael Bies' competency.**

129.    Clearly established federal constitutional law requires that at the time of Michael Bies' trial, that when a defendant stands trial for a capital offense, he must have the ability to consult with his lawyer with a reasonable degree of rational understanding and a rational and factual understanding of the proceedings against him.

130.    During both phases of his trial, Michael lacked the ability to consult with his lawyers with a reasonable degree of rational understanding.  Michael also lacked a rational and factual understanding of the proceedings against him.  Michael functioned at the level of third to sixth grade and suffered from mental retardation.  At the time of his trial he could not remember the year.  At the time of his trial and sentencing hearings, Michael was unable to assist counsel in any meaningful respect.

131.    At the time of his trial there were objective indicators in Michael's social history that demonstrated that he lacked the ability to meaningfully consult with his lawyers and to have a rational and factual understanding of the proceedings.  These indicators placed counsel on notice to raise his competency:

a.      Michael was a product of a dysfunctional family.  His father was a physically abusive alcoholic [Winter's NGRI Report, p. 2].  His mother was incapable of caring for him;

b.      Michael was developmentally delayed.  He did not learn to sit up until the age of one.  He did not walk with proficiency at the age of two and at the age of three he was still not toilet trained [Tr. 1096].   Michael suffered from several severe illnesses including multiple bouts with pneumonia and encephalitis or inflammation of the brain [Tr. 1097];

    c.  Throughout his childhood he was repeatedly confined in mental institutions and hospitals [Winter's NGRI Report p. 3];

    d.  Michael was diagnosed as having learning disorders and placed in special education classes.  His performance was so deficient in those classes that he was removed from the special education classes [Winter's NGRI Report p. 3];

    e.  Michael has a well documented history of hearing voices [Tr. 1100] [Fridman NGRI Report, p. 1; Feuss NGRI Report, p. 4];

    f.  Since the age of 14 Michael received SSI as a result of his mental retardation [Tr. 1109];

    g.  Several of the numerous doctors who have treated Michael's mental infirmities have reported the existence of brain damage [Winter NGRI Report, p. 3, 6].  He suffered several serious falls as a youth and once was struck by a bus.  He later indulged in binge drinking  [Winter's NGRI Report p. 3].

   132. Other objective indicators as to his incompetency appeared prior to and during both phases of his trial:

    a.  He was confined in the psychiatric unit of the Hamilton County Justice Center while awaiting trial [Tr. 811] [Winter NGRI, p. 3];

    b.  Dr. Winter of the Hamilton County Court Clinic administered tests to Michael which demonstrated that he had an IQ of 68 which placed him in the mildly retarded range [Winter's NGRI Report p. 5];

    c.  Michael reported to all of the mental health evaluators that he was hearing voices and could not trust other individuals [Tr. 1000; Fridman NGRI Report, p. 1; Feuss NGRI Report, p. 1, 4];

d.     The mental health evaluators that examined him during trial described his thought processes as "dense, naïve" [Winter NGRI Report, p. 2.]; "illogical … which is consistent with his mild mental retardation"; [Winter NGRI, Report, p. 2]; and, "thought processes . . . at times somewhat illogical" [Feuss NGRI Report, p. 2];

e.     Dr. Winter of the Court Clinic concluded in her report that "Mr. Bies doesn't think logically.  He often contradicts himself and doesn't seem to grasp the total picture of his circumstances with anything but superficial understanding" [Winter Mit. Report, p. 6];

f.     Dr. Myron Fridman in his report to the state trial court stated: "Michael Bies is a marginally functioning, mildly mentally retarded man from a dysfunctional family background who has never fully achieved satisfactory life adjustment"  [Fridman NGRI Report, p. 3];

g.     Michael while awaiting trial was more concerned about a theft charge in the State of Indiana than his capital case in the State of Ohio. He reasoned that "I don't want to have to worry about that sentence hanging over my head when I get out of prison" [Winter Mitigation Report p. 6];

h.     Michael told the social worker from the court clinic that he was not in Cincinnati on the day of the homicide.  When the social worker confronted him with the transcript of his inculpatory statements to the Detectives, he responded that he could not remember making these statements and therefore they were not true [Winter, NGRI Report, p. 2];

i.     Michael could not distinguish critical details and facts from insignificant details and facts.  For instance, he would dispute whether he told the police

that he "spotted" Darrell Gumm or "ran into" Darrell Gumm.   In reality, which statement applied had no impact upon his defense [Winter, NGRI Report, p. 2];

    j.  At trial Michael could not understand what was occurring [Tr. 1085].  He sat and drew pictures throughout the trial [Defendant's Mitigation Exhibit 1]. When he was evaluated by the psychologist from the Court Clinic during trial, he could not even tell the psychologist in what stage the trial was [Tr. 118];

    k.  During trial, Michael wrote the following statement for the jury:

>  I am sorry for everything.  I am 20 years old.  My sister died two months.  I can't reader thing have happening all of my life.  I wants my mother here to tell the court I am not a bad person.  I have three kids of my own, too. Always play with my two sons all the time.  I would beat as a kid by my mom's boyfriend.
>  I am sorry, yes, for not testifying.  I was honest on news to police - that's police.  I never been in court before. I afraid of it.  I once to get mercy on me her.  I will stay in jail for life if you will let me.  Thank you.  Michael Bies.

[Tr. 1088, Defendant's Mitigation, Exhibit 2].  Michael was unable to read this two paragraph statement to the jury [Tr. 1088].   He had taken almost two hours to write the statement [Tr. 1090].  The psychologist from the Court Clinic stated that she was not surprised that Michael did not have the ability to read to the jury the two paragraph statement that he had written [Tr. 1110];

    l.  During trial, Dr. Winters testified that Michael was functioning at the level of a third to sixth grader [Tr. 1104, 1106].

  133.  If trial counsel had properly raised the competency issue during the course of the proceedings, there is a reasonable likelihood that the proceedings would not have gone forward.

B.    **Trial counsel unreasonably failed to investigate the circumstances concerning Michael's custodial statements to the detectives.**

134.    Mr. Bies made several statements to Detectives Seal and Guy on July 28 and 29, 1992. See First, Second and Third Claims for Relief. The statements were very inculpatory, especially the alleged statements that were not recorded.

135.    Trial counsel filed a timely motion to suppress Michael's statements to Detectives Seal and Guy. However, trail counsel failed to address the admissibility of Michael's statements through the testimony of mental health experts who could have testified as to Michael's mental infirmities as they impacted upon Michael's inability to make a knowing and intelligent waiver of his constitutional rights.

136.    Trial counsel failed to adduce testimony at the suppression hearing that Michael was mentally incapable of a knowingly, voluntary and intelligently waiving his constitutional rights to counsel and self-incrimination.    For Example:

a.    Michael had an IQ of 68, and suffered from brain damage [Tr. 1102, 1103];

b.    Michael had learning disorders which caused him to be functionally illiterate. He was placed in special education classes and later therapeutic classes [Tr. 1136, 1099];

c.    Michael has limited capacity for abstract reasoning and to foresee the consequences of his actions. He is very compulsive and needs time to dwell upon information so he may react appropriately [Tr. 1119, 1120-21];

d.    Michael is highly susceptible to suggestion and is easily led, especially by authority figures such as male police officers [Tr. 1111-1114];

50

137.    Trial counsel had not investigated the motion to suppress at the time of the evidentiary hearing.  The trial court scheduled the evidentiary hearing for September 14, 1992 [Tr. 14].  At the conclusion of the hearing counsel asked for a continuance because they had not interviewed any of the Kentucky officers involved in the arrest or interrogation [Tr. 115].  The court continued the hearing until September 23, 1992 [Tr. 192].

138.    At the September 23, 1992 hearing counsel still had not interviewed any of the witnesses in Kentucky.  The court continued the hearing until September 30, 1992 [Tr. 142].

139.    On September 30, 1992, trial counsel called two witnesses to testify, Detective Seal who had already testified [Tr. 142] and Michael Bies [Tr. 157].  Most of the testimony of the two witnessed centered around the Detective's failure to read all of Michael's statements.  This factual issue was irrelevant to the issue of whether Michael's custodial statements were admissible.

140.    Despite the two continuances trial counsel never factually supported the legal issues with the testimony of a psychologist.  There was no mental health testimony concerning Michael's suggestibility or his ability to intelligently waive his constitutional rights.  See Second Claim for Relief.  Trial counsel did not develop the fact that Detectives Seal and Guy had pressured Michael into giving a statement by giving Michael the facts to which he would have to confess.  See First Claim for Relief.  This was despite the fact that trial counsel introduced at the Motion to Suppress Detective Seal's notes of the Kentucky interrogation which clearly indicated that the two Detectives had fed Michael the facts for Michael to include in his inculpatory statement  [Tr. 54, 86,

146, 163]. The notes reflected the following: "We now tell Michael what we know about his –"; and later in the notes, "We now tell Michael more about Aaron and dates and times. Michael gives the following statement" [Defendant's Motion to Suppress, Exhibit 2].

141. There is a reasonable probability that the outcome of the Motion to Suppress would have been different if counsel would have properly factually supported the motion.

**C.    Trial counsel unreasonably failed to meaningfully investigate and present trial phase evidence.**

142. The prosecutor had no eyewitness or forensic evidence that linked Michael to the commission of the homicide. There was one eyewitness who had seen him in the park with Gumm near the time of the homicide [Tr. 554], but she did not know what occurred in the two vacant buildings.

143. The state's case was dependent upon Michael's statements to Detectives Seal and Guy and the testimony of the jailhouse snitch, Steven Anthony Clark.

144. Trial counsel's failure to properly support their Motion to Suppress (See Subsection b) impacted directly upon the issue of guilt. Even if trial counsel had properly supported the Motion to Suppress and lost, they could have re-litigated with mental health testimony the issue to the jury in the trial phase. The jury was free to give Michael's statements any weight it chose. Michael's mental infirmities and the Detectives feeding of Michael the information would have caused the jury to discount his custodial statements. The fact that the critical custodial statements were not recorded would have contributed to the lack of trustworthiness of the statements.

145.    Trial counsel also failed to adequately investigate the credibility of jailhouse informant, Steve Anthony Clark.

a.    The informant had been housed in the psychiatric unit of the Hamilton County Justice Center when he allegedly spoke with Michael [Tr. 811].  Clark had quit taking his medication as prescribed [Tr. 820-821].  Counsel could have explored, with Clark's treating physician, Clark's mental infirmities and his failure to take the required medications.  Trial counsel raised the competency of Clark to testify [Tr. 798].  The factual basis for the competency issue should have been the basis for cross-examination.

b.    Clark testified that the first statement Michael made to him was during the evening news on July 29, 1992 at approximately 5:00-5:30 p.m. [Tr. 805, 813].  Clark claimed that Michael's statement was in response to a news story concerning Gumm's arrest [id.].  This was a physical impossibility.  Michael was with Detective Seal and Guy on July 29, 1992 between 5:00 and 5:30 p.m. [Tr. 82, 84, 149, 151, 864].  Clark's credibility would have plummeted if the detectives were called in rebuttal on this issue.

c.    Clark testified that he received no consideration in exchange for his testimony.  If defense counsel had examined the docket they would have learned that Clark received a reduction of charges and concurrent sentence.

146.    There was testimony from Phyllis Thacker, a state's witness,  that Gumm was a very irritating individual [Tr. 531], that Gumm was a mean drunk [Tr. 540], that Gumm had threatened to kill the witness's spouse [Tr. 542] and that Gumm had recently developed what appeared to be a severe mental problem [Tr. 544].   Trial counsel

conducted no investigation and called no witnesses to support the theory that Gumm was the aggressor and the sole principal offender in the killing of the victim. Defense counsel never investigated Gumm's repeated history of sexual misconduct including the molestation of his own children and childhood friends. Some of the lack of investigation was directly attributable to the state's suppression of evidence. See Fourth Claim for Relief.

147.    Counsel never investigated the theory that someone else committed the offense. If counsel had conducted a reasonable investigation they would have learned that other individuals had made inculpatory statements, other individuals were seen around the vacant building at or near the time of the homicide, that the police had other "serious" suspects and that Dallas Hayes lied when he testified at trial. See Fourth Claim for Relief. Further counsel never investigated the consideration received by Clark in exchange for his testimony. Some of counsel's ineffectiveness may have been attributable to the trial prosecutors. Id.

148.    Trial counsel conducted cross-examination concerning whether Michael was right handed or left handed [Tr. 888-891]. Assuming there was some basis for these questions, such as the blows were administered by a left or right handed person, then trial counsel should have pursued the issue with an expert. They should not have had to ask the state's witnesses whether Michael was left or right handed.

**D.    Defense counsel unreasonably failed to adequately investigate and present mitigating evidence.**

149.    A capital sentencing proceeding is sufficiently like a trial in its adversarial format that similar standards for counsel exist to ensure that the adversarial testing

process works to produce a just result. Counsel is charged with understanding the purpose of the penalty phase and producing available evidence in mitigation.

150. In order to provide effective assistance, defense counsel must conduct an adequate and reasonable investigation of potential mitigating factors. Counsel must conduct enough investigation to formulate an accurate profile of the defendant. Counsel must investigate a defendant's mental health history. Failure to investigate such history is not reasonable and falls below professional competency standards. Because of the severity of the sentence in a capital case, counsel must collect as much information as possible.

151. The prevailing standards of practice in 1992 dictated that the sentencing investigation be conducted prior to the commencement of trial in order to allow counsel to voir dire prospective jurors with respect to sentencing issues and to make strategic decisions concerning the interrelation between sentencing and trial phase issues. An adequate sentencing investigation takes approximately six to eight weeks to complete due to the need to collect necessary records (educational, employment, medical, institutional, court), conduct medical and psychological evaluations and interview all significant persons in the defendant's life.

152. The goal of the mitigation investigation is to marshal all of the relevant facts and other information to explain the defendant's involvement in the offense for which he is on trial. Once convicted in the guilt phase, the jury has decided the defendant was involved in the commission of the offense and defense counsel in the mitigation phase must explain the defendant's involvement in such a manner that the jury determines that the defendant is not deserving of the death penalty.

153.    In this case, trial counsel did not conduct any mitigation investigation prior to the commencement of Michael's trial, nor did they request the appointment of a mitigation specialist to conduct the necessary investigation.    Trial counsel called no witnesses other than Michael and Dr. Winter in the sentencing phase.

154.    If trial counsel had conducted a reasonable investigation, they would have interviewed the following individuals and called them to testify:

a.    **Linda Bies** - Ms. Bies is Michael's mother.  She would have told trial counsel, if asked, that she was from an abusive background.  Her stepfather Allen Smith abused Linda and her mother.  He called Linda a whore and a slut and sexually molested her.  Linda's mother did not believe Linda when she told her mother about the molestings.  Linda's pregnancy with Michael was difficult.  She almost miscarried at four and six months.  Michael's father, Michael Johnson, ("Johnson")  hit her in the stomach when she was 7½ months pregnant.  Michael was "black" at birth from a lack of oxygen. Michael was always very slow.  He was delayed in learning to crawl and sit up. Until the age of seven Michael wet the bed.  Michael was a very sickly child.  When he was four years of age he caught encephalitis and at the age of five he was hospitalized for the measles. At the age of five he burnt himself on a radiator or stove, but was unable to feel the pain.  At one point Michael was struck by a bus.  At the age of five Michael began self-mutilation.  He cut his wrist and shortly thereafter tried to jump out of a window.  He had violent episodes during which he would try to hurt himself by beating his head with his fists.  During Michael's childhood, Michael received treatment at the Michael Reese Dysfunctional Child Center where the doctors diagnosed him with "organic dysfunction".  At the age of 11 Michael began hallucinating.  Johnson was abusive toward Linda and

Michael. Johnson left the family when Michael was six years old. Michael is a "duplication of his father". Michael began drinking heavily when he was 14 years of age. According to Linda, Michael never had an intelligent logical person in his life. Michael's sister Sherri committed suicide with an overdose of drugs at age 17. Everyone in the family is a hepatitis B carrier and blood clots run in the family. Michael's brother Richard is a TB carrier;

> b. **Michael Johnson** ("Johnson"), is Michael's biological father. He would have told trial counsel if asked that he used to have a drinking problem. Both Johnson's mother and stepfather had drinking problems. Johnson did not marry Michael's mother. Johnson had a violent relationship with Linda. Johnson's drinking contributed to the violent relationship, and Linda added to the acrimony because she pursued other men. Linda was not a good mother, because she spent so much time with other men. Michael was very hyper as a child. He would often wake up in the middle of the night and go into the kitchen and throw pans and food around the kitchen. Johnson left Michael and Linda when Michael was in elementary school. Johnson did not see Michael again until 1991 and Michael did not seem "all together". Michael had a chip on his shoulder;

> c. **Lawrence Dalton aka William Bies**, is a former boyfriend of Linda. He would have told trial counsel if asked that he used to live with Linda prior to her living with Johnson. Linda was sexually abused by her father. Linda moved in with Lawrence to escape her abusive father. Lawrence adopted the name Michael Bies (who died in the armed services) so Linda's stepfather could not find them. Linda continually slept with other men. Lawrence eventually left Linda because of her promiscuity, she

would "go to bed with anyone and everyone." Linda listed on Michael's birth certificate the name of Michael Bies as the father to avoid having to report Johnson as the father who would then be arrested for non-support. She knew that no one could find "William Bies" because he was deceased. Linda was physically abusive toward her children. She used to whip the children with a belt and did not want any interference including Lawrence. Linda had a lot of power in the neighborhood because she ran with gangs.

        d.    **Mary Mucci** - Ms. Mucci would have told trial counsel if asked that she was a former teacher at the Victor Neumann School. This was a therapeutics school for children with severe emotional and behavior problems. Michael attended the school from 1979 to 1983. He had very severe problems, he was "very damaged" by the time that he enrolled in the school. There was a great deal of dysfunction in Michael's family. His mother had a large number of boyfriends and she would move frequently and not tell the school. Michael's brother and sister had severe learning problems, but they were enrolled in the mainstream school because they did not have the same behavioral problems as Michael. At the age of 9, Michael saw his sister being raped by a baby-sitter. Michael may have been sexually abused by the same baby-sitter. Michael was a very aggressive child. He had to be physically retrained at least once a day. Michael would scream and use obscenities when the staff tried to restrain him. Any kind of frustration would evoke a violent reaction. He made sexual advances to the staff members. Michael often came to school with bruises and marks on his face. Mary called the Children Services Hotline but to no avail. Michael should have been removed from the home. The Victor Neumann School was the only source of stability in Michael's life. Michael's mother refused to follow through with any of the recommendations of the

school and she resented any suggestions on how she should raise her children.  Mary used

to have a class of five children all of whom were profoundly mentally and emotionally

disturbed.  Michael was intensely mad and he would often throw chairs.  Michael's

mother resented the teachers because she thought that they "babied" Michael.  Linda

would often smack Michael rather than attempt to reason with him despite all of his

problems.  Michael liked school and he had endearing qualities;

     e.    **Jacklyn Hookanson** - Ms. Hookanson would have told trial

counsel if asked that she is a former director at the Victor Neumann School.  Michael's

family was "one of the most pathologically dysfunctional families she has seen in her

over twenty years of experience."  She called the Department of Family Services at least

six times:  1) Linda's boyfried tied Michael and his brother to a chair; 2) Michael came

to school for days in the same clothing; 3) Linda would leave Michael for long periods of

time; and 4) Michael came to school "black and blue."  Michael never lived in a

furnished apartment.  The outside doors did not have doorknobs and at one apartment a

blanket was used as a front door. Michael's family was more "chaotic" than any other

family that she has seen in her twenty years of education.  The family lived in a "bombed

out" building in which there were no lights or locks.  There were many former mental

patients living in the building.  Ms. Hookanson made several visits to the home.  There

was no furniture or toilet paper in the bathroom.  On one occasion there were no plates in

the kitchen or food in the refrigerator.  Once she visited the apartment and found one of

Linda's boyfriends, dressed only in his boxer shorts, screaming and  beating Michael and

his brother who were tied to a chair with a belt.  She seized the children only to be later

told by the police that she had acted improperly.  Michael's mother frequently dated men

with disabilities so she could get their disability checks.  She enjoyed starting fights.  She disliked the teachers at school.  She often seemed to be jealous of the teachers, in an incestuous manner.  Michael came to school filthy and hungry.  He frequently had bruises on his body.  When Michael enrolled in the school he was very thin.  Linda never had a kind word for Michael.  She communicated with him by hollering at him.  Michael made significant improvement while he was at the school until Linda removed him;

      f.    **Sandra Daniels** - Ms. Daniels would have told trial counsel if asked that she was the former wife of Michael.  They married on June 15, 1990.  Michael's mother was a very controlling, manipulative and deceitful woman.  She was ignorant but shrewd.  Linda hated Sandra because she was not black.  Linda dated only black men.  Linda hated her own children and often told them that.  Linda was physically abusive toward Michael; she would throw things at him and bite and scratch him.  Michael would not defend himself.  Michael told Sandra that he would never love anyone as much as his mother.  Michael would do anything for his mother, he was a real "mama's boy".  Linda ran a flophouse.  There were twenty or thirty people living in her apartment.  Linda prostituted Michael's sister Sheri.  Sheri had a baby by a black man and Linda took the child away from her.  Sheri killed herself.  Michael told her that he had sex with Sheri.  Sandra knew Darryl Gumm.  He acted real crazy.  He told people that he had sex with aliens and horses.  Gumm urinated and defecated on himself;

      g.    **Carol Lucky** - Ms. Lucky would have told trial counsel if asked that she has known Michael for many years.  Michael's mother Linda treated Michael like a dog.  She saw Linda slap Michael.  Linda always had "new boy friends" who were always black except for one Hispanic.  Linda's many boyfriends were usually high or

drunk.  Linda prostituted her daughter Sheri.  Carol once saw Michael have sex with his mother Linda on a couch when Linda was living with Michael and Carol.  Michael refused to discuss the matter with Carol;

h.    **Phyllis Thacker** - Ms. Thacker would have told trial counsel if asked that she knew Darryl Gumm and he had severe mental problems.  Gumm told Phyllis a few weeks before the crime that Phyllis' horse was talking to him and the horse was mad at Gumm because he was having sex with it.  Gumm was very unclean.

155.    Instead of interviewing the above individuals and other individuals, trial counsel relied upon Michael to arrange for the witnesses to appear and testify.  Because no witnesses voluntarily appeared there were no witnesses to testify on Michael's behalf in mitigation.  Only Dr. Winter and Michael offered testimony in the mitigation phase.  Michael, in his unsworn testimony, tried to explain the absence of his mother [Tr. 1090].  The prosecutor asked the jury to speculate that his mother did not appear because she had nothing good to say upon behalf of her son [Tr. 1175].

156.    In addition to failing to interview the above witnesses to assist in the mitigation phase of the trial, counsel also failed to obtain or use the volumes of documentary evidence available from collateral sources to assist the jury in weighing mitigating factors.  The jury at the mitigation phase must be educated as to the defendant's history, character, background, mental health history and any other factors that are relevant  to the issue of whether the defendant should be put to death.  In post-conviction, counsel was easily able to obtain literally boxes of information concerning Michael's history, character, background and mental health history that trial counsel neither saw nor even attempted to obtain.  Trial counsel did not make a reasoned strategic

decision not to use this evidence.  They simply never took time to discover it or develop it.  The following are examples of the evidence never discovered by trial counsel or considered by defense experts or the jury:

        a.      School records from the Victor Neumann School in Chicago, Illinois where Michael attended as a child;

        b.      School records from the Edgetown Therapeutic School in Chicago, Illinois where Michael attended as a child;

        c.      Hospital records from St. Mary's of Nazareth Hospital in Racine, Wisconsin where Michael was born;

        d.      Hospital records from Dunklin County Hospital in Kennet, Michigan where Michael was treated for encephalitis at 4 years old;

        e.      Hospital records from Michael Reese Hospital Dysfunctional Child Center in Chicago, Illinois where Michael was treated in 1973 and from 1973 to 1977;

        f.      Records from the Social Security Administration regarding Michael's disability determination, payments and treatment plan and history of suicide attempts since age 6;

        g.      Records from Consultative Examinations, Inc in Chicago, Illinois where Michael was given a psychological evaluation at age 12;

        h.      Hospital records from Ridgeway Hospital in Chicago, Illinois were Michael was treated as a child for various mental and physical maladies;

        i.      Hospital records from Chicago-Read Mental Health Center in Chicago, Illinois were Michael was treated after attempting to commit suicide by jumping from a second story window at age 12;

j.      Records from the State of Illinois Department of Rehabilitation Services, Bureau of Disability Adjudication regarding Michael's history of mental diseases and defects.

**E.    Counsel failed to retain reasonably necessary experts.**

157.    Trial counsel, as part of the duty to conduct a reasonable investigation, have to request funding to retain all reasonable and necessary experts. If counsel requests and makes a sufficient factual showing, they are entitled to the appointment of experts to assist the accused in the presentation of the case.

158.    Trial counsel did not request the appointment of experts to assess Michael's competency. For the reasons set forth in Section A of this Claim for Relief, counsel's performance was deficient and Michael was prejudiced.

159.    Trial counsel did not request the appointment of an expert to assess Michael's ability to knowingly and intelligently waive his Miranda rights. Any such assessment would include testing as to Michael's suggestibility and ability to give an accurate statement. For the reasons set forth in Section B of this Claim for Relief, counsel's performance was deficient and Michael was prejudiced.

160.    Trial counsel did request the appointment of an expert to conduct a mitigation psychological evaluation. However the request was made pursuant to O.R.C. § 2929.03 and consequently the expert appointed was the court's expert as opposed to an expert to assist the trial counsel. Pursuant to O.R.C. § 2929.03 the court's expert must prepare a report that goes to both parties and must be submitted to the trier of fact. If trial counsel's request had been made pursuant to O.R.C. § 2929.024, the appointed expert would have served to assist trial counsel. The experts' testimony could have been

tailored to support Michael's mitigation presentation as opposed to a mental review of Michael's life.

161.    Dr. Winter, the expert who was appointed in the mitigation stage, did not provide defense oriented testimony because she was the court's expert.  She lacked sufficient information to adequately describe Michael's development [Tr. 1094, 1098]. She knew nothing about the co-defendant and his level of involvement [Tr. 1115].  She testified as to the wrong IQ score [Tr. 1103-04] and did not know the mental age of Michael [Tr. 1116].  She testified as to factors that did not support a life sentence including future dangerousness [Tr. 1142] and Michael's sanity at the time of the commission of the offense [Tr. 1172].

162.    Trial counsel had a duty to provide the necessary information to the appointed expert so that she could testify as to all relevant mitigating factors.  The testimony of Dr. Winters made it clear that she did not have all the information.

163.    In the state post-conviction process, it became evident that additional testing of Michael was necessary.  Dr. Kristin Haskins, a licensed psychologist concluded:

> My evaluation of Michael Bies and the available collateral information strongly suggest the presence of central nervous system dysfunction which may affect Mr. Bies' cognitive processing ability, including nonverbal reasoning functions, as well as the ability to interpret complex events occurring within the context of extremely stressful circumstances. Exploration of such deficits is essential and requires neuropsychological testing, neurological examination, possible an M.R.I., a complete physical examination and possibly full-body x-rays.
>
> Exploration of these issues is essential to an accurate evaluation of Michael Bies in order to assess adequately the impact of such dysfunctions upon Mr. Bies' ability to appreciate the wrongfulness of his behavior and

his capacity to control his conduct at the time of the offenses in question.

[State Post-Conviction Petition, Exhibit J].

**F.      Trial Counsel conducted unreasonable voir dire.**

164.    Attorney Deardorff did not appear for the first day of voir dire [Tr. 172].

165.    During voir dire trial counsel that was present failed to ask questions of the prospective jurors concerning Michael's defense that he was not the principal offender and that he was just a "follower" as opposed to a leader.  Counsel also failed to address the issues of Michael's statements to Detectives Guy and Seal and the credibility of jailhouse informant.

166.    Counsel conducted voir dire that was confusing [Tr. 367, 379, 429]. Counsel asked prospective jurors if they were registered voters.  To be eligible for the jury service, individuals have to be eligible voters.   Trial counsel miscounted their peremptory challenges [Tr. 464].

167.    Counsel did make adequate efforts to rehabilitate those prospective jurors who stated that they were opposed to the death penalty [Tr. 191, 304-10].

168.    Counsel did not address with the prospective jurors any sentencing phase issues, such as the mitigating factors upon which trial counsel would go forward. Counsel also failed to determine if any of the prospective jurors would automatically return a death verdict based upon a finding of guilt as to capital murder.

169.    Counsel, as can be seen by the following, failed to challenge for cause prospective jurors who could not be fair and impartial:

a.      Jack Gunderman [Tr. 240-255] -  Mr. Gunderman was a block watch captain  [Tr. 248].   He knew several policemen as a result of that position [id.].

He would give the testimony of police officers greater credibility [Tr. 249]. He repeatedly stated that he would be most happy to sign a death verdict [Tr. 241, 249, 250]. Mr. Gunderman did not believe in imposing long sentences for murder because defendants may eventually get paroled and murder someone else [Tr. 245, 250]. Michael had to exercise a peremptory challenge to remove the prospective juror [Tr. 370];

      b.    Mary E.B. Meyung [Tr. 266-278] - She did not believe that the death penalty was strong enough [Tr. 268]. She felt that it should be extended to crimes other than murder [Tr. 268-271]. She stated that if Michael was convicted she could "only" probably recommend a sentence other than death [Tr. 273]. She did not know if gory details and photographs would impact upon her [Tr. 275]. She experienced "heartache" for the victim's parents, based upon what she had read in the newspaper [Tr. 276]. She was not sure that she could be fair and impartial [Tr. 277]. Ms. Meyung sat on the jury;

      c.    Garrett I. Sullivan [Tr. 289-294] - Mr. Garrett had discussed the case with friends of his who were police officers [Tr. 292-297]. He had seen interviews with the victim's family on television [Tr. 298]. He felt that if it was his son who was killed he would have killed Michael [Tr. 198-199]. He had already formed an opinion about the case [Tr. 293]. He felt it would be very difficult for him to be fair [Tr. 291, 293, 300];

      d.    Ronald Roark [Tr. 320-332] - Mr. Roark was a security guard at the time of the trial [Tr. 321, 326]. In that capacity he carried a night-stick and stun gun [Tr. 327]. He has arrested individuals [Tr. 326]. He believed in an "eye for an eye" [Tr.

324].  Michael had to exercise a preemptory challenge to remove the prospective juror [Tr. 465];

       e.     Patricia Brinkmeyer [Tr. 370-380] - Ms. Brinkmeyer was engaged to a Norwood police officer and scheduled to be married in less than a year.  She knew the daughter of a victim in a highly publicized capital murder in Norwood [Tr. 373].  Ms. Brinkmeyer sat on the jury.

170.    Trial counsel failed to move the court to have Michael present for the jury excusals [Tr. 142].  As a result he was denied his constitutional right to attend the proceeding.

## G.    Trial counsel failed to provide a reasonable closing argument in the sentencing phase.

171.    Trial counsel in the mitigation phase closing argument has an obligation to identify for the jury the relevant mitigating factors and the reasons that the evidence supports the mitigating factors and the legal conclusion that the aggravating circumstances do not outweigh the mitigating factors by proof beyond a reasonable doubt.

172.    Defense counsel in closing argument made legal statements that were not helpful to Michael.  Counsel reversed the balancing test [Tr. 1155] and reviewed all of the statutory mitigating factors thereby transforming the lack of mitigation into aggravation [Tr. 156].

173.    Michael in his sworn statement said that he was truthful in his recorded statements to the detectives; that he did not assault the victim [Tr. 1089].  Defense counsel in closing statement impeached Michael for making this statement:

> All Michael could do was what he did. He cooperated, he took them through the building. And maybe he did it. I don't know if he did it. Michael, I don't even know if he knows he did it.

> I know Michael knows what his story is. But I don't know whether I believe him or not. Is he not telling me the truth? Can he not remember?

[Tr. 1157].

174. Defense counsel cited to the youth of the victim [Tr. 1159] and future dangerousness [Tr. 1159]. Neither of those facts supported a life sentence.

175. Trial counsel referred to Michael as a "Frankenstein" [Tr. 1164] and a "non-entity" [Tr. 1166]. Neither of these representations supported a life sentence.

176. Trial counsel then in summary informed the jury:

> We couldn't defend this case. We had nothing to work with. So don't hold it against him that he didn't testify. I would have found him guilty if he did not testify. I'm not stupid. I'm rational.
> Why didn't he get up? Why didn't he get up there and deny what he said to officer so-and-so? Why didn't he get up here and fight?
> Now you know. And ask in your mind if he got up and did this, if you would have known this, would you have been out 7 hours? Would you have been out longer?

[Tr. 1168-1169]. In essence trial counsel asked the jury to speculate as to the reasons that Michael did not testify in the trial phase and possibly penalize him for not testifying.

## H. Defense counsel performed unreasonably in other portions of the trial and sentencing phase.

177. Defense counsel unreasonably failed to argue and assert the pretrial motions they filed. Instead they just submitted the motions without argument [Tr. 134, 139]. The trial court then perfunctory overruled the fifty motions that counsel had filed.

"All right. Well those motions will be overruled as certain Supreme Court cases have determined them" [Tr. 137].

178.     Trial counsel gave an unreasonable opening statement in both phases of the trial:

a.       In the trial phase the defendant's opening statement was three pages in length. Trial counsel initially told the jury that defense counsel usually waives opening [Tr. 525]. This trial counsel stated "The only thought that comes to my mind" [Tr. 525]. Hopefully trial counsel had more than one "thought". Defense counsel then accepted the burden of "we think that we can show that" Michael was not the principal offender [Tr. 526]. It was the prosecutor's burden to show that Michael was the principal offender since it was an essential element of the aggravating circumstance. Finally defense counsel promised the jury that Michael would testify [Tr. 526]. Michael did not testify;

b.       Trial counsel's opening statement in mitigation was no better. The statement was two pages in length [Tr. 1075-77]. Counsel told the jury it was his first capital case [Tr. 1075]. Counsel then told the jury that the facts of the case shocked him [Tr. 1076]. Trial counsel suggested to the jury that Michael's story "is pretty sad" [Tr. 1077]. Finally, trial counsel reversed the balance test [Tr. 1077].

179.     Trial counsel unreasonably failed to file a motion in limine and unreasonably failed to make timely objections concerning the prosecutorial misconduct during trial and sentencing phases. Had counsel properly objected to the prosecutor's misconduct and overreaching, it is reasonably probable that a more favorable result would have been obtained. See Eighth Claim for Relief.

180.     Trial counsel unreasonably failed to object to the court's instructions contained in the trial and mitigation stages.  See Ninth and Tenth Claims.  Those instructions were improper and unconstitutional.  Had counsel made proper objections to these instructions and secured the giving of adequate instructions, it is reasonably probable that more favorable trial and sentencing verdicts would have resulted.

181.     Trial counsel failed to object to the court ordering and considering a pre-sentence investigation and a Victim Impact Statement [Tr. 1212, 1222].

182.     Trial counsel unreasonably failed to object to the trial court's displays of bias throughout the trial.  Had counsel properly objected to the trial court's interruption of the proceedings and demonstration of bias, it is reasonably probable that a more favorable result would have been obtained [Tr. 393, 740, 853, 858, 906, 956, 1072, 1174].

183.     Trial counsel failed to secure a complete record of the proceedings by requesting that all discussions relating to the case be recorded, even if those discussions took place during bench conferences or in chambers [Tr. 239, 611, 750, 886, 906, 977, 1191, 1206].

184.     Trial counsel did not object to the matter in which the courtroom security was deployed [Tr. 864].

**I.     The court should award Michael relief as to this Claim.**

185.     Trial counsel:  a)  Failed to conduct an adequate investigation with respect to both the trial and mitigation phases;  b)  Failed to request the appointment of necessary experts in the mitigation phase;  c)   Failed to adduce relevant testimony in trial and sentencing phase proceedings;  d) Failed to meet the prevailing standards of practice in

1992 for attorneys in capital cases; and e)  Prejudiced Michael Bies by their deficient performance.

186.    Counsels' failure to perform reasonably was not the result of any tactical or strategic choice within the range of reasonable competence but was the result of counsels' lack of preparation, experience, knowledge and skill.

187.    Singularly and cumulatively, the instances of trial counsels' unreasonable failure to perform with reasonable effectiveness, and the entire course of the lack of preparation and the representation in trial constituted a constructive denial of counsel altogether which is prejudicial per se.  It is reasonably probable that if counsel had performed with reasonable effectiveness throughout the preparation for, and during the mitigation proceedings, a more favorable result would have been obtained.

**SEVENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND DEATH SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL COURT ADMITTED THIRTY-THREE SHOCKING, INFLAMMATORY AND GRUESOME PHOTOGRAPHS OF THE VICTIM WHICH HAD NEGLIGIBLE PROBATIVE VALUE. United States Constitution, Sixth, Eighth and Fourteenth Amendments.**

188.     Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

189.     It was clearly established federal constitutional law at the time of Michael's trial that the admission of inflammatory evidence which infects the trial with unfairness violates the defendant's right to due process.  A federal constitutional error occurs when the probative evidence of the evidence is nil and it directs the jury's attention from the material issues at trial.

190.     The trial court violated this clearly established constitutional law when it admitted thirty-three photographs of the young victim.  There was never any dispute that the victim died from a vicious beating that was caused with wooden boards and pieces of concrete and pipe.  The only issue was whether Michael was the "principal offender" in the commission of the aggravated murder.  The thirty-three photographs offered no probative evidence on this issue.

191.     The admitted photographs of the victim portrayed the following:

| | |
|---|---|
| State's Exhibits 1, 2 | Photographs of the victim when alive. |
| State's Exhibits 33-35 | Photographs of the body in the basement. |
| State's Exhibits 39, 41, 42 | Photographs of the back of the victim. |
| State's Exhibit 53 | Photograph of the victim's lower area. |

| | |
|---|---|
| State's Exhibit 57 | Morgue photograph of decedent's face prior to autopsy. |
| State's Exhibit 58 | Morgue photograph of the decedent prior to autopsy. |
| State's Exhibit 59 | Morgue photograph of decedent's head prior to autopsy. |
| State's Exhibit 60 | Morgue photograph of decedent's back prior to autopsy. |
| State's Exhibits 70-72 | Morgue photographs of both of decedent's feet. |
| State's Exhibit 72 | Morgue photograph of decedent's calves. |
| State's Exhibit 73 | Morgue photograph of decedent's hospital shoe. |
| State's Exhibit 74 | Morgue photograph of decedent's foot. |
| State's Exhibit 75(A) | Blow up of morgue photograph of decedent. |
| State's Exhibit 76 | Morgue photograph of victim's torso. |
| State's Exhibit 77 | Morgue photograph of decedent's head and scalp. |
| State's Exhibit 78 | Morgue photograph of decedent's face. |
| State's Exhibit 79 | Morgue photograph of left side of decedent's head. |
| State's Exhibit 80 | Morgue photograph of decedent's neck and head. |
| State's Exhibit 81 | Morgue photograph of decedent's face. |

| | |
|---|---|
| State's Exhibit 82 | Blow up of morgue photograph of back of decedent's head. |
| State's Exhibit 83 | Morgue photograph of back of decedent's head and shoulder. |
| State's Exhibit 86 | Morgue photograph of pipe next to decedent's head. |
| State's Exhibit 87 | Morgue photograph of decedent's right shoulder. |
| State's Exhibit 88 | Morgue photograph of upper chest of decedent. |
| State's Exhibit 89 | Morgue photograph of back of decedent's right leg. |
| State's Exhibit 93 | Morgue photograph of decedent's face. |

192.    In addition to thirty-three photographs, the prosecutor had admitted

seventeen photograph's that were closely connected to the victim's gruesome death.

| | |
|---|---|
| State's Exhibits 20, 21 | Photographs of decedent's ball cap. |
| State's Exhibits 54, 55 | Photographs of the basement floor without decedent's body. |
| State's Exhibit 95 | Decedent's ball cap. |
| State's Exhibit 92 | Piece of concrete used to strike decedent. |
| State's Exhibits 98-99 | Pieces of wood used to strike the victim. |
| State's Exhibit 100 | Decedent's hair. |
| State's Exhibit 101 | Metal pipe used to strike victim. |
| State's Exhibit 102 | Decedent's hair found on pipe. |
| State's Exhibit 103 | Casts of decedent's skull. |

| | |
|---|---|
| State's Exhibits 104-106 | Twine found on decedent's back. |
| State's Exhibit 107 | Cord found near victim's back. |
| State's Exhibit 108 | Twine attached to a piece of wood near victim's body. |

193.    The impact of the inflammatory evidence was not limited to the trial phase.  It had a "carryover" effect to the sentencing phase.  The trial court re-admitted all of the evidence in the mitigation phase for the jury to consider in its sentencing phase deliberations [Tr. 1078].

194.    These grisly photographs of a murder victim's badly beaten and deeply cut body caused intense emotional reactions including varied physiological symptoms, reactivation of memories of earlier traumatic experiences and extreme stress, and improperly influenced a jury.  The jury asked the judge to provide counseling for them after completion of the trial [Tr. 1208].

195.    The photographs of the victim in Michael's case were used to inflame, not to prove.  As proof, they were superfluous.  These shocking pictures were introduced to create unfair prejudice, and served as one of the state's emotional appeals for a death sentence.  Admission of them deprived Michael of due process and a fair trial on the issues of his guilt and sentence.  Michael suffered substantial and injurious prejudice.

**EIGHTH CLAIM FOR RELIEF: MICHAEL BIES CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE OF THE EXTENSIVE PROSECUTORIAL MISCONDUCT WHICH OCCURRED THROUGHOUT THE TRIAL AND PENALTY PHASES. United States Constitution, Sixth, Eighth and Fourteenth Amendments.**

196.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

197.    It was clearly established law at the time of Michael's trial that the prosecutor was limited to arguing facts in evidence which were relevant to the elements of the offenses charged with respect to the sentencing phase.  He could not argue irrelevant matters, facts no in issue or make misstatements of law.  The prosecutor's performance in the present case was the epitome of what clearly established law precluded in 1992.

**A.    Trial Phase**

198.    The prosecution violated their duty to conduct themselves in a fair manner during the trial phase.

199.    The prosecutors injected inflammatory and emotional victim impact evidence which was irrelevant to Michael's guilt. The prosecutors repeatedly referred to the victim's size, youth, physical disabilities and the terror that the victim must have felt while being assaulted [Tr. 1008, 1010, 1111, 1014, 1014].  To support this sympathy argument, the prosecutors cited to the gruesome photographs [Tr. 1009, 1013, 1015] that had been improperly admitted.  See Seventh Claim for Relief.

200.    The prosecutors relied upon the theory throughout their closing argument that the defendants were in a sexual frenzy and their frustration with the child was caused by the child rebuffing their sexual advances [Tr. 1021].  Earlier in the trial phase the

deputy coroner said there was no evidence to reach this conclusion [Tr. 796]. There was no evidence in the trial phase to support the state's theory. The state's theory was based upon a number of misstatements of fact:

      a.     The defendants wanted to anally rape the victim [Tr. 1013]. Earlier the state had conceded that the sexual assault, if any, was an oral rape [Tr. 986];

      b.     The defendants dragged the child down the basement steps to sexually assault him [Tr. 1014, 1016]. The evidence indicates that if this was a sexual assault, it occurred on the first floor and the evidence demonstrated that defendant Gumm carried the child down the basement steps [State's Trial Exhibit 113(A), p. 8];

      c.     The defendants placed a piece of twine around the victim's neck to further the assault of the child [Tr. 1015]. The criminalist testified that the piece of twice had no evidentiary value [Tr. 1015];

      d.     One of the defendants held the victim's arms while the other defendant beat the victim [Tr. 1016, 1017, 1018]. There was no evidence of the victim's arm being held;

      e.     Michael hit the victim in the mouth and broke his teeth because the victim would not let Michael put his penis in the victim's mouth [Tr. 1019, 1020]. There was no evidence that Michael hit the victim in the mouth (as opposed to Gumm) and likewise there was no evidence as to any intent Michael had if he did hit the victim in the mouth;

      f.     The victim was standing up and the defendants were trying to orally rape the victim while his was standing upright. This was possible the prosecutor

argued, because the victim was short and his mouth was at the same level as the defendants' genitals [Tr. 1017]. There is simply no evidence of any of these facts.

201.    At one point the prosecutor conceded this fact that there was no evidence to support his argument.

> If you'd like me to guess who was where and who was doing the hitting and who was doing the holding, who was going to get the blow job, I'm not a clairvoyant.

[Tr. 1018].

202.    The prosecutors were limited to arguing facts that are in the record, not speculations based upon clairvoyance.

203.    The prosecutors impermissibly gave the jury their personal opinions about the evidence, that the state had met its burden of proof, that the state's witnesses were credible and that the defendant's statements to the police were ridiculous [Tr. 983, 988, 1025, 1026, 1027].

204.    The prosecutors demeaned defense counsel by telling the jurors that defense counsel's job was to confuse the jury [Tr. 1016, 1022, 1028]. The prosecutor chided defense counsel, "Mr. Dixon would like Michael Bies to walk free from the courtroom." [Tr. 1011].

205.    The prosecutors made critical misstatements of law. They informed the jurors:

    a.    "But don't let the law confuse you because it's really not that difficult." [Tr. 1011];

    b.    "The state doesn't have to prove each and every one of these various elements to the specification, you have to find one or another. And that will

become clear to you when the judge reads his instructions" [Tr. 985]. Neither the prosecutor nor trial judge told the jury that it had to make a unanimous finding as to which particular subsection of the statute applied;

c.    The law of complicity applied to the aggravating circumstances and the term "principal offender" was the same for purposes of complicity and the aggravating specifications [Tr. 985]. That is a misstatement of Ohio law and relieved the State of its burden of proof as to the "principal offender" element of the specification, one of the few elements that Michael was contesting.

**B.    Mitigation Phase**

206.    In the State of Ohio, the factors that a jury may consider in support of the death penalty are very limited and are listed in O.R.C. § 2929.04(A). Those factors to be properly considered by the jury must be included in the indictment and proven beyond a reasonable doubt in the trial phase.

207.    In the State of Ohio, consideration or sympathy for the victim is not a statutory aggravating circumstance. Thus, the jury may not consider sympathy during the sentencing phase of a capital crime.

208.    The prosecutor argued characteristics and considerations of sympathy for the victim which were irrelevant to the jury's sentencing decision:

a.    Two individuals in a city park sitting around drinking beer, and they see a 10 year old boy, 4½ feet tall, 85 pounds. This is the way he looked before he met Michael Bies. That's the way this little boy looked.

And they decide - the little boy has every right to be in the park as you or I or these two individuals - they decide they are going to trick this

little boy and they are going to get, as they say, a blow job from him.

[Tr. 1183];

      b.    Notice who they chose, They didn't choose anybody my size. They chose a small child. Not only a small child, but a child who couldn't possibly run if confronted like this. A child with a cast on his foot. Somebody they can control. They picked the weak, the weak

[Tr. 1082-1084];

      c.    You've seen the pictures. What happens to a little 10 year old 85 pound 4 ½ foot boy with a cast on his foot?

[Tr. 1186].

209.    In the State of Ohio the nature and circumstances of the offense can only be considered as <u>mitigating</u> and not as aggravating. O.R.C. § 2929.04.

210.    The prosecutors improperly encouraged the jurors to consider the nature and circumstances of the offense as an aggravating circumstance [Tr. 1182, 1183, 1185, 1185, 1186, 1187, 1188, 1192]. A few examples of the misleading prosecutorial argument suffices:

      And all the aggravating circumstances in the case, the ones that you've already found beyond a reasonable doubt, are present in this case, and the are the things, the facts and the circumstances that surround the homicide of Aaron Raines. You've already found those beyond a reasonable doubt.

[Tr. 1152];

      They want Aaron Raines to perform oral sex upon them. That in itself, is there anything in our community more aggravating in terms of a circumstance than two people who would plot to kidnap a 10 year old boy so they could receive some type of sexual gratification?

It's very difficult even in law enforcement, to even think of a single crime worse than the act of kidnapping a little boy for the purposes of forcing this 10 year old boy to satisfy them sexually.

[Tr. 1183];

Junior's got his pants down. He's got Aaron's pants down in back. You saw the pictures. He's trying to force anal intercourse on him.

Aggravating? Boy, I'll say. Bies at this point hits him with a board, smacks him with a board. Aggravating?

So Aaron fights for his life, he doesn't want to submit to what they want him to. Aaron is dragged into that dark basement. Aggravating? I'd call that an aggravating factor.

What makes this so aggravated and the circumstance which makes this so overwhelmingly aggravating is what happened in the basement. They tried to force Aaron to satisfy them sexually, force Aaron, they tried to orally rape Aaron.

[Tr. 1185-1186];

He takes a pipe to his head trying to force him to do this. He breaks his jaw. He breaks his teeth. Aggravating? You cannot imagine a more aggravating circumstance than what has happened here.

[Tr. 1186];

"Well, we can take care of this witness. We'll just pick up a cinder block and smash it into Aaron's skull," which is exactly what happened. Aggravating? The scale is busted.

[Tr. 1188];

The aggravation here and the aggravating circumstances boggle the mind, the weight. And you just weigh them and if you determine that the aggravating circumstances outweigh the mitigating factors, you shall -

under your oath, you shall recommend the penalty of death
to Judge Sundermann.

[Tr. 1190].

211.    In the mitigation phase Dr. Winter testified that Michael, because of the horrendous environment in which he was raised could not feel remorse or sympathy.  The prosecutor improperly converted this into a non-statutory aggravating circumstance [Tr. 1174, 1176, 1187].

212.    The prosecutor told the jurors they need not give weight or effect to mitigating evidence presented under O.R.C. § 2929.04(B)(3) because Michael "knew right from wrong" [Tr. 1153, 1183, 1186].   Whether Michael knew right from wrong is the test for insanity test which was to be applied in the guilt phase of a capital proceeding, not in the penalty phase which incorporates diminished capacity as a mitigating factor.  It is prejudicial error for the prosecutor to convert the mitigating factor of diminished capacity into a test for insanity.

213.    The prosecutor attacked Michael for not testifying in the trial phase [Tr. 1171, 1182] and for making an unsworn statement in the mitigation phase [Tr. 1171, 1173-74].  Michael in deciding not to testify in the trial phase and making an unsworn statement in mitigation was exercising his constitutional rights.   A prosecutor and sentencer cannot penalize a defendant for properly exercising his statutory constitutional rights.

214.    The prosecutor invited the jury to speculate that Michael's mother did not testify because she would have testified negatively concerning him [Tr. 1175].  There was no evidence in the record to support any conclusion concerning the reason his mother failed to appear to testify or to what she would have testified if she did appear.

215.    The prosecutor improperly engaged in name calling by labeling Michael an "incredible consummate liar", "liar", a "parent's worst nightmare" and a "monster" [Tr. 1170, 1175, 1181].

216.    The prosecutor made factual statements not supported by the record. He claimed that the twine and the victim's neck was related to Michael's assault of the victim [Tr. 1179]. The criminalist testified that the twine had no evidentiary value [Tr. 709]. The prosecutor stated that Michael offered the victim ten dollars to lure him into the building [Tr. 1184]. Gumm was the individual who offered the victim ten dollars to collect scrap metal with him ("scrapping"). The prosecutor argued that Michael in his life had numerous opportunities to receive help and treatment and did not respond successfully and could not be successfully treated in the future [Tr. 1153, 1154]. There was no evidence to support either of these assertions. From these inaccurate factual assertions, the prosecutor argued that Michael would be dangerous in the future, an improper non-statutory aggravating circumstance [Tr. 1188].

217.    The prosecutor improperly denigrated the mitigation offered by Michael. The prosecutor referred to the penalty phase as "the so-called mitigation phase" [Tr. 1152] and told the jury that there was no mitigating evidence in the present case [Tr. 1190]. He told the jury that all defense counsel was attempting to do was to invoke sympathy from the jury [Tr. 1171, 1176]. The prosecutor told the jury that it should ignore the defendant's horrendous childhood because the jurors were not responsible for it:

> We are not responsible for Michael Bies' past history. We were not there when he was 3 years old. We had nothing to do with it. I didn't. You didn't. NO one in this courtroom did.

> And that's not the reason that we're here. We can't go back in time and change anything that has happened to him over the years. We have to deal with what we have now here in 1992.

[Tr. 1153].

218. The prosecutor informed the jury that a life sentence with no parole eligibility for thirty years could be shortened by the governor granting commutation and that the governor had in fact shortened a criminal sentence in the past in a Cincinnati case:

> Mr. Deardorff said, oh, he's going to be an old man when he gets out. Mr. Deardorff has no idea when he'll get out. Have you ever heard of a governor's pardon, a governor's commutation of sentences?
> Who would have thought - you all are from Cincinnati. Who would have thought the Cincinnati strangler, Posteal Laskey, convicted in he mid sixties, would have been up for parole for the last 7 years? Who would have thought that?

[Tr. 1189].

219. Finally the prosecutors took great pain to make it appear that the law forced or required the jury to return a death verdict. The prosecutor told the jury that the judge would review any death recommendation to determine if it was proper [Tr. 1153, 1190]. The prosecutor emphasized that under certain circumstances a death recommendation was the only proper verdict [Tr. 1151, 1153, 1182, 1190]. The prosecutor did not tell the jury that a life sentence was also the only proper verdict under certain circumstances. Finally the prosecutor confused the concepts of "beyond a reasonable doubt" and a "preponderance of the evidence" with respect to the mitigation deliberations [Tr. 1152] and then reversed the balancing process [id.].

220.    The prosecutor's misstatements of the law and unnecessary inflammatory comments during the penalty phase closing argument deprived Michael of his constitutional rights to a fair trial as guaranteed by the Fourteenth Amendment.

**NINTH CLAIM FOR RELIEF: MICHAEL BIES' DEATH SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL COURT RELIED UPON A DEATH RECOMMENDATION OF THE VICTIM'S MOTHER IN SENTENCING HIM TO DEATH. United States Constitution, Eighth and Fourteenth Amendments.**

221.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

222.    Clearly established federal constitutional law at the time of Michael's trial precludes a sentencer from considering inflammatory evidence when imposing sentence in a capital case. That clearly established law precludes the sentencer from including the death recommendation of the decedent's family.

223.    After the jury returned its death recommendation the trial court <u>sua sponte</u> ordered a pre-sentence investigation [Tr. 1212].

224.    As part of the pre-sentence investigation Nancy Rankin of the Hamilton County Adult Probation Department prepared a Victim Impact Statement. The statement included a sentencing recommendation from the mother of the victim in which she told the trial court that it should impose a sentence of death:

> Mrs. Raines states the defendant and his associate forced Aaron into the abandoned building where he was murdered. She relates with Aaron's disability he had no way to defend himself or to resist the two offenders. Mrs. Raines states in her opinion the defendant should receive the maximum possible penalty. She states he showed no mercy toward her son and as a result should be given no mercy by the Court.

[Victim Impact Statement, p. 3].

225.    Neither the Adult Probation Department nor the trial court advised trial counsel of the existence of the Victim Impact Statement. The cover page of the statement is stamped "**NOT FOR DEFENDANT'S VIEW**".

226.   The trial court acknowledged that it considered the Victim Impact Statement when determining the appropriate sentence:

> Under Section 2929.03, the Court has the duty and has in fact reviewed a number of things from the trial; the evidence and the testimony, the exhibits, the various psychiatric reports that were submitted on the defendant, and matters that were submitted during the mitigation phase, including the statement of the defendant, and I've had a chance to review the pre-sentence report, the <u>victim impact statement</u>, and then; this morning the arguments of counsel.

[Tr. 1220-21] [Emphasis added].

227.   The trial court's consideration of the death recommendation of the victim's mother violated the Eighth Amendment. Michael suffered substantial and injurious harm as a result of the improper consideration because the recommendation from the victim's mother unfairly tilts the weight process in Michael's case in favor of death.

**TENTH CLAIM FOR RELIEF:** **MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM DUE TO OF THE NUMEROUS ERRORS IN THE STATE COURT'S INSTRUCTION TO THE JURY DURING THE TRIAL PHASE. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

228.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

229.    The jury commenced its trial phase deliberations at 11:33 a.m. on October 13, 1992 [Tr. 1060]. The jury did not return its verdict until 11:00 a.m. the following day. [Tr. 1064]. This was a factually close case in which a flaw in the state trial court's instructions would have likely affected the jury's verdicts.

230.    During the trial phase of Michael's case, the court gave six instructions which misstated the law or would have been understood by a reasonable juror to allow a finding of guilt in an unconstitutional manner. The errors in the instructions went straight to the core of the State's case, the first Count of the indictment which contained the only charge of Aggravated Murder and only capital specifications. The errors that will be identified herein directly impacted upon the jury's finding that Michael was death eligible. Each of the errors violate clearly established law at the time of Michael's trial.

**A.    The trial court improperly instructed the jury as to the definition of "Reasonable Doubt".**

231.    At the trial phase, the court provided the jury with the following definition of reasonable doubt:

> Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge.

> Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating

to human affairs or depending on moral evidence is open to some possible
or imaginary doubt.

Proof beyond a reasonable doubt is proof of such character that an
ordinary person would be willing to rely and act upon it in the most
important of his own affairs.

[Tr. 103..]

232.    This language does not adequately convey to jurors the reasonable doubt

standard.  The "firmly convinced" language defines reasonable doubt in terms essentially

equivalent to the definition of clear and convincing evidence.

233.    Further, the "willing to act" language of the last sentence represents a

standard of proof below that required by the Due Process Clause.

234.    The reasonable doubt instruction permitted the jury to convict Michael

based on a lesser quantum of evidence than the Constitution requires.  This structural

error is <u>per se</u> prejudicial and no showing of specific prejudice is required.  In the

alternative, the Warden cannot demonstrate by proof beyond a reasonable doubt this

constitutional error is harmless and the error necessarily caused Michael substantial and

unfair prejudice.

**B.    The trial court made two errors when it instructed the jury as to the offense
of Aggravated Murder.**

235.    For a trial court to impose a death sentence in the State of Ohio the trier of

fact must initially find the defendant guilty of Aggravated Murder.  O.R.C. § 2929.03(B).

In the State of Ohio there are two types of Aggravated Murder, Murder committed with

prior calculation and design (O.R.C. § 2903.01(A)) and Felony Murder (O.R.C. §

2903.01(B)).    In the present case the Hamilton County Grand Jury indicated Mr. Bies

only for felony murder.  The trial court's instruction as to felony murder contained two

errors which rendered constitutionally infirm Mr. Bies' conviction for Aggravated Murder.

a.     In the State of Ohio, purpose is an essential element of Felony Murder.  O.R.C. § 2903.01(B).   In the State of Ohio "causation" is also an essential element of Felony Murder.  O.R.C. § 2903.01(B).  A person acts purposefully only when he has the specific intent to cause a given result.  O.R.C. § 2901.22(A).  The state trial court told the jury that it did not matter whether Mr. Bies intended to cause the death of the victim, but whether "a reasonably prudent person would have anticipated that death was likely to anyone for the performance of act or acts.  [Tr. 1038.]  This definition eliminated the need for the state to prove the element of purpose.  Once the state creates an element of a criminal statute, the federal constitution requires that the prosecutor prove each element by proof beyond a reasonable doubt.

b.     In the State of Ohio, if the indictment charges felony murder, the defendant is entitled to a unanimity instruction when the indictment charges two or more underlying felonies.  If the jury is not provided with such an instruction the jury could convict the defendant on less than a unanimous verdict.  Some of the jurors could believe that the defendant committed one of the underlying felonies while other jurors believed that the defendant committed a different underlying felony.  In the present case the state trial court charged the jury as the existence of two possible underlying felonies, attempted rape and kidnapping.  [Tr. 1034.]  The jury was never instructed that it had to be unanimous as to which felony Michael committed to convict him of Aggravated Murder.

**C.**     **The state trial committed three errors when it instructed the jury as to the aggravating circumstances.**

236.     For a trial court to impose a death sentence the trier of fact must also find in the trial phase by proof beyond a reasonable doubt that the accused is guilty of one or more specifications included in O.R.C. § 2929.04(A).  The indictment in the present case contained three capital specifications:  Specification 1, alleged that Michael committed the murder to escape detection of another felony (O.R.C. § 2929.04(A)(3); Specification 2, alleged that Michael committed the aggravated murder during the course of an attempted rape (O.R.C. § 2929.04(A)(7); and Specification 3, alleged that Michael committed the aggravated murder during the course of a kidnapping (O.R.C. § 2929.04(A)(7).

237.     To be found guilty of the felony murder specification in the Second and Third Capital Specifications in the indictment, the jury had to find that Michael was the principal offender in the commission of the Aggravated Murder or he committed the aggravated murder with prior calculation and design.  The trial court charged the jury in the alternative [Tr. 1040].  However the trial court did not give the jury unanimity instruction to insure that all twelve jurors were in agreement as to which alternate felony applied.  Without the instruction it is reasonable to conclude that Michael was convicted by a less than unanimous jury as to the Second and Third Capital Specifications.  Some jurors would have believed one alternative (principal offender) was proven and other jurors believed that the other alternative (prior calculation and design) was proven.

238.     The Second and Third Capital Specifications contained the same element except for the underlying felony. The first specification however contained different elements.  The "Purpose to avoid detection, apprehension, trial and punishment" is an

essential element of the First Capital Specification. The trial court grouped together the (A)(7) and (A)(3) specifications and instructed the jury only as to the elements contained in the (A)(7) Capital Specifications and not the "purpose to avoid" element contained in the first specification [Tr. 1040-1041]. Thus there was never a jury finding as to all of the elements of the First Capital Specification.

239.    The element "principal offender" is an essential element of the (A)(7) capital specification, unless the jury finds that the aggravated murder was committed with prior calculation and design. The prosecutor concluded he had not proven prior calculation and design and thus the "principal offender" element was critical. In the State of Ohio to be the "principal offender" the state must prove by proof beyond a reasonable doubt that the accused was the individual who actually delivers the fatal blow. In the State of Ohio there is a complicity statute which extends criminal liability to individuals who do not commit a criminal act, but assist individuals in committing is a criminal act. O.R.C. § 2923.03. The complicity standard also employs the term "principal offender" but the definition of "principal offender" is drastically different. The Ohio Supreme Court has repeatedly held that the two statutory definitions are separate and distinct and the complicity definition is never to be used in a capital cases. The trial court gave a complicity instruction in the present case over the objection of defense counsel [Tr. 977-978]. The trial court impermissibly gave the definition of principal offender contained in the complicity statute [Tr. 1041]. Consequently there has never been a jury finding as to the Second and Third Capital Specification with regards to the essential element of "principal offender."

**ELEVENTH CLAIM FOR RELIEF: MICHAEL BIES' DEATH SENTENCE IS CONSTITUTIONALLY INFIRM DUE TO THE NUMEROUS ERRORS IN THE TRIAL COURT'S SENTENCING CHARGE. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

240.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this Claim.

241.    The jury deliberated for more than one day in the penalty phase [Tr. 1205, 1210]. The jury commenced its deliberation at 12:45 p.m. on October 15, 1992 and did not return a sentencing verdict until 2:40 p.m. the following day [Id.]. Thus the evidence did not overwhelmingly support a death verdict. Consequently instructional errors were more likely to impact upon the jury's verdict.

242.    It was clearly established law at the time of Michael's trial that for a jury instruction to be constitutionally proper in the penalty phase of a capital case, the instruction must limit the jury's consideration to the proper statutory aggravating circumstances and permit the jury to freely consider all evidence that the defendant puts forward in favor of a sentence of less than death.

243.    In addition, it was clearly established federal law the instructions must adequately and intelligently convey to the jury the procedure that the jury should follow in reaching its sentencing decision.

244.    During Michael's sentencing hearing, the state trial court gave jury instructions which misstated the law or would have been understood by a reasonable juror to allow the imposition of a death sentence in an unconstitutional manner.

**A.    The state trial court improperly commented on Michael's unsworn statement**

245.    O.R.C. § 2929.03 grants the accused in the mitigation phase of a capital case in the State of Ohio the right to make an unsworn statement.

246.    In the present case Michael chose to exercise that right [Tr. 1078]. Michael because of his mental retardation [Tr. 1103], brain damage [Tr. 1102] and learning disorders [Tr. 1136] would not be able to effectively testify. Michael, because of his severe mental limitations could not even read a two paragraph statement to the jury [Tr. 1086, Defendant's Mitigation Exhibit  2].  Dr. Winter, the court's expert affirmed that he would not be able to meaningfully communicate with the jury, because of his limitations [Tr. 1110].

247.    Prior to Michael making his unsworn statement the state trial court gave the following admonition to the jury:

> Ladies and gentlemen, I think I should tell you that the defense has two options here.
>
> Mr. Bies, have a seat here, please.
>
> Mr. Bies may make what he's going to make to you right now, which is an unsworn statement.  We're not going to swear him in.
>
> If he chooses to make an unsworn statement, then he is not cross-examined, he is not available to be cross-examined.
>
> If he wanted to make a sworn statement, then he would be cross-examined. His option is to make an unsworn statement.

[Tr. 1078-79].

248.    At the conclusion of Michael's unsworn statement, the trial judge again cautioned the jury concerning Michael's unsworn statement:  "All right.  Mr. Bies, you can step down.  I'll just remind you, since he's done an unsworn statement there is not cross-examination"  [Tr. 1090-91].

249.    In closing argument in the penalty phase the prosecutor harped on the fact that Michael was a "liar" and his testimony was unreliable. The prosecutor cited to the fact that Michael's penalty phase statement was unsworn:

> But the most effective method is making people subject to cross-examination so that their statement could withstand scrutiny by the other side.
>
> How curious that Bies decides his story can't stand any scrutiny at all. "Don't ask me any questions. Don't ask me any questions. Don't make me explain why I've done this."
>
> The reason he took the unsworn statement route, don't be confused, was because it would not withstand the test of credibility. It wouldn't withstand it.

[Tr. 1173].

250.    These admonishments by the court and prosecutor penalized Michael for exercising his statutory right to make an unsworn statement and constitutional right to allocution.

251.    Michael suffered substantial and injurious harm as a result of these inappropriate remarks. The jury was in effect told by the state trial judge and prosecutor to ignore Michael's statement because it was unsworn.

**B.    The state trial court improperly defined the term reasonable doubt.**

252.    The trial court instructed the jury:

> Remember that reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say that you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt.

>    Proof beyond a reasonable doubt is proof of such a
>    character that an ordinary person would be willing to rely
>    and act upon it in the most important of his or her own
>    affairs.

[Tr. 1193-1194].

253.    The state trial court erred when it provided the jury with this instruction. In the sentencing phase of a capital case the jury is to decide the appropriate sentence, not decide the defendant's guilt.  Decisions as to the defendant's guilt are to be made in the trial phase.  By instructing the jury that it was to apply a "firmly convinced of the truth of the charge" the trial court instructed the jury to make the same finding that it did in the trial phase [Tr. 1031].  Since the jury had already made the decision finding adversely to Michael in the trial phase, the instruction mandated a death verdict in the sentencing phase.

254.    Even ignoring that the state trial court told the jury to apply the wrong test, the language does not adequately convey to jurors the reasonable doubt standard.  The "firmly convinced" language defines reasonable doubt in terms essentially equivalent to the definition of clear and convincing evidence.

255.    Furthermore, the "willing to act" language of the last sentence represents a standard of proof below that required by the Due Process Clause.

256.    This reasonable doubt instruction permitted the jury to sentence Michael based on a lesser question of evidence than the constitution required.  This structural error is per se prejudicial and no showing of specific prejudice is required.  In the alternative, the Warden cannot demonstrate by proof beyond a reasonable doubt this constitutional error is harmless.  This error necessarily caused Michael substantial and injurious prejudice.

**C.    The state trial court improperly instructed the jury as to the ultimate burden of proof.**

257.    In the State of Ohio, the prosecutor has the ultimate burden of persuasion by proof beyond a  reasonable doubt to demonstrate that the aggravating circumstances proven in the trial phase outweighed the cumulative weight of all of the mitigating factors.  O.R.C. § 2929.03(D)(2)(A). If the prosecutor does not meet its burden then the jury is required to return a life verdict.  Id.   The defendant has no burden with respect to the ultimate life or death decision.

258.    The state trial court repeatedly failed in its instruction to inform the jury that the prosecutor's burden was by proof beyond a reasonable doubt  [Tr. 1194, 1198, 1201].

**D.    The trial court erred when it failed to merge the escaping detection aggravating circumstance.**

259.    The Hamilton County Grand Jury indicted Michael for one count of Aggravated Murder (Count 1 of the indictment).   Count 1 contained three capital specifications:  that the aggravated murder was committed to escape detection for the commission of attempted rape and kidnapping (Specification 1, O.R.C. § 2929.04(A)(3); that the aggravated murder was committed during the course of an attempted rape (Specification 2, O.R.C. § 2929.04(A)(7); and the aggravated murder was committed during the course of a kidnapping (Specification 3, O.R.C. § 2929.04(A)(7).

260.    The trial court should have merged the escaping detection specification into both of the other specifications.

261.    Michael suffered substantial and injurious prejudice because the duplicate specification impermissible inflated the number of aggravating circumstances, thereby improperly tilting the weighing process in favor of death.

**E.    The trial court erred when it instructed the jury that it could only consider a life sentence after it had unanimously rejected a death sentence.**

262.    The trial court incorrectly instructed the jury that any sentencing verdict had to be unanimous [Tr. 1201] and that the jury could not consider a life sentence until it had unanimously rejected a death sentence [Tr. 1202-03].

263.    A death sentence can only be reliable if the trier of fact has been correctly charged as to the sentencing law and procedure for considering the imposition of the death penalty.

264.    The trial court's instruction that a life verdict must be unanimous was in error.  The jurors should have been instructed that a life verdict was required if they were unable to agree as to the appropriate sentence.  Unanimity is not required for a life verdict.  In addition, the jury should have been instructed that it could consider a life sentence at any time and that it need not first unanimously reject a death sentence.  Michael suffered substantial and injurious harm because it made it impermissibly difficult for the jury to even consider a life verdict and incorrectly stated Ohio law.

**F.    The trial court failed to improperly inform the jury as to the burden of proof as to mitigating factors.**

265.    The trial court failed to inform the jurors that they were to individually decide whether Michael had adduced sufficient evidence to prove a mitigating factor.  The jury was told that all of its decisions had to be unanimous [Tr. 1201].    The jury would have concluded from this instruction that it not only had to be unanimous as to its

sentencing verdicts, but also as to whether Michael had proven the existence of a mitigating factor.

266.    Jury instruction and verdict forms which could lead a reasonable juror to believe that he could only consider those mitigating circumstances which were unanimously found to exist violates the Eighth Amendment.    Such an instruction precludes the jury from giving proper consideration to the mitigating evidence.

267.    The sentencing jury's failure to consider relevant mitigating evidence is prejudicial per se, and no specific showing of prejudice is required.    This error is necessarily substantially injurious to Michael's constitutional right to a fundamentally fair sentencing hearing.    The sentencing jury as a result of this instruction did not consider all of the mitigating evidence before it.

**G.    The trial court erred when it instructed the jury on all of the statutory mitigating factors.**

268.    During the mitigation phase, defense counsel introduced four mitigating factors:  1) the youth of Michael; 2) his diminished capacity; 3) his history, background, and character; and 4) the catch all provision, any other factors which mitigate against the imposition of the death penalty.

269.    The trial court charged the jury on all of the statutory mitigating factors listed in O.R.C. § 2929.04 including those mitigating factors not raised by Michael  [Tr. 1199-1201].

270.    By charging the jury as to the mitigating factors not adduced by Michael, the trial court improperly converted mitigating factors into aggravating circumstances. This manner of review was condemned by the Ohio Supreme Court in Ohio v. DePew, 528 N.E.2d 542, 558 (1988).

271.    Additionally, by instructing on all the mitigating factors, the trial court changed the focus of the mitigation hearing from a qualitative analysis of the evidence to a quantitative analysis.  In the present case, the jury was required to conclude that the crime was only 50% mitigated, because only four of the eight mitigating factors were raised by the defendant.

272.    Jurors in capital cases often transform the lack of mitigation into aggravating circumstances.

273.    Michael suffered substantial injurious harm by the providing of this instruction.  It reduced the impact of the mitigation that he did present and created another aggravating circumstance, the lack of proof of all mitigating factors. Accordingly the instruction unfairly tilted the sentencing process weighing calculus in favor of death.

**H.    The trial court erred when it instructed the jury as to the (B)(7) mitigating factor.**

274.    The trial court erred by incorrectly defining the "Catch-all" mitigating factor contained in O.R.C. § 2929.04(B)(7) as "any other factors that are relevant to the issue of whether the offender should be sentenced to death"  [Tr. 1200-1201].

275.    The instruction allowed the jury to consider non-statutory aggravating factors or anything that it deemed relevant for purposes of sentencing, including Michael's future dangerousness, lifestyle, or criminal record.

276.    O.R.C. § 2929.04(A) limits the factors that a trier of fact may consider that support the imposition of the death penalty.  Consideration of non-statutory aggravating factors (factors not listed in O.R.C. § 23929.04) violates the Eighth and Fourteenth

Amendments.  Michael suffered substantial and injurious prejudice because the jury was permitted to consider non-statutory aggravating circumstances.

277.    The court should have instructed the jury that it could consider "any other factor that mitigates against the imposition of the death penalty or in favor of imposing a life sentence."

**I.    The trial court erred when it permitted the jury to determine what evidence it could consider in the mitigation phase.**

278.    The trial court instructed the jury that it should consider all of the evidence from the trial phase which you deem to be relevant [Tr. 1193].  This instruction failed to guide the jury's discretion.  The state trial court later repeated this instruction:

> Now what is evidence in this proceeding?  It is all the <u>relevant</u> testimony you heard in the first trial, and all the relevant exhibits admitted into evidence in the first trial, that you had the opportunity to examine, and which you will again have the opportunity to examine while you deliberate.  (Emphasis added).

[Tr. 1196].

279.    It is the trial court's responsibility to determine the admissibility of evidence.  While juries indeed may be capable of understanding the issues posed in capital sentencing proceedings, they must first be properly instructed.

280.    Mr. Bies suffered substantial and injurious harm, it is unclear what evidence upon which the jury relied in reaching its sentencing verdict.  The jury may well have employed some of the evidence in the trial phase as non-statutory aggravating circumstances which improperly supported sentences of death.

**J.    Trial court erred when it instructed the jury that a death verdict was only a recommendation.**

281.    The trial court repeatedly informed the jury that the death penalty was only a recommendation and that the trial court would make the final decision [Tr. 1192, 1192, 1194, 1194, 1201-1203].

282.    The trial court contrasted a death recommendation with a life recommendation which was binding upon the trial court [Tr. 1203].

283.    A jury instruction in a capital case may not lessen the jury's sentencing responsibility for a death sentence.  If jurors are misled in a manner that lessens their sentencing duty, the Eighth Amendment is violated.

284.    An instruction which lessens the jurors' sense of responsibility contravenes the Eighth Amendment's command of reliability unless the reviewing court can say that the communications had no effect on the sentencing decision.

285.    The trial court's instruction in the present case that it was not bound by a death recommendation, but bound by a life recommendation, impermissibly diluted the jury's sense of responsibility for the death sentence that it returned.  The instructions substantially and injuriously affected the sentencing phase deliberations to the prejudice of Michael.

**K.    The trial court erred when it instructed the jury that a death penalty in some circumstances was mandatory.**

286.    The trial court erred when it informed the jury that it <u>must</u> recommend the death penalty if the jury determined that the aggravating circumstances outweighed the mitigating factors by proof beyond a reasonable doubt [Tr. 1202].

287.    The terms "aggravating" and "mitigating" occur only very rarely in the English language and therefore individual jurors are unlikely to comprehend what the words mean.  See Post-conviction Petition, Exhibit K, Geis affidavit; Exhibit L. Tiersma article.

288.    The word "aggravate" connotes an interpretation of annoyance, irritation or bother. This interpretation is reinforced by the arguments of the prosecutor in this case.

a.    The prosecutor told the jury that it could not recommend a less severe penalty than death in order to avoid an unpleasant task [Tr. 1150].

b.    The prosecutor told the jury that Michael Bies, a mentally retarded person, had been given enough changes in his life and could not be rehabilitated [Tr. 1154].

c.    The prosecutor told the jury that even Michael's mother would have been unable to say anything pleasant about him [Tr. 1176].

289.    A juror in a capital case interprets such an instruction to require that a death verdict be returned regardless of the evidence introduced in the mitigation phase by the defendant.  Thus, a death sentence was logically and conclusively required by the instruction, and therefore the jury was prevented from determining whether or not death was the appropriate punishment.  This instruction created a conclusive presumption in favor of death and had the effect of making the death sentence mandatory in violation of the Constitution. Michael suffered substantial and injurious prejudice as a result of this instruction.

**L.    The trial court failed to properly define the term "Outweigh".**

290.    The trial court instructed the jury as follows:  "To outweigh means to weigh more than, to be more important than"  [Tr. 1193].

291.    In the State of Ohio, a jury may not return a death verdict unless it determines that the aggravating circumstances <u>outweigh</u> the mitigating factors by proof beyond a reasonable doubt.  O.R.C. § 2929.03.

292.    This instruction provided the jury with no guidance on how to compare the facts supporting aggravating circumstances with the facts supporting the mitigating factors.

293.    Because of the trial court's failure to meaningfully define the term "outweigh", the prosecution needed only show that the life of the victims was "more important" than background factors in Michael's life such as his mental retardation and brain damage.  Applying this definition of "outweigh" unfavorably tilted the sentencing process in favor of death verdicts.  This definition required Michael to demonstrate that his mitigating evidence was more significant than the decedents' lives.

294.    The trial court's failure to instruct the jury as to the definition of the term "outweigh" caused Michael substantial and injurious prejudice.

**TWELFTH CLAIM FOR RELIEF**:  MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE HE WAS NOT AFFORDED THE REASONABLE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS DIRECT APPEAL OF RIGHT OT THE HAMILTON COUNTY COURT OF APPEALS. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.

295.    It was clearly established law at the time of Michael's direct appeal of right to the Hamilton County Court of Appeals that he was entitled to effective assistance of counsel.

296.    Appellate counsel on Mr. Bies' direct appeal of right to the Hamilton County Court of Appeals failed to provide that reasonable effective assistance of counsel to Michael.

297.    Lead counsel for Michael's direct appeal to the Hamilton County Court of Appeals was Timothy Deardorff, who had also represented Mr. Bies during the trial of his capital case.

298.    It was Attorney Deardorff's first capital trial [Tr. 1075].  Attorney Deardorff solicited the appointment to represent Michael on direct appeal [Tr. 1223].  At the time of Mr. Deardorff's appointment as direct appeal counsel, he had never represented on appeal a defendant sentenced to death.  He had represented only one defendant in a criminal case on direct appeal.  Ohio v. McAndrews, No. C-840027, 1984 WL 6991 (Ham. App. Oct. 3, 1984).  This was a misdemeanor case.[4]

299.    Attorney Deardorff also successfully urged the trial court to appoint his law partner, Lorena S. Haas to serve as co-counsel on Michael's direct appeal [Tr. 1223]. At the time of her appointment she had served as counsel of record on only two appeals, neither of which was a criminal case.  Levy v. University of Cincinnati, No. C-830860,

---

[4] Attorney Deardorff had, as an assistant prosecutor, served as counsel for the State of Ohio ten years earlier on several direct appeals.

1984 WL 6973, (Ham. App. Sept. 26, 1984) and <u>Clayton v. Conrago Cadillac</u>, No. C-880625, 1989 WL 104335 (Ham. App. Sept. 13, 1989).

300.    As previously detailed herein, Attorney Deardorff was subsequently suspended from the practice of law.  Attorney Haas was also suspended from the practice because she had informed a client that the client could perjure herself if she received immunity ("tell them Santa Claus was there * * * you can lie through your teeth.") <u>Cincinnati Bar Association v. Haas</u>, 702 N.E.2d 59, 61 (1998).  She was convicted of obstruction of justice for encouraging the witness to lie.[5]

301.    The right to counsel includes the right to conflict free counsel.

a.    Attorney Deardorff labored under conflict of interest in his representation of Michael on his appeal of right to the Hamilton County Court of Appeals.  Attorney Deardorff had served as Michael's trial counsel and therefore was legally and ethically precluded from raising his own ineffectiveness.  This preclusion extended to any substantive issues that were not properly preserved by timely objection in the trial court.  For Attorney Deardorff to raise an issue that was not properly preserved for appellate review would have required Attorney Deardorff to raise his own ineffectiveness for not properly objecting.

b.    This conflict was imputed to co-counsel Lorena Haas.  A conflict from which attorney suffers on direct appeal is imputed to co-counsel.  This is especially true since both two appellate attorneys were law partners.

302.    Appellate counsel unreasonably failed to secure a complete record for appeal by failing to obtain settled statements of unreported bench conferences and

_____
[5] Attorney Herbert J. Haas, the law partner of the two appellate attorneys who represented Mr. Bies was also subsequently suspended from the practice of law for an unrelated incident.  <u>Cincinnati Bar Association v. Haas</u>, 699 N.E.2d 919 (1998).

conference in chambers at which argument was presented on objections and rulings on objections were made by the court [Tr. 139, 611, 750, 826, 906, 977, 1191, 1206]. In addition, appellate counsel failed to have the pretrial certification hearing made part of the record.

303.    Appellate counsel did not visit with Michael during the course of his direct appeal to the Hamilton County Court of Appeals.

304.    Appellate counsel did not raise Michael's competency for the time period during which his case was on direct appeal to the Hamilton County Court of Appeals.

a.    At the time of trial, Michael suffered from 1) mental retardation; 2) brain damage; and 3) learning behavior disorder. Since the conclusion of his trial he has not received any treatment or counseling which would overcome any of these mental limitations and defects. Consequently during the course of the state court review processes, Michael suffered from 1) mental retardation; 2) brain damage; and 3) learning behavior disorders.

b.    As a result of these three mental limitations and defects he was not able to participate in his trial. He drew pictures [Tr. 1084, Defendant's Mitigation Exhibit 2.], could not read a two paragraph statement to the jury [Tr. 1088, Defendant's Mitigation Exhibit 2] and did not have the most basic understanding of his trial [Tr. 1118].

c.    The direct appeal process demanded a more sophisticated knowledge of the law and ability to think logically concerning abstract terms. For instance, at trial testimony focuses upon who did what and when. During the direct

appeal, the legal pleadings focuses upon procedural default, standards of review and technical case law.

       d     At trial the defendant needs only to listen to the testimony.  Upon appeal the defendant must read lengthy transcripts and briefs to understand the process and assist counsel.

       e.     Michael's lack of competence during the direct appeal process the Hamilton County Court of Appeals is prejudicial <u>per se</u> and no showing of specific prejudice is required.  The error is substantially injurious to Michael's constitutional rights to a meaningful and fair state court review process.

305.    A single error or omission by appellate counsel can be sufficiently egregious and prejudicial to violate a defendant's right to the effective assistance of counsel.  Appellate counsel has a duty to read the trial transcripts and keep abreast of developments in the law during the pendency of the appeal.

306.    Counsel has a duty to raise constitutional issues that state courts may not find compelling, but would be deemed meritorious by federal courts in habeas review.

307.    Appellate counsel filed a fifty-four page merit brief upon behalf of Michael.  At the time of Michael's appeal to the Hamilton County Court of Appeals, appellate briefs were routinely one hundred pages in length.

308.    Appellate counsel raised only twelve assignments of error.  Appellate counsel raised no instructional errors other than the recommendation issue (Assignments of Error II and III).  Three of the twelve issues involved a weight of the evidence analysis (Assignments of Error Nos. V, VI and VII).  Appellate counsel raised several issues that were well settled in both the state and federal courts (Assignments of Error II, III, X and

XI).  The small number of issues raised by the appellate counsel in the Hamilton County Court of Appeals is to be contrasted with the same counsel who raised twenty-four issues in Michael's appeal of right to the Ohio Supreme Court.  The issues raised before the Hamilton County Court of Appeals and the Ohio Supreme Court should be almost identical.  The Ohio Supreme Court has a rule that it sporadically applies that it will not address issues not previously raised in the courts of appeals.

309.    Appellate counsel received a sixty day extension to file the merit brief. When the merit brief was filed, the court sua sponte struck it as not being in compliance with the local rules.

310.    At the time of Michael's direct appeal to the Hamilton County Court of Appeals, the Hamilton County Court of Appeals had in effect a fee schedule that severely limited the fees of both counsel. The hourly rate of thirty dollars per hour did not reimburse appointed counsel for the hourly overhead, let alone any profit or actual compensation.

311.    Appellate counsel had a duty to the extent they were not precluded by an ethical conflict to raise the issues contained in this Habeas Petition which were not raised on direct appeal and this Court determines that are procedurally defaulted because they was not raised on direct appeal.  Petitioner incorporates the allegations of those claims to the extent the Court determines that these were claims not raised on direct appeal and could have been fully and fairly raised on direct appeal.

312.    The performance of appellate counsel in not raising these issues constituted deficient performance as defined by the prevailing standards of practice

during the time period of Michael's direct appeal to the Hamilton County Court of Appeals.

313.    Appellate counsel did not have any tactical or strategic reasons within the range of reasonable competence for failing to assert these available constitutional claims or to otherwise perform reasonably in perfecting the record on appeal.

314.    The failure of appellate counsel to render effective assistance was prejudicial in that it is reasonably probable that a more favorable result would have been obtained on appeal if counsel had performed effectively.

**THIRTEENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE HE WAS NOT AFFORDED THE REASONABLE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS DIRECT APPEAL OF RIGHT TO THE OHIO SUPREME COURT. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

315.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this Claim. At the time of Michael Bies' direct appeal of right to the Ohio Supreme Court it was clearly established law that he was entitled to effective assistance of counsel on his direct appeal of right.

316.    At the time of Michael's direct appeal, the State of Ohio provided individuals sentenced to death, two direct appeals of right, to the relevant court of appeals and to the Ohio Supreme Court. Therefore Michael was entitled to the effective assistance of counsel on his direct appeal of right to the Ohio Supreme Court.

317.    Attorneys Timothy Deardorff and Lorene S. Haas also represented Michael in his direct appeal to the Ohio Supreme Court. Both attorneys represented Michael in his direct appeal to the Hamilton County Court of Appeals and Attorney Deardorff had represented Michael at trial.

318.    The two attorneys labored under the same conflict that they had in the Hamilton County Court of Appeals because Attorney Deardorff had represented Michael at trial.

319.    The two appellate attorneys also labored under a second conflict. Because both attorneys had represented Michael on direct appeal in the Hamilton County Court of Appeals, they could not raise their own appellate ineffectiveness as cause for raising issues in the Ohio Supreme Court that were not raised in the Hamilton County Court of Appeals.

320.    The procedure in effect at the time Michael appealed to the Ohio Supreme Court, required counsel, in a case involving an appeal of right, to initially file the notice of appeal with the relevant court of appeal within thirty days of its judgment and then to file the same notice of appeal with the Ohio Supreme Court within thirty days of the notice of appeal having been filed with the court of appeals.[6]

321.    Appellate counsel in the present case failed to comply with the applicable rule and the appeal was not timely perfected.  On March 30, 1994, the Hamilton County Court of Appeals issued its opinion. Ohio v. Bies, No. C-920841, 1994 WL (Ham. App. March 30, 1994).  On April 22, 1994, Appellate counsel timely filed the Notice of Appeal with the Hamilton County Court of Appeals.  However counsel did not file the second notice until July 20, 1994, fifty-nine days out-of-rule.[7]    Appellate counsel took approximately four months of continuances to file Michael's merit brief.

322.    Appellate counsel failed to raise Michael's competency for the time during which his case was on direct appeal to the Ohio Supreme Court.    See Twelfth Claim for Relief.

323.    Appellate counsel raised the same twelve issues that they had raised in the Hamilton County Court of Appeals.   In addition Appellate counsel raised twelve additional issues that they had failed to raise in the Court of Appeals.

324.    Appellate counsel, when they miss the filing deadline for the notice of appeal, contacted the Office of the Ohio Public Defender.  A member of that Office advised counsel of the procedure for having the appeal re-instated and provided counsel with the briefs submitted in State v. Campbell, Ohio Sup. Ct. No 91-2137, a Hamilton

---

[6] The Rule has since been changed.

[7] The court accepted the late notice of appeal, after both counsel in identically worded affidavits attributed the error "because of a clerical error made by my office staff."

County case that had just been decided by the Ohio Supreme Court.  Ohio v. Campbell,

630 N.E.2d 339 (1994).

325.    The twelve "new issues" that appellate counsel added to the Ohio

Supreme Court merit brief were all taken from the Campbell brief and were issues that

the Ohio Supreme Court had rejected nine months earlier.

326.    Because appellate counsel labored under two conflicts of interest they

could not argue their own ineffectiveness at both the trial and appellate level for not

having previously raised the issues in the trial or lower appellate courts.

327.    Appellate counsel did not visit with Michael during the representation of

him in the Ohio Supreme Court.

328.    Appellate counsel on Michael's direct appeal of right to the Ohio Supreme

Court unreasonably failed to raise or completely assert all the available arguments

supporting the constitutional issues asserted in this Federal Habeas Petition.  Petitioner

incorporates the allegations of those claims to the extent the Court determines that these

were claims not raised on direct appeal and could have been fully and fairly raised on

direct appeal.

329.    Appellate counsel did not have any tactical or strategic reasons within the

range of reasonable competence for failing to assert the available constitutional claims or

otherwise perform reasonably in perfecting the record on appeal.  Counsel failed to

perform with reasonable competence due to the limitations on resources and time

available to counsel and not for the purpose of gaining a tactical or strategic benefit.

330.    The failure of appellate counsel to render effective assistance was prejudicial in that it is reasonably probable that a more favorable result would have been obtained on appeal if counsel had performed effectively.

**FOURTEENTH CLAIM FOR RELIEF: MICHAEL BIES' SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE OF THE STATE COURTS' FAILURE TO CONDUCT AN ADEQUATE AND FAIR PROPORTIONALITY REVIEW OF HIS DEATH SENTENCE. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

331.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this claim.

332.    At the time of Michael Bies' direct appeal of right, it was clearly established federal law that once a state enacted a standard procedure to protect the rights of certain individuals, those procedures must be conducted in accordance with the Due Process Clause of the Fourteenth Amendment.

333.    When the Ohio General Assembly re-wrote and reinstated the current capital punishment scheme, it enacted a system of proportionality review that mandated filing and consideration of capital cases in which <u>life</u> sentences were imposed for similar offenses. As will be explained, the Ohio Supreme court has long ignored the scheme for proportionality review contained in Ohio's statutes.

334.    Indeed, in Michael Bies' direct appeal case the Hamilton County Court of Appeals and the Ohio Supreme Court arbitrarily refused to follow the clear statutory directives for proportionality review. Instead, that court limited its proportionality review of Michael's sentence only to cases where the death sentence was imposed. <u>See</u> <u>Ohio v. Bies</u>, No. C-920841, 1994 WL 102196 (Ham. App. March 30, 1994) p.**10; <u>aff'd</u> <u>Ohio v. Bies</u>, 658 N.E.2d 754, 762 (1996). This violated his right to due process of law.

335.    As enacted in 1981, the capital sentencing and review statutes applicable to Michael provided as follows. First, O.R.C. § 2929.05(A) specified that:

In determining whether the sentence of death is appropriate, the Court of Appeals and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases . . .

336.    The Ohio legislature intended to ensure that this proportionality review would include life sentence cases.  It enacted several comprehensive procedures:

A.    If an indictment or a count in an indictment charges the defendant with aggravate murder and contains one or more specifications of aggravating circumstances, the clerk of court in which the indictment is filed <u>shall</u> file a notice with the supreme court indicating the indictment was file.  R.C. § 2929.021.

B.    The trial court is <u>required</u> to prepare a written opinion identifying the aggravating and mitigating factors and the resulting balance when it imposes a life or death sentence.
    "<u>The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of Section 2929.04 of the Revised Code it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors.  The court or panel shall file the opinion required to be prepared by this division</u> with the Clerk of the appropriate Court of appeals and <u>with the Clerk of the Supreme Court</u> within fifteen days after the court or panel imposes sentence."  R.C. § 2929.03(F) (emphasis added.)

C.    The appellate court is required to prepare its own written opinion when it reviews a death sentence.  R.C. § 2929.05(A).

D.    The above opinions are required to be filed with the Ohio Supreme Court.  R.C. §§ 2929.03(G) and 2929.05(A).

337.    In the first death penalty case it decided under Ohio's 1981 law, <u>Ohio v. Jenkins</u>, 473 N.E.2d 264, 303-304 (1984), the state supreme court acknowledged the statutory scheme was mandatory and that its purpose was "to provide the reviewing courts with some basis for reviewing the proportionality of the imposition of the death sentence in comparison with sentences entered in similar cases."

338.    Ohio's statutes mandate to the creation of the capital case sentence data base for a proportionality review that is to be conducted in the context of that data base. By directing trial judges to write opinions in life sentence cases and file the opinions with the state appellate and supreme courts, the statutes clearly intended that proportionality review encompass capital cases where life sentences were imposed for offenses similar to those committed by the defendant under review.

339.    The Ohio Supreme Court simply rejected all of this in <u>Ohio v. Steffen</u>, 509 N.E.2d 383, 395 (Ohio 1987), where it announced its own proportionality review rule:

> [T]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty was been imposed . . . . <u>No reviewing court need consider</u> <u>any case where the death penalty was sought but not obtained . . . .</u> (Emphasis added.)

340.    This holding was obviously contrary to the <u>statutory</u> provisions, which directed that life sentence cases be made part of the pool of cases to be compared in a proportionality review. Thus the <u>Steffen</u> court arbitrarily excluded from proportionality review information that the Ohio legislature had mandated be considered for the purpose of conducting that review.

341.    In order to produce a state-created liberty interest, a statute setting up procedures must put specific limits on official discretion. The Ohio proportionality review statutes do set up a procedure that <u>requires</u> the filing and consideration of capital cases where life sentences were imposed. This is a requirement, not something that the legislature intended for Ohio's courts to ignore. Thus, Michael had a protected liberty interest in proportionality review that includes life sentence capital cases.

117

342.    This an important interest because, simply put, "[t]he question of who is spared ... is of necessity critical when attempting to analyze whether who is spared is arbitrary."  Krivosha, <u>A Historical and Philosophical Look at the Death Penalty - Does It Serve Society's Needs</u> (1982), 16 Creighton L. Rev. 1, 36.  Yet when conducting its perfunctory "proportionality review" of Michael's case, the Ohio Supreme Court compared his sentence to only three other cases, all of which were felony murder cases where the death penalty was imposed.

343.    The Ohio courts on direct appeal reduced Michael's protected liberty interest in the fair proportionality review prescribed by Ohio's statutes to a meaningless procedure in violation of the Due Process Clause. The Ohio Supreme Court has performed its 'proportionality' review in over 120 cases.  In each case, in accordance with the <u>Steffen</u> ruling, the Court has limited the pool of "similar" cases only to those capital cases in which it has previously affirmed the death sentence.  Accordingly, the Ohio Supreme Court has never found a death sentence to be disproportionate and there is no reason to think that it ever will.  There exists no meaningful manner in which to distinguish those capital defendants who are deserving of the death penalty from those who are not.  This violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the defendant's liberty interest in a meaningful statutory review is rendered ineffective.

344.    As a result of plea bargaining practices, and imposition of sentences by juries and three-judge panels, sentences less than death have been imposed for offenses that are more aggravated than the one for which Michael stands convicted, and in situations where the amount of mitigating evidence was less than the mitigating evidence

that existed herein.  The untrammeled power of the sentences under Ohio law to decline to impose the death penalty, means that the imposition of the death penalty is necessarily arbitrary and capricious.

345.    The proportionality review scheme enacted by the legislature is not followed in the Ohio courts.  This flouting of the statutory mandate in Michael Bies' case violated his rights under the Due Process Clause of the Fourteenth Amendment.  This Court should grant him relief from his unconstitutional sentence of death.

**FIFTEENTH CLAIM FOR RELIEF: MICHAEL BIES' SENTENCE IS CONSTITUTIONALLY INFIRM BECAUSE OHIO'S CAPITAL PUNISHMENT SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

346. Michael Bies hereby incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this Claim.

347. The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.

348. The prohibition against cruel and unusual punishment requires that the State's power to punish be exercised within the limits of civilized standards.

349. Punishment which is "excessive" constitutes cruel and unusual punishment.

350. A punishment is excessive if it makes no measurable contribution to acceptable goals of punishment and simply imposes pain and suffering, or is grossly out of proportion to the gravity of the offense. If the death penalty makes no measurable contribution to acceptable goals of punishment, or if it is disproportionate to the seriousness of the offense committed, it is excessive and unconstitutional.

351. The Ohio capital punishment scheme allows for imposition of the death penalty in an arbitrary and discriminatory manner. The virtually uncontrolled discretion of prosecutors in indictment decisions allows for arbitrary and indiscriminatory imposition of the death penalty.

352. In Ohio the virtually uncontrolled discretion of prosecutors in indictment circumvents this requirement. The Ohio system results in the imposition of death penalties in an arbitrary and racially discriminatory manner, with blacks and those who killed white victims being more likely to get the death penalty.

353.   Race matters in Ohio's administration of the death penalty.  According to the Ohio Commission on Racial Fairness: "Black males compose approximately five percent of Ohio's general population, yet they compose 50 percent of death row inmates."  The race of the victim also matters in this state.  As the Commission found in its Report:

> One hundred seventy-five (175) people were the victims of those currently residing on Ohio's death row.  Of those 175 victims, 124 were Caucasian and 42 were African-American.  The numbers speak for themselves.  A perpetrator is geometrically more likely to end up on death row if the homicide victim is white rather than black.

The members of the Ohio Commission on Racial Fairness were not a bunch of abolitionists.  The Commission was organized by the Chief Justice of the Ohio Supreme Court and was composed of lawyers, judges, law school faculty and private citizens.  These members were very troubled by the statistics they found:

> The implication of race in this gross disparity is not simply explained away and demands thorough examination, analysis and study until a satisfactory explanation emerges which eliminates race as the cause for the widely divergent numbers.

The Report of the Ohio Commission on Racial Fairness (1999), pages 37-38.

354.   The statewide racial disparity in imposition of the death sentence is reflected in Hamilton County, Ohio, the county where Michael Bies was capitally indicted and sentenced to death.  Forty-eight (48) death sentences have been imposed in Hamilton County.  Of these forty-eight death sentences, twenty-eight (58%) have been imposed against African-Americans.  According to the 1990 U.S. Census, African-Americans make up only twenty-one percent (20.9%) of the Hamilton County Population.

355.    Thirteen (13) African-Americans from Hamilton County  are on Ohio's death row for the death of Caucasians, while no Caucasians from Hamilton County are on death row for the death of an African-American.

356.    Racism in the imposition of the death penalty is the ultimate example of arbitrary, disproportionate, cruel and unusual punishment.  It is the antithesis of any evolving standards of decency.  It makes a mockery of equal justice, equal protection and due process of law.

357.    Another deficiency is that the statute does not require the State to prove the absence of any mitigating factors and that death is the only appropriate penalty.  The statutory scheme is unconstitutionally vague and leads to the arbitrary imposition of the death penalty.  The statutes have impermissibly devalued the importance of mitigation because no method exists to ensure a proper weighing and consideration is accomplished.

358.    The Ohio statutes also violate the mandate of the constitutional protections by requiring proof of aggravating circumstances in the guilt phase of capital trials.  By requiring proof of the aggravating specifications simultaneously with proof of guilt, Ohio has effectively prohibited a sufficient individualized determination in sentencing.

359.    The Ohio system is also unconstitutional because O.R.C. § 2929.03(D)(1) mandates that the results of any mental examination and background investigation performed pursuant to this statute must be furnished to the trial court, the jury and the prosecutor.  Any information learned about the Petitioner would be admitted at the mitigation phase of the proceedings.

360.    The Ohio scheme is also unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a

jury trial. A defendant who decides to plead guilty or no contest to an indictment, which contains one or more capital specifications, receives the benefit of having the trial court judge vested with the discretion to dismiss the specifications "in the interest of justice." Ohio R. Crim. P. 11(C)(3).

361.    Adequate appellate review is a precondition to a finding that a state death penalty system is constitutional. The standard for review is one of careful scrutiny. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime.

362.    Adequate appellate review is undercut by the failure of the Ohio statutes to require the jury or three judge panel recommending life imprisonment to identify the mitigating factors. Without that information, no significant comparison of cases is possible since no written findings exist to serve as a basis for comparison. Without a significant comparison of cases, there can be no meaningful appellate review.

363.    Comparative scrutiny is possible only if a sufficient data for comparisons exists. There must be as much information regarding as many cases as possible for an accurate and significant comparison--to provide a relevant basis for distinguishing cases and appropriate penalties. A standardized method is necessary for those comparisons. Yet Ohio's system provides for procedures that are incompatible with meaningful comparisons of cases. These deficiencies include accelerated review, the requirement that only minimal information be included in written findings at sentencing, an undetermined method of comparison, and incomplete data.

364.    The appropriateness analysis used by the Ohio Courts of Appeals and that the Supreme Court of Ohio is also infirm. Ohio Rev. Code § 2929.05(A) requires the

appellate courts of Ohio determine the appropriateness of the death penalty in each capital case they review. The statute directs the court to "affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." The Supreme Court of Ohio and the Court of Appeals have failed to follow the dictates of the statute. The appropriateness review ultimately conducted in each case is too cursory. It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."

365.   These systemic problems are not unique to the State of Ohio. The American Bar Association has recently called for a moratorium on capital punishment unless and until each jurisdiction attempting to impose such punishment "implements policies and procedures that are consistent with . . . longstanding American Bar Association policies intended to (1) Ensure that death penalty cases are administered fairly and impartially, in accordance with due process, and (2) minimize the risk that innocent persons may be executed . . . ." As the ABA has observed in a report accompanying its resolution, "administration of the death penalty, from being fair and consistent, is instead a haphazard maze of unfair practices with no internal consistency." The ABA concludes that this morass has resulted from the lack of competent counsel in capital cases, the lack of a fair and adequate review process, and the pervasive effects of race.

366.   The United Nations High Commissioner for Human Rights has recently studied the American capital punishment process, and has concluded that "guarantees and

safeguards, as well as specific restrictions on Capital Punishment, are not being respected. Lack of adequate counsel and legal representation for many capital defendants is disturbing." The High commissioner has further concluded that "race, ethnic origin and economic status appear to be key determinants of who will, and who will not, receive a sentence of death." The report also describes in detail the special problems created by the politicization of the death penalty, the lack of an independent and impartial state judiciary, and the racially-biased system of selecting juries. The report concluded:

> The high level of support for the death penalty, even if studies have shown that it is not as deep as is claimed, cannot justify the lack of respect for the restrictions and safeguards surrounding its use. In many countries, mob killings and lynchings enjoy public support as a way to deal with violent crime and are often portrayed as "popular justice." Yet they are not acceptable in civilize society.

367.    The Ohio capital punishment system suffers from all of the problems identified in the ABA and United Nations reports -- the under funding of defense counsel, the lack of a fair and adequate appellate review process and the pervasive effects of race.

368.    Ohio's capital statutory scheme permits the arbitrary and discriminatory imposition of the death penalty. Ohio Rev. Code § 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 violate Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

369.    In addition, Ohio's statutory provisions governing its capital punishment scheme violates Article VI of the United States Constitution and various international laws including but not limited to the Organization of American States Treaty and the American Declaration of the Rights and Duties of Man.

370.    The United States is a member nation and signatory to the Organization of American States Treaty. Pursuant to that treaty the United States is bound by the terms

of the American Declaration of the Rights and Duties of Man. Moreover, pursuant to the

Supremacy Clause of Article VI of the United States Constitution, the judges of every

State are bound by the terms of international treaties to which the United States is a party,

"anything in the constitution or laws of any State to the contrary notwithstanding."

    371.    The American Declaration provides in part:

> Article I.    Every human being has the right to life liberty and the security of his person.

> Article II.    All persona are equal before the law and have the rights and duties established in this declaration, without distinction as to race, sex, language, creed or any other factor.

> Article XVIII. Every person may resort to the court to ensure respect for his legal rights. There should likewise be available to him a simple, brief procedure whereby courts will protect him from acts of authority that, to his prejudice, violate any fundamental constitutional rights.

> Article XXV. No person may be deprived of his liberty except in the cases and according to the procedures established by preexisting laws.

> No person may be deprived of liberty for nonfulfillment of obligations of a purely civil character.

> Every individual who has been deprived of his liberty has the right to have the legality of his detention ascertained without delay by a court, and the right to be tried without unsure delay or, otherwise, to be released. He also has the right to human treatment during the time he is in custody.

> Article XXVI. Every accused person is presumed to be innocent until proved guilty

> Every person accused of an offense has the right to be given an impartial and public hearing, and to be tried by courts previously established in accordance with preexisting laws, and not to receive cruel, infamous or unusual punishment.

372.     Michael Bies has been denied his rights under the American Declaration of the Rights and Duties of Man as applicable to the State of Ohio through the Supremacy Clause for the following reasons and such other reasons as may come to light:

A)     Mr. Bies was subjected to arbitrary deprivation of his right to life as prohibited under Article I of the American Declaration because the death penalty in Ohio is imposed in a racial discriminatory manner in violation of Article II of the American Declaration of the Rights and Duties of Man and Article III of the Organization of American States (OAS) Charter.

B)     The death penalty is a cruel, infamous and unusual punishment resulting in the arbitrary deprivation of life when it is applied in a racially discriminatory manner, in the absence of an impartial hearing and equality before the law in violation of Article XXVI of the American Declaration of the Rights an Duties of Man.

373.     Mr. Bies suffered substantial and injurious harm.     His sentence was imposed in a manner not in accordance with the United States Constitution and various treaties entered into by the United States..

**SIXTEENTH CLAIM FOR RELIEF:  MICHAEL BIES' DEATH SENTENCE IS INVALID UNDER THE FEDERAL CONSTITUTIONAL GUARANTEED OF DUE PROCESS, EQUAL PROTECTION, AND A RELIABLE SENTENCE BECAUSE EXECUTION OF THE MENTALLY RETARDED CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT. United States Constitution, Eighth and Fourteenth Amendments.**

374.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

375.    The expert appointed by the trial court found Michael suffered from mental retardation [Tr. 1103, 1108].  He has an IQ of 68 [Tr. 1103].  In addition, Mr. Bies has a history of impaired adaptive behavior, which had its onset while he was still a child, long before he reached the age of eighteen.  He functions at the level of a third to sixth grader [Tr. 1104].  Based on these factors, Mr. Bies is mentally retarded under accepted mental health principles.  Petitioner incorporates the allegations of the First and Second Claims for Relief.

376.    People with mental retardation suffer from impaired short term memory, impaired communication skills, increased impulsivity, impaired concentration abilities, and impaired abilities to understand cause and effect relationships.  People with mental retardation, even mild mental retardation, suffer from severely impaired mental functioning.

377.    The Eighth Amendment guarantee against cruel and unusual punishment prohibits punishment which is inconsistent with the evolving standards of decency that mark the progress of a maturing society.

378.    Virtually every civilized nation prohibits execution of the mentally retarded, as does international law.  The United Nations has called on all civilized nations to prohibit the execution of the mentally retarded or otherwise mentally disabled, and the

Human Rights Committee of the United Nations has sharply criticized the United States for human rights abuses that arise through executing the mentally retarded. The American Bar Association has also called for a ban on executing the mentally retarded.

379.    The United States Congress, which reflects a national consensus, has prohibited the execution of the mentally retarded for violations of criminal law. During the past decade, many states have moved to prohibit the execution of the mentally retarded. This trend demonstrates that evolving standards of decency prohibit execution of mentally retarded persons.

380.    The execution of the mentally retarded constitutes cruel and unusual punishment under any and all circumstances.

381.    Even assuming, arguendo, that execution of the mentally retarded does not constitute cruel and unusual punishment under all circumstances, Michael Bies' execution nonetheless constitutes cruel and unusual punishment because under these facts, he has been sentenced to death because of his purportedly culpable mental state, which the state courts used to hold him accountable for Darrell Gumm's acts through the felony murder rule. This mental state will not permit anyone to be executed consistent with constitutional standards. In any event, it would clearly be unconstitutional to execute a mentally retarded defendant on the basis of mental state alone, since such persons do not have the same cognitive function as the remainder of society, and their execution on the basis of a culpable mental state alone can serve no legitimate purpose.

**SEVENTEENTH CLAIM FOR RELIEF: MICHAEL BIES' EXECUTION WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS, BECAUSE HE IS NOT COMPETENT TO BE EXECUTED. MICHAEL BIES DOES NOT RATIONALLY UNDERSTAND THE CONNECTION BETWEEN HIS ACTS AND THE PUNISHMENT TO BE INFLICTED, AND AS A RESULT OF HIS MENTAL RETARDATION, BRAIN DAMAGE AND MENTAL ILLNESS. United States Constitution, Eighth and Fourteenth Amendments.**

382.    Michael Bies incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this Claim.

383.    Michael suffers from mental retardation, and he suffered significant brain damage as the apparent result of an untreated closed-head injuries.

384.    As a result of Michael's limited intellectual functioning and his brain damage, he is unable to understand rationally the legal and moral connection between the offense for which he was sentenced to death and his execution, does not understand rationally the difference between right and wrong in relation to that offense, and cannot rationally assist counsel in the litigation of these proceedings. Mr. Bies "is unaware even today of the true nature of the death penalty. His adaptive skill levels suggest that death is, to him, incompletely understood. At 29, he is a little more aware of its severe and permanent implications than he was at age nine. Michael's reduced level of cognitive, adaptive and emotional competence resulted in his lack of awareness of the cause and effect of his crime." Mr. Bies has extremely limited ability to care for himself, and severely impaired adaptive behavior.

385.    As a result of his mental condition, Mr. Bies is not competent to be executed under the Eighth Amendment. As a result of his mental condition, Mr. Bies is not sane under Ohio law, which prohibits the execution of people who are insane under

O.R.C. § 2949.28, and his execution would violate the due process clause of the Fourteenth Amendment.

386.    In the alternative, Mr. Bies will become incompetent and insane at the time that his execution becomes impending, as a result of the effect of the impending execution on his mental state.    Mr. Bies therefore alleges that he will become incompetent at the time an execution date is set, to avoid any possibility of an implied waiver of this claim, pursuant to <u>Stewart v. Martinez-Villarreal</u>, 523 U.S. 637 (1998).

387.    In the alternative, to the extent that Mr. Bies could be found competent or sane, his competence or sanity would be entirely synthetic, in that it would be produced solely by the involuntary administration of anti-psychotic medication.    Mr. Bies would not consent to the administration of anti-psychotic medication for the purpose of attempting to render him competent to be executed rather than as medical treatment for his mental condition.    The intrusion into Mr. Bies bodily integrity for the purpose of rendering him synthetically sane and competent to be executed would violate his right to privacy, his right to due process of law, and his right not to be subjected to cruel and unusual punishment.

**EIGHTEENTH CLAIM FOR RELIEF: MICHAEL BIES' CONVICTIONS AND DEATH SENTENCES ARE INVALID UNDER THE FEDERAL CONSTITUTIONAL GUARANTEES OF DUE PROCESS, EQUAL PROTECTION, THE EFFECTIVE ASSISTANCE OF COUNSEL, A FAIR TRIBUNAL, AN IMPARTIAL JURY, AND A RELIABLE SENTENCE DUE TO THE CUMULATIVE ERRORS IN THE ADMISSION OF EVIDENCE AND INSTRUCTIONS, GROSS MISCONDUCT BY STATE OFFICIALS AND WITNESSES, AND THE SYSTEMATIC DEPRIVATION OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.**

388.    Michael Bies hereby incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this Claim.

389.    The Eighth Amendment and Fourteenth Amendments require a heightened degree of reliability in the determination that the death penalty is the appropriate punishment.

390.    Each of the claims specified in this petition requires the granting of habeas relief.

391.    In the alternative the cumulative effect of the errors demonstrated in this petition deprived the proceedings against Mr. Bies of fundamental fairness and resulted in a constitutionally unreliable conviction and sentences.  Whether or not any individual error requires the greater of relief, the totality of these multiple errors and omissions resulted in substantial and injurious harm to Mr. Bies.

392.    The Warden cannot show, beyond a reasonable doubt that the cumulative effect of these numerous constitutional errors was harmless beyond a reasonable doubt. In the alternative, the totality of these constitutional violations substantially and injuriously affected the fairness of the proceedings and prejudiced Mr. Bies.

**Notice of intention to challenge presumption of correctness of all state court fact-findings and the application of 28 U.S.C. §§ 2254(d) and (E)(1) (post-AEDPA) to this case.**

393.    The Ohio Attorney General, as counsel for the Warden in other federal habeas cases, has argued that the petitioner must challenge the applicability of the presumption of correctness of state court factfindings when he files his petition.  While Michael Bies disputes the validity of this argument, he nonetheless provides notice of his intention to challenge the presumption of correctness of all state court factfindings made in this case.  See 28 U.S.C. § 2254(d) (Pre-Antiterrorism and Effective Death Penalty Act - "AEDPA"); 28 U.S.C. § 2254(e)(1) (post-AEDPA).  These include, but are not limited to, any factual findings (1) made by the trial court during the trial and the post-conviction proceedings; (2) made by the intermediate appellate court during the direct and post-conviction appeals as well as during its review of Mr. Bies' Ohio R. App. P. 26(B) Application; and (3) made by the Ohio Supreme Court during the direct, post-conviction, and Ohio R. App. P. 26(B) appeals

394.    Petitioner Bies also intends to challenge the applicability of the post-AEDPA 28 U.S.C. §§ 2254(d) and (e)(1) to his case.  Application of these sections could be unconstitutionally retroactive under Landgraf v. U.S.I. Film Products, 511 U.S. 244 (1994) and its progeny.  See In re Sonshine, 132 F.3d 1133 (6th Cir. 1997); In re Hanserd, 123 F.3d 922 (6th Cir. 1997).

**Statements with respect to previous procedure.**

395.    Petitioner Michael Bies has not competently, knowingly and intelligently waived, deliberately withheld, or consented to the failure to raise, any of the constitutional claims raised in this petition.  Petitioner has not procedurally defaulted any

of these claims because there are no even-handed, consistently-applied procedural default rules in capital cases in the State of Ohio. The Ohio Supreme Courts has consistently recognized that procedural rules should be sparingly applied in capital cases.  In <u>Ohio v. Zuern</u>, 512 N.E.2d 585 (1987) the state asserted and the Hamilton County Court of appeals agreed that a procedural default had occurred barring review of nine (9) constitutional challenges to Ohio's capital sentencing scheme. The Ohio Supreme Court forgave the default, writing that:

> . . . because of the nature of the case and the exacting review necessary where the death penalty is involved, we reserve the right to consider the constitutional challenges in particular cases.

<u>Id.</u> at 592.

396.    In <u>Ohio v. Buell</u>, 489 N.E.2d 795 (1986), <u>supra</u>, the Court <u>sua sponte</u> addressed an issue neither raised nor briefed by the parties.  <u>Id.</u> at 813.  "Having addressed those constitutional issues raised by the appellant, <u>sponte</u>, we examine the constitutionality of the imposition of the death penalty in this case in light of the Supreme Court's recent decision in <u>Caldwell v. Mississippi</u>, ____ U.S. ____,86 L.Ed.2d 231 (1985)."  <u>See also</u> <u>Ohio v. Huertas</u>, 553 N.E.2d 1058, 1065 (1990) (reversing death sentence on an issue raised for the first time in the Ohio Supreme Court).

397.    During the pendency of Michael's direct appeal, the Ohio Supreme Court consistently exercised its authority to review errors that were either not objected to at trial, not raised before the intermediate state court of appeals or both.  <u>See, e.g.</u> <u>Ohio v. Williams</u>, 660 N.E.2d 724 (1996); <u>Ohio v. Benge</u>, 661 N.E.2d 1019 (1996); <u>Ohio v. Wogenstahl</u>, 662 N.E.2d 311 (1996); <u>Ohio v. Dennis</u>, 638 N.E.2d 1096 (1997); <u>Ohio v. Keith</u>, 684 N.E.2d 47 (1997); <u>Ohio v. Davie</u>, 686 N.E.2d 245 (1997); <u>Ohio v. Reynolds</u>,

687 N.E.2d 1358 (1998); Ohio v. Mason, 694 N.E.2d 932 (1998); Ohio v. Getsy, 702 N.E.2d 866 (1998).

398.    The failure to raise any of the claims asserted in this petition which were susceptible to decision on direct appeal was the result of ineffective assistance of counsel on appeal, which was also induced by the limitations on the time available for briefing imposed by the Ohio Supreme Court.

399.    The failure to raise any of the claims asserted in this petition that were susceptible of being raised in the state post-conviction on Ohio R. App. P. 26(B) proceeding was also the result of ineffective assistance of counsel, in a proceeding where petitioner had a right to effective assistance of counsel under state and federal law, and which was also induced by the state trial court's refusal to permit appointed counsel adequate resources necessary to identify and present all of the available constitutional claims.

**NINETEENTH CLAIM FOR RELIEF:  THE STATE OF OHIO IS PRECLUDED FROM CONTESTING MICHAEL BIES' MENTAL RETARDATION BECAUSE THE STATE TRIAL COURT, APPELLATE COURT AND SUPREME COURT HAVE ALREADY DETERMINED THAT HE IS MENTALLY RETARDED, AND THE STATE HAS REPEATEDLY CONCEDED THAT FACT. Fifth, Eighth and Fourteenth Amendments to the United States Constitution.**

393.    Michael Bies hereby incorporates all of the allegations contained elsewhere in this petition as if fully rewritten in this claim.

394.    The Doctrine of Collateral Estoppel, which is incorporated in the Double Jeopardy Clause of the Fifth Amendment, precludes a prosecutor from relitigating an issue that has been previously adversely decided to it in litigation between the same parties.

**A.    The State did not contest Michael Bies Mental Retardation at Trial.**

395.    Dr. Winter testified at trial that Michael had an IQ of 68 and suffered from mild to borderline mental retardation [Tr. 11054, 1117].  He was operating on the level of a third to sixth grader [Tr. 1117].

396.    During closing argument at the mitigation phase, defense counsel argued that the jury should not vote to execute Michael because he was operating at the level of a third grader because of his low IQ. [Tr. 1157-1159, 1164, 1169].

397.    The trial prosecutor stated that Michael had an IQ of 68 and conceded that "Contrary to the closing argument by Mr. Deardorff, his IQ is not 63, it's 68. It's in the report if you'd like to see it. Michael Bies is not intelligent.  I think that we can all accept that." [Tr. 1180].

**B.    The State, on direct appeal, in the First District Court of Appeals, contested Bies' mental retardation and lost.**

398.    On his direct appeal of right to the Hamilton County Court of Appeals, counsel for Michael Bies argued that there was insufficient evidence to support the jury's sentencing death recommendation [St. Ct. App. Vol. II, p. 54-61].   Counsel cited to Michael's mental retardation:

> During the penalty phase of the trial, a psychiatrist who had tested Bies noted that his score on an intelligence test was a mere 69, which meant that the Appellant was mildly to moderately retarded.  He tested at no more than a third to sixth grade level of maturity, and was in the bottom 7 percent of the population in total intelligence (T.p. 1103-1104).

[Id. at p. 55].

399.    Counsel further argued that Michael's mental age (as a result of his mental retardation) precluded a sentence of death.

> The third mitigating factor to be taken into account here is the youth of the accused, per § 2929.04(B)(4). The Appellant was twenty years old at the time the incident occurred, but his mental age was that of, at best, a sixth-grader.  The statute nowhere defined youth, as a factor in mitigation, as a particular age; this court should take into account the relative youth of the Appellant psychologically and as compared to other adults.

[Id. at p. 57].

400.    The prosecution contested Michael's mental retardation in its Merit Brief [St. Ct. App. Vol. II, p. 139].   The State's argument, however was limited to two paragraphs given the uncontraverted record of Michael's mental retardation in the trial court. [Id.]

401.    Appellate counsel submitted to the First District Court of Appeals a Reply Brief upon Michael's behalf [St. Ct. App. Vol. II, p. 164-193].   Appellate counsel vehemently opposed the State's notion that Michael was not mentally retarded.  [Id. at p. 185-186].

402.   On March 30, 1994, the Hamilton County Court of Appeals decided Michael's direct appeal.  State v. Bies, 1994 WL 102196 (Ham. App. March 30, 1994) [St. Ct. App., Vol. II, pp. 223-246].  While the Court of Appeals rejected his appeal, that Court determined that Michael suffered from "mild mental retardation to borderline mental retardation."  [Id. at p. 244.]

**C.     The State, on direct appeal in the Ohio Supreme Court, contested Bies' mental retardation and lost.**

403.   In the direct appeal of right to the Ohio Supreme Court, appellate counsel for Michael again argued that the weight of the evidence did not support the jury's death recommendation [St. Ct. App., Vol. III, pp. 143-148].  Appellate counsel focused the argument upon Michael's mental retardation.  [Id.]

404.   The State again disputed Michael's mental retardation [St. Ct. App. Vol. III, pp. 276-277].

405.   Appellate counsel, in the Reply Brief, returned to the same refrain regarding Michael's low intelligence.  [St. Ct. App. Vol. III, pp. 316-317].

406.   The Ohio Supreme Court, in affirming Michael's conviction and sentence recognized that "Dr. Winter found that Bies was mildly to borderline mentally retarded". State v. Bies, 74 Ohio St. 3d 320, 327 (1996).  From that testimony, the Ohio Supreme Court found that Michael suffered from "mild to borderline mental retardation".  Id. at 328.

**D.     In the trial court post-conviction proceedings, the State conceded that Bies was mentally retarded.**

407.   On September 20, 1996, Michael filed his initial post-conviction petition with the trial court. In his Fifth Claim for Relief he asserted that it would be

unconstitutional to execute him because he was mentally retarded.  [St. Ct. App. Vol. IV, pp. 18-20].

408.    On November 22, 1996, the State of Ohio filed its Motion for Judgment. [St. Ct. App. Vol. V, pp. 373-391]. The State responded as follows to the Fifth Claim for Relief:

> Defendant's fifth claim for relief is that it is cruel and unusual punishment to execute a retarded person.  The <u>record reveals defendant to be mildly mentally retarded</u> with an I.Q. of about 69.  As a matter of law, such a person may be punished by execution.  <u>State v. Holloway</u>, 38 Ohio St. 3d 239 ()1988).  (emphasis added.)

[St. Ct. App. Vol. V,  p. 388].[8]

409.    On July 22, 1998 the late Judge Robert S. Kraft issued his findings of facts, conclusions of law.  [St. Ct. App. Vol. V, p. 472-485].  The Assistant Prosecutor assigned to the case wrote the Judge's findings for him.  The Judge concluded, based upon the prosecutor's proposed findings, that:

> (1)    The defendant is <u>shown by the record to be mildly mentally retarded with an IQ of about 69.</u>

The Court makes the following Conclusion of Law:

> (1)    As a matter of law, a mildly mentally retarded defendant may be punished by execution.  <u>State v. Holloway</u>, 38 Ohio St. 3d 239 (1988). [emphasis added.]

[St. Ct. App. Vol. V, p. 480].

## E.    The prosecution continued to concede Bies' mental retardation throughout the post-conviction appellate process.

410.    Michael's mental retardation continued to be a non-disputed fact throughout the appeals from this Court's denial of his post-conviction petition.

---

[8] The State misconstrued the record.  Michael Bies had an IQ of 68, not 69 [Tr. 1104, 1117].

411.    In Michael Bies' appeal to the First District Court of Appeals, the prosecution conceded Michael's mental retardation:

> Defendant's fifth claim for relief is that it is cruel and unusual punishment to execute a retarded person.  The record reveals defendant to be mildly mentally retarded with an I.Q. of about 69.  As a matter of law, such a person may be punished by execution.  State v. Holloway, 38 Ohio St. 3d 239, 527 N.E.2d 831 (1988).  [emphasis added.]

[St. Ct. App. Vol. VI, p. 140].

412.    In the Ohio Supreme Court, the State, in its Memorandum In Response, again conceded Michael's mental retardation.

> Defendant's fifth claim for relief is that it is cruel and unusual punishment to execute a retarded person.  The record reveals defendant to be mildly mentally retarded with an I.Q. of about 69.  As a matter of law, such a person may be punished by execution.  State v. Holloway, 38 Ohio St. 3d 239, 527 N.E.2d 831 (1988).  [emphasis added.]

[St. Ct. App. Vol. VI, p. 310].

**F.    Collateral Estoppel precludes re-litigation of Bies' mental retardation.**

413.    The test for mental retardation that the Ohio courts will apply in Bies' mental retardation proceedings will be the same test the state courts applied at the time of his trial, direct appeal and post-conviction.

414.    The state courts will apply the following test:  1) significantly subaverage intellectual functioning, 2) significant limitations in two or more adaptive skills, and 3) onset before the age of eighteen.  State v. Lott, 97 Ohio St. 3d 303, 305 (2002).

415.    The American Psychiatric Association's definition of mental retardation at the time of Bies' trial was as follows:  1) significantly subaverage general intellectual functioning, accompanied by 2) significant deficits or impairments in adaptive functioning, with 3) onset before the age of 18.  Diagnostic and Statistical Manual of

Mental Disorders (American Psychiatric Association, Third Edition Revised, 1987), p. 28.

416. At the time of Michael's trial, the American Association Of Mental Retardation had promulgated the same definition for mental retardation; 1) significantly subaverage intellectual functioning, 2) limitation in two or more adaptive skill areas, and 3) the onset before the age of eighteen. Mental Retardation (American Association on Mental Retardation, 1992) pp. 5-6.

417. Pursuant to the Doctrine of Collateral Estoppel and the Fifth Amendment, the State of Ohio is precluded from relitigating Michael Bies' mental retardation.

418. The Court should analyze this claim for relief pursuant to 28 U.S.C. § 2241, apply a de novo standard of review, and determine that the trial court incorrectly ruled that the state could re-litigate Michael Bies' claim of retardation.

419. In the alternative, if this Court determines that 28 U.S.C. § 2141 is not the applicable statute, then this Court should analyze this claim pursuant to 28 U.S.C. § 2254, and conclude that the State trial court's determination as to the Double Jeopardy/Collateral Estoppel issue was contrary to or resulted in an unreasonable application of established federal law and/or was an unreasonable determination of the facts.

**Notice of intention to challenge presumption of correctness of all state court fact-findings and the application of 28 U.S.C. §§ 2254(d) and (E)(1) (post-AEDPA) to this case.**

420. The Ohio Attorney General, as counsel for the Warden in other federal habeas cases, has argued that the petitioner must challenge the applicability of the presumption of correctness of state court factfindings when he files his petition. While

Michael Bies disputes the validity of this argument, he nonetheless provides notice of his intention to challenge the presumption of correctness of all state court factfindings made in this case.  See 28 U.S.C. § 2254(d) (Pre-Antiterrorism and Effective Death Penalty Act - "AEDPA"); 28 U.S.C. § 2254(e)(1) (post-AEDPA).  These include, but are not limited to, any factual findings (1) made by the trial court during the trial and the post-conviction proceedings; (2) made by the intermediate appellate court during the direct and post-conviction appeals as well as during its review of Mr. Bies' Ohio R. App. P. 26(B) Application; and (3) made by the Ohio Supreme Court during the direct, post-conviction, and Ohio R. App. P. 26(B) appeals.

**Statements with respect to prior proceedings.**

421.    Michael Bies has not competently, knowingly and intelligently waived, deliberately withheld, or consented to the failure to raise, any of the constitutional claims raised in this petition.  Petitioner has not procedurally defaulted any of his claims

422.    There are no even-handed, consistently-applied procedural default rules in capital cases in the State of Ohio. During the pendency of Michael's direct appeal, the Ohio Supreme Court consistently exercised its authority to review errors that were either not objected to at trial, not raised before the intermediate state court of appeals or both. See, e.g. Ohio v. Williams, 660 N.E.2d 724 (1996); Ohio v. Benge, 661 N.E.2d 1019 (1996); Ohio v. Wogenstahl, 662 N.E.2d 311 (1996); Ohio v. Dennis, 638 N.E.2d 1096 (1997); Ohio v. Keith, 684 N.E.2d 47 (1997); Ohio v. Davie, 686 N.E.2d 245 (1997); Ohio v. Reynolds, 687 N.E.2d 1358 (1998); Ohio v. Mason, 694 N.E.2d 932 (1998); Ohio v. Getsy, 702 N.E.2d 866 (1998).

423.    The failure to raise any of the claims asserted in this petition which were susceptible to decision on direct appeal was the result of ineffective assistance of counsel on appeal, which was also induced by the limitations on the time available for briefing imposed by the Ohio Supreme Court.

424.    The failure to raise any of the claims asserted in this petition that were susceptible of being raised in the state post-conviction on Ohio R. App. P. 26(B) proceeding was also the result of ineffective assistance of counsel, in a proceeding where petitioner had a right to effective assistance of counsel under state and federal law, and which was also induced by the state appellate court's refusal to permit appointed counsel adequate resources necessary to identify and present all of the available constitutional claims.  In addition the Ohio Supreme Court refuses to recognize the Sixth Amendment right to effective assistance of counsel on direct appeals of right to that Court when the appellant has already had an appeal of right to the court of appeals.

## III.    PRAYER FOR RELIEF

WHEREFORE, Petitioner Michael Bies respectfully requests that this Court:

1)    Order the Respondent to file an answer or other responsive pleading to Petitioner's third amended petition;

2)    Conduct a hearing at which proof may be offered concerning the allegations of this third amended petition;

3)    Issue a writ of habeas corpus, on the Nineteenth Claim for Relief that precludes the State of Ohio from relitigating his mental retardation and thereby require that the trial court impose a sentence of less than death;

4)    Issue a writ of habeas corpus to have Michael Bies brought before the Court so that he may be discharge from his unconstitutional confinement and sentence;

5)    Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

Respectfully submitted,

s/ S. Scott Haynes _____
S. SCOTT HAYNES #0059586
Hallowes, Allen & Haynes
6445 East Livingston Avenue
Reynoldsburg, Ohio 43068-3560
Telephone:  (64) 868-0009
Facsimile:  (614) 868-0029

And

DAVID H. BODIKER
Ohio Public Defender

RANDALL L. PORTER #0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio  43215-2998
Telephone:  (614) 466-5394
Facsimile:  (614) 728-3670

COUNSEL FOR PETITIONER

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2005, a true copy of the foregoing MICHAEL BIES' THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access the filing through the Court's system.

s/ S. Scott Haynes
 S. SCOTT HAYNES

COUNSEL FOR PETITIONER

216048

145