RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0095p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MICHAEL BIES,

*Petitioner-Appellee,*

*v.*

No. 06-3471

MARGARET BAGLEY, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 00-00682—Susan J. Dlott, District Judge.

Argued: October 31, 2007

Decided and Filed: February 27, 2008

Before: DAUGHTREY, MOORE, and CLAY, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Carol Ann Ellensohn, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellant. Randall L. Porter, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:** Carol Ann Ellensohn, Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellant. Randall L. Porter, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, S. Scott Haynes, Reynoldsburg, Ohio, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge. Respondent Margaret Bagley, warden of the prison where Petitioner Michael Bies is incarcerated, appeals the order of the district court granting Petitioner a writ of habeas corpus pursuant to 28 U.S.C. § 2254, vacating his sentence of death, and ordering that he be resentenced to receive a sentence other than death. Respondent claims that, even though Petitioner was found to be mentally retarded on direct appeal, Ohio should be permitted to relitigate this finding now that it has taken on new legal significance in light of the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). For the reasons which follow, we hold that Respondent's claim is precluded by the Double Jeopardy Clause of the Constitution, and **AFFIRM** the decision of the district court granting habeas relief to Petitioner.

1

## STATEMENT OF FACTS

### A.    Trial and Direct Appeals

On October 13, 1992, Petitioner Michael Bies was found guilty, by an Ohio state court jury, of the kidnapping, attempted rape and murder of ten-year-old Aaron Raines. During the sentencing phase of his trial, Petitioner introduced the testimony of Dr. Donna Winter, a licensed clinical psychologist, who testified both that Petitioner has an IQ of 69, and that he possesses all the traits necessary for a clinical diagnosis of mental retardation. Dr. Winter's testimony was corroborated by a September 11, 1992 letter from Dr. Myron S. Fridman, another licensed clinical psychologist who diagnosed Petitioner as a "marginally functioning, mildly mentally retarded man . . . ." (J.A. 1501) Nevertheless, the jury recommended the death sentence, and on October 30, 1992, the trial court accepted this recommendation.[1]

Petitioner appealed both his conviction and his death sentence to the Ohio Court of Appeals. On appeal, Petitioner argued that he is mentally retarded, and that this mental retardation was a mitigating factor which should permit him to receive a sentence other than death. In response to these arguments, the government questioned Petitioner's assertion that he is "supposedly retarded," and cited specific evidence in the record which, it claimed, indicates that Petitioner does not suffer from mental retardation. (J.A. 789-90)

While the appeals court affirmed both Petitioner's conviction and his death sentence, *State v. Bies*, No. C-920841, 1994 WL 102196 at \*10 (Ohio Ct. App. March 30, 1994), it also sided with Petitioner on the question of his mental retardation. According to the appeals court, Petitioner has "exhibited developmental delays from birth," and "he has been in special-education classes since kindergarten . . . ." *Id.* at \*9. It concluded that Petitioner suffered from "mild mental retardation to borderline mental retardation," as well as "probable organic brain dysfunction characterized by specific learning disabilities." *Id.*

Petitioner appealed this decision to the Supreme Court of Ohio, where the issue of his mental retardation was again litigated. Once again, Petitioner argued that he is mentally retarded, and that this mental retardation is a mitigating factor which should lead to a sentence other than death. Once again, the government contested Petitioner's claim that he is "supposedly retarded," and once again, the government cited evidence in the record which suggests that Petitioner does not suffer from mental retardation. (J.A. 830-31) The state supreme court affirmed Petitioner's conviction and death sentence. *State v. Bies*, 658 N.E.2d 754, 762 (Ohio 1996). On the issue of mental retardation, however, the court sided with Petitioner, crediting Dr. Winter's diagnosis of Petitioner as mentally retarded. *Id.* at 761.

On September 20, 1996, Petitioner filed an "Application for Reopening" in the Ohio Court of Appeals under an Ohio appellate rule which allows a criminal defendant to claim ineffective assistance of appellate counsel. Ohio App. R. 26(B)(1). The court of appeals denied this application, and the Supreme Court of Ohio affirmed, holding that Petitioner "offered no compelling justification" for granting his application, and noting that the application was filed outside of the ninety day deadline imposed by the Ohio rules. *State v. Bies*, 680 N.E.2d 975, 975 (Ohio 1997).

---

[1] While not at issue in this appeal, Bies also was also sentenced to eight to fifteen actual years on the attempted rape count, and ten to twenty-five actual years on the kidnapping count.

No. 06-3471        *Bies v. Bagley*                                                Page 3

## B.    State Post-Conviction Proceedings

Also on September 20, 1996, Petitioner filed a petition seeking post-conviction review of his conviction and death sentence in Ohio state court. Among several claims for relief, Petitioner again argued that he is mentally retarded, and that executing him would violate the Eighth Amendment because "a national consensus against executing the mentally retarded reflects the new standard of decency in the United States." (J.A. 840)  While the government contested Petitioner's Eighth Amendment claim, this time it conceded that "[t]he record reveals defendant to be mildly mentally retarded with an I.Q. of about 69." Although the trial court held that mentally retarded individuals could be executed, it also found that "[t]he defendant is shown by the record to be mildly mentally retarded . . . ." (J.A. 881)[2]

While a second, unsuccessful petition for state post-conviction relief was being heard by the Ohio courts, the United States Supreme Court held in *Atkins v. Virginia*, that "death is not a suitable punishment for a mentally retarded criminal." 536 U.S. at 321.  Petitioner followed this decision with a May 2, 2003 petition seeking post-conviction relief in Ohio state court, this time claiming that he could not be executed under *Atkins*, and that the government is estopped from contesting the fact of his mental retardation inasmuch as this fact had already been determined by prior state court proceedings.  Despite this estoppel argument and the government's concession in an earlier proceeding that Petitioner is mentally retarded, the government contested Petitioner's *Atkins* claim on the grounds that Petitioner "is not mentally retarded." (J.A. 1593)

Petitioner moved for summary judgment on his estoppel claim, and this motion was denied in an April 5, 2004 order by an Ohio trial judge.  Noting that this order made no mention of the Double Jeopardy Clause, Petitioner then filed a Renewed Motion for Summary Judgment, arguing that "the Double Jeopardy Clause bars the prosecutor from relitigating the mental health findings" of the Ohio courts. (J.A. 1618)  The state trial court denied this renewed motion on June 21, 2004 without providing any additional reasoning with respect to Petitioner's double jeopardy claim.

## C.    Federal Habeas Proceedings

The case on appeal to this Court was initially filed on August 21, 2000 in the Southern District of Ohio.  This federal habeas petition was pending before the district court when the Supreme Court decided *Atkins*, and Petitioner filed a Motion for Summary Judgment shortly after *Atkins* was handed down.  On January 31, 2003, the district court denied this motion on the grounds that Petitioner had not yet exhausted his *Atkins* claim in state court.  Nevertheless, the district court retained jurisdiction over Bies' petition, and issued a stay of execution on July 30, 2003.

Petitioner's double jeopardy claim was first raised in Ohio state court.  After the state trial court denied him summary judgment on this issue, Petitioner moved the district court to amend his federal habeas petition to include this claim.  Although the government filed a memorandum in opposition to this motion, the district court granted Petitioner leave to amend his claim on April 11, 2005, and proposed that this double jeopardy claim be severed or bifurcated to allow it to be resolved independent of the balance of the habeas petition.  After briefing on this issue of severance or bifurcation, the district court did bifurcate the claims to allow Petitioner's double jeopardy claim to proceed separately, and granted the petition for a writ of habeas corpus on March 1, 2006 as to this double jeopardy claim.  This appeal followed.

---

[2]On appeal, the Ohio Court of Appeals did not reach Petitioner's Eighth Amendment claim on the grounds that it was not properly raised on direct appeal.  The Supreme Court of Ohio subsequently denied review of this decision.

## DISCUSSION

### *Standard of Review*

This Court reviews the district court's disposition of a petition for writ of habeas corpus *de novo*, and its factual findings for clear error. *Smith v. Hofbauer*, 312 F.3d 809, 813 (6th Cir. 2002).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides federal habeas relief for a state court defendant if the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[,]" 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We hold that this AEDPA standard should be applied here.[3]  A state court adjudication is "contrary to" Supreme Court precedent under §2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 404 (2000).  A state court adjudication "involves 'an unreasonable application of' Supreme Court precedent under § 2254(d)(2), 'if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case,' or if the court unreasonably refuses to extend, or unreasonably extends, existing legal principles from the Court's precedents to a new context." *Hofbauer*, 312 F.3d at 813 (quoting *Taylor*, 529 U.S. at 1520).

## I.    EXHAUSTION OF PETITIONER'S STATE COURT REMEDIES

In most cases, a habeas petitioner must "exhaust[ ] the remedies available in the courts of the State" before seeking relief in federal court.  § 2254(b)(1)(A).  This rule does not apply, however, when "there is an absence of available State corrective process," or when "circumstances exist that render such process ineffective to protect the rights of the applicant."  § 2254(b)(1)(B).  In *Gully v. Kunzman*, 592 F.2d 283 (6th Cir. 1979), this Court held that just such circumstances exist when a defendant raises a double jeopardy claim on habeas review.[4]  *Id.* at 286.

Like the instant case, *Gully* involved federal habeas petitioners who claimed, under various constitutional theories, that they could not be sentenced to death.  *Id.* at 286.  Among these claims, the *Gully* petitioners argued that, because they were sentenced to life in prison under a prior state proceeding, the Double Jeopardy Clause forbade the state from retrying and sentencing them to death.  *Id.*  Although we held that the *Gully* petitioners' non-double jeopardy claims must be fully

---

[3]Petitioner argues that "when reviewing pretrial claims of double jeopardy, this Court applies the standard of review contained in 28 U.S.C. § 2241," and urges us to apply § 2241's less restrictive standard to this case. (Petitioner's Br. at 21)  To support this claim, however, he relies on this Court's decision in *Moyer v. Petty*, No. 86-3243, 1986 WL 18526 (6th Cir. Dec. 23, 1986), which held that § 2254 "applies only in post-trial situations to petitioners in custody 'pursuant to the judgment of a state court.'" *Id.* at *2 (quoting 28 U.S.C. § 2254(b) (1982)); *accord Stow v. Murashige*, 389 F.3d 880, 886 (9th Cir. 2004); *Jacobs v. McCaughtry*, 251 F.3d 596, 597 (7th Cir. 2001); *Stringer v. Williams*, 161 F.3d 259, 262 (5th Cir. 1998).  Because Petitioner is imprisoned pursuant to such a judgment, § 2254(d) contains the proper standard of review to be applied here.

[4]Although *Gully* was decided pre-AEDPA, it has been applied by this Court in post-AEDPA decisions. *See, e.g., Harpster v. Ohio*, 128 F.3d 322, 325-26 (6th Cir. 1997) ("[F]ederal adjudication of double jeopardy claims raised on pre-trial petitions for habeas corpus is appropriate when those claims have been raised and rejected in the state trial court and under state law there is no right to interlocutory appeal." (citing *Gully*, 592 F.2d at 287)).  AEDPA made no substantive edits to § 2254(b), which was interpreted in *Gully*. *Compare* 28 U.S.C. § 2254(b) (1988) *with* 28 U.S.C. § 2254 (b) (2000).

exhausted in state court prior to federal habeas review, we also held that a more permissive exhaustion rule applies to double jeopardy claims. *Id.*

According to *Gully*, the Double Jeopardy Clause protects, not only against "the ultimate legal consequences of (an adverse) verdict," but also against the mere "risk or hazard" of twice defending against the same claim. *Id.* at 287 (quoting *Price v. Georgia*, 398 U.S. 323, 331 (1970)). "The 'prohibition is not against being twice punished, but against being twice put in jeopardy.'" *Id.* (quoting *Ball v. United States*, 163 U.S. 662, 669 (1896)). Because of the prohibition against a defendant being required to relitigate a previously decided matter, "if a criminal defendant is to avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge . . . must be reviewable before the subsequent exposure occurs." *Harpster*, 128 F.3d at 325 (quoting *Abney v. United States*, 431 U.S. 651, 662 (1977)).

Under *Gully*, a federal court may provide habeas review of double jeopardy claims once "the defendant has exhausted whatever procedures are available to him under state law for 'pre-exposure' vindication of his rights." 592 F.2d at 287; *see also Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 303 (1984) ("[A] requirement that a defendant run the entire gamut of state procedures, including retrial, prior to consideration of his claim in federal court, would require him to sacrifice one of the protections of the Double Jeopardy Clause."). In the instant case, however, Petitioner has exhausted these procedures.

Petitioner challenged his death sentence in a post-conviction proceeding in Ohio state court, claiming both that it would violate the Double Jeopardy Clause for the state to relitigate his mental retardation, and, in the alternative, that the trial court should again find him mentally retarded and therefore ineligible for execution. When Petitioner sought summary judgment on the double jeopardy claim, however, the trial judge denied his motion. Under Ohio law, "the proper remedy for seeking judicial review of the denial of a motion to dismiss on the ground of double jeopardy is a direct appeal to the court of appeals at the conclusion of the trial court proceedings." *Wenzel v. Enright*, 623 N.E.2d 69, 71 (Ohio 1993). Therefore, the only way for Petitioner to challenge the denial of his double jeopardy claim is for him to proceed to a full trial on the merits regarding his petition for post-conviction review. Such a trial, however, would force Petitioner to once again litigate the question of his mental retardation, a procedure which itself violates the Double Jeopardy Clause. *See Lydon*, 466 U.S. at 303 ("[A] requirement that a defendant run the entire gamut of state procedures, including retrial . . . would require him to sacrifice one of the protections of the Double Jeopardy Clause."); *Ashe v. Swenson*, 397 U.S. 436, 443 (1970) ("[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.").

In order to avoid unconstitutionally requiring Petitioner to relitigate the issue of his mental retardation, we hold that Petitioner has "exhausted whatever procedures are available to him under state law for 'pre-exposure' vindication of his rights." *Gully*, 592 F.2d at 287. The government cites no double jeopardy cases which would suggest a contrary holding, instead relying on this Court's decision in *Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002). In *Hill*, we held that a habeas petition seeking to vacate an allegedly mentally retarded inmate's death sentence on Eighth Amendment grounds must first be litigated in state court. *Id.* at 683. *Hill* is inapposite, however, because the petitioner in that case did not raise a double jeopardy claim. *Id.* at 680. As we held in *Gully*, a habeas petitioner may proceed to raise a double jeopardy claim in federal court even if the petitioner also presents additional claims which must be further litigated in state court. *See* 592 F.2d at 287.

Petitioner raised a double jeopardy claim in his habeas petition, arguing that the state may not relitigate the issue of his mental retardation. He filed a motion seeking summary judgment on this claim, and this motion was denied by the state trial court. Furthermore, Ohio law prevents Petitioner from appealing this denial until after a full trial on the question of his mental retardation.

*Wenzel,* 623 N.E.2d at 71. Such a trial, however, would deprive Petitioner of the very same double jeopardy right he asserted in his motion for summary judgment. We therefore hold that, under our decision in *Gully,* Petitioner has exhausted his state court remedies with respect to his double jeopardy claim, and may seek relief in federal court. 592 F.2d at 287. We now turn to the merits of his petition.

## II.    APPLICATION OF THE DOUBLE JEOPARDY CLAUSE TO PETITIONER'S MENTAL RETARDATION CLAIM

The Double Jeopardy Clause applies not just to criminal convictions, but also to sentencing proceedings in capital cases. *Arizona v. Rumsey,* 467 U.S. 203, 211 (1984); *See Bullington v. Missouri,* 451 U.S. 430, 445 (1981) ("The embarrassment, expense and ordeal and the anxiety and insecurity faced by a defendant at the penalty phase of a . . . capital murder trial surely are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial." (internal quotations omitted)). In the context of a capital sentence, a criminal defendant is protected against double jeopardy when a judge or jury "enter[s] findings sufficient to establish legal entitlement to the life sentence" *Sattazahn v. Pennsylvania,* 537 U.S. 101, 109 (2003).[5] Furthermore, in *Ashe v. Swenson,* the Supreme Court held that, under the Double Jeopardy Clause, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe,* 397 U.S. at 443. Taken together, these clearly established principles of federal law prohibit the State of Ohio from relitigating the issue of Petitioner's mental retardation.

### A.    Collateral Estoppel

Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94 (1980). Under *Ashe* this "established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy." 397 U.S. at 445. Moreover, in the double jeopardy context, collateral estoppel provides an absolute and mandatory bar to the relitigation of certain issues by a state party; "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443.

In the context of civil litigation, this court applies a four-part test in determining whether collateral estoppel precludes relitigation of an issue. Under that test, "Before collateral estoppel may be applied to bar litigation of an issue, four specific requirements must be met:"

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

---

[5] Although *Sattazahn* held that "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal,'" 537 U.S. at 109, the word "acquittal" in this context should not be read to mean that the defendant emerges victorious from the guilt phase of a criminal trial. Rather, "acquittal," for the purpose of the Double Jeopardy Clause in capital sentencing cases occurs when a judge or jury "enter[] findings sufficient to establish legal entitlement to the life sentence." *Id.*

*N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987) (footnotes omitted). While this Court has not yet had the opportunity to determine whether the same test applies in the double jeopardy context, this four-part test fully implements the Fifth Amendment's requirement that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443; *see United States v. Fiel*, 35 F.3d 997, 1006 (4th Cir. 1994) (applying a similar test under *Ashe*). We therefore consider each of these four-parts in turn.

### 1.    The Issue Being Relitigated

To succeed in his double jeopardy claim, Petitioner has the burden of demonstrating that "the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling v. United States*, 493 U.S. 342, 350 (1990). The government argues that Petitioner has not met his burden because, even though the Supreme Court of Ohio found that Petitioner is mentally retarded on direct appeal of his death sentence, "there was no definition of mental retardation for the purposes of the Eighth Amendment," at the time of this decision. (Reply Br. at 1) According to the government, Petitioner can only establish his mental retardation for Eighth Amendment purposes by demonstrating in a post-conviction proceeding that he is mentally retarded under the standard described in *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002).

In *Lott*, the Supreme Court of Ohio described the test Ohio courts use for determining whether a person is mentally retarded and therefore ineligible for the death penalty under *Atkins*. *Id.* at 1014. This decision was necessary because, although *Atkins* held that the mentally retarded could not be executed, it simultaneously "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)). The government contends that, because Petitioner's direct appeals were decided before *Atkins* and *Lott*, the courts hearing those appeals could not have applied the same standard articulated in *Lott* to determine that Petitioner is mentally retarded. The record reveals otherwise.

Although *Atkins* did not mandate that states follow a specific procedure in determining whether or not a capital defendant is mentally retarded, it cited favorably to the clinical definition of mental retardation established by the American Association on Mental Retardation and the American Psychiatric Association. *Id.* at 309 n.3. Under that definition:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

*Id.* (quoting *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed.2000) ("DSM-IV")).

In *Lott*, the court held that Ohio courts should apply this clinical standard in determining whether a capital defendant is mentally retarded. *See* 779 N.E.2d at 1014 ("Clinical definitions of mental retardation, cited with approval in *Atkins*, provide a standard for evaluating an individual's claim of mental retardation."). While the government conceded at oral argument that *Lott* does nothing more than restate the clinical definition of mental retardation, it also claims in its brief that this established a new rule in Ohio. Neither past Ohio decisions nor the record in this case support that claim. Prior to *Lott*, Ohio courts judging whether an individual is mentally retarded often relied on the clinical definition of mental retardation. *See, e.g., State v. Hill*, 595 N.E.2d 884, 901 (Ohio 1992) (crediting the diagnosis of a clinical psychologist in determining that a capital defendant is

mentally retarded);. *State v. Trent*, No. 17705, 1999 WL 1243352 at *2 (Ohio Ct. App. December 23, 1999) (unpublished decision) (describing an individual as mentally retarded because he fit the clinical definition under the DSM-IV). Moreover, the record in this case indicates that the state supreme court applied the same clinical definition of mental retardation in its determination that Petitioner is mentally retarded as it did in deciding *Lott*.[6]

The Supreme Court of Ohio's finding that Petitioner is mentally retarded was based solely on the diagnosis of Dr. Donna Winter, a licensed clinical psychologist. *Bies*, 658 N.E.2d at 761. Furthermore, it is clear from Dr. Winter's testimony at Petitioner's trial that she applied the same clinical method of diagnosing mental retardation which was described by the court in *Lott*. According to *Lott*, a person must display three traits in order to be diagnosed with mental retardation: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." 779 N.E.2d at 1014; *see also* DSM-IV 41 (describing the same test)[7]. Other adaptive skills listed by the clinical definition of mental retardation include "home living, social/interpersonal skills, use of community resources . . . functional academic skills, work, leisure, health, and safety." *Atkins*, 536 U.S. at 317 (quoting DSM-IV 41). In testifying as to Petitioner's mental retardation, Dr. Winter found each of the three traits required for a diagnosis of mental retardation present in Petitioner.

The first criteria for a diagnosis of mental retardation is "significantly subaverage intellectual functioning." DSM-IV 49. This prong is established by "an IQ of approximately 70 or below on an individually administered IQ test." *Id.* Dr. Winter testified that Petitioner has an IQ of 69. Similarly, Dr. Winter testified that Petitioner has significant limitations in several adaptive skills. Dr. Winter testified as to Petitioner's limited functional academic skills, noting that he is unable to read, that he suffers from "developmental academic disorder," and that he functions at a "third to sixth grade level." (J.A. 1166, 1168) Dr. Winter testified that Petitioner has significant limitations

---

[6] The fact that Petitioner was determined to be mentally retarded by the Supreme Court of Ohio on appeal, rather than by the trial court, makes no difference to this Court's consideration of this case. In *Sattazahn*, the Supreme Court held that double jeopardy attaches when a judge or jury "enter findings sufficient to establish legal entitlement to the life sentence." 537 U.S. at 109. Under Ohio law, a state appeals court reviewing a death sentence must conduct an independent review of the aggravating circumstances and mitigating factors relevant to the sentence on review. *Bies*, 658 N.E.2d at 761. Pursuant to this duty, the state supreme court made a finding that Petitioner is mentally retarded. As this finding is sufficient to establish [Petitioner's] legal entitlement to a life sentence, *Atkins*, 536 U.S. at 321, the fact that it was made by judges rather than a jury is irrelevant to our inquiry. *See Sattazahn*, 537 U.S. at 108.

This view is bolstered by the Supreme Court's decision in *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988), which held that "[b]ecause the Double Jeopardy Clause affords the defendant who obtains a judgment of acquittal at the trial level absolute immunity from further prosecution for the same offense, it ought to do the same for the defendant who obtains an appellate determination that the trial court should have entered a judgment of acquittal." *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988). To distinguish between trial and appellate in such cases would "'create a purely arbitrary distinction' between defendants based on the hierarchical level at which the determination was made." *Id.* (quoting *Burks v. United States*, 437 U.S. at 1, 11 (1978)).

A finding of fact which renders a defendant constitutionally ineligible for the death penalty requires a court to enter a judgment of "acquittal" for double jeopardy purposes. *Sattazahn*, 537 U.S. at 109; *see supra* note 5. In the instant case, the state supreme court made just such a finding. *Bies*, 658 N.E.2d at 761. We would create a "purely arbitrary distinction" by penalizing Petitioner simply because the finding of fact which requires a judgment of acquittal was made not by a trial judge, but by his or her judicial superiors. *Lockhart*, 488 U.S. at 39; *see also Cabana v. Bullock*, 474 U.S. 376, 387 (1986) *overturned on other grounds by Pope v. Illinois*, 481 U.S. 497, 503 n. 7 (1987) ("[T]he court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made.")

[7] Admittedly, the DSM-IV was published two years after Dr. Winter's diagnosis of Petitioner. Even so, the definition of mental retardation described by *Lott* was recognized as the clinical standard at least five years prior to Dr. Winter's testimony. *See Diagnostic and Statistical Manual of Mental Disorders* 28 (3d ed.1987) ("DSM-III") ("The essential features of [mental retardation] are: (1) significantly subaverage general intellectual functioning, accompanied by (2) significant deficits or impairments in adaptive functioning, with (3) onset before the age of 18.").

to his ability to communicate, noting that he had "problems with language at a very early age" (J.A. 1209) Dr. Winter testified that Petitioner has significant limitations to his social and interpersonal skills, noting that he was "violent and uncontrollable" at a very young age, (J.A. 1159), that he was expelled from public school for his disruptive and often violent behavior, and that he was transferred to a "severe behavior handicap class." (J.A. 1163) Finally, Dr. Winter testified that Petitioner has significant limitations to his ability to care for himself, noting that he had made a number of suicide attempts by the age of 13. Finally, Dr. Winter testified that Petitioner's limitations began to manifest as early as age 3, thus establishing their onset before the age of 18.

Based on Dr. Winter's testimony—the testimony of a clinical psychologist—it is clear that she relied on the clinical definition of mental retardation in diagnosing Petitioner. Because the Supreme Court of Ohio held that Dr. Winter's testimony was alone sufficient to establish Petitioner's mental retardation, *Bies*, 658 N.E.2d at 761, it is equally clear that the state supreme court found Petitioner to be mentally retarded under the clinical definition of that mental disorder. Accordingly, we conclude that the Supreme Court of Ohio's post-*Atkins* decision in *Lott* did not establish a new method of determining mental retardation for purposes of the Eighth Amendment. Rather, *Lott* simply restated the same diagnostic method the Supreme Court of Ohio applied to the Petitioner on direct appeal. Therefore, we hold that "the precise issue raised in the present case [was] raised and actually litigated in the prior proceeding." *N.A.A.C.P.*, 821 F.2d at 330.

Inasmuch as the precise issue litigated on direct appeal is now being raised again by the government, we conclude that the first prong of the collateral estoppel test has been met. *Id.*

## 2. The Necessity of the State Supreme Court's Finding

The second prong of the four-part collateral estoppel test requires that determination of the issue being relitigated "must have been necessary to the outcome of the prior proceeding." *Id.* We believe that this prong has also been established here.

Under Ohio law, a sentencing court may not impose the death penalty unless that court has first considered any mitigating factors weighing against a death sentence, Ohio Rev. Code § 2929.04(C), and found those mitigating factors proven by a preponderance of the evidence. *State v. Jenkins*, 473 N.E.2d 264, 275 (Ohio 1984); *see also Penry v. Lynaugh*, 492 U.S. 302, 322 (1989) (holding that a jury may not sentence a mentally retarded defendant to death unless it has been allowed to consider the defendant's mental retardation at sentencing). Furthermore, as the Supreme Court of Ohio expressly acknowledged in Petitioner's direct appeal, an Ohio court reviewing a death sentence must engage in an independent review of the aggravating circumstances and mitigating factors relevant to the sentence on review. *Bies*, 658 N.E.2d at 761.

When reviewing a sentence of death, "the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." Ohio Rev. Code § 2929.05(A). This independent review of the aggravating circumstances and mitigating factors is far more rigorous than the deferential standard of review which appellate courts normally apply to findings of fact by a trial court—even amounting to *de novo* review on both issues of law and issues of fact. *See State v. Holloway*, 527 N.E.2d 831, 837 (Ohio 1988) ("[T]hree opportunities are provided defendants to argue the appropriateness of a sentence less than death to courts which must decide the question *de novo*.") Indeed, the Supreme Court of Ohio's reconsideration of the mitigating factors weighing against a death sentence "parallels that of a jury when the sentence of death is imposed . . . ." *Jenkins*, 473 N.E.2d at 306.

An Ohio appellate court's review of a death sentence is not only rigorous, it is sweeping. During the sentencing phase of a capital defendant's trial, an Ohio jury may not limit its inquiry to considering only those mitigating factors the defendant argues are present in his or her case. Rather, "Ohio law provides that the jury is required to consider as possible mitigating factors the nature and circumstances of the offense; the history, character, and background of the defendant; and any other factors that call for a penalty less than death or that lessen the appropriateness of the death penalty." *State v. Jordan*, 804 N.E.2d 1, 16 (Ohio 2004). Each of these factors—including the all-encompassing inquiry into "any other factors that call for a penalty less than death or that lessen the appropriateness of the death penalty"—must be considered by the jury even if they are not raised by the defendant at trial. *See id.* (holding that a trial judge properly instructed a jury that it "must consider" each of the mitigating factors described by statute before imposing the death penalty).

Moreover, in considering these factors, the jury is not limited to finding mitigating factors present in the evidence presented during a capital defendant's mitigation case. Instead, the jury must consider "any evidence" which leads to a conclusion that "any factors in mitigation of the imposition of the sentence of death" are present in the defendant's case. *Id.; see also State v. Ashworth*, 706 N.E.2d 1231, 1239–40 (Ohio 1999) (holding that a defendant who presents no mitigating evidence to counter-balance aggravating circumstances may still receive a sentence other than death). In other words, before a capital defendant may be sentenced to death, a jury must first examine the entirety of the evidence in the case, and ask whether any parts of that evidence combine to outweigh the prosecution's case for imposing the death penalty. Because an Ohio appellate court's review of a death sentence "parallels that of a jury when the sentence of death is imposed," this far-reaching inquiry must be conducted *de novo* on appeal. *Jenkins*, 473 N.E.2d at 306.

Due to the broad inquiry an Ohio court must perform before sentencing a person to death, it would be impossible for that court to simply assume without deciding that a particular mitigating factor exists, and then argue that the death penalty may still be imposed because the aggravating circumstances outweigh that factor. Ohio law does not limit a court's task in imposing the death penalty to simply proving that the mitigating factors proffered by the defendant are insufficient to overcome the prosecutor's evidence. *Jordan*, 804 N.E.2d at 16. Rather, because a sentencing court's inquiry is open-ended, determining which mitigating factors are actually present in a case is a necessary first step to determining whether those factors outweigh the aggravating circumstances.[8]

Indeed the Supreme Court of Ohio engaged in just such an inquiry before upholding Petitioner's death sentence. In addition to determining that Petitioner is mentally retarded, the court found numerous other mitigating factors in the evidence presented to the jury at trial. The court found that the fact that Petitioner's "father was an alcoholic who physically abused Bies's mother before he abandoned the family," mitigated the seriousness of his offense. *Bies*, 658 N.E.2d at 761. It determined that his history of mental health problems, disruptive behavior and suicide attempts were mitigating factors. *Id.* The Court found that Petitioner's young age at the time of the crime mitigated its seriousness, and it determined that his lack of a prior criminal record was also a mitigating factor. *Id.* Each of these determinations were a necessary part of the court's duty to examine the entirety of the facts available to the jury and weigh them against the aggravating factors proven at trial. *Jordan*, 804 N.E.2d at 16. Such a weighing could not have occurred unless the court first determined what to place on either side of the scale.

---

[8]This reading of Ohio law is bolstered by the plain language of the state's death penalty statute, which requires a sentencing court to ask whether the "aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case." § 2929.05(A). Implicit in the requirement that a court consider the mitigating factors "present in the case" is that the court must necessarily determine which mitigating factors are actually present in that case.

Because the Supreme Court of Ohio found that Petitioner is mentally retarded pursuant to a mandatory duty to weigh the aggravating circumstances in his case against any mitigating factors which could be found in the record, we hold that the determination of this issue was "necessary to the outcome" of Petitioner's direct appeal, and thus the second prong of the collateral estoppel test is met. *N.A.A.C.P.*, 821 F.2d at 330.

### 3.    The Finality of the State Supreme Court's Judgment

Under the third prong of the collateral estoppel test, the proceeding in which Petitioner was found to be mentally retarded "must have resulted in a final judgment on the merits." *Id.* This prong is easily established here. Petitioner was found to be mentally retarded in final judgment by the Supreme Court of Ohio. *Bies*, 658 N.E.2d at 761. The Supreme Court of Ohio is the court of last resort in that state; Ohio law does not allow appellate review of its supreme court's decisions; *see* Ohio Rev. Code § 2953.02, and the United States Supreme Court denied review of the state supreme court's decision. *Bies v. Ohio*, 517 U.S. 1238, 1238 (1996). Accordingly, we hold that the decision which found Petitioner to be mentally retarded led to a final judgment on the merits of his case.

### 4.    The State's Opportunity to Litigate Petitioner's Mental Retardation

The final prong of the collateral estoppel test requires that "the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." *N.A.A.C.P.*, 821 F.2d at 330. We conclude that this prong is also established by the record in this case.

The government argues against such a conclusion by claiming that the parties "did not really have a fair opportunity before *Atkins* to litigate" the issue of Petitioner's mental retardation. (Respondent's Br. at 35-36) This argument, however, ignores the record. On direct appeal to the Ohio Court of Appeals and the Supreme Court of Ohio, Petitioner's mental retardation was a contested issue. In briefs before both courts, both parties presented arguments and cited evidence in the record regarding whether Petitioner suffers from mental retardation. In both courts, the government contested Petitioner's claim that he is "supposedly retarded," and cited evidence to support this claim. (J.A. 789-90, 830-31) Both courts found Petitioner's arguments more compelling. *Bies*, 658 N.E.2d at 761; *Bies*, 1994 WL 102196 at *9. For the government to now claim that the parties did not have a fair chance to litigate Petitioner's mental retardation ignores its own zealous advocacy on direct appeal.

We find that Petitioner and the government vigorously litigated the issue of his mental retardation during Petitioner's direct appeals. The government did not claim at any point during those proceedings that they were somehow unfair, or otherwise denied them a full and fair chance to present their arguments against a finding that Petitioner is mentally retarded. Furthermore, this Court has no reason to doubt the fairness of the jurists on the Ohio Court of Appeals and the Supreme Court of Ohio, and the government presents no evidence to this Court that the Ohio judges paid insufficient regard to their arguments that Petitioner is not mentally retarded. Accordingly, we conclude that the final prong of the collateral estoppel test has been established in this case. Moreover, as "death is not a suitable punishment for a mentally retarded criminal," *Atkins*, 536 U.S. at 321, the Supreme Court of Ohio's determination that Petitioner is mentally retarded is "sufficient to establish legal entitlement to the life sentence." *Sattazahn*, 537 U.S. at 109. We therefore hold that Petitioner cannot be forced to relitigate the issue of his mental retardation under the Double Jeopardy Clause. *Ashe*, 397 U.S. at 443.

### 5.    A Right Limited To The Accused

In an attempt to circumvent the Double Jeopardy Clause, the government also claims that double jeopardy does not apply here because two Ohio court decisions have allowed the mental retardation issue to be relitigated. *See State v. Lorraine*, No. 2003-T-0159, 2005 WL 1208119 at *3 (Ohio Ct. App. May 20, 2005); *State v. Bays*, 824 N.E.2d 167, 171 (Ohio Ct. App. 2005). Neither of these cases are relevant to the instant matter. In both cases, earlier state proceedings had concluded that a capital defendant was *not* mentally retarded, and thus it was the government, not the petitioner, who was claiming collateral estoppel. *Lorraine*, 2005 WL 1208119 at *3; *Bays*, 824 N.E.2d at 171. The Double Jeopardy Clause, however, has never been applied to allow a state to prevent relitigation of an issue. Much to the contrary, it exists for the sole purpose of protecting individual defendants against the power of overzealous state prosecutions. *See Bullington*, 451 U.S. at 445 ("The underlying idea [of the Double Jeopardy Clause] is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense . . . ." (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)).

Moreover, insofar as collateral estoppel is a doctrine which exists independent of the Double Jeopardy Clause, *see Ashe*, 397 U.S. at 443, a state actor may not avail itself of this doctrine in the criminal context. *See United States v. Smith-Baltiher*, 424 F.3d 913, 920 (9th Cir. 2005); *United States v. Gallardo-Mendez*, 150 F.3d 1240, 1244 (10th Cir. 1998); *United States v. Pelullo*, 14 F.3d 881, 893 (3d Cir. 1994); *United States v. Harnage*, 976 F.2d 633, 633 (11th Cir. 1992). Outside of the double jeopardy context, the doctrine of collateral estoppel exists because of concerns over judicial economy and finality—in most cases, a promptly issued decision, not subject to endless appeals and relitigation, is desirable. *Pelullo*, 14 F.3d at 893; *Harnage*, 976 F.2d at 634. In criminal cases, however "finality and conservation of private, public, and judicial resources are lesser values than in civil litigation." *Pelullo*, 14 F.3d at 893 (quoting *Ashe*, 397 U.S. at 465 (Burger, C.J., dissenting)). This is so, not because economy and finality lose value in the criminal context, but because in a criminal case, the defendant "has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction."[9] *In re Winship*, 397 U.S. 358, 363 (1970). As the Supreme Court has explained:

> [T]he purpose of a criminal court is not to provide a forum for the ascertainment of private rights. Rather it is to vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant. The public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases . . . .

*Standefer v. United States*, 447 U.S. 10, 25 (1980).

Because of a criminal defendant's "interest of transcending value" in vindicating his rights in a criminal case, *Winship*, 397 U.S. at 364, we join the Third, Ninth, Tenth and Eleventh Circuits in holding that, in a criminal case, collateral estoppel may only be invoked by the accused. *See Smith-Baltiher*, 424 F.3d at 920; *Gallardo-Mendez*, 150 F.3d at 1244; *Pelullo*, 14 F.3d at 893; *Harnage*, 976 F.2d at 633. Collateral estoppel's concern with swift, final adjudication cannot overcome a criminal defendant's interest in his own life and liberty. Accordingly, we reject the government's claim that, because Ohio law allows a death-row inmate to relitigate the issue of his mental retardation, *Lorraine*, 2005 WL 1208119 at *3; *Bays*, 824 N.E.2d at 171, we must apply the same standard when the government seeks to relitigate this same issue.

---

[9]Although a petition for a writ of habeas corpus constitutes a civil, not a criminal, proceeding, a habeas petitioner's interests in avoiding stigma and preserving his own liberty are no less than those of a criminal defendant.

## B.    AEDPA

Even though the Double Jeopardy Clause prohibits relitigation of Petitioner's mental retardation, this Court may only grant his petition if he is in custody pursuant to a state court's decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[,]" § 2254(d)(1), or which was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). In determining whether a state court unreasonably determined the facts of a case, this Court presumes that any "determination of a factual issue made by a State court" is correct. § 2254(e)(1). This presumption, however, may be rebutted by clear and convincing evidence. *Id.*; *Haliym v. Mitchell*, 492 F.3d 680, 690 (6th Cir. 2007).

Clear and convincing evidence does demonstrate that the Ohio state court based its decision to permit relitigation of Petitioner's mental retardation on unreasonable determinations of fact. In the Ohio trial court's decision denying Petitioner's motion for summary judgment, the court concluded that "while the record contains evidence that Mr. Bies is mentally retarded, the Court is unable to determine whether the experts applied the test as laid out by [*Lott*] to determine this issue." (J.A. 1610) With respect to Dr. Winter's testimony, the Ohio trial court found that "Dr. Winter concludes that Mr. Bies is mildly mentally retarded. There is no analysis of this issue, however . . . ." (J.A. 1611) In a footnote, the opinion finds that Dr. Winter's diagnosis of Petitioner "appears to be based primarily on the IQ test." (J.A. 1611 n.1) These findings, however, are contrary to the record.

Dr. Winter's testimony comprises fifty-six pages of the record in this case. In it, Dr. Winter testified not only to Petitioner's low IQ, but also to his limited functional academic skills, his significant limitations to his ability to communicate, his significant limitations to his social and interpersonal skills, and his significant limitations to his ability to care for himself, in addition to testifying that all of these signs of mental retardation manifested at an early age. Contrary to the Ohio trial court's finding that Dr. Winter's diagnosis is "based primarily on the IQ test," her testimony clearly demonstrates that she considered each of the three factors contained in the clinical test for mental retardation, and found each of them present in Petitioner. *See Lott*, 779 N.E.2d at 1014.

Furthermore, the Ohio trial court's finding ignored Dr. Winter's occupation as a *clinical* psychologist in finding that it is "unable to determine" whether Dr. Winter applied the clinical standard for diagnosing Petitioner. The clinical test for assessing mental retardation, which is described in *Lott*, represents the standard level of care offered by clinical psychologists in diagnosing their patients. *See Atkins*, 536 U.S. at 318 ("[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.") Moreover, this standard of care represents the consensus view of researchers and clinicians across the mental health care profession, and is used by "psychiatrists, other physicians, psychologists, social workers, nurses, occupational and rehabilitation therapists, counselors, and other health and mental health professionals." DSM-IV xxiii. By suggesting that Dr. Winter may have used an alternative method for diagnosing mental retardation, the Ohio trial court impliedly suggested that she may have committed malpractice without any basis in the record for such a suggestion. *See Bruni v. Tatsumi*, 346 N.E.2d 673, 676 (Ohio 1976) (holding that a health care professional may be liable for malpractice if they "did some particular thing or things that [providers] of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which [providers] of ordinary skill, care and diligence would have done under the same or similar circumstances.").

The standard for diagnosing mental retardation described in *Lott* was not created from whole cloth. Rather, *Lott* did no more than appropriate the very same standard of care which psychologists and other mental health care professionals have applied for decades. *See* DSM-III 28 (defining mental retardation in the same manner as *Lott* based on the standard of care in 1987). The record provides no evidence that Dr. Winter abandoned her professional training when she diagnosed Petitioner as mentally retarded; indeed her own testimony expressly describes Petitioner as possessing each of the three traits required for a clinical diagnosis of mental retardation. In light of the overwhelming evidence that Dr. Winter did in fact apply the clinical standard recognized by her own profession, we conclude that clear and convincing evidence demonstrates that the Ohio trial court unreasonably found that Dr. Winter could have applied a different standard.

The Ohio trial court's determination that Dr. Winter may not have applied the clinical definition of mental retardation was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). As the Supreme Court of Ohio followed Dr. Winter's testimony in its 1996 finding that Petitioner is mentally retarded, *Bies*, 658 N.E.2d at 761, the Ohio trial court's unreasonable determination of fact led to its equally unreasonable determination that the 1996 finding relied on a different method than the one described in *Lott*. Accordingly, we hold that Petitioner's double jeopardy rights are being violated pursuant to a state court decision that is based on unreasonable determinations of fact.

## CONCLUSION

Under the Double Jeopardy Clause, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. This rule establishes an absolute bar to a state seeking to relitigate such an issue of ultimate fact, regardless of the correctness of the original decision. *See Burks v. United States*, 437 U.S. 1, 16 (1978). We therefore do not concern ourselves with the merits of Petitioner's *Atkins* claim; the only question before this Court is whether the government, having litigated and lost the issue of Petitioner's mental retardation, is now attempting to reopen this question. *Gully*, 592 F.2d at 287 (holding that a criminal defendant may not be "twice put in jeopardy.")

Having examined the record in this case, we determine that Petitioner was found to be mentally retarded, under the clinically accepted definition of mental retardation, by a final judgment of the Supreme Court of Ohio. We further determine that the government is now seeking to relitigate this identical issue, that the Supreme Court of Ohio's finding was necessary to its judgment, and that the government had a full and fair opportunity to litigate this issue on direct appeal. *N.A.A.C.P.*, 821 F.2d at 330. Accordingly, this case is controlled by the United States Supreme Court's decision in *Ashe*, and this Court is obligated to follow that decision. As § 2254 does not require us to defer to the state court's judgment in this case, we therefore **AFFIRM** the decision of the district court granting habeas relief to Petitioner, vacating his sentence of death, and ordering that he be resentenced to receive a sentence other than death.