*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0279p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

MICHAEL BIES,

                *Petitioner-Appellee*,

    v.

MARGARET BAGLEY, Warden,

                *Respondent-Appellant*.

No. 06-3471

Filed: August 5, 2008

Before: DAUGHTREY, MOORE, and CLAY, Circuit Judges.

---

**ORDER**

---

    The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active[*] judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original panel.

    The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. Accordingly, the petition is denied.

---

[*] Judge Cook recused herself from participation in this ruling.

CLAY, Circuit Judge, concurring in the denial of rehearing *en banc*. When a court "enter[s] findings sufficient to establish legal entitlement to the life sentence," the Double Jeopardy Clause "bars any retrial of the appropriateness of the death penalty." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 108, 109 (2003). Furthermore, under *Atkins v. Virginia*, 536 U.S. 304 (2002), "death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321. Therefore, when the Ohio Supreme Court entered a finding that Michael Bies is mentally retarded, *State v. Bies*, 658 N.E.2d 754, 761 (Ohio 1996), that finding barred any future trial regarding whether Bies could be executed, and every Article III judge to hear Bies' case has said as much. *See Bies v. Bagley*, 519 F.3d 324, 329 342 (6th Cir. 2008). Nevertheless, the dissent from the denial of rehearing *en banc* attempts to argue that the uncontroversial issues presented by Bies' case somehow warrant *en banc* review. This opinion explains why *Bies v. Bagley* does not require such an extraordinary procedure.

I.

On October 13, 1992, Michael Bies was found guilty, by an Ohio jury, of kidnapping, attempted rape and murder. During the sentencing phase of his trial, Bies introduced the testimony of Dr. Donna Winter, a licensed clinical psychologist, who testified both that Petitioner has an IQ of 69, and that he possesses all the traits necessary for a clinical diagnosis of mental retardation. Dr. Winter's testimony was corroborated by a letter from Dr. Myron S. Fridman, another licensed clinical psychologist who diagnosed Petitioner as a "marginally functioning, mildly mentally retarded man. . . ." *Bies*, 519 F.3d at 327. Nevertheless, the jury recommended the death sentence, and on October 30, 1992, the trial court accepted this recommendation.

Bies appealed his sentence to the Ohio Court of Appeal, and eventually to the Ohio Supreme Court. Although both courts affirmed the death sentence, both courts also expressly held that Bies is mentally retarded, and the state supreme court explicitly credited Dr. Winter's diagnosis in making this finding. *See Bies*, 658 N.E.2d at 761; *State v. Bies*, No. C-920841, 1994 WL 102196 at *9 (Ohio Ct.App. March 30, 1994).

On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, which held that mentally retarded individuals cannot constitutionally be executed. *See* 536 U.S. at 321. In light of *Atkins*, Bies challenged his death sentence in a habeas petition filed pursuant to 28 U.S.C. § 2254. After Bies exhausted his remedies in state court, the district court held that, under the Double Jeopardy Clause, the government could not relitigate the already-decided question of whether Bies is mentally retarded, and thus held that *Atkins* entitles Bies to a sentence other than death. *Bies*, 519 F.3d at 329. In a unanimous decision, a panel of this Court affirmed. *Id.* at 342.

II.

Under existing Supreme Court precedent, a person challenging their death sentence may claim relief under two separate double jeopardy doctrines. The first of these doctrines, which the panel opinion in *Bies* largely relied upon, stems from *Ashe v. Swenson*, 397 U.S. 436 (1970), which held that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443; *Bies*, 519 F.3d at 332. As the panel opinion explained, this holding in *Ashe* incorporates the collateral estoppel doctrine into in the Double Jeopardy Clause. *Bies*, 519 F.3d at 332–33. To bar relitigation of an issue under the collateral estoppel doctrine, four requirements must be met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is

sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id.* at 333 (quoting *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir.1987) (footnotes omitted)).

In *Sattazahn v. Pennsylvania*, the Supreme Court described a second avenue which a death row inmate may pursue in challenging their sentence under the Double Jeopardy Clause. Under *Sattazahn*, once a judge or jury has "acquitted" a capital defendant "by entering findings sufficient to establish legal entitlement to the life sentence," jeopardy attaches to such an "acquittal," and the defendant cannot again be placed in danger of a death sentence for the same offense. 537 U.S. at 108–09. Unlike collateral estoppel, which is available to capital and non-capital defendants alike, *see Ashe*, 397 U.S. at 446 (applying collateral estoppel to benefit a robbery defendant), *Sattazahn* affords double jeopardy protections to capital defendants above and beyond those enjoyed by persons accused of less serious crimes; ensuring that once a defendant is declared entitled to a life sentence, that declaration will not be relitigated. 537 U.S. 108–09; *see also Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality opinion) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed.")

Focusing on *Sattazahn*'s use of the word "acquittal," the dissent claims that we must limit application of the Double Jeopardy Clause to the circumstances described in *Poland v. Arizona*, 476 U.S. 147 (1986). In *Poland*, the Supreme Court held that a defendant is protected against a second capital sentencing proceeding when the court in the first proceeding, "'decid[ed] that the prosecution has not proved its case' for the death penalty and hence has 'acquitted' petitioners." 476 U.S. at 154 (quoting *Bullington v. Missouri*, 451 U.S. 430, 443 (1981)). In *Sattazahn*, however, the Court clarified *Poland*'s holding, explaining that, unlike other cases where double jeopardy shielded a defendant against a second capital sentencing hearing, "in *Poland* . . . neither the judge nor the jury had 'acquitted' the defendant in his first capital-sentencing proceeding *by entering findings sufficient to establish legal entitlement to the life sentence*." *Sattazahn*, 537 U.S. at 108–09 (emphasis added).

As this language from *Sattazahn* makes clear, the Supreme Court understands *Poland* to establish two propositions. First, the Double Jeopardy Clause prohibits a second capital sentencing proceeding when the first such proceeding results in an "acquittal." *Id.* Just as importantly, however, *Sattazahn* defines an acquittal as a judgment which enters "findings sufficient to establish legal entitlement to the life sentence." *Id.*

This understanding of *Sattazahn* is consistent with the facts underlying *Poland*, which concerned capital defendants who, after their conviction and capital sentence was overturned by a state appellate court, were retried and again sentenced to death. *Poland*, 476 U.S. at 150. At the first trial, the prosecution argued that two statutory aggravating circumstances were present in the defendants' act of murder: (1) "[defendants] had committed the offense as consideration for the receipt, or in expectation of the receipt, of [something] of pecuniary value; and (2) [defendants] had committed the offense in an especially heinous, cruel, or depraved manner." *Id.* at 149 (internal citations and quotation marks omitted). Although the trial court found that the second aggravating circumstance was present, it also concluded that the first circumstance did not exist because, as a matter of law, that circumstance could only exist in a case involving a "contract killing." *Id.*

On appeal, the Arizona Supreme Court held that the *Poland* defendants' verdict was tainted, and thus ordered a new trial. *Id.* at 150. In so holding, however, the state supreme court held both that the evidence presented in the first trial did not show that the defendants had acted in a "heinous, cruel, or depraved manner," and that the trial court was incorrect, as a matter of law, in holding that the "pecuniary value" aggravating factor could only be applied to contract killings. *Id.* On remand,

the defendants were once again convicted and sentenced to death, and the trial court found both aggravating factors were present.

In light of these facts, *Sattazahn*'s holding that a court acquits a defendant "by entering findings sufficient to establish legal entitlement to the life sentence" is consistent with *Poland*'s holding that the defendants in that case were not entitled to relief under the Double Jeopardy Clause. In their first trial, the *Poland* defendants were sentenced to death pursuant to the trial court's factually unsupported conclusion that one aggravating circumstance was present, and its legally erroneous conclusion that another did not apply. *Id.* Although the state supreme court reversed the trial court's factual determination that the defendants' crime was committed in a "heinous, cruel, or depraved manner," it also reversed the trial court's legal determination that the pecuniary value aggravating circumstance was not present. *Id.* Thus, at no point did a court enter a finding of fact that no aggravating circumstances were present in *Poland*, thus entitling the *Poland* defendants to a life sentence.

Unlike *Poland*, however, in *Bies*, a court did issue a finding of fact which entitles Bies to a life sentence. On direct appeal of Bies' sentence, the Ohio Supreme Court found that Bies is mentally retarded, as that term is clinically defined. *See Bies*, 658 N.E.2d at 761. Because such a finding renders Bies constitutionally ineligible for the death penalty, *see Atkins*, 536 U.S. at 321; *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002), it amounts to an "acquittal" under *Sattazahn*, and thus jeopardy attaches to the determination that Bies is mentally retarded. *Sattazahn*, 537 U.S. at 108–09.

III.

Although *Sattazahn* provides sufficient grounds to hold that Michael Bies cannot constitutionally be forced to relitigate the issue of his mental retardation, the panel instead relied on collateral estoppel principles incorporated into the Double Jeopardy Clause by *Ashe*. *Bies*, 519 F.3d at 332–40. As the panel explained at length in its opinion, Bies has proved each of the four elements necessary to assert collateral estoppel; that is, he has shown that: (1) the question of his mental retardation was raised and actually litigated in the prior proceeding; (2) determination of this issue was necessary to the outcome of that proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the government had a full and fair opportunity to litigate the question of whether Bies is mentally retarded. *Id.* at 333 (citing *N.A.A.C.P.*, 821 F.2d at 330).

The dissent does not contest that the panel applied the correct legal standard in holding that *Bies* must prove these four elements in order to succeed under *Ashe*. Instead, the dissent argues that the panel erred in determining both that Bies' mental retardation was raised and litigated before the Ohio Supreme Court, and that determination of this issue was necessary to the outcome of that proceeding. Neither of these claims has merit.

A.    "Actually Litigated"

The dissent argues that "the constitutionality of Bies' death sentence was not 'actually . . . determined' by the state courts because saying that Bies suffered from mild mental retardation in deciding the mitigating factors that counsel against a death sentence is not the same thing as saying that Bies is ineligible for the death penalty under *Atkins*." Dissenting Op. at 12. Essentially, this argument claims that, though the Ohio Supreme Court made a finding of fact during its resolution of one legal issue, that same finding of fact may now be relitigated in the context of a different legal inquiry.

The Supreme Court disagrees with the dissent, however. In *Turner v. Arkansas*, 407 U.S. 366 (1972), Dennis Turner was charged with murdering Larry Wayne Yates during a poker game, but was acquitted upon the jury's finding that Turner was not present at the game. *Id.* at 366, 369. Subsequent to his acquittal on the murder charge, Turner was charged with robbing another member

of the same poker game. *Id.* 368. The two trials presented two very different legal questions; the first concerned whether Turner could be convicted of murder, and the second whether he could be convicted of robbery. Nevertheless, the Supreme Court applied collateral estoppel, holding that once a court made the factual determination that Turner was not present at the poker game, the state could not constitutionally claim that Turner was actually at that poker game in a future proceeding. *Id.* at 369–70.

The instant case is controlled by *Turner*. On direct appeal, the Ohio Supreme Court determined, under the clinically accepted definition of the term, that Michael Bies is mentally retarded. Because a person who is mentally retarded under the clinical definition of that term cannot constitutional be executed in the State of Ohio, *see Atkins*, 536 U.S. at 317; *Lott*, 779 N.E.2d at 1014, Bies now argues that he cannot be executed. Though Bies' *Atkins* claim raises a different *legal* issue than the one originally considered by the Ohio Supreme Court, both claims involve the same issue of *fact*; the Ohio Supreme Court determined that Bies is mentally retarded, as that term is clinically defined, and the government does not contest that if Bies is mentally retarded, he cannot constitutionally be executed. *See Atkins*, 536 U.S. at 316–17. Moreover, under *Turner*, the State is not free to contest Bies' mental retardation. Once a factual issue "has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. This rule applies even if the future lawsuit concerns a different question of law. *See Turner*, 407 U.S. at 369–70. Accordingly, the panel did not err in holding that the government cannot relitigate the question of whether or not Bies is mentally retarded.

Additionally, the dissent suggests that there might be some relevant distinction between the "individualized" determination that a particular defendant is mentally retarded and the "categorical" bar on executing mentally retarded persons. However, whatever distinction the dissent is drawing, it is not relevant to *Bies*. The Ohio Supreme Court determined, in a mitigation proceeding, that Michael Bies is mentally retarded under the clinical definition of that term. Had the identical finding of fact been made in an *Atkins* hearing, that finding alone would have been sufficient to render Bies ineligible for the death penalty. *See Atkins*, 536 U.S. at 317; *Lott*, 779 N.E.2d at 1014. Regardless of what legal questions were at issue in various proceedings, the question of fact resolved by the Ohio Supreme Court is identical to the one now contested by the state.

**B.     "Necessary to the Outcome"**

Next, the dissent argues that, though Ohio law forbids a state appellate court from affirming a death sentence unless it first determines which mitigating factors are present in the case and weighs those factors *de novo* against any aggravating factors, *see State v. Jenkins*, 473 N.E.2d 264, 296 (Ohio 1984) (holding that an Ohio appellate court's role in reviewing a death sentence "parallels that of a jury when the sentence of death is imposed"), the Ohio Supreme Court's determination that Michael Bies is mentally retarded was somehow not "necessary" to its decision to affirm Bies' death sentence. If the panel had held otherwise, however, it would have applied a tortured meaning to the word "necessary."

In order to invoke collateral estoppel, an accused must prove, among other things, that resolving the factual issue determined by an earlier proceeding was necessary to the outcome of that proceeding. *N.A.A.C.P.*, 821 F.2d at 330; *see Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.") To say that X is "necessary" to Y is the same thing as saying that it is impossible for Y to exist unless X also exists. Accordingly, because it is impossible for an Ohio appellate court to affirm a death sentence without first determining which mitigating factors are present in a case, *see Jenkins*, 473 N.E.2d at 296, the Ohio Supreme Court's resolution of the question of whether or

not Michael Bies is mentally retarded was necessary to its eventual decision to affirm Bies' death sentence; and the panel committed no error in applying collateral estoppel in *Bies*.

The dissent claims that collateral estoppel does not apply to the Ohio Supreme Court's determination that Bies is mentally retarded because that finding "cuts against" that court's ultimate conclusion that Bies should be executed. Dissenting Op. at 12. This claim, however, overstates the extent to which the fact that a court's determination was contrary to its ultimate holding precludes the application of collateral estoppel. It is generally the case in the collateral estoppel context that "[a] determination adverse to the winning party does not have preclusive effect." *Fireman's Fund Ins. Co. v. Int'l Market Place*, 773 F.2d 1068, 1069 (9th Cir. 1985). Moreover, as the dissent correctly states, the purpose of this general rule is to protect litigants from being estopped "from relitigating an issue decided in proceedings from which it could not appeal." Dissenting Op. at 12; *see United Aircraft Corp. v. NLRB*, 440 F.2d 85, 99 (2d Cir. 1971); *see also White v. Elrod*, 816 F.2d 1172, 1174 (7th Cir. 1987) ("[W]hen a decision of a tribunal of first instance is subject to appeal, the decision cannot be given collateral estoppel (or res judicata) effect if the party sought to be bound could not have appealed it, for example because he had won.")

When, however, the party against whom collateral estoppel is asserted was able to challenge the findings reached in the prior proceeding on appeal, courts have held that a finding of fact which is adverse to the party prevailing in that prior proceeding may nonetheless have preclusive effect. *See, e.g.*, *United States v. Weems*, 49 F.3d 528, 533 (9th Cir. 1995); *United Aircraft*, 440 F.2d at 99. Thus in *United States v. Weems*, defendant Clarke Weems used structured funds to purchase two parcels of land,[1] one of which was used for the cultivation of marijuana. 49 F.3d at 530. In a 1990 opinion concerning whether or not the properties were subject to forfeiture, a district court found that Weems was unaware of the marijuana cultivation on his property, but nevertheless held that the properties were subject to forfeiture because they had been purchased with illegally structured funds. *Id.* About fifteen months later, Weems was indicted on three counts of structuring currency transactions, and the trial court permitted the prosecution to introduce evidence that Weems was growing marijuana on his property as evidence of Weems' motive in structuring the transactions. *Id.* After he was convicted, Weems appealed his conviction on collateral estoppel grounds, arguing that the 1990 finding that he was unaware of marijuana cultivation on his property precluded the prosecution from arguing in a successive proceeding that this cultivation motivated his decision to structure funds.

The government argued on appeal that because it was "not entitled to appeal, as of right, the district court's finding [which] was contained in a judgment in the government's favor," that finding should not be given preclusive effect. *Id.* at 533. The Ninth Circuit, however, rejected this argument, explaining that "the government had the opportunity to cross-appeal the court's decision in this case when defendant appealed the forfeiture," and thus *Weems* did not fall within the normal complement of cases where a judgment in favor of the party against whom collateral estoppel is asserted could not have be appealed by that party. *Id.* Under *Weems*, when the fact that a judgment was obtained in a party's favor does not prevent any findings contained in that judgment from being appealed by that party, collateral estoppel may operate against that party with respect to the judgment's findings of fact.

The Second Circuit reached a similar result in *United Aircraft Corp. v. NLRB*. In that case, a union attempted to relitigate the question of whether an employer's unfair labor practice had caused the union to lose majority support among the employer's workers, even though a prior NLRB decision, whose ultimate result was favorable to the union, had found that the employer's unfair labor

---

[1] "Structuring" consists of manipulating transactions with a financial institution with the purpose of evading the reporting requirements governing such institutions. 31 U.S.C. § 5324(a)(3).

practices did not result in the union losing its majority. *United Aircraft*, 440 F.2d at 99. Although the finding of fact adverse to the union was contained in a decision favorable to the union, the court held that collateral estoppel prevented the union from relitigating the adverse finding of fact because "the union could have sought review of the Board's adverse determination on this issue." *Id.* Once again, "the general rule that 'determinations adverse to the winning litigant do not have conclusive effect as collateral estoppel' should not be applied" when the litigant's victory in the prior proceeding did not prevent them from appealing the adverse determination. *Id.* (quoting 1B James William Moore, Federal Practice 3923 (1965)).

*Bies v. Bagley* fits comfortably within the rule articulated by *Weems* and *United Aircraft*. Michael Bies was convicted and sentenced to death in an Ohio trial court. Bies appealed his sentence to an intermediate appeals court, which found both that Bies is mentally retarded and that he should nonetheless be executed, and he appealed it again to the Ohio Supreme Court, which reached the same conclusion. Thus, although Bies' mental retardation was initially determined in a decision favorable to the government, the government was never prevented from seeking reconsideration of this determination on appeal. Indeed, the final decision to determine that Bies is mentally retarded was issued by the Ohio Supreme Court, which is the court of last resort for all issues of fact raised in Ohio state court. *See* Ohio Rev.Code § 2953.02. Thus, the government had every possible opportunity to appeal the determination that Bies is mentally retarded, and the determination nonetheless survived appellate review. In such circumstances, "the general rule that 'determinations adverse to the winning litigant do not have conclusive effect as collateral estoppel' should not be applied." *United Aircraft*, 440 F.2d at 99 (quoting 1B Moore 3923).

Indeed, the dissent does not contest the existence of the rule described in *Weems* and *United Aircraft*. Instead, the dissent claims that Bies may not benefit from the collateral estoppel doctrine because the government's victory before the Ohio Supreme Court prevented it from appealing the question of Bies' mental retardation to the United States Supreme Court. Dissenting Op. at 12-13. This claim, however, reflects a misunderstanding of the United States Supreme Court's jurisdiction.

With a few rare exceptions, the Supreme Court's jurisdiction is entirely discretionary, and the Court generally will only exercise its discretion to resolve an "important question of federal law," or to resolve a question federal law which has created confusion amongst the lower courts. *See* Sup. Ct. R. 10 (describing the Supreme Court's "Considerations Governing Review on Certiorari"). The United States Supreme Court does not exercise its jurisdiction to review a state court's finding of fact, especially when multiple state courts have all reached the same factual conclusion. *See, e.g.*, *Oliver v. United States*, 466 U.S. 170, 175 n.4 (1984) ("[W]e do not review here the state courts' finding as a matter of 'fact' that the area searched was not an 'open field.'"); *Page v. Arkansas Natural Gas Corp.*, 286 U.S. 269, 271 (1932) ("Many and complicated questions of fact are involved and were argued here, but, as they have been found in favor of the respondent by both courts below, we do not review them . . . ."); *Creswill v. Grand Lodge Knights of Pythias of Georgia*, 225 U.S. 246, 261 (1912) ("[I]t is true that upon a writ of error to a state court we do not review findings of fact"). Thus, the dissent's concern—that it is somehow unfair to apply collateral estoppel when the outcome of the Ohio Supreme Court's decision prevented review of a factual conclusion by the United States Supreme Court—is baseless. Regardless of the outcome of the Ohio Supreme Court's decision, the United States Supreme Court does not review a state court's findings of fact.

IV.

Finally, the dissent claims that the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), requires deference to the state court's opinion denying relief to Bies. Specifically, the dissent alleges that the Supreme Court's cases cut against the decision in *Bies*, and that the panel erred in determining that the state decision denying post-conviction relief to Bies was based on an unreasonable determination of facts.

The dissent is simply wrong in its characterization of Supreme Court precedent; indeed the Supreme Court's decisions in *Ashe*, *Atkins*, and *Sattazahn* compel the result reached by the panel. *Ashe* held that, under the Double Jeopardy Clause, once "an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443. *Atkins* held that a mentally retarded offender may not constitutionally be executed. 536 U.S. at 320. *Sattazahn*, held that a judgment "based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty." 537 U.S. at 108 (emphasis removed). In *Bies*, the Ohio Supreme Court determined in a valid and final judgment that Michael Bies is mentally retarded. Because *Atkins* renders a mentally retarded individual ineligible for the death penalty, the determination that Bies is retarded was a "finding[] sufficient to establish legal entitlement to the life sentence;" and it could not be relitigated in a future proceeding. Any other holding would be contrary to *Ashe*, *Atkins*, and *Sattazahn*.

Moreover, even if these three cases do not compel the result reached in *Bies*, the panel determined that the state decision denying post-conviction relief to Bies was based on an unreasonable determination of the facts. Although the dissent does not contest that the state decision under review made an unreasonable finding of fact, it accuses the panel of failing to "connect [an] allegedly botched fact finding to an established legal doctrine." Dissenting Op. at 13. This is curious accusation, however, because, as the panel opinion explains at great length, *Bies*, 519 F.3d at 333–37, 340–42, the state court's unreasonable finding concerned a factual issue which, according to that very state court, was dispositive of Bies' case.

An Ohio prisoner is ineligible for the death penalty if he is mentally retarded as that term is clinically defined. *See Atkins*, 536 U.S. at 317; *Lott*, 779 N.E.2d at 1014. In determining that Bies is mentally retarded, the Ohio Supreme Court adopted the testimony of Dr. Donna Winter, a clinical psychologist who clinically diagnosed Bies as being mentally retarded. As the panel opinion in *Bies* explains in detail, *Bies*, 519 F.3d at 333–37, 340–42, Dr. Winter applied the appropriate clinical definition of mental retardation when she diagnosed Bies. Yet in the post-conviction proceeding under review in *Bies*, an Ohio court found that Dr. Winter might have applied some other, non-clinical standard in her diagnosis, and relied on this finding in denying relief to Bies. Indeed, as the Ohio court's opinion makes clear, the court not only relied on this finding, the finding was the sole basis for the court's decision. According to the Ohio court, *Atkins* and *Lott* "provide the test to determine whether someone is mentally retarded for purposes of the present analysis," but "[t]here is no indication that the [Ohio Supreme] Court applied the analysis now required." (J.A. 1612) This finding of fact made up the sole factual basis of the court's decision to deny relief to Bies under the Double Jeopardy Clause—absent this finding, which the panel determined to be unreasonable, there is no basis whatsoever for the Ohio court's decision.

Furthermore, the Ohio court's unreasonable finding of fact was not only dispositive of its decision, it was hugely relevant to the question of whether Bies is entitled to relief under the collateral estoppel doctrine. As this opinion has already explained, the first prong of the collateral estoppel analysis concerns whether "the precise issue raised in the present case [was] raised and actually litigated in the prior proceeding." *N.A.A.C.P.*, 821 F.2d at 330. Accordingly, when the Ohio court determined that the issue of whether or not Bies is mentally retarded (as that term is clinically defined) was not litigated in the prior proceeding that found him to be mentally retarded, this determination by the Ohio court necessarily foreclosed relief under the collateral estoppel doctrine. When the panel determined the Ohio court's finding to be unreasonable, and thus found that "the precise issue raised in the present case [was] raised and actually litigated in the prior proceeding," it allowed Bies' collateral estoppel claim to move forward. Thus, contrary to the dissent's claim that the panel failed to "connect [an] allegedly botched fact finding to an established legal doctrine," the Ohio court's "botched" finding of fact was intimately connected to the question of whether Bies may seek relief under the collateral estoppel doctrine.

No. 06-3471    *Bies v. Bagley*    Page 9

## CONCLUSION

*Bies v. Bagley* is an easy case.  It warrants no further review by the *en banc* Court.  As the panel opinion correctly explained, the collateral estoppel doctrine which the Supreme Court articulated in *Ashe v. Swenson* mandates that Michael Bies be granted a writ of habeas corpus.  Moreover, even if any uncertainty did exist regarding the proper application of *Ashe*, Bies' case provides an abysmal vehicle to resolve such alleged uncertainty because the Supreme Court's decision in *Sattazahn v. Pennslyvania* provides an alternative grounds upon which Bies is entitled to relief.  Thus, despite the dissent's efforts to stir controversy where none exists, the *en banc* Court correctly decided not to subject Bies to further unnecessary litigation.

SUTTON, Circuit Judge, dissenting from the denial of rehearing en banc. Four Article III judges have reviewed this case, and each of them has come to the same conclusion—that the Double Jeopardy Clause bars the State from litigating Bies' eligibility for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). They may be right. I write today, however, simply to point out that there may be another side to the story.

In 1992, Michael Bies and a friend attempted to rape a ten-year-old boy, beat him severely when he resisted, then left him to die. *State v. Bies*, 658 N.E.2d 754, 756–57 (Ohio 1996). An Ohio jury convicted Bies of aggravated murder and three capital-eligibility specifications. *Id.* at 758. At trial and on direct appeal, Bies argued that his diminished mental capacity mitigated his culpability for the offense, and each court acknowledged that Bies had "mild mental retardation to borderline mental retardation." *State v. Bies*, No. C-920841, 1994 WL 102196, at *9 (Ohio Ct. App. Mar. 30, 1994) (internal quotation marks omitted); *Bies*, 658 N.E.2d at 761. But in the end the state courts all found that Bies' diminished mental capacity and other mitigating factors did not "outweigh the aggravating circumstances of the murder" and found the death penalty appropriate for the crime. *Bies*, 1994 WL 102196, at *10; *see also Bies*, 658 N.E.2d at 762.

Six years after Bies' efforts to overturn his capital sentence on direct review had come to an end, the United States Supreme Court decided *Atkins*, which held that the Eighth (and Fourteenth) Amendment prohibits governments from imposing a capital sentence on individuals suffering from mental retardation, 536 U.S. at 321, and which directed the States to develop appropriate standards for determining whether capital-eligible defendants suffer from mental retardation, *id.* at 317. Soon enough, Bies sought state-court, post-conviction relief on two grounds: that the Eighth Amendment, as construed in *Atkins*, required the State to vacate his capital sentence, and that the Double Jeopardy Clause required the State to vacate his capital sentence in view of the Ohio courts' mitigation determinations that he suffers from mild mental retardation. After the state trial court denied his double-jeopardy claim, but before it had a chance to rule on his *Atkins* claim, Bies moved to amend his then-pending federal habeas petition to include a double-jeopardy claim. The district court permitted the amendment. Then the district court, and later a panel of this court, held that the Double Jeopardy Clause required the federal courts to vacate Bies' capital sentence and to impose a life sentence instead.

In questioning the panel's approach to this case, let me start by acknowledging that I do not question many of the premises that underlie it. The United States Constitution and Ohio law indeed require the state courts independently to weigh the aggravating circumstances that favor a capital sentence against any mitigating factors, including if appropriate the defendant's mental and psychological profile, before upholding a death sentence. I will accept for the sake of argument that the Ohio courts independently determined that Bies is mentally retarded in upholding his death-penalty conviction, even though that is far from clear. *See Bies*, 658 N.E.2d at 761; *Bies*, 1994 WL 102196, at *9. *Atkins* prevents a State from imposing the death penalty on an individual suffering from mental retardation. And the Double Jeopardy Clause prevents a State from relitigating a criminal defendant's eligibility for the death penalty. *See Bullington v. Missouri*, 451 U.S. 430, 445 (1981).

Yet these legal principles and this finding offer no basis for applying double jeopardy to a state court decision that *affirms* a death sentence. Double jeopardy bars a State from relitigating a defendant's eligibility for capital punishment only when "the sentencing judge or the reviewing court has decided that the prosecution has not proved its case for the death penalty and hence has acquitted petitioners." *Poland v. Arizona*, 476 U.S. 147, 154 (1986) (internal quotation marks and alteration omitted). Or, as the Court has put the point more recently, "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'" *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003). But no court in this case *ever* determined that the prosecution failed to prove its sentencing case: The state courts serially rejected Bies' claims that

the death penalty should not be imposed. Put another way—the way the Constitution describes it—Bies was never "twice put in jeopardy," U.S. Const. amend. V, in the post-conviction claim that *he* filed in state court. Quite to the contrary: he was taking a second run at vacating his death sentence—which is assuredly his right but just as assuredly does not offend the double-jeopardy bar.

*Poland* offers considerable guidance on the point. In *Poland*, the prosecution relied on two aggravating factors: (1) that the defendant expected pecuniary gain from the murder and (2) that the crime was especially heinous, cruel or depraved. 476 U.S. at 149. In imposing the death penalty, the state sentencing court held that the State proved the second aggravating factor but not the first (because the crime was not a contract killing). *Id.* On appeal, the Arizona Supreme Court came to the opposite conclusion on each point, holding (1) that the pecuniary-gain aggravator was not limited to contract killings and (2) that the State had not proved that the second aggravating factor applied. *Id.* at 150. After being retried and sentenced to death again, the defendant appealed to the United States Supreme Court, arguing that his independent acquittals on both aggravating factors taken together barred the State from relitigating his eligibility for the death penalty. The Supreme Court disagreed, holding—in words with direct relevance here—that "[a]ggravating circumstances are not separate penalties or offenses" upon which jeopardy can attach, but are instead "standards to guide the making of the choice between the alternative verdicts of death and life imprisonment." *Id.* at 156 (internal quotation marks and alterations omitted). Because double jeopardy's concern is the death determination itself, and because no court had held "that the prosecution had failed to prove its case that the petitioners deserved the death penalty," *id.* at 154 (internal quotation marks omitted), the Court held that the State was not barred from relitigating the petitioners' eligibility for it, *id.* at 156–57. What is true of aggravating factors is also true of mitigating factors. The Ohio courts all individually affirmed Bies' capital sentence, and therefore no statement from those courts, whether about aggravating factors or mitigating factors, implicates the double-jeopardy bar.

These principles, it seems to me, suffice to resolve this case. In reaching a different conclusion, the panel (and the concurrence) principally rely on three double-jeopardy decisions—*Ashe v. Swenson*, 397 U.S. 436 (1970), *Turner v. Arkansas*, 407 U.S. 366 (1972) (per curiam), and *Sattazahn*. I am not persuaded. *Ashe* involved two prosecutions, not one, and one acquittal, not none. *See* 397 U.S. at 439–40. In the first prosecution in *Ashe*, the question was whether the defendant was one of the individuals who had robbed a multi-participant poker game. The jury acquitted the defendant. In the second prosecution, the government charged the same defendant with robbing other participants in the same poker game. The Court barred the second prosecution, holding that the State could not relitigate the defendant's involvement in the robbery because "the single rationally conceivable issue in dispute before the [first] jury was whether the petitioner had been one of the robbers." *Id.* at 445. *Turner* is of a piece with *Ashe*, as it involved strikingly similar facts and the same result. *See* 407 U.S. at 368–70 (holding that double jeopardy barred prosecution of the defendant for robbing a poker game participant where the defendant's prior acquittal for being an accessory to the robbery victim's murder necessarily included a finding that he was not present at the time of the robbery). Unlike *Ashe* and *Turner*, however, the State has not reprosecuted Bies after an acquittal, and thus "the controlling constitutional principle" of a "prohibition against multiple trials" has not been offended. *United States v. Wilson*, 420 U.S. 332, 346 (1975). *Ashe* and *Turner*, in short, involved serial prosecutions by the government while this case involves serial efforts by the defendant to vacate his capital sentence.

As the panel reads *Sattazahn*, it establishes that double jeopardy applies "when a judge or jury 'enter[s] findings sufficient to establish legal entitlement to the life sentence,'" *Bies v. Bagley*, 519 F.3d 324, 332 (6th Cir. 2008) (quoting *Sattazahn*, 537 U.S. at 109), whether there has been an acquittal or not. But that is not how I read the case. The rest of the quotation reiterates the time-honored precondition that jeopardy does not attach in a sentencing proceeding unless there has been an "acquittal" on the death penalty itself. In full, the Court says that "in *Poland*, unlike in [*Bullington* and *Arizona v. Rumsey*, 467 U.S. 203 (1984)], neither the judge nor the jury had 'acquitted' the

defendant in his first capital-sentencing proceeding by entering findings sufficient to establish legal entitlement to the life sentence." *Sattazahn*, 537 U.S. at 108–09. The holding *for the State* in *Sattazahn* confirms the point—namely, that a hung jury regarding the death penalty did not present a double-jeopardy problem because that "result—or more appropriately, that non-result—cannot fairly be called an acquittal." *Id.* at 109. Because "the touchstone for double-jeopardy protection in capital-sentencing proceedings" remains "whether there has been an 'acquittal,'" and because Bies, like Sattazhan, "cannot establish that the jury or the court 'acquitted' him during his first capital-sentencing proceeding," *id.*, the double-jeopardy bar does not apply.

Besides ignoring the traditional acquittal requirement for invoking the double-jeopardy bar, the panel takes a wrong turn in its application of traditional issue-preclusion principles to this case. Preclusion generally attaches only to questions that were both "*actually* and *necessarily* determined" by "prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979) (emphasis added). As to the first requirement, the constitutionality of Bies' death sentence was not "actually . . . determined" by the state courts for this basic reason: saying that Bies suffered from mild mental retardation in considering the mitigating factors that counsel against a death sentence is not the same thing as holding that Bies is ineligible for the death penalty under *Atkins*. Just as the law contains many similar, yet distinct, inquiries for competence—competence to stand trial, competence to waive jury trial rights, competence to represent oneself—so too here. *Cf. Indiana v. Edwards*, 128 S. Ct. 2379 (2008). The mitigation and *Atkins* inquiries flow from different constitutional requirements under the Eighth Amendment—the requirement that capital defendants receive individualized consideration of mitigating factors, *see Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978), and the categorical (i.e., non-individualized) requirement that those who are mentally retarded not be executed due to the diminished deterrent value of the death penalty on, and the diminished culpability of, such individuals, *see Atkins*, 536 U.S. at 317–21. But if proof were needed to establish that the Ohio courts did not "actually . . . determine[]" the *Atkins* issue, it ought to suffice to point out that they could not have decided the question: *Atkins* was decided six years *after* the Ohio Supreme Court's opinion.

As to the second requirement, I am hard-pressed to understand how the Ohio courts "necessarily determined" the *Atkins* issue—how in other words they necessarily decided an issue "that did not affect *the result*" of the state courts' review of Bies' capital sentence. 18 Charles Alan Wright et al., *Federal Practice & Procedure: Jurisdiction 2d* § 4421 (2008) (emphasis added); *see also NLRB v. Master Slack &/or Master Trousers Corp.*, 773 F.2d 77, 81 (6th Cir. 1985). Unlike *Ashe* and *Turner*, where the precluded issue was necessary to the first judgment, *see Ashe*, 397 U.S. at 445; *Turner*, 407 U.S. at 369, the Ohio courts' mitigation determinations had no bearing on the results of those cases, for the simple reason that they would have affirmed his capital sentence either way—whether he suffered from mental retardation or not. Far from being necessary to the judgment, the Ohio courts' mental-retardation findings cut against it—making them quintessentially the kinds of rulings not eligible for issue-preclusion treatment. *See, e.g.*, *McKinley v. City of Mansfield*, 404 F.3d 418, 429 (6th Cir. 2005); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457–58 (2d Cir. 1995); *Balcom v. Lynn Ladder & Scaffolding Co., Inc.*, 806 F.2d 1127, 1127–28 (1st Cir. 1986); *see also* 18 Wright et al., *supra*, § 4421 (explaining that the classic example of issues not necessary to the judgment are those that are contrary to the ultimate result, such as jury findings of negligence where the defendant wins on contributory-negligence grounds).

The effect of the panel's decision is to say that the State lost this criminal case by winning it. Yet issue preclusion generally does not bar the State (or any party) from relitigating an issue decided in proceedings from which it could not appeal. *See* 18 Wright et al., *supra*, § 4421; *see also Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1204–05 n.7 (1st Cir. 1993); *White v. Elrod*, 816 F.2d 1172, 1174 (7th Cir. 1987). But the panel opinion does just that. As a mitigating factor that the state courts had to weigh *against* the aggravating factors, a finding of Bies' mental retardation was an obstacle to the judgment entered rather than a necessary step toward it. Having won the case in

the state courts, Ohio of course had no reason to seek review in the United States Supreme Court (even had *Atkins* already been decided), and Bies will search in vain for a case in which that Court accepted review of a State's appeal from a victory. I know of no case in which any court applied the double-jeopardy bar to invalidate a decision that the State (or United States) had won.

The panel's only argument that Bies' mental capacity was necessary to the state courts' judgments is that the courts had a "duty to examine the entirety of the facts available to the jury and weigh them against the aggravating factors proven at trial." *Bies*, 519 F.3d at 338. But the fact that the state courts had to consider (or even to decide) Bies' mental capacity does not mean that the determination they reached was necessary to the *outcome* of the decision. Because any state court finding that Bies was mentally retarded was in no sense "necessarily determined" by the prior judgment, *Montana*, 440 U.S. at 153, and because no court has ever held that the prosecution "failed to prove its case that [Bies] deserved the death penalty," *Poland*, 476 U.S. at 154 (internal quotation marks omitted), neither issue preclusion nor double jeopardy bars relitigation of the issue.

All of this would be true even if AEDPA did not apply. But of course AEDPA does govern this case, and, as I have shown, the only Supreme Court decisions bearing on this case all cut against the panel's decision. It is true, as Bies and the panel point out, that AEDPA permits a federal court to grant habeas relief solely on the ground that the state courts made unreasonable findings of fact. And it is true that the panel rested its AEDPA analysis on the view that the state trial court, in ruling on Bies' double-jeopardy claim, unreasonably questioned whether the Ohio Supreme Court relied on the same standard for assessing mental retardation in conducting its direct review of Bies' sentence that was later adopted as "a standard for evaluating an individual's claim of mental retardation" under *Atkins* in *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002). *See Bies*, 519 F.3d at 340–42. But this does not satisfy AEDPA, even if I accept for the sake of argument that the state trial court's finding was unreasonable. A federal court cannot simply identify an unreasonable fact finding, then conclude that AEDPA has been satisfied. It must connect that allegedly botched finding to an established legal doctrine. Here there are a series of *legal* hurdles that Bies must clear before this alleged fact question has any bearing on this case: Does the Double Jeopardy Clause apply without an acquittal? Do issue-preclusion principles apply when the issue purportedly decided in the earlier case was not actually or necessarily decided in that case? Because Bies cannot satisfy these requirements under established law, much less under AEDPA, his fact-finding argument simply chases the tail of identifying a cognizable theory of relief.

*   *   *

What is most trying about all of this is that it does not seem necessary. When the federal courts first acted in this case, they interrupted a state trial court proceeding designed to determine whether Bies had a successful *Atkins* claim. The whole point of the double-jeopardy argument was to stop the state court proceeding in its tracks and to prevent the same courts from opining about the validity of his *Atkins* claim. In obliging Bies, however, we have failed to give the state courts a chance to bring their judgment to bear on the point, and after this decision federal district courts within the circuit presumably will do the same thing with other similarly situated *Atkins* cases. *See State v. Hill*, No. 2006-T-0039, 2008 WL 2719570, at *6 (Ohio Ct. App. July 11, 2008) (disagreeing with *Bies* and holding "that the issue of Hill's mental retardation was not 'actually and directly litigated' at his sentencing hearing"). AEDPA's exhaustion requirement exists to prevent just this kind of premature intervention while a State addresses the petitioner's challenge. *See Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005). And unlike cases where we have permitted unexhausted double-jeopardy challenges before the defendant's *second prosecution* commenced, *see Gully v. Kunzman*, 592 F.2d 283, 286 (6th Cir. 1979), Bies faces no risk of a second prosecution.

By contrast, were we to allow the state court proceeding to go forward, Bies is hardly in a disadvantaged position. He has an IQ of 69, and two licensed clinical psychologists have concluded

No. 06-3471               *Bies v. Bagley*                                                    Page 14

that he is mildly mentally retarded. Assuming that these opinions stem from balanced evaluations of Bies' mental capacity, there is ample reason to think that the Ohio courts will take his claim seriously. Atkins, like Bies, was mildly mentally retarded, *Atkins*, 536 U.S. at 308–09, and Bies' IQ places him within the category of individuals the Court recognized might be affected by its decision, *see id.* at 316 (noting that the practice of executing mentally retarded individuals has become "truly unusual" given that "only five [States] have executed offenders possessing a known IQ less than 70" since the Court last ruled on the question).

Nor have the Ohio courts been reluctant to grant relief under *Atkins*. The Ohio Supreme Court already has granted relief in one such case, *State v. White*, 885 N.E.2d 905, 917 (Ohio 2008), and the state trial courts have done the same in six others, *see* Karen Farkas, *Ruling on Mental Retardation Takes 6 Off Ohio's Death Row*, Cleveland Plain Dealer, May 12, 2008, at B1. And even if the worst should happen from Bies' perspective, even if the Ohio courts should conclude that Bies was not mentally retarded under *Atkins*, he could seek certiorari on the question or seek habeas relief in the district court. Far from undermining *Atkins*, this path (through state court determinations) is exactly what the Supreme Court envisioned: For *Atkins* left "to the States the task of developing appropriate ways to enforce the constitutional restriction," *id.* at 317 (internal quotation marks and alteration omitted), and principles of comity and federalism mandate that we give the Ohio courts the first opportunity to apply that restriction to Bies' case.

I respectfully dissent from the court's denial of rehearing en banc.

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green
_____
Clerk