# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

MICHAEL BIES,

:

     Petitioner,                          Case No. 1:00-cv-682

:                    Chief Judge Susan J. Dlott

    -vs-                             Magistrate Judge Michael R. Merz

MARGARET BAGLEY, Warden,

:

     Respondent.

---

## REPORT AND RECOMMENDATIONS

---

Petitioner Michael Bies is before this Court on his Third Amended Petition for Writ of Habeas Corpus (Doc. No. 93) in which he raises nineteen grounds for relief challenging his convictions for the aggravated murder, kidnapping, and attempted rape of ten-year-old Aaron Raines in 1992. Respondent filed her Return of Writ (Doc. No. 127), Bies filed his Traverse (Doc. No. 135), and both parties have filed their briefs in lieu of an evidentiary hearing (Docs. No. 160, 162, 164). The matter is now ripe for decision.

### FACTS

The facts leading to Bies' conviction for the aggravated murder of Aaron, as found by the Ohio Supreme Court, are as follows:

Shortly after daybreak on May 12, 1992, police found the bludgeoned

body of ten-year-old Aaron Raines in the basement of an abandoned building in the 2100 block of West Eighth Street in Cincinnati. A nine-week investigation led the police to two suspects: Darryl "Junior" Gumm and defendant-appellant Michael Bies.

The police investigation revealed that the day before Aaron's body was discovered, Gumm and Bies were drinking beer and idling the day away in a park adjacent to the abandoned building in which Aaron's body was found. As evening approached, they decided they wanted to have sex with a child.

Aaron Raines, a small ten-year-old, was playing in the park that evening. Aaron had had some physical difficulties as the result of being struck by a van a year earlier. In addition, Aaron wore a partial cast on his right foot because he had dropped weights on his toe earlier that spring.

Gumm, who knew Aaron, approached the boy and offered him $10 to help him and Bies remove scrap metal from an abandoned building near the park.

After Aaron accepted Gumm's offer, Bies, Gumm and Aaron entered one abandoned building and crossed over a walkway into a second abandoned building. At this point, Aaron began to resist. Once inside this second building, Gumm attempted to have intercourse with Aaron, but Aaron screamed and resisted. When Aaron refused, Gumm struck him. Aaron began to cry. Bies admitted striking Aaron with a wooden board across the chest or head. Gumm then carried Aaron down into the basement of that building.

The beating continued in the basement. Bies further admitted he hit Aaron with a pipe three or four times, and with a piece of concrete, two or three times. Aaron was also kicked with such force as to leave the imprint of shoe tread patterns on his body.

Bies and Gumm left Aaron in the basement. They returned to the first building and performed oral sex on one another. They then left the area and went their separate ways.

When Aaron did not return home that evening, his nineteen-year-old brother became concerned and began to look for him. When Aaron's mother came home from work that night, she phoned the police to report him missing. The police searched the surrounding area, but left the search of the abandoned buildings until morning

because of their dilapidated condition.

When police discovered Aaron's body the next morning, several objects were located around the body, including a rock, a metal pipe, some rope and pieces of wood. Human hairs found on these objects were consistent with the hair sample taken from Aaron's head. Blood stains found on the pipe and piece of concrete were also consistent with Aaron's blood type.

The autopsy revealed that Aaron had sustained nineteen separate scalp lacerations, representing distinct injuries or impacts, and that there were so many tears of the scalp that they had become almost one wound. The wounds on the back of his head were consistent with injuries that would be left by the threads of a metal pipe. The entire left side of Aaron's face had been flattened by severe skull fractures caused by a very heavy and broad implement, such as a brick, a chunk of concrete, or a rock. Bleeding of the muscle tissue around Aaron's windpipe was observed, indicating pressure had been exerted around the neck by some sort of ligature, like a piece of twine.

Other injuries sustained by Aaron included five broken ribs, four of which punctured his right lung, a broken jaw, chipped teeth, a pattern injury on the back caused by some sort of long thin object like a tube or a stick, and scrapes on the back of the right leg consistent with drag marks. There was no evidence of any defensive wounds. Cause of death was multiple blunt injuries to Aaron's head, neck, chest and abdomen.

Police arrested Gumm and questioned him about his involvement in the murder. After talking to Gumm, the police went to Hazard, Kentucky, to question Bies.

Bies gave several statements to the police, two of which were tape-recorded. Initially, he denied any involvement in the murder. However, once the police presented him with information they already had, Bies admitted that he was with Gumm that day, but essentially stated that Gumm was responsible for what had occurred.

As a result of his statements, the police arrested Bies and transported him to Cincinnati. Bies offered to return to the crime scene to refresh his memory of the events in order to assist the police in solving the case. As they walked through the buildings and the surrounding

area, Bies offered detailed statements regarding the instruments used to kill Aaron, including that the pipe had threading around the top and that the weapons used to kill Aaron were similar in weight to other objects lying around the building.

When they returned to the police station, the officers told Bies that they knew he was lying because of the detailed comments he had given at the crime scene. Bies then gave his last statement, which was unrecorded per his request, admitting to his involvement in Aaron's death.

*State v. Bies*, 74 Ohio St. 3d 320, 320-22, 1996-Ohio-276 (1996). Bies was tried and found guilty of kidnapping, attempted rape, and aggravated murder with three death specifications. (Trial Tr. at 1065-55.) Following his presentation of mitigation evidence, the jury recommended a sentence of death on the aggravated murder conviction. *Id*. at 1211. The trial court adopted the jury's recommendation after independently weighing the aggravating circumstances and mitigating factors, and also imposed a sentences of ten to twenty-five years each on the attempted rape and kidnapping convictions, to run consecutively. *Id*. at 1222-23.

## PROCEDURAL HISTORY

### Direct Appeal

Bies appealed his convictions and sentences to the Hamilton County Court of Appeals, raising twelve assignments of error. (Appendix, Vol. 2 at 22-89.) On March 30, 1994, that court rejected each of Bies' claimed errors and affirmed Bies' convictions and sentence of death. *State v. Bies*, No. C-920841, 1994 WL 102196 (Ohio App. 1st Dist. March 30, 1994) (unreported). Due to a misunderstanding, Bies' appeal to the Ohio Supreme Court was untimely, but a delayed appeal was allowed, and Bies presented twenty-four propositions of law to the state supreme court in January 1995. (Appendix, Vol. 3 at 7-157.) Each was overruled, *State v. Bies*, 74 Ohio St. 3d 320,

1996-Ohio-276 (1996), and a petition for a writ of certiorari to the United States Supreme Court was denied on June 3, 1996, *Bies v. Ohio*, 517 U.S. 1238 (1996).

Approximately three and one-half months later, Bies filed an application to reopen his direct appeal in the state court of appeals, contending his appellate counsel were ineffective for failing to raise as error on direct appeal twenty-three proposed assignments of error. (Appendix, Vol. 2 at 289-98.) The court of appeals denied the application on timeliness grounds. *Id*. at 309-10. Bies appealed that decision to the Ohio Supreme Court (Appendix, Vol. 3 at 412-21), which affirmed the court of appeals on the same procedural ground, *State v. Bies*, 79 Ohio St. 3d 192, 1997-Ohio-168 (1997).

**State Post-Conviction Petition**

On September 20, 1996, Bies filed a petition for post-conviction relief in the state trial court, advancing fifteen claims. (Appendix, Vol. 4 at 3-55.) The trial court dismissed Bies' petition three separate times, but with three essentially identical sets of findings of fact and conclusions of law. (Appendix, Vol. 5 at 395-407, 434-47, 472-85.) The first of these was set aside after the prosecutor agreed that the court should consider Bies' objections (Appendix, Vol. 5 at 408-28) before entering final judgment, *id*. at 431. The second set of findings of fact and conclusions of law was vacated following Bies' Ohio R. Civ. P. 60(B) motion for relief from the trial court's order dismissing his post-conviction petition. (Appendix, Vol. 5 at 448-55, 471.) The third and final set of findings of fact and conclusions of law were filed on July 22, 1998. *Id*. at 472-85.

From that order, Bies appealed to the Hamilton County Court of Appeals. (Appendix, Vol. 6 at 3.) Each of Bies' four assignments of error, *id*. at 60-119, was rejected by that court, *State v. Bies*, No. C-980688, 1999 WL 445692 (Ohio App. 1st Dist. June 30, 1999) (unreported), and further appeal

was declined by the Ohio Supreme Court, *State v. Bies*, 87 Ohio St. 3d 1440 (1999) (table).

**Second State Post-Conviction Petition**

In October 2001, Bies filed another post-conviction petition in the state court, raising eleven claims for relief. (Appendix, Second Post-Conviction Trial ("2d PCP"), Vol. 1 at 15-48.) The trial court found the petition to be successive and out of compliance with the statutorily established conditions under which a successive post-conviction petition may be considered. *Id.*, Vol. 4 at 327. Bies appealed that decision to the state court of appeals, which affirmed the trial court. *Id.* at 329; *State v. Bies*, No. C-020306, 2003 WL 202177, 2003-Ohio-442 (Ohio App. 1st Dist. Jan. 31, 2003) (unreported). The Ohio Supreme Court declined further appeal. *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (2003) (table).

**Federal Habeas Corpus**

Between August 21, 2000, and July 19, 2001, Bies filed his petition for writ of habeas corpus and two amended petitions in this Court. (Doc. Nos. 7, 22, and 26, respectively). He later moved for and was granted a stay of these habeas proceedings to allow him to return to the state court to exhaust a *Brady* claim based on newly discovered evidence. (Doc. Nos. 28 and 39.) Following the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), holding that the execution of the mentally retarded violates the Eighth Amendment's prohibition against cruel and unusual punishment, Bies moved for summary judgment on his sixteenth ground for relief in his habeas petition, where he alleged he is mentally retarded and therefore constitutionally ineligible for the death penalty. (Doc. No. 26 at 127-28; Doc. No. 48.) That motion was denied because the constitutional basis for the claim, established in *Atkins*, had not yet been exhausted in Bies' case by presentation to the state court. (Doc. Nos. 53 and 57.) Bies was ordered instead to return to the

state court and present his mental retardation claim in a successive petition for post-conviction relief. (Doc. No. 57.)

**State Court Post-Conviction Petition on *Atkins* (Mental Retardation) Issue**

In the state court, Bies presented his *Atkins* claim as ordered by this court (Doc. No. 69, Exhibits 2 and 5), and later moved for summary judgment on that claim (Doc. No. 72 at Tab 4). In his motion, Bies argued that the state courts had repeatedly acknowledged his mental retardation. *Id.* at 2, 5, and 12, *citing State v. Bies*, No. C-920841, 1994 WL 102196 at *9 (Ohio App. 1st Dist. Mar. 30, 1994) (unreported); *State v. Bies*, 74 Ohio St. 3d 320, 327-28, 1996-Ohio-276 (1996); *State v. Bies*, No. B-925607 (State Post-Conviction Court's Findings of Fact and Conclusions of Law, Appendix, Vol. 5 at 475); see also, *State v. Bies*, No. C-980688, 1999 WL 445692 at *5 (Ohio App. 1st Dist. June 30, 1999) (unreported). (Doc. No. 72, Tab 4 at 2.) In addition, he argued, the prosecutor had also acknowledged Bies' mental retardation numerous times. (Doc. No. 72, Tab 4 at 12, *citing* Trial Tr. at 1180; Motion for Summary Judgment (Doc. No. 72, Tab 5, Exhibits 3 and 5)). Bies' contention was that the Double Jeopardy Clause of the Fifth Amendment, specifically the doctrine of collateral estoppel, precluded relitigation of the mental retardation issue. (Doc. No. 72, Tab 4 at 12-13; Doc. 79-2 at PAGEID 117-22.) The state post-conviction court denied Bies' motion for summary judgment on his *Atkins* claim (Doc. No. 79-1 at PAGEID 110-16; Doc. No. 79-3 at PAGEID 133-34.)

**Resumption of Federal Habeas Corpus Proceedings**

On March 17, 2005, Bies filed a Motion to Amend his Habeas Petition seeking to add a nineteenth ground for relief in which he contended that the Double Jeopardy Clause precluded the State from contesting his mental retardation. (Doc. No. 89 at PAGEID 260-74.) Bies argued that because relitigation of the mental retardation issue was the very harm from which he was protected

by the Double Jeopardy Clause, he was entitled to pursue habeas relief in federal court prior to the conclusion of a state court trial on the *Atkins* issue. *Id*. This Court agreed and granted Bies' motion to amend his habeas petition. (Doc. No. 92 at PAGEID 316-320.) Bies filed his comprehensive third amended petition for writ of habeas corpus on April 18, 2005. (Doc. No. 93.) Bies moved to bifurcate his nineteenth ground for relief from the rest of his habeas claims pursuant to Fed. R. Civ. P. 42(b). (Doc. No. 98.) This Court granted the motion (Doc. No. 102), and after briefing by the parties (Doc Nos. 103, 104), recommended issuance of the writ of habeas corpus on Bies' nineteenth ground for relief, finding that the state trial court unreasonably applied clearly established federal law to Bies' double jeopardy claim (Doc. No. 107 at PAGEID 598-99). After objections and a supplemental report and recommendations adhering to the findings and recommendations of the first report, both reports and recommendations were adopted. (Doc. Nos. 108, 110, 111, 113.) Respondent appealed to the Sixth Circuit Court of Appeals (Doc. No. 114), which affirmed the district court decision. *Bies v. Bagley*, 519 F.3d 324 (2008). A request for rehearing was subsequently denied. *Bies v. Bagley*, 535 F.3d 520 (2008).

Respondent pursued an appeal to the United States Supreme Court (Doc. No. 122), which granted certiorari, and reversed the Sixth Circuit's decision. *Bobby v. Bies*, 556 U.S. 825 (2009). The Court determined that Bies was not in danger of being "twice put in jeopardy," but was rather engaging in "serial efforts . . . to vacate his capital sentence." *Id*. at 2149. In addition, the Court distinguished between a judicial finding of mental retardation for mitigation purposes as opposed to the same finding for *Atkins* purposes. *Id*. The Court stated, however, that the "[m]ost grave among the Sixth Circuit's misunderstandings" was that "issue preclusion is a plea available to prevailing parties," a category of litigant that did not include Bies. *Id*. Thus, Bies was ordered to

return to the state court to litigate the issue of his mental retardation (Doc. No. 149). On June 18, 2010, the trial court concluded that Bies is mentally retarded and therefore not eligible for the death penalty, and sentenced him to consecutive terms of imprisonment of life with parole eligiblity after thirty years, eight-to-fifteen years, and eight-to-twenty-five years. (Judgment Entry, Doc. No. 152-1 at PAGEID 1476.)

Bies subsequently withdrew all or part of thirteen of the grounds for relief or sub-claims therein identified in his third amended petition for writ of habeas corpus. (Doc. Nos. 93, 155, and 165.) In lieu of an evidentiary hearing, the parties agreed to submit briefing to the Court, which was completed on January 31, 2011. (Doc. Nos. 158, 160, 161, 162, and 164.) The matter is now ripe for decision.

## ANALYSIS

Since Bies filed his Petition for a Writ of Habeas Corpus well after the effective date of the Anti-terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to his petition. (*See* Petition, Doc. No. 7.[1]) The Sixth Circuit has summarized the standard of review under the AEDPA as follows:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) . . . , a federal court
>
> may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of,

---

[1] As noted above, Bies filed a Petition (Doc. No. 7), an Amended Petition (Doc. No. 22), a Second Amended Petition (Doc. No. 26), and a Third Amended Petition (Doc. No. 93), in these proceedings. Although this particular citation to the "Petition" refers to the first of these documents, citation to the "Petition" after this point will refer to the Third Amended Petition.

clearly established Federal law, as determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir.2002) (quoting 28 U.S.C. § 2254(d)).

This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998) ("[the AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).

The first line of analysis under [the] AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis and quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id*. at 409-11.

The second line of analysis under [the] AEDPA concerns findings of fact made by the state courts. [The] AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The [federal] court gives complete deference to the . . . state court's findings of fact supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir.2004) (citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007)(parallel citations omitted). Of course, the "clear and convincing evidence" being offered to rebut the presumption of correctness due a state court's factual findings refers to evidence found within the state court record. 28 U.S.C. § 2254(d)(2).[2]

_____

[2]In *Cullen v. Pinholster*, 556 U.S. ___, ___, 131 S.Ct. 1388, 1398 (2011), the Supreme Court held that 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits," but notes its inapplicability to Bies' case since Bies did not request an evidentiary hearing

In addition, as the court of appeals has stated, "federal courts need not review every point of error raised by a *habeas* petitioner." *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010). The court explained:

> When a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this circuit, to determine whether a federal claim has been procedurally defaulted, we apply the three-prong test initially laid out in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986):
>
> > First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim . . . .
>
> *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138). If the state procedural rule was not complied with and that rule was an "adequate and independent" ground for default, we may still excuse the default if the petitioner can demonstrate "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138.

*Hoffner*, 622 F.3d at 495 (parallel citations omitted). It is with these principles in mind that this Court considers Bies' nineteen grounds for relief.

**First, Second, and Third Grounds for Relief**

In his first, second, and third grounds for relief, Bies contends that his statements to police

---

upon returning to the federal court after pursuing his *Atkins* post-conviction petition in the state court.

during interrogation should not have been admitted into evidence at his trial because they were not voluntarily made. (Petition, Doc. No. 93 at PAGEID 335-51.) He argues that his mental retardation and functional illiteracy made him particularly vulnerable to the interrogating officers' interrogation techniques, which he characterizes as "trickery and coercion," and that he does not have the intellectual ability to knowingly and voluntarily waive his *Miranda* rights. *Id*. at 343-51. In addition, he claims that his statements to police made without his having been advised of his *Miranda* rights were improperly admitted into evidence during his trial. *Id*. at 349-51.

Respondent acknowledges the claims are preserved for federal habeas corpus review, but asserts that the Ohio Supreme Court's decision rejecting them is completely in line with United States Supreme Court holdings regarding a suspect's voluntary statements to police, and the provision of the *Miranda* warnings. (Return of Writ, Doc. No. 127 at 840-43.) Bies claims that the Ohio Supreme Court's decision was based on an unreasonable determination of the facts, entitling him to habeas corpus relief. (Traverse, Doc. No. 135 at PAGEID 940-52.)

When Bies presented the issue to the state supreme court, that court held as follows:

> Bies argues that the trial court erred in overruling his motion to suppress his statements made to police officers. Bies contends that he lacked the mental capacity to waive his *Miranda* rights, and that under the totality of the circumstances, his confession was involuntary.
>
> A review of the officers' testimony and the taped statements of Bies reveals that he was advised of and waived his *Miranda* rights before each interview with the police. Moreover, at no time during the motion to suppress hearing did defense counsel attempt to establish that Bies lacked the mental capacity to voluntarily waive his *Miranda* rights. As noted in *State v. Hill* (1992), 64 Ohio St. 3d 313, 318, 595 N.E.2d 884, 890, while the state must prove voluntariness by a preponderance of the evidence, a low mental aptitude of the interrogee is not enough by itself to show police overreaching. Following *Colorado v. Connelly* (1986), 479 U.S. 157, . . . this court

recognized that evidence of police coercion or overreaching is necessary for a finding of involuntariness. *Hill*, *supra*. None of the interviews of Bies indicates police coercion, threats, mistreatment or physical deprivation. The questioning of Bies was neither prolonged nor intense. Under the totality of circumstances test of <u>*State v. Smith* (1991), 61 Ohio St. 3d 284, 288, 574 N.E. 2d 510, 515</u>, the trial court did not err in overruling Bies's motion to suppress.

*State v. Bies*, 74 Ohio St. 3d 320, 323, 1996-Ohio-276 (1996).

In a recent case, the *en banc* Sixth Circuit Court of Appeals summarized the federal law governing federal habeas corpus claims arising out of the United States Supreme Court's decision in *Miranda v Arizona*, 384 U.S. 436 (1966), as follows:

> [A habeas petitioner] has the burden of establishing that, under the totality of the circumstances, he did not knowingly and intelligently waive his rights before speaking to the police. <u>*Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005)</u>. "We are also mindful that in a habeas proceeding the petitioner 'has the burden of establishing his right to federal habeas relief . . . .'" <u>*Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)</u> (quoting <u>*Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001)</u>). Under this inquiry, we examine "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." <u>*Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)</u>; *see also* <u>*Edwards v. Arizona*, 451 U.S. 477, 482 (1981)</u>. The relevant question is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege," but rather whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." <u>*Colorado v. Spring*, 479 U.S. 564, 574 (1987)</u>.

> . . .

> It is well-established [sic], in this circuit and others, that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a <u>*Miranda*</u> waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her <u>*Miranda*</u> rights. [Citations omitted.] Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to the interrogation.

*Garner v. Mitchell*, 557 F.3d 257, 260-61, 264 (6ᵗʰ Cir. 2009)(parallel citations omitted).  The court

explained that the original purpose of the *Miranda* decision was to "'reduce the likelihood that the

suspects would fall victim to constitutionally impermissible practices of police interrogation.'"  *Id*.

at 262, *quoting New York v. Quarles*, 467 U.S. 649, 656 (1984).  As the Seventh Circuit Court of

Appeals has explained:

> The relevant constitutional principles are aimed not at protecting
> people from themselves but at curbing abusive practices by public
> officers . . . .  [T]he knowledge of the police is vital.  If they have no
> reason . . . to think that the suspect doesn't understand them, there
> is nothing that smacks of abusive behavior.  It would seem to follow
> that the question is not whether if [a defendant] were more
> intelligent, informed, balanced, and so forth he would not have
> waived his *Miranda* rights, but whether the police believed he
> understood their explanation of those rights; more precisely,
> whether a reasonable state court judge could have found that the
> police believed this.

*Rice v. Cooper*, 148 F.3d 747, 750-51 (7ᵗʰ Cir. 1998), *citing Colorado v. Connelly*, 479 U.S. 157, 161-62

(1986).  The Sixth Circuit has softened the harshness of *Connelly*, however, suggesting that if it is

apparent that because of illness, insanity, or mental retardation a suspect is incapable of rationally

waiving his *Miranda* rights, an officer's calculated, conscious effort to extract a waiver from him

would be an abusive practice.  *Garner*, 557 F.3d at 263 n.1.  However, "[t]he underlying police-

regulatory purpose of *Miranda* compels that [the] circumstances [surrounding the waiver of rights]

be examined, in their totality, primarily from the perspective of the police."  *Garner*, 557 F.3d at 263.

At the outset of Bies' first recorded statement to police, taken on July 28, 1992, in Hazard,

Kentucky, he acknowledged having been advised of his rights, and identified a form that he had

signed indicating that he understood those rights.  (Appendix, *Atkins* PCR, Vol. 9 at 3.)  He

indicated to the officers that he had finished the tenth grade and was preparing to enter his junior

year at Allen High School, although he could not think of how to spell the name of the school. *Id*. at 4. The remainder of that interview consisted mainly of Bies' claims that he had never been anywhere in Cincinnati other than the bus station, and his account of his whereabouts during the prior few months. *Id*. at 4-14.

In his second recorded statement, taken in Hazard on the same day, Bies again acknowledged that he understood and signed the rights waiver form. *Id*. at 15. He expressed his discomfort with the tape recorder, *id*. at 21, but admitted that he and Darryl Gumm had gone into the abandoned buildings with Aaron. *Id*. at 16-22. Bies stated that Gumm had beaten Aaron because Aaron refused to have sexual intercourse with Gumm. *Id*. at 21, 23-24. Throughout the interrogation, however, Bies denied having any part in beating Aaron. *Id*. at 18-20, 22-24.

In his videotaped walk-through of the abandoned buildings in Cincinnati, Bies showed the officers how he and Gumm approached the buildings and accessed one from the other. *Id*. at 25-27. He described Aaron's hat falling off when Gumm first hit him before the three went into the basement. *Id*. at 29. He pointed out the spot in the basement where Aaron's body was found and the location of the metal pipe that was used as a weapon, and he described the injuries he had seen on Aaron's body. (Appendix, *Atkins* PCR, Vol. 9 at 31-34.) Bies also incriminated Gumm in Aaron's murder, while maintaining that he did not participate in the beating, and only tripped over Aaron's body when he went into the basement to check on the boy's well being. *Id*. at 31-35. Bies indicated he had "studied the police" for seven years, a dubious claim at best, and that his purpose in returning to the scene of Aaron's murder with the police was to "help out with the crime." *Id*. at 35.

At the suppression hearing held prior to Bies' trial, Cincinnati Police Department Sergeant

Lucian Guy testified that he personally advised Bies of each of the rights contained in the waiver form prior to the first interview, and that Bies understood those rights and did not request an attorney. (Trial Tr., Vol. 1 at 46.) No threats or promises were made to Bies in order to induce him to make any statement. *Id.* at 47. Guy stated that after the first interview concluded, he and officer Gary Seal told Bies that they knew he was lying. *Id.* at 48. After reviewing Bies' rights with him again, the second interview was conducted. *Id.* Following the videotaped walk-through, Bies, Guy, and Seal returned to the Cincinnati police station, and Bies was readvised of his rights before a third interrogation, this time unrecorded, was conducted. *Id.* at 49-50, 53, 80.

Officer Seal also testified at the suppression hearing. He stated that Bies was advised of his *Miranda* rights before each interview, including the third unrecorded statement in which Bies incriminated himself in Aaron's murder. *Id.* at 89, 95.

Although Bies testified at the suppression hearing as well, he did not make any statements pertaining to his understanding of his *Miranda* rights, the waiver form he signed, or any police coercion or mistreatment directed at him during his interrogation. *Id.* at 157-61. Instead, he testified that he had dropped out of school in the tenth grade, and he denied making the statements attributed to him admitting his involvement in Aaron's murder. *Id.* He stated he had not indicated discomfort with his interviews being recorded, and that he did not see Seal take any notes during the third unrecorded interview. *Id.* As noted above, the trial court denied the motion to suppress, finding that Bies had been fully apprised of his rights prior to any statement to police. *Id.* at 166.

Bies claims that his mental retardation, his non-specific brain damage manifested as learning disabilities and mental retardation, his functional illiteracy, and the very nature of police

interrogations rendered his statements involuntary. (Petition, Doc. No. 93 at PAGEID 336-44.) He expresses doubt as to the veracity of the interrogating police officers' testimony that they advised him of his *Miranda* rights, *id*. at PAGEID 347, and specifically argues that he was not advised of his rights prior to making his inculpatory statements on the ride from Hazard, Kentucky, to Cincinnati, or on the ride from the Cincinnati Police Department to the crime scene, id. at PAGEID 349-50. In addition, Bies repeatedly attempts to cast suspicion on the police officers' failure to record Bies' most inculpatory statement which was taken at the police station following the videotaped walk through of the crime scene. (Petition, Doc. No. 93 at PAGEID 342-43, 347; Traverse, Doc. No. 135 at PAGEID 947; Supplemental Brief, Doc. No. 160 at PAGEID 1511-23.) Bies contends that all of these circumstances combine to render his waiver of his *Miranda* rights and his subsequent statements to police involuntary, and the admission of his statements into evidence at his trial improper.

With regard to Bies' claim that his statements to police were involuntary, he submitted no evidence to the state court suggesting any abusive practices by the police officers who interrogated him. Officers indicating to a suspect that they know he is lying, or even their active misrepresentation to a suspect about the evidence against him, does not amount to coercion sufficient to have overwhelmed the suspect's will, even one who is mentally retarded. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969), *Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009); *United States v. Harris*, 914 F.2d 927-933 (7th Cir. 1990). It bears repeating that the "primary significance given the original purpose underlying the Miranda decision . . . was to 'reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation.'" *Garner*, 557 F.3d at 262, *quoting New York v. Quarles*, 467 U.S. 649, 656 (1984). Nothing in the record

suggests that the officers who interrogated Bies engaged in any such conduct.

Similarly, Bies has failed to demonstrate that the police officers had, at the time of his interrogation, an indication that his "age, experience, education, background, and intelligence" prevented him from understanding the *Miranda* warnings. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Bies indicated he had finished the tenth grade in school, told the officers he could read and write, and stated he understood the rights he was waiving. (Trial Tr. at 46.) The officers' uncontradicted testimony at the suppression hearing establishes that Bies was advised of his rights at least three times in the course of his interrogations. (Trial Tr. at 46, 48, 49, 57, 60, 95.) The record provides no reason to conclude the officers should have known that Bies' representations about his educational background, literacy, and ability to understand his rights were untrue.

The Sixth Circuit has previously observed that even if a suspect's mental capacity, age, background, and experience prevented him from understanding the *Miranda* warnings, the pivotal question remains whether the officers questioning the suspect had some way of discerning his misunderstanding. *Garner*, 557 F.3d at 262. When Bies testified at the suppression hearing, he said that he dropped out of school in the tenth grade, an insignificantly slight difference from what he told the officers during his interrogation, and he never testified that he failed to comprehend the *Miranda* warnings or the consequences of his waiver of his rights. (Trial Tr., Vol. 1 at 157-61.) In addition, Bies has offered no evidence that his allegedly un-Mirandized statements made during the trips from Hazard to Cincinnati, and from the Cincinnati police station to the scene of Aaron's murder were in response to police questioning, or in any way involuntary. Bies argues that his

mental deficiencies render him particularly susceptible to routine interrogation techniques,[3] making his waiver and confession involuntary. (Supplemental Brief, Doc. No. 160 at PAGEID 1511-23.) That argument, however, is contradicted by *Garner*, 557 F.3d at 262. In light of these facts, there is no question but that the Ohio Supreme Court's decision rejecting Bies' claims that his statements to police were involuntary was neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court, nor was the decision based upon an unreasonable determination of the facts. Accordingly, Bies' first, second, and third grounds for relief should be denied.

**Fourth Ground for Relief**

In his fourth ground for relief, Bies contends the prosecutors in his case withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Petition, Doc. No. 93 at PAGEID 352-65.) Respondent argues the claim is procedurally defaulted and meritless as well. (Return of Writ, Doc. No. 127 at PAGEID 844-52.) Bies contests Respondent's procedural default defense, and argues that the withheld evidence compromised the reliability of the jury's verdicts. (Traverse, Doc. No. 135 at PAGEID 960-980.)

During discovery in these habeas corpus proceedings, material not previously disclosed to Bies by the Hamilton County Prosecutor's office was brought to light. (*See e.g.*, Doc. Nos. 19, 28.) That material precipitated Bies' return to the state court to litigate his second post-conviction petition, which included a *Brady* claim based on the material discovered here. Respondent is only

---

[3]For instance, Bies claims his initial claim of innocence, the officers' repeated interrogations, their singular attention to Aaron's murder during the interrogations, their focus on obtaining a confession, and their taking Bies to the crime scene all render his statements involuntary. (Supplemental Brief, Doc. No. 160 at PAGEID 1529-33.) There is nothing coercive about any of those techniques even if the suspect suffers intellectual deficiencies. Finding as Bies urges would make questioning any person with intellectual deficits practically impossible.

partially correct in stating that Bies raised the instant claim in its entirety in the state court, however. Part of Bies' *Brady* claim here was indeed raised in his second petition for post-conviction relief, but his arguments concerning potential suspects or witnesses Jimmy Toulbac, Adam Inman, Dwayne L. Emmons, Terry Linville, Mitchell Noble, Gregory Maynard, Leonard Swinford, Christopher Strader, George Putteet, Shane Gaskins, Harold Reidner, Jr., David Bowlin, Joseph Grabler, and Jennifer Jackson were not included in his claim in the state court. (Petition, Doc. No. 93 at PAGEID 358-59, 363; Appendix, 2d PCP, Vol. 1 at 29-33.) Consequently, to the extent Bies argues he should have been apprised of the allegedly exculpatory evidence those individuals possessed, his claim is procedurally defaulted as having never been presented to the state court.

Concerning the alleged *Brady* material Bies identified in his second post-conviction petition, the trial court relied on the procedural aspects of Ohio Rev. Code § 2953.23(A)[4] and declined to entertain Bies' second petition. (Appendix, 2d PCP, Vol. 4 at 327.) The state court of appeals affirmed the trial court's procedural ruling, *State v. Bies*, No. C-020306, 2003 WL 202177 at *1, 2003-

---

[4]That statute reads as follows:

[A] court may not entertain . . . a second petition or successive petitions for similar relief on behalf of a petitioner unless both of the following apply:

(1)    Either of the following applies:

    (a)    the Petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.

    (b)    . . . [T]he United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(2)    The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the setntencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

Ohio-442 (Ohio App. 1st Dist. Jan. 31, 2003) (unreported), and the Ohio Supreme Court declined further appeal, *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (2003) (table).

When a state court has denied a claim on procedural grounds, the first step in the federal court's analysis is to determine whether the state procedural rule is applicable to the claim at issue and whether the petitioner complied with the rule. *Maupin*, 785 F.2d at 138. Bies does not contest that Ohio Rev. Code § 2953.23(A) was applicable to his *Brady* claim, nor does he challenge the state court's finding that he failed to comply with the rule. There is little question that the state courts enforced the rule in Bies' case. *Maupin*, 785 F.2d at 138.

Bies' focuses instead on the third *Maupin* prong: "whether the state procedural rule enforced in his case is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim." *Id*. at 138. To be "independent and adequate," a state's procedural rule must be "firmly established and regularly followed," but it need not be so rigidly enforced as to eliminate all judicial discretion in the application of the rule. Wait., ___ U.S. ___, ___, 131 S.Ct. 1120, 1127-28 (2011), *quoting Beard v. Kindler*, ___ U.S. ___, ___, 130 S. Ct. 612, 617-18 (2009); *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011), *see also Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002)(stating that "[a] state procedural rule is adequate if it was firmly established and regularly followed by the time it was applied"). The adequacy of the state ground also entails an examination of the State's legitimate interests in the procedural rule in light of the federal interest in considering federal claims. *Maupin*, 785 Fl.2d at 138, *citing Henry v. Mississippi*, 379 U.S. 443, 446-48 (1965). That question is itself a federal question. *Cone v. Bell*, 556 U.S. 449, ___, 129 S.Ct. 1769, 1780 (2009), *citing Lee v. Kemna*, 534 U.S. 362, 375 (2002); *see also Coleman v. Thompson*, 501 U.S. 722, 736 (1991).

Although Bies argues that the Ohio courts have not regularly followed Ohio Rev. Code § 2953.23(A), in fact, the rule set forth in Ohio Rev. Code § 2953.23(A) was firmly established and regularly followed in the Ohio state courts on October 11, 2001, when Bies filed his second post-conviction petition, and on April 16, 2002, when the trial court applied the rule to Bies' petition (Appendix, 2d PCP, at 327). *See Sheppard v. Bagley*, No. 1:00-cv-00493, Report & Recommendations, Doc. No. 94 at PAGEID 296-97 (S.D. Ohio, June 1, 2004) (citing twenty-six cases between 1997 and 2003, including eleven death penalty cases, in which the Ohio courts enforced the procedural provision of Ohio Rev. Code § 2953.23(A)). Bies contends that he should be treated the same as his co-defendant Gumm, arguing that the state court of appeals addressed Gumm's second post-conviction petition on its merits. (Petition, Doc. No. 135 at PAGEID 979.) While the appellate court may have discussed the merits of Gumm's claims, it ultimately determined that it was without jurisidiction, which rendered the court's discussion of the merits of Gumm's claims a nullity. *State v. Gumm*, 169 Ohio App. 3d 650, 661, 2006-Ohio-6451 at ¶¶ 39-40 (Ohio App. 1st Dist. 2006). Thus, Bies' second post-conviction petition is in a substantially different procedural position than Gumm's. In Bies' particular set of circumstances, it is the balancing of state and federal interests that saves his *Brady* claim from default.

Where a state court is presented with previously withheld, newly discovered evidence in the context of a *Brady* claim, there can be no legitimate state interest in denying the claim on the procedural ground that the claimant failed to discover the withheld evidence earlier, particularly where discovery of the evidence was vigorously pursued but ultimately denied at trial and in collateral proceedings in the state court. While there is a legitimate state interest in limiting a successive post-conviction petitioner's ability to bring claims that could have been brought in

earlier proceedings, *see Reynolds v. Berry*, 146 F.3d 345, 348 (6th Cir. 1998), *citing Wesselman v. Seabold*, 834 F.2d 99, 101 (6th Cir. 1987), that interest must yield to a petitioner's federal constitutional right, established in *Brady*, to have all material exculpatory and impeaching evidence in the State's possession turned over to him. A state may not thwart a petitioner's discovery of exculpatory evidence being withheld by a prosecutor, then fault the petitioner for not discovering and presenting the evidence earlier in the process. Such a practice would only encourage the withholding of evidence favorable to the accused in violation of *Brady*.

In Bies' memorandum opposing the State's motion to dismiss his second post-conviction petition, he stated that he diligently sought comprehensive discovery in the pretrial stage of his trial and in his first post-conviction petition proceedings, and the record bears that out. (Appendix, 2d PCP, Vol. 4 at 18-19; Trial Docs, Box 3, Vol. 1 at 13-14, 33-38, 114-16, 224-45.) Prior to trial, however, the state court found that the prosecutors had provided Bies with all the discovery to which he was entitled. (Appendix, Trial Docs., Box 3, Vol. 1 at 380.)

In his first post-conviction proceeding, Bies filed a motion requesting all files in Bies' and Gumm's cases be transmitted to the post-conviction court for *in camera* review and identification and disclosure of any additional exculpatory or impeaching evidence found therein. (Appendix, Trial Docs., Box 3, Vol. 5 at 184-97.) He also filed a motion to conduct discovery. *Id*. at 198-202. This Court finds no indication in the record that the state court ruled on either of those discovery motions, but it is clear that no discovery was conducted. Significantly, Respondent does not contend here that Bies could have presented the alleged *Brady* material to the state court sooner had he exerted even greater diligence in pursuing its discovery, other than to state her reliance on the state court's procedural ruling, and she does not address the ruling's logical inconsistency. (Return

of Writ, Doc. No. 127 at PAGEID 844.)

The Sixth Circuit Court of Appeals has summarized the law governing *Brady* claims as follows:

> Under *Brady v. Maryland*, the government has a constitutional obligation to furnish a criminal defendant with any exculpatory evidence related to the defendant's guilt or possible punishment. 373 U.S. at 87. "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. Thus, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) (internal quotation marks omitted).
>
> The prosecutor's duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence. *Id*. at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *Hawkins v. Coyle*, 547 F.3d 540, 556 (6th Cir. 2008). "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).
>
> "A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008). . . .
>
> Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *accord Johnson v. Bell*, 525 U.S. 466, 475 (6th Cir. 2008) (citing *Strickler*, 527 U.S. at 289-90.) As the Supreme Court has further explained:
>
> > *Bagley*'s touchstone of materiality is a "reasonable probability"

-24-

> of a different result, and the adjective is important. The
> question is not whether the defendant would more likely than
> not have received a different verdict with the evidence, but
> whether in its absence he received a fair trial, understood as a
> trial resulting in a verdict worthy of confidence.
>
> *Kyles*, 514 U.S. at 434. Therefore, "favorable evidence is subject to
> constitutionally mandated disclosure when it 'could reasonably be
> taken to put the whole case in such a different light as to undermine
> confidence in the verdict.'" *Cone v. Bell*, 129 S.Ct. 1769, 1783 (2009)
> (quoting *Kyles*, 514 U.S. at 435).

*Robinson v. Mills*, 592 F.3d 730, 735 (2010) (parallel citations omitted). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). In addition, an evaluation of the question of prejudice requires consideration of all the relevant evidence that the factfinder would have had if the withheld evidence had been disclosed, including any evidence that might have been derived from the withheld material. *Wong v. Belmontes*, ___ U.S. ___, ___, 130 S.Ct. 383, 386 (2009).

In considering the procedural default of a *Brady* claim recently, the Sixth Circuit stated that if a petitioner "can meet the elements of his *Brady* claim and the withheld evidence was the reason the claim was not presented to the state court, he also has established cause and prejudice to excuse his procedural default." *Henness v. Bagley*, 644 F.3d 308, 324 (6th Cir. 2011), *citing Banks v. Dretke*, 540 U.S. 668, 691 (2004). The record establishes that Bies' *Brady* claim was not presented to the state courts because the evidence was withheld by the State throughout Bies' trial and first post-conviction proceedings in spite of Bies' diligence in attempting to obtain the alleged *Brady* material. Thus, Bies has established cause for his having not raised the *Brady* claim sooner than in his second post-conviction petition in the state court.

In order to determine whether Bies suffered prejudice from the State's failure to disclose the alleged *Brady* material, it is necessary to conduct a thorough examination of the materials discovered in these habeas proceedings[5] and submitted to the state court in support of Bies' second post-conviction petition. Essentially, this amounts to an evaluation of the merits of Bies' *Brady* claim. *Henness, supra.*

It is recalled that Bies failed to include any claim relating to Jimmy Toulbac, Adam Inman, Dwayne L. Emmons, Terry Linville, Mitchell Noble, Gregory Maynard, Leonard Swinford, Christopher Strader, George Putteet, Shane Gaskins, Harold Reidner, Jr., David Bowlin, Joseph Grabler, and Jennifer Jackson in his second post-conviction petition, and that Bies' *Brady* claim as to that material is procedurally defaulted without excuse.

Bies alleges that the prosecutors failed to disclose inculpatory statements made by three individuals: Roger Cordray, Reggie Hetzler, and Duffy Cody. (Petition, Doc. No. 93 at PAGEID 355-56.)

**Inculpatory Statements by Others**

**Roger Cordray**

First, Bies contends that the prosecution was required by law to disclose to him information

---

[5]This task is made immeasurably more difficult and time consuming by Bies' failure to clearly identify where the documents supporting his allegations might be found in the record before this Court. Rather than directing the Court to a place in this Court's docket or a particular volume and page in the Appendix, Bies merely cites to "Exhibits 2, 5, 6, 14," or "Exhibits 3, 4, 5 6 8 9 10, 11, 12, 13, 15." The Court asks, "Exhibits to what? The state post-conviction appendix? Habeas Doc. No. 19? Habeas Doc. No. 28? Some other document?" Such references are wholly insufficient when the exhibits to some of those documents consist of nearly 450 pages! (See Appendix, 2d PCP, Vol. 1, Exhibit 2, spanning pages 53-498.) The inadequate references persist into Bies' brief in lieu of an evidentiary hearing. (Doc. No. 160.) The Court is left to wonder and search the record itself for the evidence Bies claims would have, if timely disclosed, resulted in a different trial outcome. It bears repeating here that it is not this Court's place, as a neutral body, to search the record for evidence of a habeas petitioner's claimed constitutional error. *Franklin v. Bradshaw*, No. 3:04-cv-187, 2009 WL 649581 at *31 (S.D. Ohio March 9, 2009).

the police obtained respecting allegedly inculpatory statements made by Roger Cordray. (Petition, Doc. No. 93 at PAGEID 355; Traverse, Doc. No. 135 at PAGEID 966-67.) Bies refers the Court to several exhibits that were presented to the state courts in his second petition for post-conviction relief. Those exhibits contain copies of "Crime-Stoppers" and other tips, police interview notes, transcriptions of recordings made by police in the course of their investigation, and what appears to be a witness statement, although the witness is not identified.

The "Crime-Stoppers" tips include information that an individual by the name of Roger was known to sleep in the building where Aaron's body was found. (Petitioner's Motion to Hold Proceedings in Abeyance, Doc. No. 28, Exhibit 3.) Roger also frequently drank in the building next door. *Id*. Another tip came from Barb Desborough, who indicated that Roger Cordray confessed to the murder. *Id*. at Exhibit 4. Desborough also informed police that Vivian Stimetz might know who heard Roger confess, but the tip sheet stated that Vivian had not been located as of May 18, 1992. *Id*. Barb Desborough reported hearing from people who attended Aaron's funeral that Roger Cordray was bragging that he had killed Aaron, and that he was glad Aaron was dead. *Id*. at Exhibit 5. The police eventually found Vivian Stimetz, who was Aaron's aunt, and interviewed her. She stated that Betty Gumm, sister of co-defendant Darryl Gumm, communicated a rumor to Stimetz that Cordray was bragging about how he had killed Aaron by holding him by his feet and swinging him against the walls. *Id*. at Exhibits 6 and 7. Stimetz also repeated the rumor that Cordray lived in the abandoned building where Aaron's body was found, but stated that she had never seen him anywhere but on the street. *Id*. There is a reference to Cordray's having been taken away by the paramedics after he said "this," but the context of that comment is unclear. *Id*.

The police also interviewed Christine Robertson, who said that "supposedly" there was a

coat belonging to Cordray found in the building where Aaron's body was discovered. (Petitioner's Motion to Hold Proceedings in Abeyance, Doc. No. 28, Exhibit 8.) Robertson stated that she had been threatened by Cordray not to say anything about the coat or he would harm her. *Id.*

Anthony Steele told the police that Roger Cordray had confessed to him that he had killed "the little kid." *Id*. at Exhibit 9. Steele noticed that Cordray's hands and knuckles were scraped up, too. *Id*. Steele also stated that Cordray had confided to him that Cordray was a suspect in the murder, but that he could never "do that" because he loves kids. *Id*. at Exhibit 10. In an investigative summary, a police officer described a meeting with Anthony and Theresa Steele, who stated they were near the abandoned buildings with Cordray on an unspecified date when Cordray told them he had killed "the little kid." *Id*. at Exhibit 11. Although both Anthony and Theresa were under the influence of drugs or alcohol at the time, both believed Cordray was being honest with them. *Id*. The officers returned to the Steele home to talk with Anthony and Theresa again and the Steeles repeated their story with somewhat more detail during the second conversation. *Id*.

In the same summary, the officer related how he eventually located Cordray and took pictures of his shoes and fingerprinted him. *Id*. Cordray described his activities on the night of the murder, denied knowing Aaron Raines or seeing him the night of the murder, and stated he would never do anything to hurt a child. *Id*. In addition, the tread on Cordray's shoes did not match the imprints from the crime scene. *Id*. A comparison of Cordray's palm print to one found at the scene revealed similarities, but no points upon which an identification of the found print as Cordray's might be made. *Id*. The author of the investigative summary expressed his belief that Cordray was being truthful, and skepticism that Cordray was involved in Aaron's murder. *Id*.

In notes from an interview of Betty Gumm, it is stated that Donna Jones heard Roger

Cordray "make the statement about Aaron." (Petitioner's Motion to Hold Proceedings in Abeyance, Doc. No. 28, Exhibit 12.) There is also a note indicating that Paul Worthington heard Cordray "bragging to the cops + priest that he had done the killing." *Id*. at Exhibits 13 and 14. Talk around the neighborhood was that Cordray had committed the murder. *Id*. at Exhibit 15. Another investigative summary basically repeats the information gathered from Barb Desborough. *Id*. at Exhibit 16. A conversation with Roberta Shinkle indicated that William O'Malley beat Cordray because Cordray said he and a friend had killed Aaron. *Id*. at Exhibit 17.

**Reggie Hetzler**

Bies also claims he should have been provided with the information fifteen-year-old Larry Peters reported to the police on May 14, 1992, which is, verbatim, as follows:[6]

> States an unknown stranger approached him at the bus stop on Fountain Square and told him he killed + raped the little boy at 8th + State along with his brother - Peters asked him to write their names and address down - the unk. subject wrote:
>
> Steve Pence 1658 Carll St
> Reggie Hetsler 1437 Walnut St
>
> Peters states the subject was MW19 leather jacket, blk "Metallica" t-shirt, white jeans, 5'08" thin, blk short hair, low top McGregor gymshoes, scars on nose + walked with limp (Reggie Hetsler)

(Petitioner's Motion to Hold Proceedings in Abeyance, Doc. No. 28 at Exhibits 27 and 28.) Peters' statement is patently incredible and warrants no further consideration insofar as Bies' *Brady* claim is concerned.

---

[6]Although Bies provides only the bare citation "Exhibits 20-21," for the information about Hetzler, the Court found the relevant material in Exhibits 27-28, attached to Bies' Motion to Hold Proceedings in Abeyance. (Doc. No. 28.)

**Cody Duffey**[7]

Bies directs the Court to "Exhibits 22, 23" in his petition, but the court finds no material relating to Duffy Cody there or anywhere else in the more than fifty exhibits attached to the motion to hold proceedings in abeyance. (Doc. 28.) Through sheer happenstance, the Court found the documents to which Bies refers in the appendix to his second post-conviction petition. (Appendix, 2d PCP, Vol. 3, Exhibits 31-35 at 178-87.)

The information provided to police respecting Cody Duffey came through an anonymous caller who stated that she considered Duffey a suspect because he is "weird, harrasses [sic] the neighborhood kids, [and] always carries a large crowbar." *Id*. at 178. The tipster stated she was a neighbor of Duffey's and that shortly after Aaron's body was found, Duffey approached her and asked her what she thought she would do if someone had killed her child. *Id*. at 178-79. The caller described Duffey's demeanor as "strange and cold sounding . . . as if he knew something" about Aaron Raines' murder. *Id*. Duffey's criminal record shows numerous traffic violations, one arrest for disorderly conduct in 1990, and one arrest for domestic violence in 1984. *Id*. at 183. A copy of Duffey's fingerprint card is also included in the materials Bies claims should have been disclosed to him at the time of his trial. *Id*. at 185.

**Other Suspects**

### Garland Inman

Several of the documents Bies claims should have been disclosed to him at trial concern an individual named Garland Inman. An undated flier indicates that at some point in time, Inman

_____

[7]Bies refers to the individual as "Duffy Cody," but the exhibits to which he directs the Court's attention all identify him as "Cody Duffy" or "Cody Duffey." This Court adopts the latter form because it matches Duffey's signature on his fingerprint card. (Appendix, 2d PCP, Vol. 3 at 185.)

was wanted on two juvenile parole violations. (Appendix, 2d PCP, Vol. 3 at 190.) He also had a juvenile criminal record that included two sexually oriented offenses. *Id*. at 194-96. The documents included a 1989 juvenile investigative report detailing Inman's sexual abuse of children left in his care, and a request and authorization to obtain the phone records for Inman's father's telephone. *Id*. at 202-8. The rest of the documents are investigative summaries stating one or another person's expressed belief that Inman may have had something to do with Aaron's murder, that Inman was recently released from detention, and that described Inman's suspected whereabouts following the murder. *Id*. at 197-201, 209-25.

**Claude Justice**

Next, Bies contends that "Claude Justice was an adult often seen in the company of young males" and had frequently been seen in the vacant building where Aaron was murdered, that police were in possession of that information, and that it should have been disclosed to him prior to his trial. (Petition, Doc. No. 93 at PAGEID 357; Traverse, Doc. No. 135 at PAGEID 968.) Although Bies makes no further argument about Justice, the materials apparently submitted to the state court in support of his claim there include a Crime Stoppers tip in which an anonymous caller stated that he knew Justice to be a homosexual who propositioned boys for sex, that Justice had approached the caller himself when he was younger, and that the caller had seen Justice engaged in sex with a boy under a viaduct some twenty years earlier. (Appendix, 2d PCP, Vol. 3 at 226-27.[8]) The caller also stated he had in the past seen Justice come out of the vacant building where Aaron's

---

[8]The material submitted to the state court does not appear in the Exhibits to Bies' Memorandum in Support of the Court's Release of Records that the Warden Filed Under Seal (Doc. No. 19) or his Motion to Hold Proceedings in Abeyance (Doc. No. 28), documents this Court presumes make up the totality of the exculpatory evidence forming the basis of Bies' *Brady* claim. Nevertheless, the Court will assume without holding that Bies came upon the information concerning Claude Justice in the course of following up on what was discovered in these habeas proceedings.

body was found, sometimes followed minutes later by a boy. *Id*. Finally, there appears in the record what purports to be a copy of Justice's criminal record, but it merely shows the number of traffic violations, misdemeanors, and felonies Justice had been convicted of without revealing the substance of the convictions. *Id*. at 228.

**Raymond Moore**

Bies also argues he was entitled to the information police collected respecting Raymond Moore, who Bies claims was near the abandoned buildings the night Aaron was murdered. (Petition, Doc. No. 93 at PAGEID 357; Traverse, Doc. No. 135 at PAGEID 969.) During the investigation into Aaron's murder, several people, including Aaron's uncle William Raines called the police to say that they thought Raymond Moore could be a suspect. (Petitioner's Motion to Hold Proceedings in Abeyance, Doc. No. 28, Exhibits 19, 20, 21, 22, 24.) It seems that Moore told William Raines that he had twice searched without success for Aaron in the building where the boy's body was ultimately found. (Doc. No. 28, Exhibits 19, 21, 22.) Raines stated that Moore had been living in that same building for years, and that Moore was acting strangely when he related his story to Raines. (Doc. No. 28, Exhibit 22.)

Soon after the police received the tips from Raines and several unknown tipsters, they learned that Moore was living in the basement of his aunt's house. (Doc. No. 28, Exhibit 24 at 1.) The officers went to the home and transported Moore to the police station where they photographed Moore's shoes even though they did not resemble the shoe prints left at the scene of the murder. *Id*. Moore's palm prints were taken as well. *Id*. Moore related that he joined in the search for Aaron at the request of the police after the child was reported missing. *Id*. at 2. He searched for three or four hours, entering several abandoned buildings, including the one in which

Aaron's body was eventually found.  *Id*. at 2-3.  After questioning Moore about his activities the night Aaron was murdered and driving Moore past the building where Aaron's body was found, Moore told the officers he was not sure he went into that building after all.  *Id*. at 3.  The officers apparently saw no point in pursuing Moore any further due to the lack of similarities between his shoes and the shoe prints found on and around Aaron's body, Moore's admittedly "shot" memory, and their determination of his truthfulness.  *Id*. at 3-4.

**Luther Hatton**

Luther Hatton is the next alleged suspect of whom Bies contends he should have been made aware during his trial.  (Petition, Doc. No. 93 at PAGEID 357-58; Traverse, Doc. No. 135 at PAGEID 969.)  Some of the information to which Bies claims entitlement originated with an ex-convict named Mark Jackson.  Jackson told police that Hatton is gay, and that the word in the Lucasville Correctional Institution was that Hatton killed Aaron Raines.  (Doc. No. 28, Exhibit 25.)  Jackson stated Hatton was very violent and had "supposedly" been arrested for molesting children before, providing the basis for Jackson's belief that Hatton killed Aaron.  *Id*.  The officer who talked with Jackson noted that Jackson's information was "real vague" other than "pointing the finger at Hatton" for the murder.  *Id*.  In addition, Jackson admitted that he had no affection for Hatton, but denied that was the reason he implicated him in Aaron's death.  *Id*.  Jackson was also intoxicated during his interview, and mixed up words and ideas during the discussion.  *Id*.  Jackson's shoes did not share a brand name or tread pattern with the shoes that left prints in and around the murder scene, and Jackson's fingerprints were taken for the purpose of eliminating him as a possible suspect.  *Id*.

Aaron's uncle Clayton Raines also mentioned Hatton to police as a possible suspect.  *Id*.,

Exhibit 26. Clayton Raines told police that he heard Hatton and his brother were in the vicinity of the abandoned building the night Aaron was killed. *Id*. He directed the officers to Beverly Fitch, who had been drinking with the Hatton brothers on the night Aaron disappeared not far from where his body was found. *Id*. Fitch stated that she had left the brothers to buy more beer, and that when she returned to their drinking spot ten or fifteen minutes later, she could not find the men. *Id*.

**Carl Miller**

Bies contends he should have been provided with information concerning Carl Miller, who was "very high" the night of Aaron's murder, and whose clothes were "filthy" and consistent with having crawled through a vacant building. (Petition, Doc. No. 93 at PAGEID 358; Traverse, Doc. No. 135 at PAGEID 969.) Bies states that Miller was extremely nervous the night of the murder and did not deny having been in the vacant building with Aaron, although it is not clear from Bies' argument when Miller's visit to the building with Aaron might have taken place. *Id*. Miller was apparently anxious to leave the area after Aaron's body was discovered. *Id*.

In his argument, Bies directs the Court to Exhibits 58, 59, 60, and 61. *Id*. There exist no such exhibits attached to Bies' motion to hold proceedings in abeyance (Doc. No. 28), or in his memorandum supporting the Court's release of records the Warden filed under seal (Doc. No. 19). Bies' second post-conviction petition filed in the state court had exhibits so numbered, but those documents do not mention the name "Carl Miller" or Miller's nickname, "Junebug," nor do they concern the substance of Bies' argument respecting Miller.[9] (Appendix, 2d PCP, Vol. 3, Exhibits 59,

_____

[9]Like the information relating to Claude Justice, the material allegedly casting suspicion on Carl Miller for Aaron's murder does not appear in his documentation of newly discovered evidence in these proceedings. (See Doc. Nos. 19, 28.) Thus, the Court will also assume without holding that Bies came upon the information concerning Carl Miller in the course of following up on what was discovered in these habeas proceedings.

60, at 229-33.) Instead, the information to which Bies refers is most likely that found in Exhibits 65 through 69 to his second post-conviction petition in the state courts. (Appendix, 2d PCP, Vol. 3 at 247-54.) Those documents reflect that Clayton Raines told police that someone else thought Miller had something to do with Aaron's murder because Miller was "excited and high and wanted to get out of the neighborhood" the night Aaron disappeared. *Id*. at 248, 250. Clayton Raines also expressed that "he has a strong feeling" about Miller for the same reason. *Id*. at 250-51. In spite of Miller's apparently urgent desire to leave town the night Aaron disappeared, Clayton Raines continued to see him in the neighborhood days later. *Id*. at 253-54.

**Robert Shelton and Jimmy Ball**

Bies also contends the prosecutor should have disclosed information suggesting that Aaron had been in a fight with Robert Shelton and Jimmy Ball the night of Aaron's murder. (Petition, Doc. No. 93 at PAGEID 359; Traverse, Doc. No. 135 at PAGEID 970.) The documentation Bies submitted in the state court to support his claim consisted of an investigative report indicating someone named "Jimmy, last name unknown," told someone he knew who committed the murder.[10] (Appendix, Second Post-Conviction Petition, Box 4, Vol. 3 at 282.) There is also a note generated following an unknown police officer's telephone conversation with Teresa Wright, who stated that she heard through "hearsay" that Aaron was with Robert Shelton at an establishment called the Whippy Dip the night of the murder. *Id*. at 285. Wright heard that Aaron and Shelton were fighting with Jimmy Ball there, and that she herself believed that Ball killed Aaron. *Id*. A notation at the bottom of the document states "Contacted by Hoffman 5/16/92, 0800 hrs., No follow-up

---

[10]The material relating to Robert Shelton and Jimmy Ball also appears only in the state court record, and not in the documents filed in these proceedings which precipitated Bies' return to the state court to litigate his second post-conviction petition. It will be considered in the same manner as the material concerning Claude Justice and Carl Miller.

needed." *Id*.

**Analysis of "Inculpatory Statements by Others" and "Other Suspects" Material**

Taken in its totality, the information Bies claims should have been disclosed to him under *Brady* does not create a "probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Much of the alleged *Brady* material is nothing more than rumor, hearsay, hearsay upon hearsay, hearsay upon hearsay upon hearsay, or worse. Bies has not explained how any of that "evidence" would have been rendered admissible in court, or how it would have led to admissible evidence. Roger Cordray's alleged statements to others that he had killed "the little kid," for instance, are inadmissible hearsay, and Cordray himself denied making the statements attributed to him when questioned directly about them by the police. His denial strongly suggests that there would have been no "Perry Mason" moment in Bies' trial in which Cordray would have confessed to the murder on the witness stand. The officers eliminated him as a suspect after noticing that Cordray's shoes did not possess the tread pattern seen at the crime scene nor did his palm print match one found at the scene. (Appendix 2, Vol. 10 at 194.) In addition, they assessed Cordray's truthfulness and found his denial of involvement in Aaron's murder credible. *Id*. Thus, all that remained of the "evidence" that Cordray had anything to do with the murder was rumor, hearsay, and conjecture, and Bies has not demonstrated how it could have led to the development of material, admissible evidence.

For the same reason, the information police possessed respecting Reggie Hetzler, Cody Duffey, Garland Inman, Claude Justice, Raymond Moore, Luther Hatton, Carl Miller, Robert Shelton, and Jimmy Ball fails to put Bies' case in such a different light that confidence in the jury's

verdict is undermined. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

**Co-Defendant Gumm**

Bies argues he was entitled to the information in the prosecution's possession indicating that Gumm "knew the [abandoned] building 'like the back of his hand,' and had been in it 'hundreds' of times." (Petition, Doc. No. 93 at PAGEID 359-60; Traverse, Doc. No. 135 at PAGEID 971-72.) He claims that information tended to show which person, Gumm or Bies, lured Aaron into the abandoned buildings for the purpose of performing sexual acts with Aaron. *Id*. at PAGEID 360.

In his Petition and Traverse, Bies argues that all of that information was relevant to which of the two, himself or Gumm, were more culpable in Aaron's murder and therefore more deserving of a death sentence. (Doc. Nos. 93 and 135 at 359-60, 971, respectively.) Since he limits his argument to the penalty phase of his capital trial and since Bies is no longer sentenced to death because he has been found to be mentally retarded (Doc. No. 152-1 at PAGEID 1475-76), insofar as his claim relates to the evidence concerning Gumm, it is moot and need not be considered further.

**Steven Clark**

Bies next contends that the prosecutors withheld information relating to Steven Clark, to whom Bies allegedly made inculpatory statements while being held in the Hamilton County Justice Center prior to trial. (Petition, Doc. No. 93 at PAGEID 360-61; Traverse, Doc. No. 135 at PAGEID 972-73.) Bies argues he should have been provided evidence that Clark had a more extensive criminal record than he admitted to during his testimony; that he obtained favorable treatment in exchange for his testimony against Bies; and that contrary to his testimony, he had a complete understanding of the facts surrounding the offenses to which he pled guilty. *Id*.

Although the exhibit numbers Bies refers to in his traverse do not guide the Court to any

document relating to Clark in the record, he appended the relevant information to his memorandum in support of the court's release of records filed under seal, and it indicates that Clark had been convicted of two bank robbery offenses in the 1980s. (Doc. No. 19, Exhibit 2.) There are also documents detailing Clark's 1992 convictions on corruption of a minor and gross sexual imposition offenses. (Doc. No. 19, Exhibits 2-5.) The prosecutor dismissed the specifications to those two offenses after Clark was convicted and sentenced, but no date appears on the entry. (Doc. No. 19, Exhibit 3.)

At Bies' trial, Clark testified that Bies was housed in the same pod as he was at the Justice Center. (Trial Tr. at 803.) According to Clark, Bies initially maintained his innocence in Aaron's murder, but later told Clark how great he felt when he was killing Aaron, that he felt the god-like power to give and take life. *Id*. at 805, 808. Clark answered affirmatively when the prosecutor asked him if he had a "record for bank robbery" from 1987. *Id*. at 800, 813-14. That answer, as far as it went, was truthful according to the materials Bies submitted in support of his claim. (Appendix, Box 4, Vol. 3 at 305.) Clark did have a bank robbery conviction from 1987. It happens that he also had a bank robbery conviction from 1985, but he was not asked about that conviction on direct examination, nor was he asked on direct or cross-examination if the 1987 bank robbery conviction was the only conviction of that kind in his past. In addition, the jury was immediately made aware that Clark had recently pled guilty to one count of corruption of a minor and one count of gross sexual imposition, for which sentence was imposed just before his testimony in Bies' case. (Trial Tr. at 800-1.) Thus, nothing in the exchange between Clark and his examiners respecting his criminal record was untruthful, and even if defense counsel had known of the 1985 conviction, it possessed no additional impeaching value. Moreover, it is unlikely that any juror would have been

persuaded to acquit Bies of Aaron's murder if he or she had known that Clark had another, more temporally remote conviction for bank robbery.

On cross-examination, defense counsel brought out that Clark had pled guilty to the two most recent charges even though he testified that he did not know what he was supposed to have done to commit gross sexual imposition. (Trial Tr. at 810, 823.) He admitted having sexual intercourse with a young girl which resulted in the corruption of a minor conviction. *Id*. at 811. Clark also admitted that when he was initially brought to the Justice Center he was admitted into the psychiatric unit because he had threatened to commit suicide. *Id*. at 818-19. He recalled being diagnosed with depression and prescribed lithium, which he stated he took for a few weeks before discontinuing the medication, but later acknowledged that he did not remember whether he took the lithium for weeks or days. *Id*. at 820-21. He later stated again that he was on the medication for eighteen or twenty days, *id*. at 825, and that he may have been taking the lithium when he had a conversation with Bies, *id*. at 822. Clark was later moved out of the psychiatric unit, which was the reason he gave for threatening suicide a second time. *Id*. at 824. Even if defense counsel had been aware of and brought out the 1985 bank robbery conviction on cross-examination, it could hardly have damaged Clark's credibility anymore than did his own admissions and spotty memory.

As for Bies' allegation that Clark received favorable treatment in exchange for his testimony against Bies, he has offered insufficient evidence to succeed on that claim. Both Clark and his own attorney, David West, testified that the only promise the prosecutor made to Clark was that the prosecutor would write a letter to the parole board stating that Clark had cooperated in Bies' case. (Trial Tr. at 802, 832.) West also testified that Clark's plea agreement was struck prior to Clark's

being approached by the prosecutors about testifying against Bies. *Id*. at 831. The only documentary evidence submitted to support Bies' argument that Clark was treated leniently in exchange for his testimony is an undated dismissal of the specifications attached to the corruption of a minor and gross sexual imposition charges because the "defendant stands convicted and sentenced" on those charges. (Appendix, 2d PCP, Vol. 3 at 310.) The letter was obviously written after Clark was sentenced, which happened to be the same day he testified against Bies. Although the timing of the letter certainly piques one's interest, it is not enough to demonstrate that the prosecutors dismissed the specifications to the two charges against Clark in exchange for his testimony against Bies, especially when Clark's attorney, also an officer of the court, testified under oath that no such deal was made.

Finally, Bies' claims he was also entitled to information showing Clark fully comprehended the facts surrounding his convictions for corruption of a minor and gross sexual imposition, (Petition, Doc. No. 93 at PAGEID 361; Traverse, Doc. No. 135 at PAGEID 973), which contradicts Clark's testimony at trial. The Court presumes Bies intended to direct its attention to the documents appended to his memorandum in support of the court's release of records filed under seal relating the facts of the offenses which also include Clark's acknowledgment of some of those facts. (Doc. No. 19, Exhibit 2, 3.) Even if this Court were to assume that Clark's testimony could have been effectively impeached by showing that he did indeed know the facts surrounding his convictions, which is a stretch, Bies has not demonstrated that there is any reasonable probability that the outcome of his trial would have been different as a result. *See United States v. Bagley*, 473 U.S. 667, 682 (1985).

It is likely that all of the evidence to which Bies claims he was entitled respecting Clark

would have been admissible at trial. It simply lacks exculpatory or impeachment value sufficient to undermine the fairness of Bies' trial. Considering all of the alleged *Brady* evidence about Clark's criminal history and the circumstances of his testimony at Bies' trial cumulatively, it is unlikely that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*

**Dallas Hayes**

Dallas Hayes, Aaron's brother, testified at Bies' trial that Aaron never played in the abandoned buildings and that he last saw Aaron at about 6-7:00 pm on the day he was murdered. (Trial Tr. at 566-67, 572.) Bies contends he was entitled to a statement given by David Bowlin in which Bowlin said he and Aaron had been playing in the abandoned buildings five or six days prior to Aaron's murder. (Petition, Doc. No. 193 at PAGEID 362-63; Traverse, Doc. No. 135 at PAGEID 973, 975; *see also* Appendix, 2d PCP, Vol. 3 at 314-15.[11]) Bies also argues that the results of a polygraph test administered to Hayes should have been disclosed to him prior to trial. (Petition, Doc. No. 93 at PAGEID 362; Traverse, Doc. No. 135 at PAGEID 974; *see also* Doc. No. 28, Exhibit 30.) According to Bies, one unnamed individual stated that Hayes was resentful of the attention Aaron received from their mother. (Petition, Doc. No. 93 at PAGEID 362; Traverse, Doc. No. 135 at PAGEID 974.) Bies claims that information, too, should have been turned over to him prior to trial. *Id.* He alludes to evidence in the form of a Crime Stoppers tip indicating Hayes had hurt his hand around the time Aaron was murdered and references an Exhibit 104, but the only exhibit possessing that number in the record contains no information about Hayes' hand injury.

---

[11]The notes documenting Bowlin's statement are not included as exhibits to either Doc. No. 19 or 28, but do appear in the appendix to Bies' second post-conviction petition in the state court. Those facts place the Bowlin evidence in the same category as that of Claude Justice, Carl Miller, Robert Shelton, and Jimmy Ball, *supra*, and the Court will treat it accordingly.

(*See* Appendix, 2d PCP, Vol. 3 at 326-27.)  Bies also claims entitlement to information respecting

Dallas Hayes' placement in special education classes on account of his "borderline intelligence" and

his conviction for sexually abusing his cousin.  (Traverse, Doc. No. 135 at PAGEID 974.)  Bies'

references to the record in support of that information, too, leads the Court to a dead end, as the

exhibits cited relate to Darryl Gumm, and never mention Dallas Hayes.  (Appendix, 2d PCP, Vol.

3 at 293-301.)

That Hayes' testimony about Aaron's habits of play might have been contradicted by

another witness is neither here nor there.  Had Bowlin testified, his knowledge of Aaron's having

played in the abandoned buildings would not have meant that Hayes was in any way untruthful

or incredible because Hayes only testified as to what was within his own personal knowledge.

Because the information Bowlin possessed was neither material, exculpatory, nor impeaching, Bies

was not entitled to its disclosure prior to his trial.

Absent a stipulation by the parties, the report summarizing Hayes' polygraph examination

would not have been admissible at trial, nor would the police officer's impressions of whether

Hayes was being truthful during the examination.  *State v. Davis*, 62 Ohio St. 3d 326, 341-42 (1991);

*State v. Souel*, 53 Ohio St. 2d 123 (1978).  There is no suggestion in the record before this Court that

the parties would have stipulated to admission of the report. Bies has made no argument, let alone

demonstrated, that the contents of the report would have led to admissible evidence, either.  *Davis*,

62 Ohio St. 3d at 341-42.  Moreover, the report mostly describes how Hayes staunchly maintained

his innocence and how Hayes' shoes did not match the shoe prints found at the scene, none of

which can be construed as material to the issue of Bies' guilt.  Therefore, it is unlikely that the result

of Bies' trial would have been different had the defense been provided with the report detailing

Hayes' polygraph examination and interview with the police.  *See Bagley*, 473 U.S. at 682.

As for Bies' argument that prosecutors should have disclosed Joseph Gribbins, Jr.'s, statement about Hayes' alleged resentment toward Aaron because Hayes was envious of the time their mother spent with Aaron, Bies simply misunderstands the statement.  In relevant part, the notes of Gibbins' interview state as follows:

> - Dallas was Aaron + Aaron was Dallas
> - Dallas would take up for Aaron - wouldn't let anybody mess with him
> - Dallas expressed some feelings of wanting more freedom (Boys Club
>  ~~Hoped~~ Wanted his mother to spend more time with him
> -Aaron spends alot [sic] more time w/Dallas

(Doc. No. 28, Exhibit 32.)  When read in context, it becomes clear that the "him" Hayes wanted his mother to spend more time with was Aaron, not himself.  Hayes, an apparently typical teenager, wanted more freedom, not more time with his mother.  Thus, Bies' contention that Hayes was resentful of all the time their mother spent with Aaron is contradicted rather than supported by the record.  Bies has failed to direct the Court to the rest of the material concerning Dallas Hayes, specifically the evidence of his alleged hand injury and borderline intelligence, and the Court has not been able to locate it despite making a diligent attempt to do so.

Bies has failed to demonstrate that the evidence discovered in these proceedings relating to Dallas Hayes constitutes *Brady* material.  The evidence has not been shown to be favorable to Bies or material to the issue of his guilt, and there is no reasonable probability that the outcome of his trial would have been different had he possessed it in time to present it to the jury.  *Bagley*, 473 U.S. at 682.

**Evidence Inconsistent with the Prosecution's Theory of the Case**

Bies argues that the prosecution failed to disclose evidence contradicting Dallas Hayes' statement that Aaron would not have entered the abandoned buildings absent coercion or trickery, and that Aaron was seen alive after the time he was supposed to have been murdered. (Petition, Doc. No. 93 at PAGEID 363-64; Traverse, Doc. No. 135 at PAGEID 974-75.) The first allegation of inconsistent evidence, that Aaron would have avoided the abandoned buildings, does not rise to the level of materiality required by *Brady* since Bies confessed to Officers Guy and Seal that Aaron was lured into the buildings by Gumm's promise to pay Aaron for helping them collect scrap metal. (Trial Tr. at 871, 922, 932.) Bies also admitted that the real reason the two men wanted to get Aaron into the abandoned buildings was that they wanted Aaron to perform oral sex on them. *Id*. at 868, 922, 931-32. The absence of testimony from one of Aaron's friends that Aaron had played in the buildings sometime prior to his murder does not undermine confidence in the outcome of Bies' trial. *Bagley*, 473 U.S. at 682.

With regard to the allegation that Aaron was seen alive after the prosecution's theory of the case indicated he had died, the entire argument Bies sets forth is a product of pure conjecture. He contends the following:

> The prosecutors preceded [sic] at trial on the theory that one or both of the defendants carried the victim into the basement of the vacant house where they fatally beat him. This offense occurred on May 11, 1992, so the sun *would have* set at the latest in the middle of the evening. The building in question was vacant, so there *would have* been no electricity in the basement. The defendants *would not have* carried the victim into a totally dark basement. Consequently the abduction and fatal beating *would have* had to occur earlier in the evening when the basement was still lit by sunlight. This conclusion is consistent with the trial testimony of state's witness Charlotte Jean Baker who saw Michael [Bies] and [Darryl] Gumm together in the park next to the vacant building at approximately 7:00 that evening. The prosecutors failed to disclose to defense counsel that four individuals who knew the victim personally saw him late in the

evening . . . .

(Traverse, Doc. No. 135 at PAGEID 975 (emphasis added).)  Bies' repetitive use of the term "would have" exposes the total lack of evidence behind his suppositions.  While it is easy to believe that an abandoned building would have no electrical service, this Court is neither willing nor able to credit Bies' argument, if indeed it can be characterized as such, that he and Gumm would not have carried Aaron into a dark basement.  If one is seeking to avoid detection during the commission of a brutal murder of a child, a better choice of location can hardly be imagined.  Bies' conclusion that the murder "would have had to occur earlier in the evening when the basement was still lit by sunlight," based as it is on nothing more than supposition, is too thin a reed for this Court to rely on in granting the extraordinary relief Bies requests.  Finally, no time of death was established at trial (see Testimony of Dr. Amy Martin, Trial Tr. at 752-797), and the fact that Baker saw Gumm and Bies at 7:00pm in the park near the abandoned buildings establishes little with regard to Aaron's time of death.  Dallas Hayes testified that the last time he saw his brother was at approximately 6:00 or 7:00 that evening, which means only that Aaron was killed sometime after 6:00pm.  On the whole, therefore, Bies' claim that evidence inconsistent with the prosecution's theory of the case fails to reach, or even approach, the level of materiality required by *Brady*.

**Conclusion**

Bies has not demonstrated that the prosecutors in his case suppressed any exculpatory evidence or evidence that could have been used to effectively impeach any witness that, had it been disclosed, would have had a reasonable probability of affecting the jury's verdicts.  In addition, cumulating the effect of all the bits of information Bies argues should have been disclosed results in no greater impact.  Much of the material he claims should have been disclosed consists of

inadmissible hearsay, inadmissible polygraph test results, supposition, and conjecture, and he has not indicated how any of that information would have led to material evidence that could have been presented at his trial. Accordingly, Bies' fourth ground for habeas corpus relief should be denied.

**Fifth Ground for Relief**

In his fifth ground for relief, Bies contends the prosecutors in his case engaged in misconduct by knowingly presenting false testimony at his trial. (Petition, Doc. No. 93 at PAGEID 366-69.) Respondent pleads procedural default, and also argues the claim is without merit. (Return of Writ, Doc. No. 127 at PAGEID 852-54.) Bies claims the evidence upon which the instant ground relies was only discovered in these habeas proceedings, and that the state court erroneously concluded that he had failed to satisfy the procedural rule for filing a second post-conviction petition when the claim was presented there. (Traverse, Doc. No. 135 at PAGEID 988.) He also argues, as he did in the prior ground for relief, that the state procedural rule was neither firmly established nor regularly followed at the time of his second post-conviction petition. *Id*. at 988-89.

Bies presented his prosecutorial misconduct claim to the state courts as his eighth cause of action in his second post-conviction petition. (Appendix, 2d PCP, Vol. 1 at 38-40.) As he acknowledges, that petition was dismissed by the trial court which determined that Bies had failed to meet the statutory requirements for filing a second post-conviction petition. *Id*. at 327. The state court of appeals affirmed, concluding that Bies had not demonstrated that he was unavoidably prevented from discovering the facts underlying his claims. *State v. Bies*, No. C-020306, 2003 WL 202177 at *1, 2003-Ohio-442 (Ohio App. 1st Dist. Jan. 31, 2003) (unreported). Further appeal was declined by the Ohio Supreme Court. *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (2003)

(table).

Bies' statement that he discovered the facts upon which his claim relies in these habeas petitions is uncontested by Respondent, and the record bears out his explanation as to why the issue was not previously presented to the state court. (*See* Petitioner's Memorandum in Support of the Court's Release of Records, Doc. No. 19, Exhibits 2-5; Motion to Hold Proceedings in Abeyance, Doc. No. 28, Exhibit 30, 40-42.) As observed in this Court's discussion of Bies' fourth ground for relief, a state may not thwart a petitioner's discovery of evidence being withheld by a prosecutor, then fault the petitioner for failing to discover and present the evidence earlier in the process. Therefore, this Court will address Bies' claim *de novo*. *Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009)(observing that "the deferential standard supplied by [the] AEDPA does not apply here because no state court addressed the merits of Rosencrantz's knowing-presentation-of-false-testimony claims," and consequently applying *de novo* review).

The United States Supreme Court has long acknowledged that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). It matters not whether the state actually solicited the false evidence; allowing such evidence to go uncorrected when volunteered by a witness nets the same result. *Id*. The principle applies when the false evidence bears only on the credibility of a witness, as well. *Id*. Although the "'reliability of a given witness may well be determinative of guilt or innocence,'" a new trial is not automatically required whenever "'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .'" *Giglio v. United States*, 405 U.S. 150, 154 (1972), *quoting Napue*, 360 U.S. at 269, and *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968). *Brady*, too,

requires a finding of materiality where a prosecutor's knowing presentation of false evidence is found. 373 U.S. at 87. "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154, *quoting Napue*, 360 U.S. at 271.

The Sixth Circuit has summarized the interplay of *Brady* and *Giglio* as follows:

> [There is a] difference between *Brady/Giglio* false-testimony claims and traditional *Brady* withholding claims. . . . *See Agurs*, 427 U.S. at 104. To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005); *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (placing the burden on the habeas petitioner). But in these *Brady/Giglio* claims, the materiality assessment is less stringent than that for more general *Brady* withholding of evidence claims. We weigh the materiality of *Brady* withholding claims by asking whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985))). By contrast, for *Brady/Giglio* claims, we ask only "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 104 (*citing Giglio*, 405 U.S. at 154); *see also Carter* [*v. Mitchell*], 443 F.3d [517,] 535 [(2006)]. The distinction matters here, because while a traditional *Brady* materiality analysis obviates a later harmless-error review under *Brecht v. Abrahamson*,[12] courts may excuse *Brady/Giglio* violations involving known and materially false statements as harmless error. *See Carter*, 443 F.3d at 537; *Gilday* [*v. Callahan*], 59 F.3d [257,] 268 [(1st Cir. 1995)].

*Rosencrantz*, 568 F.3d at 583-84.

The alleged false testimony to which Bies refers here is for the most part a repetition of the

---

[12]*Brecht v. Abrahamson*, 507 U.S. 619 (1993), established that in the habeas corpus context, whether constitutional error warranted relief was determined by asking whether the error had "a substantial and injurious effect" on the verdict.

information concerning Steven Clark and Dallas Hayes that he argued in his fourth ground for relief should have been disclosed by the prosecutors prior to his trial. In particular, he contends that the prosecutors presented false testimony from Clark by bringing out that he had only one bank robbery conviction in his past, that he did not understand what behavior of his had caused him to be charged with corruption of a minor and gross sexual imposition, that his sentences on those offenses were to be served consecutively, that he did not receive any consideration in exchange for his testimony against Bies, and that he had a conversation with Bies at a time when Bies was actually with Officers Seal and Guy instead. (Petition, Doc. No. 93 at PAGEID 367.)

As observed above, Clark never testified that the 1987 conviction was his only conviction for bank robbery. He merely testified that as of 1987 he had a "record for bank robbery," a term that only means his criminal record as of 1987 included at least one conviction for bank robbery, and which does not preclude the possibility of additional convictions for bank robbery or other offenses. (*See* Trial Tr. at 800.) Clark's statement, as far as it went, was true and was not actual false evidence that placed upon the prosecutor a duty to correct the testimony.

Bies has also failed to carry his burden with respect to Clark's testimony that he did not understand what behavior of his had resulted in his being charged with corruption of a minor and gross sexual imposition. (*See* Trial Tr. at 810.) Significantly, Bies appears to assume that since Clark had at least some understanding of his behavior that resulted in the charges in July 1992 (Doc. No. 28, Exhibit 42), that he must have had the same understanding when he testified in Bies' case on October 8, 1992 (Trial Tr. at 746, 800). Bies also neglects to acknowledge that immediately following the allegedly false testimony about his charges, Clark admitted that he had argued with a 15-year-old girl right before she accused him of inappropriate behavior, that he was "fuzzy on the details"

of that accusation, and that he had had sexual intercourse with another girl who was fourteen or fifteen years old. *Id*. at 811. Clark indicated that the sexual encounter with the second girl resulted in the corruption of a minor charge. *Id*. Thus, Bies has not demonstrated that Clark testified falsely on that point. In addition, even if Clark's denial that he understood what led to the two charges was false, there is no reasonable likelihood that the false testimony could have affected the judgment of the jury with regard to Clark's credibility, especially since Clark contradicted himself immediately after making the claimed false statement. *See Giglio*, 405 U.S. at 154.

Bies further alleges Clark testified that the sentences imposed for his corruption of a minor and gross sexual imposition convictions were to be served consecutively. (Petition, Doc. No. 93 at PAGEID 367; Traverse, Doc. No. 135 at PAGEID 982-83.) What Clark actually testified to was his *belief* that his sentences on the corruption of a minor and gross sexual imposition convictions were to be served consecutively, a substantially different statement.[13] (Trial Tr. at 801.) That he misunderstood whether the sentences he received were consecutive or concurrent does not render his testimony in any way false. As a practical matter, it is impossible for Bies to demonstrate by clear and convincing evidence that Clark testified falsely about his belief that his sentences were to be served consecutively. A person's beliefs exist wholly within that person's own mind, and are therefore undiscoverable absent a statement from the holder of the belief, and they are entirely unimpeachable. There being no false testimony, there is no merit to Bies' claim that the prosecutors were duty bound to correct it.

Bies also claims that Clark testified falsely when he stated he had received no consideration

---

[13]The selective and disingenuous use of an incomplete or out-of-context statement such as Bies' mischaracterization of Clark's testimony here, appears to be an attempt to mislead this Court, and is strongly discouraged in the future.

in exchange for his testimony against Bies. (Petition, Doc. No. 93 at PAGEID 367; Traverse, Doc. No. 135 at PAGEID 983.) Clark testified against Bies on October 8, 1992. (Trial Tr. at 746, 799-827.) He began his testimony by acknowledging that he had just that morning been sentenced on the corruption of a minor and gross sexual imposition convictions after having pled guilty to those charges. *Id*. at 801. He denied that any threats or promises had been made to him to induce him to testify against Bies. *Id*. at 802, 804. Clark's attorney, David West, also testified that it was his recollection that Clark's plea agreement had been arranged before Bies' prosecutors approached Clark about testifying against Bies. (Trial Tr. at 831.) Clark and West both testified that the only consideration Clark was to receive from the prosecutors was a letter the prosecutors agreed to write for his file stating that he had aided and assisted the State of Ohio by testifying in Bies' case. *Id*. at 801-2, 832, 836. To the best of this Court's knowledge, any such letter, if it exists, has not been made a part of the record in these proceedings.

Bies contends that the following exchange between the prosecutor and West proves that Clark obtained consideration for his testimony, but that West was unaware of the deal:

> Q.   At the time of this plea, was there any discussion whatsoever about making a bargain for Steven Clark in return for his testimony in this particular case today?
>
> A.   None whatsoever.
>
> Q.   Through you that you know of?
>
> A.   None whatsoever that I'm aware of.

(Trial Tr. at 830.) Bies surmises that "[t]he prosecutor would not have asked the second question unless there was a side deal that was made without the knowledge of Attorney West." (Traverse, Doc. No. 135 at PAGEID 984.) Bies is certainly free to draw such a conclusion based on that short

exchange; the Court is not.

Bies' claim that Clark received consideration for his testimony and lied about it on the witness stand is not sufficiently supported by the record to warrant habeas corpus relief. While "jailhouse snitch" testimony is frequently and perhaps legitimately criticized as untrustworthy, in Bies' case, Clark's attorney also testified in court that he was aware of no consideration given Clark in exchange for his testimony other than the letter the prosecutor said he would place in Clark's file indicating that he had cooperated with prosecutors at Bies' trial. The leap Bies makes to his conclusion that there must have been a secret deal that even Clark's attorney did not know about is one the Court is unable to make based on the evidence in the record. There being no substantial evidence that a secret deal was made, the Court cannot conclude that Clark testified falsely.

Finally, Bies contends Clark's testimony about the date and time that he and Bies first discussed Aaron's murder constituted perjury. (Petition, Doc. No. 93 at PAGEID 367; Traverse, Doc. No. 135 at PAGEID 985.) Specifically, Bies argues that Clark testified he discussed the murder with Bies on July 29, 1992, between 5:00 and 5:30 in the evening, but that Officers Seal and Guy testified Bies was with them during that time. *Id*. The transcript reveals something different.

Clark testified that the first contact he had with Bies was on the day Bies first came into the Justice Center, which he believed to be July 29. (Trial Tr. at 805.) At that time, Bies professed his innocence to Clark. *Id*. Clark testified first that he did not know what time it was when he talked with Bies, then that he thought they talked "*about an hour before* the news came on and it was 5:00, 5:30 news that we watched." *Id*. at 811, 813 (emphasis added). Clark acknowledged, however, that "time tends to blend together when you're locked down . . . [and] you don't really pay attention to the clock too much." *Id*. at 811-12. Thus, Clark's estimate of the time at which he and Bies

conversed is at best equivocal. Nevertheless, taking his estimate at face value, it appears that the conversation took place sometime between 4:00 and 4:30pm. Bies has not argued that he was somewhere other than at the Justice Center during that time. In addition, Officers Lucian Guy and Gary Seal testified at the pretrial suppression hearing that they were with Bies at his walk-through of the abandoned buildings at about 5:30 to 5:45 on the evening of July 29, not 5:00, as Bies contends. (Trial Tr. at 82, 84.) Consequently, Bies has failed to demonstrate that there was any conflict between the Officers' and Clark's testimony, much less that the prosecutors' knowingly presented false testimony.

The Court has considered Bies' allegations of prosecutorial misconduct in presenting false testimony individually and cumulatively, and finds no legitimate reason to grant habeas corpus relief. The claimed false testimony was not false at all, or was immaterial, or was factually different from Bies' description of the evidence. Accordingly, Bies' fifth ground for relief should be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, Bies contends his trial counsel provided him ineffective assistance. (Petition, Doc. No. 93 at PAGEID 370-96.) Respondent argues the claim is partially procedurally defaulted and wholly without merit. (Return of Writ, Doc. No. 127 at PAGEID 855-66.) Bies disputes Respondent's defense of procedural default, and urges this Court to address his ineffective assistance of trial counsel claim *de novo*. (Traverse, Doc. No. 135 at PAGEID 1022-23.) The procedural status and merits of each sub-claim will be addressed individually, keeping in mind that the law governing any preserved ineffective assistance of counsel claims is embodied in *Strickland v. Washington*, 466 U.S. 668 (1984), which holds as follows:

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence has

two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

**Sub-Claim One**

Bies claims his trial counsel failed to investigate his competence to stand trial. (Petition, Doc. No. 93 at PAGEID 371.) He points to his mental retardation, his dysfunctional family of origin, his developmental delay, hospitalizations as a child, his learning disorders, his hearing voices, brain damage, his confinement in the psychiatric unit of the Hamilton County Justice Center while awaiting trial, his contradictory statements during a psychiatric evaluation, his unusual concern over a theft charge while awaiting trial on aggravated murder charges, his belief that his previous statements were not true because he could not remember making them, his inability to distinguish important facts from insignificant ones, his drawing pictures during his trial, and his inability to read his own statement to the jury as evidence of his incompetence. (Petition, Doc. No. 93 at PAGEID 371-74.)

Respondent notes that the claim was presented to the state court in Bies' second post-conviction petition, and rejected by the state court because Bies failed to satisfy the requirements of Ohio Rev. Code § 2953.23(A),[14] resulting in procedural default of the claim here. (Return of Writ,

---

[14]See footnote 4, *supra*, for the relevant provisions of the statute.

Doc. No. 127 at PAGEID 855.)

Bies encourages the Court to disregard the state court's procedural ruling because he contends he should be treated the same as was his co-defendant Gumm, *id*. at PAGEID 1024, an argument that was fully considered and rejected in this Court's discussion of Bies' fourth ground for relief, *supra*.

Bies also contests Respondent's claim of procedural default and contends that since one of his trial attorneys was appointed to represent him on direct appeal, the attorney could not be expected to raise his own ineffectiveness as a proposition of law on appeal. (Traverse, Doc. No. 135 at PAGEID 1022-23.) He also asserts that his claim relied upon evidence outside the trial court record that was only discovered in these habeas proceedings, making his second post-conviction petition the first opportunity to raise the instant sub-claim. *Id*. The Court disagrees that Bies' claim of ineffective counsel due to counsel's failure to investigate his competence to stand trial could not have been raised on direct appeal.

Unmentioned by either party is the fact that Bies raised three ineffective assistance of trial counsel claims in his First Post-Conviction Petition. (Appendix, Vol. 4, at 6-17.) Some parts of those three causes of action related solely to the mitigation phase of Bies' capital trial, and those portions themselves are not relevant to his claim here. The evidence produced to support those allegations and others relating to the guilt phase of Bies' trial, however, indicate that much of the information he contends was discovered in these habeas proceedings was actually presented to the jury at trial, or was known to Bies' counsel at the time of his trial and his first post-conviction petition. Evidence of Bies' mental retardation was presented both at trial and in support of his first post-conviction petition. (Trial Tr. at 1103-7; Appendix, Vol. 4 at 13-15.) Significant evidence of family dysfunction

was presented in both proceedings as well (Trial Tr. at 1094, *et.seq.*; Appendix, Vol. 4 at 16), as was evidence of Bies' developmental delays (Trial Tr. at 1096; Appendix, Vol. 4 at 11), and the possibility that Bies suffered some brain damage (Trial Tr. at 1102, 1117; Appendix, Vol. 4 at 16). In addition, evidence presented at trial provided the jury with information about Bies' learning disorders (Trial Tr. at 1099); his experience of having heard voices, *id*. at 1100; his concern over his pending theft charge, *id*. at 1119; his belief that if he did not remember making statements, they were rendered untrue, *id*. at 1118; the fact that he drew child-like drawings during his trial, *id*. at 1105, and his inability to read his own statement at his trial, *id*. at 1088. All of that evidence was known to Bies' attorneys at the time of his trial and beyond. By the time Bies was litigating his first post-conviction petition, his attorneys also possessed evidence of his several childhood hospitalizations. (Appendix, Vol. 4 at 10-11.)

The only evidence Bies references in the instant sub-claim that was not presented to the state court at his trial or in conjunction with his first post-conviction petition is that he was confined in the psychiatric unit of the Hamilton County Justice Center while awaiting trial, that he made contradictory statements during a psychological examination, and that he was unable to distinguish important facts from insignificant ones. That evidence of Bies' alleged incompetence pales in comparison to material discussed in the previous paragraph, evidence that was available to both his trial counsel and his first post-conviction proceeding counsel. Consequently, his first opportunity to raise his ineffective assistance of trial counsel claim based on their failure to request a competency examination was on direct appeal, or at the very latest, his first post-conviction proceeding, not his second.

When Bies raised his trial counsel's ineffectiveness in his second post-conviction petition,

therefore, the trial court predictably found that he failed to comply with the procedural requirements for a second or successive petition. (Appendix, 2d PCP, Vol. 4 at 327.) The state court of appeals affirmed on the same basis, *State v. Bies*, No. C-020306, 2003 WL 202177 at *1, 2003-Ohio-442 (Ohio App. 1st Dist. Jan. 31, 2003) (unreported). Specifically, the court found that the record did not demonstrate that Bies was "unavoidably prevented from discovering the facts underlying his claim[]" and thereby unable to raise the claim in his first post-conviction petition. *Id.* The Ohio Supreme Court declined further review, *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (2003) (table).

Bies does not allege that Ohio Rev. Code § 2953.23(A) was inapplicable to his claim in the state court, nor does he dispute that the state courts enforced the rule in his case. *See Maupin*, 785 F.2d at 138. By arguing that his first opportunity to raise the claim was in his second post-conviction petition, he disputes that he failed to comply with the rule, but as the discussion above demonstrates, the claim could have been raised on direct appeal or in his first post-conviction petition. This Court has observed that the rule expressed in Ohio's statute was firmly established and regularly followed at the time of Bies second post-conviction proceedings. (*See* Fourth Ground for Relief, *supra*.) Thus, the state courts applied an independent and adequate state procedural rule to Bies' claim and found that Bies did not comply with the rule. *Maupin*, 785 F.2d at 138. While Bies argues his claim is not procedurally defaulted, he does not make the alternative argument that should the claim be found to be defaulted, cause and prejudice excuse the default. Consequently, Bies' claim is procedurally defaulted without excuse.

Even if Bies had preserved his sub-claim for habeas corpus review, however, he has not demonstrated entitlement to the relief he seeks. In *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006),

the Sixth Circuit Court of Appeals concisely summarized the test applicable to determining whether a defendant is competent to stand trial as follows:

> The due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence that a defendant is incompetent. *Pate v. Robinson*, 383 U.S. 375, 385-86 (1966). To be adjudged competent, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. U[nited] S[tates]*, 362 U.S. 402[, 402] (1960)(per curiam).

(Parallel citations omitted.) *See also Drope v. Missouri*, 420 U.S. 162, 170 n.7 (1975). Even when a defendant has been held competent prior to his trial, a trial court must always be alert to circumstances arising during the proceedings that might render the accused unable to meet the standards of competence to stand trial. *Drope*, 420 U.S. at 181. The Supreme Court has also stated that

> [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient [to establish the defendant's incompetence]. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists [or psychologists] can entertain on the same facts.

*Drope*, 420 U.S. at 180, discussing the import of *Pate v. Robinson*, 383 U.S. 375 (1966).

The United States Supreme Court has acknowledged that the mentally retarded "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to

understand the reactions of others," even as it observed that "[m]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial." *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). The fact that Bies is mentally retarded, by itself, does not suggest he was incompetent to stand trial. In the same vein, his excess concern over a theft charge when he was awaiting trial on an aggravated murder charge, his inability to distinguish important facts from insignificant ones, his contradictory statements during his psychological evaluation, his making childish drawings during his trial, his belief that if he denied making a prior statement it would render the facts therein untrue, his developmental delay, his learning disorders, and his inability to read his own unsworn statement at trial all seem to be part and parcel of his mental retardation, and do not in and of themselves indicate an inability to sufficiently comprehend the nature and purpose of his trial or to assist his attorneys in his defense. Certainly coming from a dysfunctional family, even one as dysfunctional as Bies', is no indication of incompetence to stand trial, and the same is true of Bies' hospitalizations during his childhood and the bare fact that he was at some point held in the psychiatric unit of the Hamilton County Justice Center while awaiting trial.

The psychologists' reports prepared when Bies was considering a not-guilty-by-reason-of-insanity defense provide information strongly suggesting that even if Bies' attorneys had requested a competency evaluation, he would have been found competent to stand trial. One of the psychologists to evaluate Bies for that purpose was Dr. Nancy Schmidtgoessling, who stated that Bies was "alert, fully oriented, and cooperative." (Appendix, Vol. 1 at 338.) She further observed that "[h]is thought content and cognitive associations were appropriate." *Id.* Dr. Schmidtgoessling stated that Bies reported having made two suicide attempts while awaiting trial as a result of his

sister's recent death, but also noted that Bies and his mother may have exaggerated his suicidal tendencies in the past, suggesting at least that Bies may have been exaggerating still. *Id*. at 339-40. Dr. Schmidtgoessling did not believe Bies suffered from any thought disorder. *Id*. at 340.

A second psychologist also evaluated Bies before his trial. Dr. Donna Winter characterized Bies' thinking as concrete and sometimes illogical, but noted that it was consistent with his mild mental retardation. *Id*. at 343. Dr. Winter also stated that although Bies had been evaluated by psychologists at the Hamilton County Justice Center, he had *not* required care on the Mental Health Unit. *Id*. Thus, it can be inferred that Bies' presence in the psychiatric unit while awaiting trial was for the purpose of his evaluation, and not for any more urgent or serious reason. Dr. Winter also reported that prior to his arrest, Bies had gone "about the community, unassisted," and was able to "carr[y] out the activities of daily life fairly independently." *Id*. at 346.

Bies informed a third psychologist who evaluated him, Dr. Bill Fuess, that he was in protective custody in the Hamilton County Justice Center because he feared his life was in danger in the general population. *Id*. at 349. Dr. Fuess noted that Bies engaged in no unusual or bizarre behaviors during his evaluation or throughout his incarceration, and that he did not detect any thought process disorder or significant mental deficiency in Bies. *Id*. at 349, 352. Although it is true, as Bies argues, that Bies claimed not to be aware of the year at the time, Dr. Fuess attributed that response to Bies' resistance to involving himself in the evaluation. *Id*. at 350. As for the contradictory statements during the evaluation, Dr. Fuess made it clear that the subject of those contradictory statements was Bies' activities on the day of the murder. *Id*. A capital murder suspect's contradictory statements about his activities around the time of the murder might very well indicate a desire to avoid punishment rather than an inability to assist his attorneys at trial.

Bies states that he "lacked the ability to consult with his lawyers with a reasonable degree of rational understanding" and that he did not possess a rational and factual understanding of the proceedings against him. (Petition, Doc. No. 93 at PAGEID 371.) Bies fails to describe any instances in which his attorneys attempted to involve him in his trial and failed because of his inability to comprehend the process. Although he stated in his unsworn statement during the mitigation phase of his trial that he was drawing pictures during the guilt phase because he did not understand what was going on, he immediately expressed an understanding of the jury's role in determining the appropriate sentence for him. (Trial Tr. at 1984-85.)

When viewing all the evidence available to trial counsel at the time of the trial, this Court is not convinced that counsel's failure to request a competency evaluation was unreasonable. In addition, there is no reasonable probability that the outcome of a competency evaluation would have been favorable to Bies.

Bies' first sub-claim of his sixth ground for relief is procedurally defaulted, and even if it had been properly preserved for habeas corpus review, it is highly doubtful that it would have been a winning claim. Accordingly, Bies is not entitled to habeas corpus relief, and his sub-claim should be denied.

**Sub-Claim Two**

Bies next contends that his attorneys provided ineffective assistance by failing to present the testimony of mental health experts at the pretrial suppression hearing concerning Bies' statements to police. (Petition, Doc. No. 93 at PAGEID 375.) He further states that trial counsel failed to develop the fact that the police officers "fed" Bies the details of Aaron's murder, although one of the officer's notes apparently suggested as much. *Id*. at PAGEID 377. Bies alleges the expert

would have testified that Bies was mentally incapable of knowingly, voluntarily, and intelligently waiving his rights to counsel and to remain silent. *Id*.

Respondent argues that Bies' sub-claim is preserved for habeas corpus review insofar as he alleges his counsel's ineffectiveness for failing to present expert testimony as to his mental retardation. (Return of Writ, Doc. No. 127 at PAGEID 856-57.) Respondent states Bies first presented as error his attorneys' failure to produce evidence of his mental retardation at the suppression hearing in his first post-conviction petition in the state court. (Return of Writ, Doc. No. 127 at PAGEID 857.) She acknowledges, however, that the post-conviction trial court and the state court of appeals found Bies had raised the claim on direct appeal and that it was overruled on *res judicata* grounds, but inexplicably states that "[i]n view of this determination, Respondent does not assert that the claim is procedurally defaulted." *Id*. A review of the errors claimed in the Ohio Court of Appeals and Ohio Supreme Court on direct appeal, however, reveals that the matter was not brought before either of those courts. (*See* Appendix, Vol. 2 at 22-89, Vol. 3 at 42-156.) In fact, Bies raised no errors respecting his counsel's representation in either appeal. *Id*. Bies did raise the claim in his first petition for post-conviction relief, as Respondent acknowledges (Appendix, Vol. 4 at 15-16), but the trial court dismissed it because it concluded Bies' mental retardation was not such that it would warrant suppression of his statements to police. (Appendix, Vol. 5 at 475-76.) The court also made the factually erroneous finding that Bies had raised the claim on direct appeal and concluded that the doctrine of *res judicata* precluded it from being raised in post-conviction. *Id*.

On appeal from denial of his post-conviction petition, the court of appeals repeated the trial court's factual error, stating that "[w]e note that the claim that trial counsel was [sic] ineffective for

failing to challenge the confession based upon Bies's mental retardation was, in fact, raised on direct appeal and rejected by the Ohio Supreme Court in _State v. Bies (1996), 74 Ohio St. 3d 320, 658 N.E.2d 754_." _State v. Bies_, No. C-980688, 1999 WL 445692 at *6-7 n.1 (Ohio App. 1st Dist, June 30, 1999) (unreported). The court of appeals went on to dismiss Bies' argument that because one of his trial attorneys also represented him on direct appeal, he could not be expected to raise trial counsel's ineffectiveness on direct appeal, stating as follows:

> We have previously held that where trial counsel is joined by new co-counsel on appeal [as is the case here], the syllabus of [_State v._] _Perry_[, 10 Ohio St. 2d 175, 226 N.E.2d 104 (1967) (paragraph nine of the syllabus)], applies, since it is presumed that the new attorney added for purposes of appeal will not be restrained from advancing any errors he or she perceives in trial counsel's performance. . . . Although in this case new appellate counsel practiced law with trial counsel, we still adhere to the presumption that new counsel followed his or her professional duty and exercised independent judgment while zealously advocating the interests of the client, even if that duty meant impugning the trial performance of appellate co-counsel.

_Bies_, 1999 WL 445692 at *7. Even though the state court of appeals in post-conviction erroneously stated Bies had presented his claim on direct appeal, it also alternatively found that Bies had no excuse for failing to raise trial counsel's ineffectiveness as error on direct appeal, and it concluded the claim was barred by the doctrine of _res judicata_ for that reason as well. _Id_. Further review from that decision was not allowed by the Ohio Supreme Court. _State v. Bies_, 87 Ohio St. 3d 1440 (1999) (table).

The Sixth Circuit has repeatedly found that the state court's application of the _res judicata_ bar to claims of ineffective assistance of trial counsel where one of two trial attorneys also represents the petitioner on direct appeal with new co-counsel does not result in a procedural bar in a federal habeas case. In _Combs v. Coyle_, 205 F.3d 269, 276-77 (6th Cir. 2000), the court concluded

that no firmly established state procedural rule existed requiring ineffective assistance of trial counsel claims to be raised on direct appeal rather than in a post-conviction petition under such circumstances. *See also Lorraine v. Coyle*, 291 F.3d 416, 425-26 (6th Cir. 2002); *Sowell v. Collins*, 557 F.Supp.2d 843, 885 (S.D. Ohio 2008). This Court's research revealed no more solidity to the rule at present than existed at the time of *Combs*. Consequently, no procedural bar to habeas review flows from the state's application of the rule in Bies' case. *Combs*, 205 F.3d at 277.

Bies also presented his sub-claim to the state court in his second post-conviction petition. (Appendix, 2d PCP, Vol. 1 at 43-44.) As noted above, the second post-conviction trial court declined to entertain Bies' second petition because he failed to satisfy the procedural requirements of Ohio Rev. Code § 2953.23(A). (Appendix, 2d PCP, Vol. 4 at 327.) The court of appeals affirmed on the same ground, *State v. Bies*, No. C-020306, 2003 WL 202177 at *1, 2003-Ohio-442 at ¶¶ 5-6 (Ohio App. 1st Dist. Jan. 31, 2003) (unreported), and the Ohio Supreme Court declined further review, *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (May 16, 2003) (table). Given that Bies properly raised his claim in his first post-conviction petition, his raising it in his second was surplusage and of no consequence insofar as procedural default of the claim in these proceedings is concerned.

Recall that in his first, second, and third grounds for relief, Bies claimed his statements to police were neither knowing, intelligent, nor voluntary primarily because he is mentally retarded. This Court recommended denial of that claim because Bies did not demonstrate there was any coercion exerted by his interrogators, and mental retardation alone does not render a suspect's statements involuntary. Because the claim underlying the instant ineffective assistance of trial counsel sub-claim is without merit, trial counsel's failure to include evidence of Bies' mental

retardation at the suppression hearing cannot be deemed deficient. "Counsel [is] not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel." *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998). Consequently, to the extent Bies claims his trial counsel were ineffective for failing to introduce evidence of his mental retardation at his suppression hearing, his second sub-claim of his sixth ground for relief should be denied.

Respondent argues the second part of Bies' sub-claim, where he alleges his attorneys should have produced testimony at his suppression hearing showing that the police officers provided the facts of the murder to Bies to facilitate a confession, is procedurally defaulted. (Return of Writ, Doc. No. 127 at PAGEID 857.) Bies does not contest that assertion and the Court finds the allegation that the police "fed" Bies the facts of the case appears only in a claim of prosecutorial misconduct advanced in Bies' second post-conviction petition. (Appendix, 2d PCP, Vol. 1 at 33-34.) Since Bies has never presented the instant ineffective assistance of trial counsel claim to the state court it is unexhausted. There being no non-futile state remedy available to Bies to litigate the claim at this late date, the issue is also procedurally defaulted. *See In re Abdur'Rahman*, 392 F.3d 174, 186-87 (6th Cir. 2004), *vacated on other grounds*, *Bell v. Abdur'Rahman*, 545 U.S. 1511 (2005). Accordingly, Bies' request for a writ of habeas corpus as to this sub-claim should be denied.

**Third Sub-Claim**

In his third ineffective assistance of trial counsel sub-claim, Bies contends his attorneys failed to conduct a meaningful investigation and presentation of evidence in the guilt phase of his trial. (Petition, Doc. No. 93 at PAGEID 377-79.) Specifically, Bies claims his trial counsel failed to adequately investigate witness Steven Clark's credibility, failed to call witnesses to support the defense's theory that Darryl Gumm was the principal offender, failed to adequately investigate

Gumm's background and history of sexual misbehavior; failed to investigate the theory that someone else murdered Aaron, and failed to establish whether Bies was right or left handed. *Id.* at PAGEID 378-79. Respondent argues that the sub-claim is both procedurally defaulted and meritless. (Return of Writ, Doc. No. 127 at PAGEID 857-58.)

Although Bies raised three ineffective assistance of trial counsel claims in his first post-conviction petition in the state court (Appendix, Vol. 4 at 6-18), none of them mentioned the specific instances of alleged ineffectiveness of counsel included in his claim here. In his second post-conviction petition, Gumm raised the issue as part of his tenth cause of action, however. (Appendix, 2d PCP, Vol. 1 at 43-45.) As with the prior two sub-claims, the post-conviction court found that Bies had not met the procedural requirements for filing a second post-conviction petition, and dismissed the claim. (Appendix, Second Post-Conviction Petition, Box 4, Vol. 4 at 327.) The state court of appeals affirmed, *State v. Bies*, No. C-020306, 2003 WL 202177 at *1, 2003-Ohio-442 at ¶5 (Ohio App. 1st Dist. Jan. 31, 2003) (unreported), and the Ohio Supreme Court declined further review, *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (2003) (table). Bies advances no new arguments respecting the procedural status of his third sub-claim that he has not made in his prior sub-claims, which leaves the instant claim procedurally defaulted without excuse.

Even supposing the claim had been properly preserved for habeas corpus review, however, it would fail. The evidence Bies claims his attorneys should have uncovered through adequate investigation is the same as the alleged *Brady* material he claims the prosecutors should have disclosed to the defense in his fourth ground for relief, *supra*. This Court has recommended denial of that *Brady* claim because the material was either inadmissible hearsay with no showing that it

would have led to or been developed into admissible evidence, or it did not have any impeaching or evidentiary value insofar as Bies' participation in Aaron's murder is concerned.  What was true there is true here as well.  Trial counsel are no more duty bound to collect and present inadmissible or irrelevant evidence than prosecutors are to disclose it.

Because Bies' third sub-claim of his sixth ground for relief is procedurally defaulted without excuse, it should be denied.

**Fourth Sub-Claim**

Bies has withdrawn his fourth sub-claim.  (Notice of Correction of Prior Pleading, Doc. No. 165 at PAGEID 1671.)

**Fifth Sub-Claim**

Although Bies has not withdrawn any part of his fifth sub-claim, all but four paragraphs of his approximately ten-page argument relate exclusively to the mitigation phase of his capital trial.   (Petition, Doc. No. 93 at PAGEID 379-90, and ¶¶ 157-59, 163.)  As Bies is no longer under sentence of death (Doc. No. 152-1 at PAGEID 1475-76), only those paragraphs devoted to counsel's performance during the guilt phase of his trial will be addressed; the others are moot.

Bies contends that his trial counsel failed to provide effective assistance because they did not request appointment of experts to assess his competency and his ability to knowingly and intelligently waive his *Miranda* rights.  (Petition, Doc. No. 93 at PAGEID 388.)  He also cites to Dr. Kristin Haskins' post-conviction report suggesting that her evaluation of Bies along with the material available in the record caused her to suspect some central nervous system dysfunction which may have had some consequences impacting Bies' competence to stand trial.  *Id*. at PAGEID 389.  She suggested that a battery of psychological and neurological tests as well as a complete

physical examination would have been necessary to determine to what extent her suspicions were accurate. *Id*. Dr. Haskins also opined that Bies' suspected deficits may have had some relevance to the question of his sanity at the time of Aaron's murder, but as that is not an issue raised by Bies in the instant sub-claim, it will be disregarded. *Id*.

Respondent alleges Bies first raised the relevant parts of his sub-claim in his first petition for post-conviction relief in the state court. (Return of Writ, Doc. No. 127 at PAGEID 863.) As for Bies' claim that his attorneys should have obtained expert testimony respecting his competence, Respondent seems to indicate that that claim was raised as part of Bies' third claim for relief in the first petition, but the claim there was explicitly limited to counsel's failure to adequately prepare for the mitigation phase of the trial. (Appendix, Vol. 4 at 13-15.) In Bies' second post-conviction proceeding, he raised an ineffectiveness claim based on his counsel's failure to raise his incompetence during trial, but he made no separate claim that counsel should have obtained experts to testify at the suppression hearing about his incompetence, as he has in these habeas proceedings. (Appendix, 2d PCP, Vol. 1 at 43-45.) Consequently, because Bies never presented the argument to the state court that his attorneys should have presented expert testimony supporting his contention that he was incompetent to stand trial, it has not been preserved for habeas corpus review here. To that extent, his fifth sub-claim in his sixth ground for relief should be denied.

Respondent correctly identifies Bies' fourth post-conviction claim in his first petition as one containing Bies' additional allegation that his attorneys should have obtained experts to testify about his inability to knowingly and intelligently waive his *Miranda* rights at the pretrial suppression hearing. (Return of Writ, Doc. No. 127 at PAGEID 863; Appendix, Vol. 4 at 15-16.) The trial court found the claim meritless and barred by the doctrine of *res judicata*. (Appendix, Vol. 5

at 475-76.)  The state court of appeals agreed the claim was barred on *res judicata* grounds for two incongruous reasons:  (1) the claim was actually raised on direct appeal (which it was not), and (2) one of Bies' trial counsel also represented him on direct appeal, but because new co-counsel was appointed for the direct appeal, Bies could have raised trial counsel's ineffectiveness as error on direct appeal.  *State v. Bies*, No. C-980688, 1999 WL 445692 at *6-7 (Ohio App. 1st Dist. June 30, 1999) (unreported).  As discussed in this Court's consideration of Bies' second sub-claim in his sixth ground for relief, neither of those reasons are adequate to effect a procedural default of the instant claim.  The Ohio Supreme Court declined further review.  *State v. Bies*, 87 Ohio St. 3d 1440 (1999) (table).  Bies' claim is not procedurally defaulted, and this Court addresses it on the merits.

Bies' claim is not saved by the conclusion that it retains procedural vitality, however.  Bies presented the substance of his underlying claim, that he was not competent to waive his *Miranda* rights, and that his statements to police were involuntary, in his first, second, and third grounds for relief.  Denial of those claims on their merits would be recommended had they been preserved for habeas corpus review, as discussed above.  Bies' trial counsel cannot have been deficient in failing to pursue a losing strategy.  Accordingly, Bies' fifth sub-claim of his sixth ground for relief should be denied.

**Sixth Sub-Claim**

In his sixth sub-claim, Bies contends his trial counsel failed to conduct an adequate *voir dire* of prospective jurors, thereby rendering ineffective assistance.  (Petition, Doc. No. 93 at PAGEID 390-92.)  Respondent argues the claim is procedurally defaulted because the state court rejected the claim on *res judicata* grounds when Bies presented it in his first post-conviction proceeding.  (Return of Writ, Doc. No. 127 at PAGEID 864-65.)  Bies does not specifically address Respondent's

procedural default argument, and instead insists that he should not be required to demonstrate prejudice from his attorneys' failures respecting *voir dire*. (Traverse, Doc. No. 135 at PAGEID 1019-20.)

As Respondent acknowledges, Bies raised his claim in his first post-conviction petition. (Appendix, Vol. 4 at 16-17.) The trial court found that to the extent Bies claimed his attorneys failed to challenge for cause prospective jurors who indicated they could not be impartial because they had already formed an opinion about the case, Bies had failed to raise an issue for review.[15] (Appendix, Vol. 4 at 16; Vol. 5 at 477.) Similarly, the post-conviction court rejected Bies' claim that his trial counsel "had no comprehension of the purpose of voir dire . . .," (Appendix, Vol. 4 at 17), because Bies failed to present any documentary evidence or citations to the record in support of his claim, (Appendix, Vol. 5 at 478-79). The state court of appeals affirmed the trial court's determination that Bies' ineffective assistance during *voir dire* claim was barred in post-conviction on *res judicata* grounds, *State v. Bies*, No. C-980688, 1999 WL 445692 at *6-7 (Ohio App. 1st Dist. June 30, 1999) (unreported), and the Ohio Supreme Court declined further review, *State v. Bies*, 87 Ohio St. 3d 1440 (1999) (table).

Bies takes no issue with the state courts' decisions, and offers no cause or prejudice to excuse the default other than what has already been discussed and rejected in previous sub-claims, above. Consequently, his claim that his attorneys provided ineffective assistance during *voir dire* is procedurally defaulted.

---

[15]It appears, at least to this Court, that the state court's finding took untoward advantage of a typographical error in Bies' petition. Bies' claim appears in his petition as "Defense counsel did challenge for cause those jurors who indicated that they could not be objective based upon their pre-conceived opinions about the case." (Appendix, Vol. 4 at 16.) Obviously, the word "not" was left out of that assertion in error, and this Court will not penalize Bies as harshly as the state court did for his careless but immaterial mistake.

Furthermore, to preserve a claim for federal habeas corpus review, the claim must have been fairly presented to the state courts first. The Sixth Circuit Court of Appeals has explained that requirement as follows:

> Ordinarily, state prisoners must exhaust available state remedies by, among other things, fairly presenting their federal claims to the state courts before petitioning for a federal writ of habeas corpus. *See* 28 U.S.C. § 2265(b), (c); *Whiting v. Burt*, 395 F.3d 602[, 612-13] (6th Cir. 2005). Due to longstanding policies of comity and respect between state and federal courts, a habeas petitioner must give the state courts the first opportunity to consider and rule upon the federal claims the prisoner wishes to use to attack his state court conviction. *Picard v. Connor*, 404 U.S. 270, 275 (1971). A petitioner need not cite federal law "book and verse" to fairly present a claim, *id*. at 278, but the factual and legal underpinnings of the claim must be presented as a federal claim to the state courts, *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).
>
> In situations in which a petitioner has failed to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted. *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002).

*Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (parallel citations omitted).

In relevant part, Bies' claim as presented to the state post-conviction trial court is as follows:

> Petitioner's conviction and/or sentence are void or voidable because Petitioner did not receive effective assistance of counsel within the meaning of the Sixth Amendment during his capital trial. Petitioner's attorneys fell far short of a minimum professional standard in representing Petitioner, by numerous actions and failures to act, including, inter alia, the following:
>
> . . .
>
> F.    Defense counsel did [not] challenge for cause those jurors who indicated that they could not be objective based upon their pre-conceived opinions about the case.
>
> . . .

> I.      Defense counsel had no comprehension of the purpose of
>         voir dire . . . .

(Appendix, Vol. 4 at 16-17.)  Bies offered in support of his ineffective assistance of counsel claims

the affidavit of attorney Jeffry Kelleher.  (Appendix, Vol. 4 at 65-71.)  In relevant part, Kelleher

averred as follows:

> Counsel who tried the *Bies* case violated each of the standards for
> capital litigation, to wit:
>
> F.      Defense counsel did [not] challenge for cause those jurors
>         who indicated t6hat they could not be objective based upon
>         their pre-conceived opinions about the case.
>
> . . .
>
> I.      Defense counsel had no comprehension of the purpose of
>         voir dire . . . .

*Id.*[16]  Since Bies failed utterly to provide the state post-conviction court with any *factual* basis for his

claims of attorney ineffectiveness during *voir dire*, and there is no non-futile state remedy available

with which to do so at this late date, his claim is procedurally defaulted as never having been fairly

presented to the state court.  Accordingly, Bies' sixth sub-claim in his sixth ground for relief should

be denied.

**Seventh Sub-Claim**

Next, Bies argues his trial counsel provided ineffective assistance by delivering a sub-par

closing argument in the mitigation phase of his capital trial.  (Petition, Doc. No. 93 at PAGEID 392-

93.)  Although Bies has not withdrawn that portion of his sixth ground for relief (see Motion to

---

[16]It does not escape this Court's notice that the alleged errors identified by Kelleher are identical
in every respect (right down to the typographical error!) as those imported, without elaboration, directly
into Bies' post-conviction petition.

Amend the Third Amended Habeas Petition, Doc. No. 155, and Notice of Correction of Prior Pleading, Doc. No. 165), all matters dealing exclusively with the mitigation phase of Bies' trial are now moot, as he is no longer under a sentence of death. (Doc. No. 152-1 at PAGEID 1475-76.) Consequently, there is no need for this Court to consider Bies' seventh sub-claim of his sixth ground for relief.

**Eighth Sub-Claim**

In his eighth sub-claim, Bies contends his counsel were ineffective throughout both phases of his trial. (Petition, Doc. No. 93 at PAGEID 393-95.) Because any claims relating to the mitigation phase have been rendered moot by the subsequent vacation of his death sentence and imposition of a life sentence (Doc. No. 152-1 at PAGEID 1475-76), those matters are moot and will not be considered.

Bies faults his attorneys' performance during the guilt phase of his trial for the following reasons:

1. They unreasonably failed to argue and assert the fifty pretrial motions they filed;

2. Their opening statement was unreasonable;

3. They failed to object to prosecutorial misconduct;

4. They failed to object to jury instructions;

5. They failed to object to the trial court's displays of bias;

6. They failed to assure that bench conferences were recorded, and;

7. They failed to object to the manner in which courtroom security was deployed.

(Petition, Doc. No. 93 at PAGEID 393-95.)

Respondent advances a procedural default defense, and argues that even if the claim had been preserved, it is nevertheless meritless. (Return of Writ, Doc. No. 127 at PAGEID 865-66.) Bies does not address this sub-claim in his Traverse, other than to reiterate parts of it. (Traverse, Doc. No. 135 at PAGEID 1016-17.)

Respondent correctly observes that Bies has never presented the substance of his first, fifth, and seventh sub-sub-claims to the state court. Bies offers neither argument disputing that observation nor cause and prejudice for having failed to raise the sub-claims in the state court. Accordingly, the first, fifth, and seventh sub-sub-claims are procedurally defaulted without excuse, and should be denied on that basis.

In addition, however, Bies has failed to demonstrate how his trial counsel's performance was deficient in those three sub-sub-claims. For instance, he seems to be attributing the state court's perfunctory rejection of all of his fifty or so pretrial motions on his attorneys' failure to argue the motions. (Petition, Doc. No. 93 at PAGEID 393-94.) He does not explain what the motions were for, what additional argument beyond the motions themselves was necessary, or that there was any law supporting the positions taken in the motions, even though he acknowledges that the trial court denied the motions because "certain Supreme Court cases have decided them." *Id*. at PAGEID 394.[17] Had the issue been preserved, this Court would not be inclined to search the record, read each of the fifty or so motions, and research Ohio law to find support for Bies' statement that his attorneys should have and could have persuasively argued each or any of the motions.

Respondent initially asserts that Bies did not present his second sub-sub-claim to the state

---

[17]Although Bies referenced page 137 of the trial transcript contained that quotation from the trial court, the Court finds it actually appears on page 139.

courts, but in the next sentence states it was raised in his second post-conviction petition. (Return of Writ, Doc. No. 127 at PAGEID 865.) This Court finds no corresponding claim is contained in Bies' first or second post-conviction petitions. Bies offers no cause and prejudice for his failure to present the claim to the state courts, so this claim, too, is procedurally defaulted without excuse, and should be denied for that reason.

Bies' third sub-sub-claim, on the other hand, was included in his first post-conviction petition, with the same specificity he presents the claim here, which is to say none. (Appendix, Vol. 4 at 17.) At least in his habeas corpus petition, he attempts to incorporate the allegations of prosecutorial misconduct he claims in his eighth ground for relief, but in the state court, he included no reference to any instance of prosecutorial misconduct that he contends should have generated an objection by his attorneys. Thus, Bies failed to "fairly present" his claim, including its factual underpinnings, to the state court. As such, and because Bies offers no cause for his default or prejudice therefrom, the claim is procedurally defaulted without excuse, and should be denied on that basis.

The same is true of Bies' fourth sub-sub-claim. In the state court, the claim was devoid of any factual support whatsoever. Bies merely stated that "[d]efense counsel did not object to each instance of prosecutorial misconduct." (Appendix, Vol. 4 at 17.) Here, Bies refers this Court to his ninth and tenth grounds for relief in an attempt to incorporate those allegations into his ineffective assistance of counsel claim. But Bies withdrew his ninth ground for relief completely (Motion to Amend Third Amended Habeas Petition, Doc. No. 155 at PAGEID 1483). Bies' tenth ground for relief identifies three instances of allegedly improper jury instructions, the first two of which have been withdrawn (Traverse, Doc. No. 135 at PAGEID 1038), and the third of which is exclusively

relevant to the mitigation phase of Bies' capital trial and is therefore moot (Petition, Doc. No. 93 at PAGEID 416-17 (asserting that the trial court erred when it provided improper or erroneous instructions on the capital aggravating circumstances); *see* Doc. No. 152-1 at PAGEID 1475-76). Thus, Bies has failed to support his claim of trial counsel's ineffectiveness based on their failure to object to unidentified but allegedly erroneous jury instructions. Because Bies did not "fairly present" his claim in the state court, and because he has offered nothing more than bald assertions in his claim here, he has both failed to preserve the claim and failed to present a claim that can be adjudicated in federal habeas corpus. Consequently, it should be denied.

Next, Bies contends his trial counsel failed to assure that all sidebar and in-chambers discussions during his trial were recorded. (Petition, Doc. No. 93 at PAGEID 395.) Respondent states the claim was raised in Bies' second post-conviction petition (Return of Writ, Doc. No. 127 at PAGEID 865), but this Court finds no corresponding claim therein (Appendix, 2d PCP, Vol. 1 at 15-48). Since Bies does not address the procedural status of the instant claim, and offers no cause for the default or resulting prejudice therefrom, his sixth sub-sub-claim should be denied as procedurally defaulted.

Even if it were preserved, however, it would be meritless since Bies has not directed this Court to any evidence of import missing from the record as a consequence of trial counsel's failure to assure all proceedings, even sidebar and in-chambers discussions, were recorded. As such, his claim would fail for lack of a showing of prejudice from any error that might be found.

**Conclusion**

The Court has considered each of Bies' claims of his trial counsel's ineffectiveness individually and found each procedurally defaulted or fatally lacking in factual support.

Accordingly, Bies' sixth ground for relief should be denied.

**Seventh Ground for Relief**

Bies has withdrawn his seventh ground for relief. (Traverse, Doc. No. 135 at PAGEID 1028.)

**Eighth Ground for Relief**

In his eighth ground for relief, Bies contends the prosecutors engaged in misconduct during closing argument in the guilt phase of his trial. (Petition, Doc. No. 93 at PAGEID 401-10.) Respondent argues part of the claim is procedurally defaulted and that it is otherwise meritless. (Return of Writ, Doc. No. 127 at PAGEID 868-70.) Bies counters that his presentation of the instant claim to the state court in his second post-conviction petition preserved the claim for federal habeas corpus review, urging this Court to disregard the state court's rejection of the claim on procedural grounds. (Traverse, Doc. No. 135 at PAGEID 1037.)

It is true, as Respondent acknowledges, that Bies raised part of his prosecutorial misconduct claim on direct appeal in the Ohio Supreme Court. There, however, his claim was limited to challenges to the prosecutor's closing argument in the penalty phase of the trial. (Appendix, Vol. 3 at 94-97.) Any alleged error relating to that phase of the trial has been rendered moot by the vacation of Bies' death sentence because of his mental retardation. (Doc. No. 152-1 at PAGEID 1475-76.)

Bies first raised the instant claim in his second post-conviction petition. (Appendix, 2d PCP, Vol. 1 at 26-29.) The trial court dismissed the petition since Bies failed to comply with the procedural requirements of Ohio Rev. Code § 2953.23(A). (Appendix, 2d PCP, Vol. 4 at 327.) Although Bies assigned the trial court's dismissal of his petition, and specifically his prosecutorial

-77-

misconduct claim, as error on appeal (Appendix, 2d PCP, Vol. 5 at 59-63), the court of appeals did not explicitly address the misconduct issue, and instead found as follows:

> We conclude that the common pleas court properly declined to entertain the appellant's second postconviction petition, because the record does not demonstrate either that the appellant was unavoidably prevented from discovering the facts underlying his claims or that his claims were predicated upon a new or retrospectively applicable federal or state right recognized by the United States Supreme Court since the filing of his first petition.

*State v. Bies*, No. C-020306, 2003 WL 202177 at *1, 2003-Ohio-442 at ¶ 6 (Ohio App. 1st Dist., Jan. 31, 2003) (unreported). The Ohio Supreme Court declined further appeal. *State v. Bies*, 99 Ohio St. 3d 1413, 2003-Ohio-2454 (2003) (table). As discussed in previous grounds for relief, the state courts' reliance on an independent and adequate state procedural rule in disposing of Bies' claim deprives this Court of the opportunity to review the merits of the claim. Bies' argument that he and Darryl Gumm were similarly situated, procedurally speaking, in the state court during their second post-conviction proceedings is factually incorrect, and does not persuade this Court that it may disregard the state court's legitimate interest in enforcing its own procedural rules. As Bies offers no cause for failing to present the claim on direct appeal where it would have been properly raised under state law, and no prejudice from its omission, his habeas claim is procedurally defaulted without excuse, and should be denied on that basis.

Even if it had been preserved, however, Bies' claim would fail. The Sixth Circuit has articulated the relevant standard for habeas claims of prosecutorial misconduct as follows:

> On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (citation omitted). Even if the prosecutor's conduct was improper or even "universally condemned," *id*., we can provide

relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). Under [the] AEDPA, this bar is heightened by the deference we give to the . . . [Ohio] Supreme Court's determination of . . . [Petitioner's] prosecutorial-misconduct claims. *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002)("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003). In addition, an examination of alleged prosecutorial misconduct is performed in the context of the trial as a whole. *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004), *citing United States v. Young*, 470 U.S. 1, 12 (1985) and *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).

The prosecutor's arguments that Bies and Gumm may have desired anal sex as opposed to oral sex from Aaron, that the sexual assault took place in the basement of the abandoned building rather than on the first floor, that Aaron's arms were held behind his back as he was beaten, and that Aaron was in a standing position when his attackers were trying to force him into performing fellatio are not the sorts of arguments that could so infect Bies' trial with unfairness as to make his convictions a denial of due process. In addition, crediting Bies and Gumm with placing the twine around Aaron's neck, even in light of a witness' testimony that the twine had no evidentiary value, can hardly be viewed as a determining factor in Bies' conviction, as there was no other explanation for the twine being around the boy's neck. In addition, the jurors were instructed that what the

attorneys say is not evidence and that the jurors were the "sole judges of the facts, the credibility of the witnesses, and the weight of the evidence." (Trial Tr. at 510, 1030.) Bies argues the prosecutor's attributing blows to Aaron's mouth to Bies was misconduct since there was no evidence establishing which of Aaron's attackers hit him in the mouth, but the jurors were also instructed that "[w]hen two or more persons have a common purpose to commit a crime and one does one part and a second performs the other," both are equally guilty of the crime. *Id.* at 1041.

Bies also contends the prosecutors speculated about "who was doing the hitting and who was doing the holding, who was going to get the blow job," but the prosecutor actually refused to guess who was doing what, acknowledging that he is "not a clairvoyant," and that the physical evidence indicated two people were involved in Aaron's beating and murder. *Id.* at 1018-19. The prosecutor's expressions of confidence that the jury would find it abundantly clear that Aaron's murder was a purposeful killing after reviewing the evidence, *id.* at 983, and that the prosecution had established each element of the crimes charged beyond a reasonable doubt, *id.* at 988, are routine comments in closing argument rather than impermissible expressions of the prosecutor's opinion on the evidence. In addition, the comments were made in the prosecutor's rebuttal in response to defense arguments that the prosecution had not met its burden and casting suspicion on the prosecution's witnesses. (Trial Tr. at 992, 1004-5.) Bies also contends the prosecutors characterized his statements to police as "ridiculous," (Petition, Doc. No. 93 at PAGEID 403), but no such comment appears in the transcript pages to which Bies directs the Court.

The prosecutor's rebuttal argument cautioning the jurors not to be confused by defense counsel's argument that only one person can be the principal offender in a murder (Trial Tr. at

1016), his statement that the defense can try to confuse the jury, *id*. at 1022, and his general warning to the jury not to be confused, *id*. at 1028, are all proper argument and would not warrant habeas relief even if Bies' claim were preserved. In addition, his statement that defense counsel would like to see Bies walk free, *id*. at 1011, is merely a restatement of defense counsel's arguments for acquittal throughout his closing argument. Finally, Bies claims that the prosecutor's comment to the jurors that they should not let the law confuse them, *id*. at 1011, merely acknowledged defense counsel's earlier argument that "some lawyers even have a hard time understanding and applying" the law, *id*. at 993.

To summarize, Bies failed to preserve his prosecutorial misconduct claim for habeas corpus review when he did not raise it at the first opportunity in the state court. The claim is consequently procedurally defaulted, and Bies offers no cause and prejudice to excuse the default. For that reason the claim should be denied. Even if he had properly preserved the claim, however, Bies' allegations of prosecutorial misconduct, considered individually and cumulatively, would not have warranted the relief requested.

**Ninth Ground for Relief**

Bies has withdrawn his ninth ground for relief in its entirety. (Motion to Amend Third Amended Habeas Petition, Doc. No. 155 at PAGEID 1483.)

**Tenth Ground for Relief**

In his tenth ground for relief, Bies presents three sub-claims challenging the trial court's instructions to the jury. (Petition, Doc. No. 93 at PAGEID 413-17.) He has withdrawn the first two of those sub-claims, (Traverse, Doc. No. 135 at PAGEID 1038), and the third has been rendered moot by the vacation of Bies' death sentence due to his mental retardation. (Doc. No. 152-1 at

PAGEID 1475-76.)

**Eleventh Ground for Relief**

Bies has withdrawn his eleventh ground for relief in its entirety. (Motion to Amend Third

Amended Habeas Petition, Doc. No. 155 at PAGEID 1483.)

**Twelfth Ground for Relief**

In his twelfth ground for relief, Bies alleges his appellate counsel provided ineffective

assistance on direct appeal in the state court of appeals. (Petition, Doc. No. 93 at PAGEID 430-35.)

In his motion to amend his third amended petition, parts of Bies' twelfth ground for relief relating

to the penalty phase of his capital trial have been withdrawn on the authority of a "Mr. Benge."

(Doc. No. 155 at PAGEID 1483.) This Court is unaware of Mr. Benge's connection to Bies' case and

hereby amends its notation order of August 6, 2010, to reflect denial of Mr. Benge's withdrawal of

any portion of Bies' twelfth ground for relief. At the same time, the Court recognizes that those

parts of Bies' claim having to do with the penalty phase of Bies' trial have been rendered moot as

Bies is no longer under sentence of death. (Doc. No. 152-1 at PAGEID 1475-76.)

Respondent argues that Bies' claim is procedurally defaulted because the Ohio courts found

Bies' application to reopen his direct appeal untimely under Ohio R. App. P. 26(B). (Return of Writ,

Doc. No. 127 at PAGEID 881.) Respondent also argues that the claim is meritless. *Id*. at PAGEID

881-84. Bies counters that the rule relied upon by the state courts and Respondent here was neither

firmly established nor regularly followed at the time it was applied to his application to reopen his

direct appeal and therefore cannot be the basis for a procedural default of his claims. (Traverse,

Doc. No. 135 at PAGEID 1059-60.)

The state court of appeals' judgment entry and decision on Bies' direct appeal were filed

March 30, 1994. (Appendix, Vol. 2 at PAGEID 221-46.) Pursuant to Ohio R. App. P. 26(B)(2)(b), Bies had ninety days from that date within which to file his application to reopen his direct appeal. He did not do so, however, until September 20, 1996. (Appendix, Vol. 2 at 289.) The court of appeals relied on the procedural rule in denying Bies' application, stating that he had failed to file within the allotted time and had not shown good cause for the delay. *Id*. at 309-10. In a footnote, the court also observed that "appellant's application contains a simple list of twenty-three assignments of error, with no statement of the basis for any of the claims, no statement of the manner in which the alleged deficiency in counsel's performance affected the outcome of the appeal, and no citations to the record," again citing Rule 26(B). (Appendix, Vol. 2 at PAGEID 316.)

The history surrounding the creation of Ohio's Rule 26(B) is fully detailed in the Sixth Circuit Court of Appeals' opinion in *Franklin v. Anderson*, 434 F.3d 412, 418-21 (6th Cir. 2006), and need not be repeated in full here. This Court has summarized the Sixth Circuit's findings as follows:

> The Sixth Circuit Court of Appeals recently performed a searching review of the Ohio Supreme Court's enforcement of the timeliness requirement of Ohio R. App. Proc. 26(B). The court noted that "[f]or several years following the enactment of . . . Rule 26(B), the Ohio Supreme Court regularly enforced the rule's timeliness requirements," citing nine cases spanning the years between 1995 and 2000. *Franklin v. Anderson*, 434 F.3d 412, 420 (6th Cir. 2006). The court went on to observe, however, that in 2000 the state court began addressing applications to reopen on their merits in spite of their untimeliness, even when a state appellate court had already denied the application on timeliness grounds. *Franklin*, 434 F.3d at 420-21 (citing nineteen Ohio Supreme Court decisions from 2000 to 2004 in support). The Ohio Supreme Court reversed course again and began to affirm dismissals of applications to reopen in capital cases on timeliness grounds in more recent years. *Id*. at 421 (citing three 2004 supreme court cases in support).

*Henness v. Bagley*, No. 2:01-cv-043, 2007 WL 3284930 at *58 (S.D. Ohio, Oct. 31, 2007) (unpublished).

Thus, at the time Bies filed his application to reopen in the state court of appeals, and on December 4, 1998, when the state court of appeals applied the rule to his application, the timeliness requirement of Rule 26(B) was firmly established and regularly followed.

Bies argues the firmness of the rule's establishment, and the regularity of its being followed should be viewed as of the date of the court of appeals' decision on direct appeal, specifically March 30, 1994, rather than the date on which the state court actually applied the rule in Bies' case. (Traverse, Doc. No. 135 at PAGEID 1060.) Bies' argument is in direct contradiction to Sixth Circuit precedent stating that "[a] procedural rule is adequate only when it is firmly established and regularly followed *at the time it was applied*." *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (emphasis added), *citing Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998); *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003). Furthermore, the United States Supreme Court has indicated that whether a state procedural rule is firmly established and regularly followed for procedural default purposes is determined by looking at the rule as of the date it was applied to the petitioner's case by the state court. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). Consequently, Bies' argument that his claim is saved from procedural default because the rule upon which the state court relied was not firmly established and regularly followed on the day the court of appeals entered judgment in Bies' direct appeal is unavailing.

The state court of appeals found that Bies had failed to comply with Rule 26(B), and by denying his application to reopen his direct appeal, enforced the rule in Bies' case on December 4, 1996. That date is within the time period identified by the Sixth Circuit in which the Ohio Supreme Court was regularly enforcing the rule in death penalty cases. *Franklin*, 434 F.3d at 420-21. Since Bies has not demonstrated cause and prejudice for the default, it is without excuse, and his twelfth

ground for relief should be denied on that basis.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

**Thirteenth Ground for Relief**

In his thirteenth ground for relief, Bies contends his appellate counsel's representation on direct appeal in the Ohio Supreme Court was deficient.  (Petition, Doc. No. 93 at PAGEID 436-39.) Whether preserved or not, Bies has failed to state a claim cognizable in federal habeas corpus.  The United States Supreme Court has never recognized a federal constitutional right to appellate counsel beyond the first appeal of right.  *Lopez v. Wilson*, 426 F.3d 339, 350 (6th Cir. 2005), *citing Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) and *Coleman v. Thompson*, 501 U.S. 722 (1991).  Bies' first appeal of right was had in the state court of appeals and he was not entitled to counsel at all, let alone effective counsel, in his further appeal to the Ohio Supreme Court.[18]  Accordingly, Bies' thirteenth ground for relief should be denied as failing to state a claim cognizable in habeas corpus.

**Fourteenth, Fifteenth, Sixteenth, and Seventeenth Grounds for Relief**

Bies has withdrawn his fourteenth, fifteenth, sixteenth, and seventeenth grounds for relief in their entirety.  (Motion to Amend Third Amended Petition, Doc. No. 155 at PAGEID 1483-84.)

**Eighteenth Ground for Relief**

In his eighteenth ground for relief, Bies argues that the cumulation of the errors described in his previous grounds for relief, exclusive of the claims and parts of claims that relate solely to the penalty phase of his capital trial, warrant granting a writ of habeas corpus.  (Petition, Doc. No.

---

[18]Although appeal to the Ohio Supreme Court after completing an appeal to the state court of appeals was mandatory rather than discretionary at the time of Bies' appeals, that fact alone does not entitle him to effective counsel in the second appeal under the federal constitution.  *See* Ohio Rev. Code § 2929.05(A).

93 at PAGEID 457-60; Motion to Amend Third Amended Petition, Doc. No. 155 at PAGEID 1484.)

Whether Bies preserved the claim of cumulative error or not, it is not a claim cognizable in federal habeas corpus. The Sixth Circuit Court of Appeals has held that "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010).

Bies also challenges the applicability of 28 U.S.C. § 2254(d) and (e)(1) as amended by the AEDPA because "[a]pplication of these sections could be unconstitutionally retroactive." (Petition, Doc. No. 93 at PAGEID 458.) Bies' retroactivity concern is perplexing, given that he filed his initial petition for a writ of habeas corpus on August 21, 2000, by which time the AEDPA had been in effect for more than four years.

Bies' argument that the cumulation of his preceding grounds for relief entitles him to habeas corpus relief is without foundation in federal law as determined by the United States Supreme Court. For that reason, his eighteenth ground for relief should be denied.

**Nineteenth Ground for Relief**

In his nineteenth ground for relief, Bies argues that collateral estoppel applies to the state courts' findings that he is mentally retarded, and that he should not be forced to return to the state court to relitigate that issue. (Petition, Doc. No. 461-68.) That claim was bifurcated from Bies' eighteen preceding grounds for relief, and was conclusively rejected by the United States Supreme Court. *Bobby v. Bies*, ___ U.S. ___, ___, 129 S.Ct. 2145 (2009).

## Conclusion

This Court has considered each of Bies' grounds for relief except those withdrawn from the

Court's consideration, and found none that warrant habeas corpus relief. Accordingly, his petition for a writ of habeas corpus should be denied. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied leave to appeal *in forma pauperis* and any requested certificate of appealability.

November 14, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).