IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Michael Bies, | : | |
| | : | Case No. 1:00-cv-682 |
| Petitioner, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING |
| Margaret Bagley, Warden, | : | CONDITIONALLY IN PART AND |
| | : | DENYING IN PART THE THIRD |
| Respondent. | | AMENDED PETITION FOR WRIT |
| : | | OF HABEAS CORPUS |
| | : | |

In this case, Magistrate Judge Michael R. Merz has recommended denying Petitioner

Michael Bies' Third Amended Petition for Writ of Habeas Corpus ("Third Habeas Petition")

(doc. 93). Currently pending before the Court are the Magistrate Judge's Report and

Recommendations ("R&R") (doc. 167) and Supplemental Report and Recommendations ("Supp.

R&R") (doc. 173) and Petitioner's Objections to the R&R and to the Supp. R&R (docs. 171,

174).

For the reasons that follow, the Court will **GRANT CONDITIONALLY IN PART**

**AND DENY IN PART** the Third Amended Petition. The Court will grant conditionally the

Third Amended Petition as to the "other suspects" subclaim in the Fourth Claim for Relief and

deny it in all other respects. Accordingly, the Court will **ADOPT IN PART AND**

**OVERRULE IN PART** the R&R and the Supp. R&R and **SUSTAIN IN PART AND**

**OVERRULE IN PART** the Objections thereto.

1

## I.     BACKGROUND

### A.     Conviction in State Court and Procedural History

Magistrate Judge Merz set forth in the R&R the long and winding history regarding Bies'

conviction for the kidnapping, attempted rape, and aggravated murder of ten-year-old Aaron

Raines.  (Doc. 167 at 4–9.)  The procedural history need not be restated in full here.

### 1.     Trial Evidence

The Court will restate the facts supporting Bies' conviction as set forth in the Ohio

Supreme Court opinion on Bies' direct appeal:

> Shortly after daybreak on May 12, 1992, police found the bludgeoned body of
> ten-year-old Aaron Raines in the basement of an abandoned building in the 2100
> block of West Eighth Street in Cincinnati.  A nine-week investigation led the
> police to two suspects: Darryl "Junior" Gumm and defendant-appellant Michael
> Bies.
>
> The police investigation revealed that the day before Aaron's body was
> discovered, Gumm and Bies were drinking beer and idling the day away in a park
> adjacent to the abandoned building in which Aaron's body was found.  As
> evening approached, they decided they wanted to have sex with a child.
>
> Aaron Raines, a small ten-year-old, was playing in the park that evening.  Aaron
> had had some physical difficulties as the result of being struck by a van a year
> earlier.  In addition, Aaron wore a partial cast on his right foot because he had
> dropped weights on his toe earlier that spring.
>
> Gumm, who knew Aaron, approached the boy and offered him $10 to help him
> and Bies remove scrap metal from an abandoned building near the park.
>
> After Aaron accepted Gumm's offer, Bies, Gumm and Aaron entered one
> abandoned building and crossed over a walkway into a second abandoned
> building.  At this point, Aaron began to resist. Once inside this second building,
> Gumm attempted to have intercourse with Aaron, but Aaron screamed and
> resisted.  When Aaron refused, Gumm struck him. Aaron began to cry. Bies
> admitted striking Aaron with a wooden board across the chest or head.  Gumm
> then carried Aaron down into the basement of that building.
>
> The beating continued in the basement.  Bies further admitted he hit Aaron with a

2

pipe three or four times, and with a piece of concrete, two or three times.  Aaron was also kicked with such force as to leave the imprint of shoe tread patterns on his body.

Bies and Gumm left Aaron in the basement.  They returned to the first building and performed oral sex on one another.  They then left the area and went their separate ways.

When Aaron did not return home that evening, his nineteen-year-old brother became concerned and began to look for him.  When Aaron's mother came home from work that night, she phoned the police to report him missing.  The police searched the surrounding area, but left the search of the abandoned buildings until morning because of their dilapidated condition.

When police discovered Aaron's body the next morning, several objects were located around the body, including a rock, a metal pipe, some rope and pieces of wood.  Human hairs found on these objects were consistent with the hair sample taken from Aaron's head.  Blood stains found on the pipe and piece of concrete were also consistent with Aaron's blood type.

The autopsy revealed that Aaron had sustained nineteen separate scalp lacerations, representing distinct injuries or impacts, and that there were so many tears of the scalp that they had become almost one wound.  The wounds on the back of his head were consistent with injuries that would be left by the threads of a metal pipe.  The entire left side of Aaron's face had been flattened by severe skull fractures caused by a very heavy and broad implement, such as a brick, a chunk of concrete, or a rock.  Bleeding of the muscle tissue around Aaron's windpipe was observed, indicating pressure had been exerted around the neck by some sort of ligature, like a piece of twine.

Other injuries sustained by Aaron included five broken ribs, four of which punctured his right lung, a broken jaw, chipped teeth, a pattern injury on the back caused by some sort of long thin object like a tube or a stick, and scrapes on the back of the right leg consistent with drag marks.  There was no evidence of any defensive wounds.  Cause of death was multiple blunt injuries to Aaron's head, neck, chest and abdomen.

Police arrested Gumm and questioned him about his involvement in the murder. After talking to Gumm, the police went to Hazard, Kentucky, to question Bies.

Bies gave several statements to the police, two of which were tape-recorded. Initially, he denied any involvement in the murder.  However, once the police presented him with information they already had, Bies admitted that he was with Gumm that day, but essentially stated that Gumm was responsible for what had

occurred.

As a result of his statements, the police arrested Bies and transported him to Cincinnati.  Bies offered to return to the crime scene to refresh his memory of the events in order to assist the police in solving the case.  As they walked through the buildings and the surrounding area, Bies offered detailed statements regarding the instruments used to kill Aaron, including that the pipe had threading around the top and that the weapons used to kill Aaron were similar in weight to other objects lying around the building.

When they returned to the police station, the officers told Bies that they knew he was lying because of the detailed comments he had given at the crime scene.  Bies then gave his last statement, which was unrecorded per his request, admitting to his involvement in Aaron's death.

*Ohio v. Bies*, 74 Ohio St. 3d 320, 320–22, 658 N.E.2d 754 (1996).

A few additional facts disclosed through evidence at trial are worth discussing.  Phyllis Thacker, a resident of Hazard, Kentucky, testified at Petitioner Bies' trial about how Gumm and Bies met in Hazard.  (Tr. 528–44.)  Thacker had met Gumm when both lived in Cincinnati, before she moved to Hazard.  (*Id.*)  Gumm stayed with her family in Hazard from January 1992 until April 1992, the month before Aaron's murder, at which time she asked him to leave because she had become afraid of him.  (Tr. 532–33, 542–44.)  Gumm then stayed with the family of Charlotte Jean Baker in Hazard until early May 1992.  Thacker met Bies in Hazard in February or March 1992 when he was visiting his wife and her family in Hazard.  (Tr. 534–35.)  Thacker introduced Bies and Gumm and believed they became friends.  (Tr. 535.)

Charlotte Jean Baker then testified at Bies' trial about how Gumm and Bies ended up in Cincinnati, Ohio on May 11, 1992.  (Tr. 545–62.)  Baker drove with her parents to Cincinnati on that date to visit relatives and friends in Cincinnati.  (Tr. at 548, 551.)  Bies and Gumm rode with the Bakers to Cincinnati.  (Tr. 549–50.)  In the late morning or early afternoon, the Bakers dropped off Bies and Gumm near downtown Cincinnati after crossing into Ohio from Kentucky.

4

(Tr. 552.)  Charlotte Baker testified that later that evening around 7:00 p.m. she saw Bies and Gumm sitting together at a park in Cincinnati near State Street when her family was beginning its drive back to Hazard.  (Tr. 554–55.)

Finally, Dallas Hayes, Aaron's brother, testified at Bies' trial that their family lived three blocks away from the corner of Eighth Street and State Street in Cincinnati, Ohio, an intersection next to a park and the abandoned buildings in which Aaron's body was found.  (Tr. 565.)  Hayes testified that he last saw Aaron around 6:00 p.m. or 7:00 p.m. on the night he was murdered and that Aaron never played in the abandoned buildings where his body was found.  (Tr. 566–67, 572.)

### 2.    Conviction and Sentencing

At the conclusion of his trial, on October 14, 1992, a Hamilton County, Ohio jury convicted Bies of kidnapping, attempted rape, and one count of aggravated murder with three death-penalty specifications.  (Tr. 1064–66.)  At the sentencing phase of the trial, the jury heard testimony from a clinical psychiatrist that Bies suffered from mild mental retardation.  (Tr. 1091, 1103.)  Nonetheless, the jury recommended a sentence of death and the trial court sentenced Bies to death.  (Tr. 1211, 1222.)

Subsequent to Bies' conviction and sentencing, the United States Supreme Court held in 2002 that the execution of mentally retarded criminals violated the Eighth Amendment to the United States Constitution.  *Atkins v. Va.*, 536 U.S. 304, 321 (2002).  Thereafter, the Ohio trial court held a proceeding pursuant to *Atkins* and *Ohio v. Lott*, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002), and determined that Bies was a mentally retarded person.  (Doc. 152-1.)  The trial court, accordingly, re-sentenced Bies to life imprisonment with the possibility of parole after

thirty years.  (*Id.*)

3.       **Habeas Proceedings**

In these habeas proceedings, Bies filed his Third Amended Petition on April 18, 2005,

but due to the procedural complexities in this case, the Warden did not file the Return of Writ

("ROW") until October 30, 2008.  (Docs. 93, 127.)  The case then was stayed pending

adjudication of Bies' *Atkins* claim and a post-conviction relief petition in state court.  (Doc. 149.)

The stay was dissolved on July 16, 2010.  (Doc. 153.)  Thereafter, the parties completed their

briefing, the Magistrate Judge issued the R&R and Supp. R&R, and Petitioner Bies filed his

Objections thereto.

**B.       Claims Remaining for Adjudication**

In the R&R, Magistrate Judge Merz recommended denying each of the Claims for Relief

stated in the Third Habeas Petition which remained for adjudication: the First, Second, Third,

Fourth, Fifth, Sixth (in part), Eighth, Twelfth, Thirteenth, Eighteenth, and Nineteenth Claims for

Relief.  (Doc. 167.)  Petitioner filed Objections to only the First through Sixth Claims for Relief.

(Doc. 171 at 4, 27, 35, 41.)  In so doing, Petitioner has waived the Eighth, Twelfth, Thirteenth,

Eighteenth, and Nineteenth Claims for Relief.  Magistrate Judge Merz again in the Supp. R&R

recommended denying the First through Sixth Claims for Relief and Petitioner again filed

Objections.  (Docs. 173, 174.).

**II.       LEGAL STANDARDS FOR HABEAS CORPUS PETITIONS**

Petitioner Bies filed his Habeas Petition after April 24, 1996 so it is subject to the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Hamilton v. Morgan*,

474 F.3d 854, 858 (6th Cir. 2007).  A habeas petitioner must exhaust all remedies available to

him in state court before filing a habeas petition.  28 U.S.C. § 2254(b)(1)(A).  The AEDPA requires federal courts to respect any determination "on the merits made in [s]tate court proceedings" unless it resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. §§ 2254(d)(1) & (2).  Significantly, § 2254(d) "applies even where there has been a summary denial."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington*, 131 S. Ct. at 785.  On a summary denial, "[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  *Cullen*, 131 S. Ct. at 1402 (citing *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court further explained the meaning of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412–13.  An unreasonable application is more than simply incorrect; it must be objectively

unreasonable.  *See also Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *Williams*, 529 U.S. at 409, 411.  "[C]learly established Federal law" under § 2254(d)(1) means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  "Clearly established" refers to only holdings, not to dicta.  *Id.*  "Under [the] AEDPA, if there is *no* clearly established Federal law, as determined by the Supreme Court, that supports a habeas petitioner's legal argument, the argument must fail."  *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (internal citation omitted and emphasis in the original).  Finally, a § 2254(d)(1) review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen*, 131 S. Ct. at 1398.

Pursuant to 28 U.S.C. § 2254(e)(1), a determination of a factual issue by a state court is presumed correct and the applicant has the burden of rebutting the presumption by clear and convincing evidence.  This presumption does not apply to mixed questions of law and fact.  *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).  Instead, the "unreasonable application" prong of § 2254(d)(1) applies to mixed questions of law and fact.  *Id.*

## III.  ANALYSIS

### A.  First, Second, and Third Claims for Relief

**First Claim for Relief:**  Michael Bies' Convictions and Sentences are Constitutionally Infirm. The Trial Court Erred When It Admitted Mr. Bies' Statements Because They Were Not the Product of His Own Free Will.  United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.

**Second Claim for Relief:**  Michael Bies' Convictions and Death Sentences Are Constitutionally Infirm.  The Trial Court Admitted Custodial Statements of Michael Bies Which Were Not Preceded by Mr. Bies Knowingly, Intelligently and Voluntarily Waiving His Miranda Rights.  United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.

**Third Claim for Relief:**  Michael Bies' Convictions and Death Sentences Are Constitutionally Infirm Because The Trial Court Admitted Custodial Statements of Michael Bies Which Were Not Preceded by Michael Being Advised or Having Waived His Miranda Rights.  United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.

(Doc. 93 at 10, 20, 24.)

### 1.    Procedural History of the First, Second, and Third Claims for Relief

In the First, Second, and Third Claims for Relief, Petitioner Bies challenges whether his

statements to the police at the time of his arrest were knowingly, voluntarily, and willingly made.

The Warden has conceded that these claims have been properly preserved.  (Doc. 127 at 63.)

The Ohio Supreme Court held as follows during Bies' direct appeal:

> Bies argues that the trial court erred in overruling his motion to suppress his statements made to police officers.  Bies contends that he lacked the mental capacity to waive his Miranda rights, and that under the totality of the circumstances, his confession was involuntary.
>
> A review of the officers' testimony and the taped statements of Bies reveals that he was advised of and waived his Miranda rights before each interview with the police.  Moreover, at no time during the motion to suppress hearing did defense counsel attempt to establish that Bies lacked the mental capacity to voluntarily waive his Miranda rights.  As noted in *State v. Hill* (1992), 64 Ohio St.3d 313, 318, 595 N.E.2d 884, 890, while the state must prove voluntariness by a preponderance of the evidence, a low mental aptitude of the interrogee is not enough by itself to show police overreaching.  Following *Colorado v. Connelly* (1986), 479 U.S. 157, this court recognized that evidence of police coercion or overreaching is necessary for a finding of involuntariness.  *Hill*, supra.  None of the interviews of Bies indicates police coercion, threats, mistreatment or physical deprivation.  The questioning of Bies was neither prolonged nor intense.  Under the totality of circumstances test of *State v. Smith* (1991), 61 Ohio St.3d 284, 288, 574 N.E.2d 510, 515, the trial court did not err in overruling Bies' motion to suppress.

*Bies*, 74 Ohio St. 3d at 323 (parallel citations omitted).

Magistrate Judge Merz concluded that the Ohio Supreme Court's decision was not

contrary to nor an unreasonable application of federal law.  He recommended denying the First,

Second, and Third Claims for Relief. (Doc. 167 at 19.)

### 2. Facts Common to First, Second, and Third Claims for Relief

### a. Bies Is Mentally Retarded

Bies has been medically diagnosed and judicially determined to be a mentally retarded individual. (Doc. 152-1; Doc. 161-1 Ex. 10 at 37–45; Doc. 161-1 Ex. 11 at 47.)

Two clinical psychologists, Myron S. Fridman, Ph.D. and Bill S. Fuess, Ph.D., and a clinical psychiatrist, Donna E. Winter, Ph.D., examined Bies prior to his trial for the purposes of determining whether an insanity plea would be appropriate. (ROW Apx., 2d PCP Vol. 8 at 29–31; *Id.*, 2d PCP Vol. 8 at 32–37; *Id.*, Vol. I at 349–53.) There is no indication that the experts were asked to determine whether Bies was competent to waive his *Miranda* rights or competent to stand trial. Bies was found to be borderline mentally retarded with an IQ of 68. (*Id.*, 2d PCP Vol. 8 at 32–37.) Each of the experts determined that Bies knew the difference between right and wrong, and therefore, that an insanity plea would not be appropriate. (*Id.*, 2d PCP Vol. 8 at 31; *Id.*, 2d PCP Vol. 8 at 37; *Id.*, Vol. I at 352.)

Bies' mother told Dr. Winter that he had been diagnosed as a child with "organic dysfunction on the left side of the brain." Bies suffered developmental delays from birth and was subjected to a violent, chaotic family upbringing. (*Id.*, 2d PCP Vol. 8 at 32–37.) He displayed an unusually high degree of violence and anger from the time he was a toddler. (*Id.*) He had learning disabilities and had to be educated in special schools called therapeutic schools in Illinois. (*Id.*) He complained of a history of hallucinations, including voices which told him to kill himself, but he specifically denied that the voices ever told him to hurt or kill another person. (ROW Apx., 2d PCP Vol. 8 at 29–31.)

10

Dr. Winter noted that Bies was "cooperative, but dense, naive, and in denial about his unique legal situation." (ROW Apx., 2d PCP Vol. 8 at 32–37.) She said he had a "concrete, and sometimes illogical way of thinking." (*Id.*) On the other hand, he was able to tell her a "relevant, coherent, and detailed account" of the events leading to his arrest. (*Id.*) She noted that he was able to "go[] about the community, unassisted" and "carr[y] out the activities of daily life fairly independently." (*Id.*) She later testified at Bies' original sentencing hearing that he had an IQ of 69 and was "mildly mentally retarded to a level of borderline mentally retarded." (Tr. 1103, 1117.) She testified that Bies had ability "to think clearly, logically" similar to that of a youth between third and sixth grades. (Tr. 1116.) She also testified that Bies "always" acted in an "extremely impulsive" manner such that he did not think about the consequences of his actions. (Tr. 1120.)

Myron S. Fridman, Ph.D., stated that Bies was "alert, fully oriented, and cooperative." (ROW Apx., 2d PCP Vol. 8 at 29–31.) He said Bies' "thought content and cognitive associations were appropriate," but that Bies' thought process "was at times somewhat illogical." (*Id.*) He described Bies as a "marginally functioning, mildly mentally retarded man." (*Id.*) Dr. Fridman reported that Bies told him that he had tried to commit suicide two times since he had been held in the Hamilton County Justice Center following his arrest due to the death of his sister. (*Id.*)

Finally, Bill S. Fuess, Ph.D., a clinical psychologist, noted that Bies was "oriented to person, place, time, and situation." (ROW, Apx. Vol. I at 349–53.) Dr. Fuess noted that Bies had an awareness of the status of the charges against him. (*Id.*) He noted that Bies contradicted himself when relating the story of the crime. (*Id.*)

11

### b. The Police Subjected Bies to Multiple Interrogations at the Time of His Arrest.

Bies was arrested in Hazard, Kentucky on July 28, 1992, more than two months after Aaron Raines was murdered, by the Hazard County Sheriff's Department on an Indiana warrant for a crime unrelated to this case. (Tr. 93; Doc. 161-1 Ex. 12 at 49.) Detectives from the Cincinnati Police Department began questioning him around 6:45 p.m. after they read him his rights and secured his signature on a written "waiver of rights" form. (Doc. 161-1 Ex. 12 at 49.) Bies appeared to read the waiver of rights form before he signed it. (Tr. 46.) Both detectives testified that they believed Bies understood his rights. (Tr. 46, 848–50.) Bies did not request an attorney. (Tr. 46.) The detectives did not make any threats or promises to induce Bies' statement. (Tr. 46–47.)

The initial interrogation was recorded. (Doc. 161-1 Ex. 13 at 50–61.) The detectives, of course, did not have knowledge of the medical reports summarized above concerning Bies' mental capacity at the time they questioned Bies. Nonetheless, there were arguably some indications of Bies' diminished mental capacity in this first interrogation. Bies told the detectives that he only had completed the tenth grade at Allen Elementary, which he then corrected to High School, in Skokie, Illinois. (*Id.* at 50–51.) Bies was unable to think of the "exact spelling" of Allen without help from the detectives. (*Id.*)

In the first interrogation, Bies denied being in Cincinnati on the day of the murder and stated that his experience in Cincinnati was limited to three or four layovers at the bus station. (*Id.* at 52–55.) The Cincinnati detectives then turned off the tape recorder after the short interrogation session, but continued to speak to Bies. The detectives informed Bies of facts which they had learned in their investigation which were contrary to those stated by Bies in the

12

first recorded statement.  (Tr. 48.)  These facts included that Bies had been seen at a park with

Gumm near the building where Aaron's body was found around the time that Aaron was

missing.  (*Id.*; Doc. 161-1 Ex. 15 at 73–74.)  They also informed Bies that they had fingerprints

from the crime scene, but did not identify whose prints they were.  (Tr. 99.)

The detectives began a second recorded interrogation of Bies at 8:55 p.m. that same

night.  (Doc. 161-1 Ex. 14 at 62–72.)  The detectives did not obtain a new signed waiver of

rights form before the second recorded interrogation.  However, Bies acknowledged that the

detectives had explained the waiver of rights form and that he had signed it.  (*Id.* at 62.)  Bies

stated that the tape recorder made him nervous, but he answered the detectives' questions.  (*Id.* at

68.)  Bies stated during the questioning that he had been in Cincinnati with Gumm at a park near

an abandoned building.  (*Id.* at 63–64.)  He stated that Gumm took a young boy (Aaron) into an

abandoned building and struck him when the boy refused to have sexual intercourse with him.

(*Id.* at 65, 68–72.)  Bies stated that he separated himself from Gumm and Aaron for a bit, then

later found Aaron's dead body in the basement of the building.  (*Id.* at 65–67, 69.)  Bies said that

he got blood on his hand when he touched Aaron' neck to determine whether he was breathing.

(*Id.* at 70.)  Bies described Aaron's injuries and stated that it looked like he had been hit in the

head with a steel rod with "threaded rivets."  (*Id.* at 65, 67.)  Bies appeared confused about some

details of the event, such as the clothing Aaron was wearing and where in the building Aaron

was assaulted.  (*Id.* at 64, 71–72.)  Bies told the detectives that he was "willin' to help" and

"willin' to cooperate with the department an' testify to everything that is stated in this

statement."  (*Id.* at 71.)

Bies waived extradition to the State of Ohio the next day on July 29, 1992.  (Tr. 860–61.)

13

The detectives then drove Bies back to Cincinnati.  (Tr. 100, 861).  Bies discussed the facts of the case during the three- or four-hour drive, though the detectives did not attempt to interview him nor did they take notes regarding Bies' comments.  (Tr. 61, 861.)  Bies told the detectives that he wanted to return to the scene of the murder to try to remember more facts in order to help the police.  (Tr. 861.)

On the evening of July 29, 1992, the detectives videotaped Bies' walkthrough of the abandoned buildings where Aaron had been murdered.  (Doc. 161-1 Ex. 16. at 79–90.)  Bies showed the detectives how he and Gumm accessed the buildings and entered one building from the other.  (*Id.* at 79–80, 83.)  He described how Aaron's hat fell off when Gumm first hit him before they went into the basement.  (*Id.* at 83.)  He showed the detectives the area in the basement where he found Aaron's body, he described the type and size of metal pipe that was used as a weapon, and he described the injuries on Aaron's body.  (*Id.* at 85–89.)  Bies again blamed Gumm for the assault and murder of Aaron and did not admit to participating in the crimes.  (*Id.*)  Bies affirmed in the recording that it had been his idea to return to the crime scene and stated that the detectives had treated him well since his arrest.  (*Id.* at 89.)  He concluded by stating that "I've studied the police - - - - - for seven years an' I wanted to return back to the scene so I could help out with the crime."  (*Id.*)  Bies' claim about studying police work strained credulity on its face in light of his earlier statement that he had completed schooling only through the tenth grade.

The detectives interrogated Bies one final time after the walkthrough at a Cincinnati police station.  (Tr. 49–50.)  Bies was re-advised of his rights using the waiver of rights form, but he was not asked to re-initial the form or to sign a new form.  (Tr. 49, 53, 57, 94–95.)  The

14

detectives testified at the motion to suppress hearing and at Bies' trial that Bies refused to allow them to record this third formal interrogation. (Tr. 53, 867.) The detectives told Bies during this interrogation that they did not believe that he could have such detailed knowledge about the attack on Aaron, including the type of weapons used, unless he had participated in the assault. (Tr. 53, 868.) The detectives testified that Bies admitted to participating in the sexual assault and murder of Aaron for the first time in this unrecorded interrogation. (Tr. 53, 78–80, 868–71.) They testified that Bies told them that he had struck Aaron with a board, a brick, and a metal pipe with threading on the end. (Tr. 53, 869–71.)

At the suppression hearing before trial, Bies testified about the videotaped walkthrough of the buildings. (Tr. 158.) He testified that he did not refuse to allow the final interview to be recorded and that he did not confess to participating Aaron's murder. (Tr. 158.) Bies did not contend that he had not been given, had not understood, or had not waived his rights. (Tr. 157–62.) The trial judge denied the motion to suppress Bies' statements to the police. (Tr. 166.)

### 3. Law and Analysis

Petitioner Bies argues that his statements to the police were not voluntary and that he did not knowingly and intelligently waive his *Miranda* rights. He asserts that his statements were the product of his severe mental limitations and of police over-reaching. The Sixth Circuit has framed issues similar to the ones Bies raises here as follows:

> A suspect in custody may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona,* 384 U.S. 436, 444, (1966). The Supreme Court has stated that this inquiry involves "two distinct dimensions":
>
> > First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the

15

> waiver must have been made with a full awareness both of the
> nature of the right being abandoned and the consequences of the
> decision to abandon it.  Only if the totality of the circumstances
> surrounding the interrogation reveal both an uncoerced choice and
> the requisite level of comprehension may a court properly
> conclude that the *Miranda* rights have been waived.
>
> *Colorado v. Spring,* 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine,* 475
> U.S. 412, 421 (1986)).  As this court has explained, while [*Colorado v.*] *Connelly*
> establishes the standard for showing that a confession was involuntary, the
> question of whether a *Miranda* waiver was knowing and intelligent is a separate
> question.  *Clark v. Mitchell,* 425 F.3d 270, 283 (6th Cir. 2005).

*Smith v. Mitchell*, 567 F.3d 246, 257 (6th Cir. 2009) (parallel citations omitted).

The test of the voluntariness of a confession is whether the confession "is the product of

an essentially free and unconstrained choice by its maker."  *Schneckloth v. Bustamonte*, 412 U.S.

218, 225 (1973).  "In determining whether a defendant's will was overborne in a particular case,

the Court has assessed the totality of all the surrounding circumstances—both the characteristics

of the accused and the details of the interrogation."  *Id.* at 226.  Relevant factors include the

youth, intelligence, and education level of the accused, the advisement of constitutional rights,

and the length and condition of the accused's detention.  *Id.*

The Supreme Court held in *Colorado v. Connelly*, 479 U.S. 157 (1986), that "coercive

police activity is a necessary predicate to the finding that a confession is not 'voluntary' within

the meaning of the Due Process Clause of the Fourteenth Amendment."  *Id.* at 167.  The Sixth

Circuit has instructed that "[t]o determine voluntariness, a court must examine whether law

enforcement officials have overborne the defendant's will through coercive activity."  *U.S. v.*

*Brown*, 66 F.3d 124, 126 (6th Cir. 1995) (citations omitted).  The mental condition of a

defendant is relevant to the voluntariness inquiry, but "mere examination of the confessant's

state of mind can never conclude the due process inquiry."  *Connelly*, 479 U.S. at 164.

Petitioner Bies' claim that his statements to the police, including his final unrecorded confession, were involuntary fails under the *Connelly* standard.  He argues that the police acted in a coercive manner because they repeatedly interrogated him over the course of two days despite his protestations of innocence, they focused their questioning specifically on the crimes against Aaron, they attempted to induce him to inculpate himself by having him confirm the veracity of facts they had learned during their investigation, and they took him to the crime scene.  The Supreme Court recognized that the composition of a written confession by police officers, rather than by a defendant who was "insane and incompetent" at the time of his questioning, was an indication that the defendant may not have voluntarily confessed. *Blackburn v. Ala.*, 361 U.S. 199, 207 (1960); *see also Sutkiewicz v. Monroe Cty. Sheriff*, 110 F.3d 352, 358–60 (6th Cir. 1997) (indicating that when officers "fed" facts to a mentally unstable and poorly-educated suspect, facts to which the suspect later confessed, the officers' conduct was relevant to a probable cause determination.)  However, the detectives' techniques here were not coercive in the circumstances of this case, even acknowledging Bies' mental limitations.

The state courts had sufficient evidence upon which to conclude that the detectives notified Bies of his constitutional rights before questioning him.  The police did not compose a written confession for Bies to sign, but rather engaged in a question-and-answer process with him.  Bies appeared to understand the questions asked of him.  He repeatedly expressed a willingness to talk to the police and requested to view the crime scene.  The detectives kept the interrogation sessions relatively brief and did not subject Bies to mistreatment or deprivation. Much of the alleged "feeding" of facts by the detectives to Bies occurred in the context of the police informing Bies the extent to which they knew he had lied in his first recorded statement.

17

For example, the police told Bies that witnesses saw him with Gumm in a Cincinnati park near the abandoned buildings where Aaron was found, repudiating Bies' initial statement that he had only been at the bus station.  The fact that he changed his story when confronted with discrepancies between what he told the detectives and what they had learned through their investigation, though a potential indication of coercion, also is an indication that he understood the substance of the matters being discussed.  In sum, the Court holds that the Ohio Supreme Court's conclusion that Bies' statements were voluntary—not the result of police coercion—was not contrary to or an unreasonable application of federal law.

Next, Petitioner Bies also contends that he did not knowingly or intelligently waive his *Miranda* rights.  He has the burden of establishing that his waiver was not knowing or intelligent.  *Garner v. Mitchell*, 557 F.3d 257, 260–61 (6th Cir. 2009) (*en banc*).  "To determine whether the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether [the petitioner] understood his right to remain silent and to await counsel."  *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005).  Bies' mental limitations are central to his argument that he did not waive his rights knowingly or intelligently.  He emphasizes his low IQ scores, his limited schooling, and Dr. Winter's conclusion that Bies' thought on a level of a third-grader to a sixth-grader.  Bies cites to this discussion by the Supreme Court to provide context for the finding that he is mentally retarded:

> [C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand

18

> the reactions of others. There is no evidence that they are more likely to engage
> in criminal conduct than others, but there is abundant evidence that they often act
> on impulse rather than pursuant to a premeditated plan, and that in group settings
> they are followers rather than leaders. Their deficiencies do not warrant an
> exemption from criminal sanctions, but they do diminish their personal
> culpability.

*Atkins*, 536 U.S. at 318 (holding that the execution of mentally retarded persons violates the

Eighth Amendment).

"The *Miranda* warnings protect [the privilege against self-incrimination] by ensuring that

a suspect knows that he may choose not to talk to law enforcement officers, to talk only with

counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574

(1987). "[M]ental capacity is one of many factors to be considered in the totality of the

circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent[,]" but

"diminished mental capacity alone does not prevent a defendant from validly waiving his or her

Miranda rights." *Garner*, 557 F.3d at 264. However, "if it is apparent that because of illness,

insanity, or mental retardation the suspect is incapable of rationally waiving his *Miranda* rights,"

then a police officer's attempts to obtain a *Miranda* waiver could be considered an abusive

practice. *Id.* at 263 n.1; *see also Murphy v. Ohio*, 551 F.3d 485, 514 (6th Cir. 2009) (expressing

concern "about the voluntariness of a confession made by mentally impaired criminal defendant

when that impairment is known to the police" and noting that a lesser amount of coercion is

needed in those circumstances to render a confession involuntary). Other factors to be

considered in the *Miranda* waiver analysis include the defendant's conduct during and prior to

the custodial interrogation, his background and experiences, and other facts and circumstances

relevant to the particular case. *Garner*, 447 F.3d at 261.

To begin the examination of these factors, it is relevant whether at the time of the

19

interrogation, the detectives knew that Bies' "age, experience, education, background, and intelligence" may have prevented him from understanding the *Miranda* warnings.  *Id.* at 262. The police officers did not know at the time they questioned Bies that he met the clinical definition for mental retardation.  The detectives did know that he was an adult who had failed to complete high school.  Further, Bies made comments that should have indicated to the detectives that Bies had below average intelligence including his inability to spell the name of the last school he had attended (Allen High School) and his implausible statement that he had studied police procedure for seven years.

On the other hand, as discussed above, Bies appeared to read and was able to sign his name to the waiver of rights form, he demonstrated by his answers that he understood the questions presented to him about Aaron's assault and murder, and he affirmed his willingness to help the police.  Both detectives believed Bies understood his rights.  At the suppression hearing, when Bies testified about his statements to the police, he did not testify that he had not understood his rights.  Bies' defense attorneys did not challenge his competency to waive his rights with expert medical testimony.  This Court agrees with Magistrate Judge Merz that the Ohio Supreme Court decision rejecting Bies' claim that his waiver of rights was not knowing and intelligent was not contrary to or an unreasonable application of federal law nor did it involve an unreasonable determination of the facts.

Accordingly, the Court will deny Petitioner Bies' First, Second, and Third Claims for Relief.

**B.      Fourth Claim for Relief**

Michael Bies' Convictions and Sentences are Constitutionally Infirm Because the Trial Prosecutors Failed to Provide Defense Counsel with All Exculpatory

Evidence.  United States Constitution, Sixth, Eighth and Fourteenth Amendments.

(Doc. 93 at 27.)

## 1.      Procedural History

Petitioner Bies claims that his convictions are invalid because the State withheld

exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The Warden

initially argued that this claim was procedurally defaulted.  (Doc. 127 at 66.)  Petitioner

responded that the default should be excused.  (Doc. 135 at 76–78.)  Petitioner did not discover

the evidence upon which the claim is based until these federal habeas proceedings, after which

time he presented the claim to the state courts as the fifth cause of action in his second post-

conviction petition.  (ROW Apx., 2d PCP Vol. 1 at 29–32.)[1]  The state trial court denied the

second post-conviction petition on procedural grounds and the court of appeals affirmed.  *Ohio*

*v. Bies*, No. C-020306, 2003 WL 202177, at *1 (Ohio App. Jan. 31, 2003).  The Ohio Supreme

Court declined review.  *Ohio v. Bies*, 99 Ohio St. 3d 1413, 788 N.E.2d 648 (2003).

Magistrate Judge Merz recommended that the procedural default should not be enforced.

(Doc. 167 at 20, 25.)  The State cannot thwart a petitioner's discovery of evidence by

withholding it, then seek to enforce a procedural default based on the petitioner's failure to

discover and present the evidence earlier.  State misconduct in withholding *Brady* material can

serve as cause to excuse the procedural default.  *See Strickler v. Greene*, 527 U.S. 263, 283

---

[1] Petitioner Bies did not raise *Brady* arguments about the following potential suspects or witnesses in his second post-conviction petition in state court:  Jimmy Toulbac, Adam Inman, Dwayne L. Emmons, Terry Linville, Mitchell Noble, Gregory Maynard, Leonard Swinford, Christopher Strader, George Putteet, Shane Gaskins, Harold Reidner, Jr., David Bowlin, Joseph Grabler, and Jennifer Jackson.  (ROW Apx., 2d PCP Vol. 1 at 29–32.)  Arguments concerning these individuals are procedurally defaulted.

(1999); *Henness v. Bagley*, 644 F.3d 308, 324 (6th Cir. 2011).  In these situations, the determination of whether cause exists to excuse the procedural default is inextricably intertwined with the merits determination of whether the prosecutors withheld *Brady* evidence.  *See Strickler*, 537 F.3d at 282.  The Court will consider this claim *de novo*.  *See Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009).[2]  "[T]he deferential standard supplied by AEDPA does not apply here because no state court addressed the merits" of the petitioner's claims.  *Id.*

### 2. *Brady* Standard

The Sixth Circuit Court of Appeals summarized the law governing *Brady* claims as follows:

> Under *Brady v. Maryland*, the government has a constitutional obligation to furnish a criminal defendant with any exculpatory evidence related to the defendant's guilt or possible punishment.  373 U.S. at 87.  "[S]uppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.*  Thus, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."  *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) (internal quotation marks omitted).

> The prosecutor's duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence.  *Id.* at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *Hawkins v. Coyle*, 547 F.3d 540, 556 (6th Cir. 2008).  "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

> "A successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in

---

[2] Importantly, the Warden has not filed any objection to the Magistrate Judge's consideration of this claim *de novo*.

prejudice." *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008). . . .

Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *accord Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008) (citing *Strickler*, 527 U.S. at 289-90). As the Supreme Court has further explained:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434. Therefore, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Cone v. Bell*, --- U.S. ----, ----, 129 S.Ct. 1769, 1783 (2009) (quoting *Kyles*, 514 U.S. at 435).

*Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010) (parallel citations omitted). Relevant to the parties' arguments here, "information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *U.S. v. Phillip*, 948 F.2d 241, 249–50 (6th Cir. 1991). The petitioner must give the Court some basis to "conclud[e] that disclosure of this item would have led to the discovery of other admissible evidence" if the *Brady* material itself is inadmissible. *Hutchison v. Bell*, 303 F.3d 720, 743 (6th Cir. 2002).

### 3. Purported *Brady* Material Concerning Other Suspects

#### a. Roger Cordray

The police files contain numerous reports, including an anonymous "crime-stoppers" tip, concerning an individual named Roger Cordray who was believed to sleep in the abandoned

building where the victim's body was found. (Traverse Ex. 2, Doc. 135-2 at 10; *Id.* Ex. 14, Doc.,
135-2 at 25–26.) Betty Gumm told police that Donna Jones and Paul Worthington had heard
Cordray confess to the murder. (*Id.* Exs. 11–12; Doc. 135-2 at 22–23.) Paul Worthington told
the police that he heard others discussing the fact that Cordray had confessed. (*Id.* Ex. 13, Doc.
135-2 at 24.) Barb Desborough reported to police that Cordray confessed to the crime and that
she had heard from people who attended Aaron's funeral that he "bragg[ed]" about killing
Aaron. (*Id.* Exs. 4, 15, Doc. 135-2 at 12, 27.) Roberta Shinkle told police that William
O'Malley had beaten up Cordray because Cordray stated that he and a friend had killed Aaron.
(*Id.* Ex. 16, Doc. 135-2 at 30.)

Aaron's aunt, Vivian Stimetz, reported that she heard a rumor that Cordray bragged
about beating and killing Aaron. (*Id.* Exs. 5–6, Doc. 135-2 at 13–14.) Stimetz also reported that
Roger Cordray was "taken away by paramedics" after stating that he had killed Aaron. (*Id.* Ex.
6, Doc. 135-2 at 14.) Christina Robertson told police that "supposedly" a coat found in the
abandoned buildings belonged to Cordray, but that he had threatened to beat her if she told
anybody. (*Id.* Ex. 7, Doc. 135-2 at 15.) Anthony Steele, Aaron's uncle, reported that Cordray
confessed to him and his girlfriend/common-law wife, Teresa Wright Steele, that he "killed the
little kid." (*Id.* Exs. 8–9, Doc. 135-2 at 16–17.) Steele also told police that Cordray's hands and
knuckles were "all scraped up." (*Id.* Ex. 8, Doc. 135-2 at 16.) Anthony and Teresa Steele were
both high when they spoke to the police. (*Id.* Ex. 10, Doc. 135-2 at 18–21.) They said that
Cordray was high on Valium and intoxicated when he confessed to them. (*Id.*)

The police investigated Cordray. In an investigative summary dated May 16, 1992, an
officer wrote that they picked up Cordray, talked to him, took pictures of his shoes, and took his

fingerprints.  (*Id.* Exs. 10, 15, Doc. 135-2 at 18–21, 27–29.)  The officer reported that Cordray

was an alcoholic, but that they thought he was being truthful with them.  (*Id.* Ex. 10, Doc. 135-2

at 18–21.)  Cordray told police that "he never saw any kid walking around with a cast on that

night" and that "he would never do anything to a kid."  (*Id.*)  His gym shoe prints did not match

the prints found at the scene.  (*Id.*)  The police found "some similarities . . . in the ridge pattern

of the palm prints," but concluded that there were "no points" they "could match up to positively

identify this."  (*Id.*)  He added that another officer did not think the police would be able to

identify anyone from the crime scene palm prints.  (*Id.*)  The officer concluded that he did not

think Cordray was involved in the murder, but that the police would "keep him in mind."  (*Id.*)

### b. Reggie Hetsler

A fifteen-year-old named Larry Peters told the police that a stranger who identified

himself as Reggie Hetsler confessed the crime to him.  The police notes state in full:

> –States unknown subject approached him at bus stop @ Fountain Square and told
> him he killed + raped the little boy at 8th + State along with his brother  –
> Peters asked for his name and address  –
> subject wrote:
>
> > Steve Pence 1658 Carll St
> > Reggie Hetsler 1437 Walnut St
>
> –Peters states the subject (Reggie Hetsler) MW19 5'08" thin, blk short hair,
> leather jacket, black "Metallica" t-shirt, white jeans low top "McGregor"
> gymshoes, scars on nose + walked with limp[.]

(Traverse Exs. 20–21, Doc. 135-2 at 37–38.)

### c. Cody Duffy

The police records contain two reports—one handwritten and one typed—concerning a

telephone call from an anonymous female identifying Cody Duffy as a suspect.  (Traverse Exs.

25

22–23, Doc. 135-2 at 39–43.)  She stated that she considered him a suspect because he was

"weird, harasse[d] the neighborhood kids, always carrie[d] a large crowbar and also made a

weird comment about possibly killing the kid the night that the Aaron Raines homicide was

reported on the news."  (*Id.* Ex. 22, Doc. 135-2 at 39–41.)  The caller stated she was a neighbor

of Duffy's and that shortly after Aaron's body was found, Duffy approached her and asked her

what she thought she would do if someone had killed her child.  (*Id.*)  She described Duffy's

demeanor as "strange and cold sounding . . . as if he knew something about Aaron Raines" being

killed.  (*Id.*)  A copy of Duffy's fingerprints taken in 1980 and his police record were added to

the investigation file on Aaron's murder.  (*Id.* Exs. 24–26, Doc. 135-2 at 44–48.)  Duffy's

criminal record shows numerous traffic violations, one arrest for disorderly conduct in 1990, and

one arrest for domestic violence in 1984.  (*Id.* Ex. 24, Doc. 135-2 at 44–45.)

### d.    Additional Suspects

Garland Inman was a juvenile who had been adjudicated delinquent for the rape of his

three younger cousins and was reportedly seen in the vicinity of the crime on the night of the

crime.  The police investigated Inman, though some of the records in the investigation files

concern police reports dated well before Aaron's murder.  (*Id.*, Exs. 34, 38–44, Doc. 135-2 at 58,

63–83.)

Claude Justice was the subject of a "crime-stoppers" tip.  The anonymous caller said that

Justice was a homosexual, that he had "propositioned little boys for years," and that he had seen

Justice several times in the vacant buildings where Aaron's body was found.  (*Id.* Exs. 47–48,

Doc. 135-2 at 87–88.)

An anonymous caller reported seeing Raymond Moore going into the buildings where

Aaron's body was found around 7:00 p.m. on the night of the murder.  Also, Aaron's uncle told

the police that Moore told him that he went into the buildings to help search for Aaron and might

have left prints in the building.  (*Id.* Exs. 51–53, Doc. 135-2 at 93–98.)  The police questioned

Moore.  (*Id.*, Ex. 54, Doc. 135-2 at 99–102.)  The tennis shoes they found in the room where

Moore was living did not match the sole prints found at the crime scene.  Moore's palm prints

also did not match the palm prints from the scene.  (*Id.*)  Moore told the police that he searched

for Aaron on the night he went missing.  (*Id.*)  Moore at first claimed to have searched the first

and second floors of the buildings where Aaron was found, but later said he was unsure after

officers took him to the building.  (*Id.*)  The officers did not believe Moore was involved in

Aaron's murder after talking to him.  (*Id.*)

A man named Mark Jackson accused Luther Hatton of "probably" killing Aaron.

(Traverse Ex. 55, Doc. 135-3 at 1–3.)  Jackson, who was intoxicated at the time of his statement

to the police, stated that Hatton was gay, was known to be violent, and "supposedly" had been

arrested previously for molesting children.  (*Id.*)  Jackson stated that Hatton had been living in

the abandoned buildings where Aaron's body was found for several months.  (*Id.*)  Clayton

Raines, Aaron's uncle, also told the police that Hatton was known to "frequent" the house where

Aaron's body was found.  (*Id.* Ex. 56, Doc. 135-3 at 4–9.)  Another woman told the police that

Hatton was wearing tennis shoes, maybe Nike brand, the night Aaron was killed.  (*Id.*)

Clayton Raines also told the police that he was told by a friend that Carl "Junebug"

Miller was high and appeared nervous on the night Aaron was killed.  Miller reportedly said he

was in a hurry and needed a ride out of Cincinnati to Covington, Kentucky on that night.  (*Id.*,

Exs. 60–61, Doc. 135-3 at 13–17.)

### e.    Analysis of Other Suspects Evidence

Magistrate Judge Merz recommended denying the *Brady* claim.  He concluded that Bies had not proven that the withheld information was admissible or would have led to the admission of admissible evidence as required to support a *Brady* claim.  *See Phillip*, 948 F.2d at 249–50. Clearly, some withheld information, such as an anonymous tip or rumor that Cordray had confessed, would not have been admissible or likely to lead to admissible evidence.  Other withheld information likely would have led to admissible evidence, such as Cordray's alleged confession to Donna Jones, Anthony Steele, and Teresa Wright Steele.  Likewise, William O'Malley could have testified to the alleged incident where he beat up Cordray and Christina Robertson could have testified that Cordray threatened her if she told anyone that Cordray's coat had been found in the abandoned buildings.

Regarding this likely admissible evidence, Magistrate Judge Merz faulted Petitioner Bies for failing to have gathered first-hand affidavits from these individuals in the many years since the police reports were discovered in these habeas proceedings.  He stated as follows:

> Under *de novo* review in federal habeas corpus, however, it was incumbent upon Bies to demonstrate that those "could haves" were changed into "would haves," or at a minimum, had a reasonable probability of (1) becoming or leading to admissible evidence that (2) created a reasonable probability that the result of his trial would have been different.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985).  That the information "could have" led to admissible evidence and "could have" created reasonable doubt in the mind of one or more jurors does not meet that requirement.  In other words, Bies should have performed during preparation of this habeas case the work he argues his trial counsel would have performed had they known about the rumors about and alleged confession of Cordray.  Bies did nothing to develop the information concerning Cordray into a form that would be admissible in court.
>
> . . .  Having learned about Cordray's alleged admissions, Bies' counsel have done nothing to show what competent trial counsel would have done with that information, how they would have developed it into admissible evidence.

(Doc. 173 at 7–8.)

Petitioner contends that this Court should reject the reasoning of Magistrate Judge Merz, and instead adopt the reasoning of Judge Walter Rice, who has granted relief on a substantially similar *Brady* claim in the habeas case of Bies' separately-tried co-defendant, Darryl "Junior" Gumm. Judge Rice analyzed Gumm's *Brady* claim as follows:

> In this case, Petitioner [Gumm] objects to the prosecutor's failure to turn over investigative notes and lead sheets concerning: inculpatory statements made by three other suspects; information concerning local sex offenders who were questioned about Aaron's death; information concerning other individuals seen in the area at the time of the crime; information about others who were with the victim on the night in question; information that would have called into question the testimony of Dallas Hayes, Aaron's step-brother, that Aaron never played in the vacant building where his body was found; evidence that was inconsistent with the prosecution's theory about what time Aaron was killed; and information that gym shoes belonging to another individual matched the gym shoe marks found on Aaron's body. Petitioner argues that this suppressed evidence could reasonably have put the whole case in such a different light as to undermine confidence in the verdict. He also argues that if the evidence had been disclosed, there is a reasonable probability that the outcome of the proceedings would have been different.
>
> The state court found that this undisclosed evidence, viewed collectively, was not material and did not undermine confidence in the verdict. The court concluded that the prosecutor's failure to disclose this evidence did not deprive Petitioner of his right to a fair trial.
>
> In the Report and Recommendations, the Magistrate Judge found that "[m]uch of the alleged Brady material is nothing more than rumor, hearsay, hearsay upon hearsay, hearsay upon hearsay upon hearsay, or worse. Gumm has not explained how any of that 'evidence' would have been rendered admissible in court, or how it would have led to admissible evidence." (R & R at 50.) The Magistrate Judge therefore agreed with the state courts that the undisclosed evidence, viewed collectively, was not material, and did not create a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed.
>
> Petitioner objects to the Magistrate Judge's finding concerning the materiality of the undisclosed evidence. He notes that the prosecution has a duty to turn over all favorable exculpatory evidence. Petitioner argues that even if the evidence itself was not admissible at trial, it could prompt defense counsel to pursue other

investigative leads and could ultimately lead to other admissible evidence. *See United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991) ("information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes.").

The Court sustains Petitioner's objection on this claim. The Court agrees with the Magistrate Judge that much of the undisclosed evidence was itself inadmissible, but that does not necessarily mean that it would not lead to admissible evidence or that it was not subject to disclosure.

* * *

In Petitioner's case, the State had tips and investigative files on several other suspects, but failed to turn them over to defense counsel. The Court is particularly troubled by the prosecutor's failure to turn over tips, interview notes and other evidence concerning suspect Roger Cordray. The police had received Crime–Stoppers tips that Cordray slept in the vacant building where Aaron's body was found, and often drank in the building next door. Christine Robertson told the police that Cordray's coat was supposedly found in the building where Aaron's body was found and Cordray had threatened her not to say anything about it. There were rumors in the neighborhood that Cordray had killed Aaron. However, more significantly, the police had statements from Anthony and Theresa Steele, who said that Cordray had confessed to them that he had killed Aaron. Interview notes from Petitioner's sister indicate that two other individuals— Donna Jones and Paul Worthington—also heard Cordray say that he had killed Aaron. In addition, police interviewed Roberta Shinkle, who told them that William O'Malley beat Cordray, because Cordray said that he and a friend had killed Aaron.

The police located Cordray, questioned him, fingerprinted him, and took pictures of his shoes. Cordray denied any involvement in the murder and the police officers found him to be credible. The tread on his shoes did not match imprints from the crime scene. His palm print bore some similarities to prints found at the scene, but no positive match could be made.

Even if the police considered the evidence of Cordray's alleged confessions to be unreliable, it was still favorable to Petitioner and should have been disclosed. If this information had been turned over by the prosecutor, defense counsel could have conducted their own investigation and may have called Anthony and Theresa Steele, Donna Jones, and Paul Worthington to testify at trial. Cordray's statements to them would appear to fall under the hearsay exception set forth in Ohio Evid. R. 804(B)(3) for statements against interest. . . .

30

* * * *

Cordray's alleged confession obviously subjected him to criminal liability.  In the Court's view, there were sufficient "corroborating circumstances" to support the trustworthiness of his confession.  Perhaps most significantly, he apparently confessed to at least four separate individuals and was allegedly beaten up because of his involvement in Aaron's murder.  In addition, he was known to hang around the vacant building where Aaron's body was found, and he allegedly threatened Christine Robertson not to tell anyone that his coat was also found in that building.  Cordray's palm print revealed some similarities to prints found at the scene of the crime, and Anthony Steele also testified that he noticed that Cordray's hand and knuckles were scraped up.

Such evidence, if presented at Petitioner's trial, could have established reasonable doubt in the minds of the jurors.  This is particularly true because, as the Magistrate Judge notes in his Report and Recommendations, the evidence against Petitioner was not very strong.  There was no physical evidence linking Petitioner to the crime.  The police officers had only Petitioner's confession which, because of his mental retardation and his heightened susceptibility to police coercion, must be viewed with some skepticism.  Under these circumstances, it would not take as much evidence to create reasonable doubt in the minds of the jurors.

For this reason, in the Court's view, the investigatory file on Roger Cordray must be considered material evidence that was withheld by the prosecutor in violation of Brady.  There is a reasonable probability that the outcome of the trial would have been different if this evidence, standing alone, had been disclosed.  The other evidence at issue may not have been as likely to lead to admissible evidence.  It nevertheless factors into the Court's finding that, viewed collectively, the evidence that was withheld undermines confidence in the jury's verdict.  The state court's decision to the contrary involved an unreasonable application of clearly established federal law.  The Court therefore sustains Petitioner's objection to the Magistrate Judge's Report and Recommendations and grants the third amended petition for a writ of habeas corpus on the Second Claim for Relief.

*Gumm v. Mitchell*, No. 1:98-cv-838, 2011 WL 1237572, at *5–8 (S.D. Ohio Mar. 29, 2011).

This Court finds Judge Rice's reasoning persuasive, with the exception of his inclusion of the Dallas Hayes evidence discussed separately in a different subclaim below.  The police reports indicating that Cordray confessed to killing Aaron to multiple individuals and that other sex offenders had been seen at the scene of the crime or had been known to frequent the

abandoned building, collectively, are material under the *Brady* standard.  This is particularly true in light of the fact that the State's case against Bies was not strong.

The police had no physical evidence connecting Bies to the assault and murder.  The State's case was premised upon the sighting of Bies at the park near the abandoned buildings, Bies' alleged confession to the police, and Bies' alleged confession to a fellow inmate at the Hamilton County Justice Center.  The strength of the confession to the police is undermined by the fact that Bies is a mentally retarded man who repeatedly denied involvement in the murder prior to his final unrecorded statement to the police and who denied the confession at his suppression hearing.  Moreover, as discussed separately below, the credibility of the jailhouse informant also can be attacked on several bases.  For all these reasons, the Court concludes that the disclosure of this other suspects evidence puts the case against Bies in such a different light as to undermine confidence in the jury's verdict.

Finally, the Magistrate Judge suggested that Petitioner Bies should be required to prove that the withheld exculpatory material, in fact, would lead to admissible evidence in order to prove a *Brady* violation.  (Doc. 173 at 7–8.)  Such a showing of existing admissible evidence, such as affidavits from the witnesses who spoke to the police about other suspects, would assist a habeas petitioner with establishing prejudice as a result of the purported *Brady* violation. However, Petitioner Bies correctly points out that courts in the Sixth Circuit have granted writs of habeas corpus on the grounds of a *Brady* violation without imposing the stringent evidentiary standard suggested by Magistrate Judge Merz.

The Sixth Circuit in *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002), granted a *Brady* claim based on the State's failure to disclose statements made to the police about the culpability

of the defendant and about other potential suspects. *Id.* at 389–91. The court based its holding

upon the original reports and statements withheld by the State. The court did not impose or

discuss a requirement that the habeas petitioner produce new affidavits from the police witnesses

who did not testify at the trial. *Id.* The analysis in *Castleberry v. Brigano*, 349 F.3d 286 (6th

Cir. 2003), *rehearing and rehearing en banc denied* (6th Cir. Feb. 27, 2004), is similar. The

court held that the State withheld material exculpatory or impeaching evidence, including the

statements of three of the victim's neighbors who provided the police with information

concerning other potential suspects. *Id.* at 293–94. Again, the court did not impose or discuss a

requirement that the habeas petitioner prove those neighbors would be available to testify or

provide affidavits supporting what they had told the police near the time of the crime. *Id.*

Finally, in *D'Ambrosio v. Bagley*, 527 F.3d 489 (6th Cir. 2008), one police report

described a tape in which an individual named Crimi implicated other unnamed suspects in the

murder of the victim, and another report indicated that an individual named Hudak saw the

victim alive on the day after the State claimed that the victim was murdered. *Id.* at 498. The

court held that this evidence, together with other *Brady* evidence, "would have substantially

increased a reasonable juror's doubt of D'Ambrosio's guilt." *Id.* Interestingly, during the

district court habeas proceedings, Hudak recanted her earlier statement to the police by testifying

in an affidavit and at an evidentiary hearing that the police report was erroneous and that she did

not see the victim the day after he allegedly was killed. *D'Ambrosio v. Bagley*, No. 1:00 CV

2521, 2006 WL 1169926, at *32 (N.D. Ohio Mar. 24, 2006). The district court stated that "[h]er

recantations, however, were immaterial to the Court's *Brady* inquiry" because "[a] habeas court

must review the exculpatory value of a document withheld from the defense in the context of its

usefulness to the defense during trial." *Id.* at *29, 32.

Applying these principles here, the Court can grant habeas relief for a *Brady* violation, even without Bies submitting admissible affidavits from the witnesses discussed in the police reports. The Warden has not attempted to distinguish the *Castleberry*, *Jamison*, or *D'Ambrosio* cases or provided precedent to the contrary. For all these reasons, the Court will overrule the R&R and Supp. R&R on this other suspects subclaim and grant a writ of habeas corpus on the issue that the State violated Bies' rights by failing to disclose *Brady* material concerning other potential suspects.

### 4. Evidence Inconsistent with the Prosecutors' Timeline of Events

In this subclaim, Bies contends that the prosecutors withheld evidence inconsistent with the prosecutors' timeline of events. Jennifer Jackson told the police that she talked to Aaron between 9:45 p.m. and 10:00 p.m. on the night he went missing. (Traverse Ex. 94, Doc. 135-4 at 31.) Tamie Cantrell, Terry Linville, and George Putteet reported seeing Aaron in the neighborhood around 10:30 p.m. (*Id.* Exs. 96, 98, Doc. 135-4 at 33–35, 38.) The police also received information that Aaron had been at a business called Whippy Dip on the night he died and been involved in a fight with Robert Shelton, a nineteen-year old, and Jimmy Ball, a twenty-five year old, and that police had been called to the scene. (*Id.* Ex. 84, Doc. 135-4 at 9.) At least two reports stated that Aaron was seen at the Whippy Dip around midnight. (Traverse Exs. 83, 87, Doc. 135-4 at 3–8, 12.)

The difficulty with this subclaim is that Petitioner Bies does not identify the evidence in the trial court record establishing a definitive timeline. Aaron's brother, Dallas Hayes, testified at trial that he last saw Aaron around 6:00 p.m. or 7:00 p.m. on the night he was murdered. (Tr.

566–67.)  Charlotte Jean Baker testified that she saw Bies and Gumm together at a park near the abandoned buildings also around 7:00 p.m.  (Tr. 554–55.).  In these proceedings, Bies speculates that the crime had to take place early in the evening during daylight hours because there would not have been light in the basement of the abandoned buildings by which to commit the crime. However, in his purported confessions, Bies did not specify when he and Gumm took Aaron into the abandoned buildings.  (Doc. 161-1 Exs. 13–16 at 50–90. )  Bies told the police in one recorded statement that he tripped over Aaron's body in the basement and that he used a lighter to see, suggesting that the crime did occur at night.  (Doc. 161-1 Ex. 16 at 85, 88.)  Further, the deputy coroner testified at Bies' trial that she could not establish time of death.  (Tr. 781.)  The Court cannot conclude based on this limited evidence that the withheld police reports concerning witnesses who saw Aaron late at night on the night he was reported missing was exculpatory or material.  The Court will deny this subclaim.

### 5. Evidence Concerning Culpability of Co-Defendant Junior Gumm

In this subclaim, Bies alleges that the prosecutors withheld evidence indicating that Darryl Gumm, and not Bies, was more likely to have lured Aaron into the abandoned buildings for sexual gratification.  The Court agrees with Judge Merz that Petitioner asserted this subclaim solely with respect to its relevance to mitigation in the sentencing phase of his trial.  (Doc. 93 at 39–40; Doc. 135 at 69–70.)  Petitioner already has received the relief he seeks because he has been removed from death row.  Accordingly, this subclaim is moot.

### 6. Impeachment Evidence Regarding Steven Clark

Steven Clark, a fellow inmate of Bies at the Hamilton County Justice Center after Bies had been arrested, testified at Bies' trial that Bies confessed to killing Aaron.  Clark was in jail

on charges of corruption of a minor and gross sexual imposition.  (T.p 800–01.)  Clark testified

at Bies' trial that Bies appeared "shaken up" on an unspecified date after he met with a visitor

Clark assumed to be Bies' attorney.  Bies asked Clark after his meeting with the visitor whether

he could be convicted on the basis of a palm print.  (Tr. 806–07.)  Clark further testified that a

few days later Bies told him that he had a "great feeling inside" and felt "God-like power" to

have killed a ten-year old boy because he had "the power to give life and take life."  (Tr. 808.)

Relevant to the Court's analysis of the alleged *Brady* impeachment evidence, Clark

admitted during his testimony at Bies' trial to having psychiatric problems.  He admitted that he

had been confined in the psychiatric unit at the Justice Center because he had threatened suicide.

(Tr. 811, 819.)  He had been diagnosed with depression and was prescribed lithium.  (Tr.

820–22.)  He expressed confusion as to the nature of the gross sexual imposition charge for

which he had been sentenced that same day he testified, but stated that he pleaded guilty because

he knew he "couldn't beat it."  (Tr. 810–11, 823.)  This information regarding Clark's mental

condition was brought out by defense counsel to impeach Clark's credibility.

Bies first argues that the prosecutors withheld evidence concerning Clark's criminal

history.  Clark admitted, when questioned during his testimony at Bies' trial, that he "had a

record for bank robbery back in 1987" and that he had been sentenced for "corruption of a minor

and gross sexual imposition" earlier in the morning on the day he testified against Bies.  (T.p

800–01, 811.)  Prosecutors, however, were aware that Clark had two prior convictions for bank

robbery, one in 1985 and one in 1987.  (Traverse Ex. 71, Doc. 135-3 at 44–49.)  Nonetheless, the

Court will not deny this subclaim to the extent it is based on the non-disclosure of a 1985 bank

robbery.  The withheld evidence has limited impeachment value and is not material for *Brady*

36

purposes.  The jury already had significant reasons  to question Clark's credibility as a witness, including his other convictions and his mental condition.  One additional robbery conviction was not likely to significantly change that calculus.

Bies also asserts that prosecutors withheld evidence concerning the consideration Clark received for testifying against Bies.  Clark and Clark's attorney both testified at Bies' trial that the prosecutors only agreed to write a letter to the parole board on Clark's behalf in exchange for his testimony.  (Tr. 801, 832.)  Clark's attorney further clarified that at the time Clark pleaded guilty to the corruption of a minor and gross sexual imposition charges on September 15, 1992, Clark had not yet made any deal through his attorney with the prosecutors.  (Tr. 830.)[3]  In fact, Clark's criminal records indicated that specifications to both state charges listed in the grand jury indictment against Clark were dismissed.  (Traverse Exs. 71–72, Doc. 135-3 at 44–52.) However, as Magistrate Judge Merz points out, the record is silent as to when and why the state prosecutors dismissed the specifications to the corruption of a minor and gross sexual imposition charges.  This Court will not assume, in the absence of any proof, that the prosecutors dismissed the specifications in consideration for Clark's testimony against Bies.  The Court concludes that prosecutors did not violate *Brady* by withholding evidence concerning Steven Clark.

### 7.    Impeachment Evidence Concerning Dallas Hayes

Dallas Hayes, Aaron's brother, testified at Bies' trial that he last saw Aaron around 6:00 p.m. or 7:00 p.m. on the night he was murdered and that Aaron never played in the abandoned buildings where his body was found.  (Tr. 566–67, 572.)  Bies asserts that the prosecutors

---

[3] Bies argues that the prosecutor's questions to Clark's attorney suggest that the prosecutor made a deal with Clark directly, and not through his attorney, but the argument is based only on speculation.  (Tr. 830.)

withheld several pieces of evidence with impeachment value.  First, the police had a statement

from a friend of Aaron's that he and Aaron had played in the abandoned buildings less than one

week before Aaron's murder.  (Traverse Ex. 89, Doc. 135-4 at 15.)  The withheld statement does

not prove that Hayes testified falsely because it does not prove or suggest that Hayes knew that

his brother had played in the abandoned building.  Rather, it suggests only that Hayes might have

been mistaken.  Moreover, the statement is not material in that its exclusion from the trial does

not undermine confidence in the jury verdict.  The fact that Aaron played in the abandoned

buildings at least one time does not undermine or impeach the detectives' testimony that Bies

confessed that Gumm, or he and Gumm, had lured Aaron into the buildings on the night he was

murdered in order to seek sexual favors from the child.

Next, Bies asserts that the police wrongfully withheld police reports indicating that

Hayes had failed a polygraph examination administered by the police on June 3, 1992.  (Traverse

Ex. 62, Doc. 135-3 at 18–20.)  The polygraph examiner concluded that Hayes "was lying on all

questions that had to do with Aaron's death."  (*Id.*)  The officer does not describe or identify,

however, what questions Hayes was asked about Aaron's death.  (*Id.*)  The Court notes that

Hayes did not testify about Aaron's death at the trial.  Without knowing the questions asked

during the polygraph examination, the Court cannot determine the impeachment value of the

failed polygraph examination in regard to the specific testimony that Hayes gave at trial.

Moreover, the polygraph examination results likely would not have been admissible at Bies'

trial.  *See Ohio v. Souel*, 53 Ohio St. 2d 123, 372 N.E.2d 1318, at syllabus (1978) (stating that

polygraph evidence is not admissible in Ohio without the consent of the defendant, the

prosecutor, and the trial judge); *see also Leal v. Morris*, No. 87-3014, 1988 WL 25007 at *8 (6th

Cir. Mar. 18, 1988) (same).  The Sixth Circuit has stated that "a prosecutor has no constitutional duty even to *disclose* to a criminal defendant the fact that a witness has 'failed' a polygraph test." *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999) (emphasis in the original).  The State did not violate *Brady* on this issue because the withheld material was inadmissible at trial and unlikely to lead to admissible evidence.

Finally, Bies states that the prosecutors withheld information that Hayes injured his hand around the time of Aaron's death and that an unnamed source said Hayes was resentful of the attention their mother gave to Aaron.  An officer's handwritten notes of an interview with Hayes on May 12, 1992 indicates that Hayes injured his left hand "punching the ground while being subdued at the scene."  (Traverse Ex. 104, Doc. 135-5 at 91.)  Absent some indication that Hayes's explanation is false, the Court does not understand how this report of a hand injury has impeachment value.

Finally, an individual told police that "Dallas wanted his mother to spend more time with him."  (*Id.* Ex. 99, Doc. 135-4 at 39.)  The police notes do not specify  whether "with him" meant "with Hayes" or "with Aaron."  The notes also say that Hayes "want[ed] more freedom."  The report has little, if any, impeachment value for suggesting that Hayes was resentful of Aaron.  The report also states that "Dallas was Aaron + Aaron was Dallas" and "Dallas would take up for Aaron—wouldn't let anybody mess with him."  (*Id.*)  Overall, the report paints a picture of a close brother relationship.  In sum, the Court denies the subclaim alleging the prosecutors violated *Brady* by withholding impeachment evidence for Dallas Hayes.

### 8.      Conclusion on Fourth Claim for Relief

The Court will grant the Fourth Claim for Relief in part, as to the other suspects

subclaim, and will deny it in part, as to the remainder.

## C. Fifth Claim for Relief

Michael Bies' Convictions and Sentences are Constitutionally Infirm Because the Trial Prosecutors Knowingly used False Testimony Which Was Neither Corrected by the Trial Prosecutors Nor Was the False Testimony Disclosed to Trial Counsel for Michael Bies.

(Doc. 93 at 41.)

### 1. Procedural History

Petitioner Bies asserts in this claim that the prosecutors at his trial engaged in misconduct by knowingly presenting false testimony from a jailhouse informant, Steven Clark, and from his brother, Dallas Hayes, at the state court trial. The issues in this claim overlap with the Clark and Hayes subclaims in the Fourth Claim for Relief.

The Warden initially argued that this claim was procedurally defaulted. However, Petitioner Bies did not discover the evidence upon which the claim is based until these federal habeas proceedings, after which time he presented the claim to the state courts as the eighth cause of action in his second post-conviction petition. (ROW Apx., 2d PCP Vol. 1 at 38–40.) Although the state trial court denied the second post-conviction petition on procedural grounds, *Bies*, 2003 WL 202177, at *1, Magistrate Judge Merz recommended that the procedural default should not be enforced. (Doc. 167 at 47.) The prosecutors' misconduct in withholding the alleged exculpatory evidence—in this claim evidence that allegedly establishes that the prosecutors knowingly presented false testimony—can serve as cause to excuse the procedural default. *See Strickler*, 527 U.S. at 283; *Henness*, 644 F.3d at 324.

The Court will consider this claim *de novo* as recommended by the Magistrate Judge. "[T]he deferential standard supplied by AEDPA does not apply here because no state court

40

addressed the merits of [the petitioner's] knowing-presentation-of-false-testimony claims."

*Rosencrantz*, 568 F.3d at 584. The Warden has objected to *de novo* consideration.

## 2.    Law and Analysis

A conviction obtained through the use of false testimony, known to be false by the

prosecutors, whether or not the prosecutors actively solicited the false testimony, violates the

Fourteenth Amendment. *Napue v. Ill.*, 360 U.S. 264, 269 (1959). This principle applies when

the false evidence concerns only the credibility of a witness. *Id.* However, a new trial is not

required unless the false testimony was material such that it "in any reasonable likelihood

[could] have affected the judgment of the jury." *Giglio v. U.S.*, 405 U.S. 150, 154 (1972).

The Sixth Circuit has summarized the parameters of this type of claim as follows:

> A conviction obtained by the knowing use of perjured testimony must be set aside
> if "the false testimony could ... in any reasonable likelihood have affected the
> judgment of the jury...." *Giglio v. United States*, 405 U.S. 150, 154 (1972)
> (internal quotation marks omitted); *see also United States v. Agurs*, 427 U.S. 97,
> 103 (1976). [The petitioner] relies on *Giglio*'s rule that a prosecutor may not
> deliberately deceive "a court and jurors by [presenting] known false evidence,"
> 405 U.S. at 153, and on the command in *Brady v. Maryland*, 373 U.S. 83 (1963),
> that a prosecutor must disclose evidence favorable to the accused. By relying on
> both *Brady* and *Giglio*, [the petitioner] implicitly asserts a specific type of *Brady*
> violation: one where the prosecutor failed to correct false testimony that he knew,
> or should have known, to be false (a "knowing-presentation-of-false-testimony
> claim").

> The difference between *Brady/Giglio* false-testimony claims and traditional
> *Brady* withholding claims drives the analysis here. *See* [*United States v.* ]*Agurs*,
> 427 U.S. [97,] 104 [(1976)]. To prove that the prosecutor's failure to correct false
> testimony violated due process rights, a petitioner must demonstrate that: (1) the
> statement was actually false; (2) the statement was material; and (3) the
> prosecution knew it was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998);
> *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005); *Carter v. Bell*, 218
> F.3d 581, 601 (6th Cir. 2000) (placing the burden on the habeas petitioner). But
> in these *Brady/Giglio* claims, the materiality assessment is less stringent than that
> for more general Brady withholding of evidence claims. We weigh the
> materiality of *Brady* withholding claims by asking whether "there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). By contrast, for *Brady/Giglio* claims, we ask only "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 104 (citing *Giglio*, 405 U.S. at 154; *see also Carter*, 443 F.3d at 535.

*Rosencrantz,* 568 F.3d at 583–84 (parallel citations omitted).

### a.    Steven Clark

At Bies' trial, the prosecution presented the testimony of Steven Clark, a fellow inmate of Bies at the Hamilton County Justice Center after Bies had been arrested, but prior to his trial. Clark was in jail on charges of corruption of a minor and gross sexual imposition. (Tr. 800–01.) Clark's testimony at Bies' trial was summarized in the Fourth Claim for Relief.

Bies first asserts that Clark's testimony that he did not understand the nature of the gross sexual imposition charge against him was false.[4] Bies asserts it was false because Clark had made a statement to the police in July 1992 wherein he admitted to having intercourse with one fourteen-year-old girl, but denied allegations that he previously had groped the breasts and buttocks of another fourteen-year-old girl and that he had exposed his penis to them. (Traverse Ex. 73, Doc. 135-3 at 53–55.) The Court cannot conclude that Clark's testimony was necessarily false. It is possible that he denied the accusations made against him by the police during his interview in July 1992, but did not understand that those same accusations were the basis of the gross sexual imposition charge to which he later pleaded guilty in September 1992. Further, a reasonable jury is not likely to have judged Clark's credibility significantly more harshly if they had known about his July 1992 interview with the police.

---

[4] On the other hand, Clark testified that the corruption of a minor charge stemmed from his having intercourse with a fourteen-year-old. (Tr. 810–11.)

Next, Bies asserts that the prosecutors knowingly permitted or failed to correct several false statements made by Clark.  Clark admitted, when questioned during his testimony at Bies' trial, that he "had a record for bank robbery back in 1987" and that he had been sentenced for "corruption of a minor and gross sexual imposition" earlier in the morning on the day he testified against Bies.  (Tr. 800–01, 811.)  Bies argues that this testimony was false in that Clark had two prior convictions for bank robbery, one in 1985 and one in 1987.  (Traverse Ex. 71, Doc. 135-3 at 44.)  This Court agrees with Magistrate Judge Merz, however, that the omitted information was not material in that it would have added little impeachment value, as discussed earlier in the Fourth Claim for Relief.

Next, Bies contends that Clark gave false testimony concerning the sentence he received for the corruption of a minor and gross sexual imposition charges.  Clark testified that his sentences for those most recent charges were to run consecutively.  (Tr. 801.)  Clark's attorney testified immediately after him at Bies' trial that Clark's sentences were to run concurrently.  (Tr. 835.)  Clark's false or erroneous testimony about the nature of his sentence is unlikely to have affected the judgment of the jury.  The prosecutors immediately corrected Clark's misstatement with his attorney's testimony.  Also, the jury already had reason to question the accuracy or veracity of Clark's knowledge about his own criminal proceedings because he testified that he did not understand the nature of a criminal charge to which he had pleaded guilty.

Relatedly, Bies contends that Clark gave false testimony concerning the consideration he received for his testimony against Bies during Bies' trial in October 1992.  As discussed in regard to the Clark subclaim on the Fourth Claim for Relief, Bies asserts that the testimony that

43

Clark received only a letter to the parole board on Clark's behalf in exchange for his testimony was false.  (Tr. 801, 832.)  Bies asserts that the prosecutors also dismissed the specifications to the corruption of a minor and gross sexual imposition charges in consideration for his testimony. However, Bies offers only speculation to support his assertion and the Court cannot grant relief on that basis.

In sum, the Court has considered all of the alleged false statements by Clark knowingly permitted by the prosecutors at Bies' trial.  The Court holds that statements, taken individually or collectively, were either not false or were not material in that they were unlikely to have affected the judgment of the jury.

<b>b.    Dallas Hayes</b>

Dallas Hayes, Aaron's brother, testified at Bies' trial that he last saw Aaron around 7:00 p.m. on the night he was murdered and that Aaron never played in the abandoned buildings where his body was found.  The Court addressed in the Fourth Claim for Relief the testimony and evidence concerning Hayes which Bies asserts the State wrongfully withheld.  Relevant to this Claim for Relief, Bies makes two arguments:  (1) the prosecutors should not have called Hayes to testify because a police polygraph examiner who administered a polygraph to Hayes concluded that Hayes was lying about the Aaron's death; and (2) the prosecutors knew that Hayes's testimony that Aaron did not play in the abandoned buildings was false.

As to the former issue, Bies contends that the State should not have called Hayes to testify at trial because the police earlier in their investigation had concluded in an investigative summary that he lied about Aaron's death during a polygraph examination on June 3, 1992. (Traverse Ex. 62, Doc. 135-3 at 18–20.)  Significantly, an officer continued to question Hayes

44

for about four hours after the polygraph examination  (*Id.*)  The officer described Hayes's temperament as hostile at times.  (*Id.*)  Hayes did not change his story and insisted that he had been truthful to the police, except to the extent that he had not been watching his brother as closely as he first indicated on the night Aaron went missing.  (*Id.*)  The officer also noted that the police had checked Hayes's prints against those found at the crime scene and the results were negative.  (*Id.*)  Likewise, the police had checked Hayes's shoes and concluded that they did not match the shoe prints made at the crime scene area.  (*Id.*)  The officer concluded "we really don't have any physical evidence to link Dallas [Hayes]" to the crime.  (*Id.*)

The Court cannot conclude that the State violated the *Brady*/*Giglio* standard based on the information contained in the investigative summary.  The Court does not know the specific substance of Hayes's allegedly false polygraph examination.  Moreover, the police had concluded that they had no physical evidence linking Hayes to the crime and Hayes had relevant testimony to share concerning the timeline of events the night Aaron was murdered.  A belief that Hayes may have lied to the police about Aaron's death does not prove that he testified falsely at trial about matters preceding Aaron's death.

As to the latter issue, there is no evidence before the Court that Hayes made a knowingly false statement when he testified that Aaron never played in the abandoned building.  Bies argues that the prosecutors knew or should have known the statement was false because the police had taken a statement from a friend of Aaron's that he and Aaron had played in the buildings less than one week before Aaron's murder.  (Traverse Ex. 89, Doc. 135-4 at 15.) However, as discussed in the Hayes subclaim in the Fourth Claim for Relief, Bies has not proven the materiality of the incorrect statement.

### 3.        Conclusion

For the foregoing reasons, the Court will deny Petitioner Bies' Fifth Claim for Relief.

## D.        Sixth Claim for Relief

> Michael Bies' Convictions and Sentences Are Constitutionally Infirm Because
> Trial Counsel Failed to Provide Him with Reasonably Effective Assistance of
> Counsel During the Trial and Mitigation Phases.  United States Constitution,
> Sixth, Eighth and Fourteenth Amendments.

(Doc. 93 at 45.)

Bies asserts multiple subclaims based on ineffective assistance of counsel in this Claim

for Relief.  First, Bies asserts that his defense counsel unreasonably failed to investigate Bies'

competency to stand trial.  Second, he asserts that his defense counsel failed to investigate the

constitutionality of Bies' custodial statements and should have presented the testimony of mental

health experts at the suppression hearing.  Third, he asserts that his defense counsel failed to

conduct a meaningful investigation and failed to present evidence at the guilt phase of the trial.

Fourth, Bies asserts that his defense counsel should have requested the appointment of experts to

assess his competency and his ability to knowingly and intelligently waive his *Miranda* rights.[5]

The Court will address each subclaim separately, after setting forth the governing standard,

because the subclaims do not all stand in the same procedural posture.

### 1.        Governing Standard for Ineffective Assistance of Counsel

The governing standard for effective assistance of counsel is found in *Strickland v.*

*Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to

---

[5] This was the fifth subclaim of the Sixth Claim for Relief in the Third Amended Habeas
Petition.  Bies has waived several subclaims in the Sixth Claim for Relief.  (Doc. 171 at 55.)

> require reversal of a conviction or death sentence has two components.  First, the
> defendant must show that counsel's performance was deficient.  This requires
> showing that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment.  Second, the defendant must show that the
> deficient performance prejudiced the defense.  This requires showing that
> counsel's errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.  Unless a defendant makes both showings, it cannot be
> said that the conviction or death sentence resulted from a breakdown in the
> adversary process that renders the result unreliable.

Id. at 687.  Strategic decisions of defense counsel are "virtually unchallengeable."  *Buell v.*

*Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001) (citation omitted).  However, an attorney's strategy

must be "reasonable" and must be "within the range of logical choices an ordinarily competent

attorney" would consider "as reasonable to achieve a 'specific goal.'"  *Cone v. Bell*, 243 F.3d

961, 978 (6th Cir. 2001), *overturned on other grounds*, *Bell v. Cone*, 525 U.S. 685 (2002).

Under the prejudice prong of the *Strickland* test, "[t]he defendant[/petitioner] must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different."  466 U.S. at 694.  A reasonable probability is one

that "is sufficient to undermine confidence in the outcome."  *Id.*  The Supreme Court further

explained that when a petitioner challenges a conviction, "the question is whether there is a

reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt

respecting guilt."  *Id.* at 695.  "[C]ounsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment."  *Id.* at 690.  A district court's review of a state court decision on the merits denying

an ineffective assistance of counsel claim is "doubly deferential."  *Cullen*, 131 S. Ct. at 1403.

"We take a highly deferential look at counsel's performance through the deferential lens of §

2254(d)."  *Id.* (internal citations and quotations omitted).

## 2. First Subclaim: Defense Counsel Failed to Investigate Bies' Competency to Stand Trial.

The Warden asserts that this subclaim is procedurally defaulted.  The Warden notes that this subclaim was presented to the state court as the tenth cause of action in Bies' second post-conviction petition filed on October 11, 2011.  (ROW Apx., 2d PCP Vol. 1 at 43.)  The state court denied the petition because Bies failed to comply with the requirements of Ohio Revised Code § 2953.23(A).  *Bies*, 2003 WL 202177, at *1.  Petitioner Bies responds that one of his two trial attorneys, Timothy Deardorff, represented him on his direct appeal as well.  A defendant is not required to present a claim on appeal of his trial attorney's ineffectiveness if that trial attorney represents him on the appeal.  *Landrum v. Mitchell*, 625 F.3d 905, 920–21 (6th Cir. 2010), *cert denied*, 132 S. Ct. 127 (2011); *Samatar v. Clarridge*, 225 F. App'x 366, 374 (6th Cir. 2007).  Accordingly, *Bies* had to bring the subclaim in post-conviction relief proceedings.

Magistrate Judge Merz points out, however, that Bies asserted ineffective assistance of counsel claims arising from his mental limitations, though not this exact subclaim, in the first post-conviction petition filed on September 9, 1996.  (ROW Apx., Vol. 4 at 6–17.)  Bies knew or should have known the majority of facts upon which he relies to support this subclaim at trial or at the time he filed his first post-conviction petition.  Magistrate Judge Merz summarizes this evidence in the R&R as follows:

> Evidence of Bies' mental retardation was presented both at trial and in support of his first post conviction petition.  Significant evidence of family dysfunction was presented in both proceedings as well, as was evidence of Bies' developmental delays, and the possibility that Bies suffered some brain damage.  In addition, evidence presented at trial provided the jury with information about Bies' learning disorders; his experience of having heard voices; his concern over his pending theft charge; his belief that if he did not remember making statements, they were rendered untrue; the fact that he drew child like drawings during his trial; and his inability to read his own statement at his trial.  All of that evidence

48

was known to Bies' attorneys at the time of his trial and beyond. By the time
Bies was litigating his first post conviction petition, his attorneys also possessed
evidence of his several childhood hospitalizations.

(Doc. 167 at 55–56 (citations omitted)).

In contrast, as Magistrate Judge Merz correctly noted, the relevant evidence developed
only during the habeas corpus proceedings is minimal: "[Bies] was confined in the psychiatric
unit of the Hamilton County Justice Center while awaiting trial, [ ] he made contradictory
statements during a psychological examination, and [ ] he was unable to distinguish important
facts from insignificant ones." (Doc. 167 at 56.) Accordingly, even if Bies could not have
brought the subclaim on direct appeal, he could have filed it in his first post-conviction petition.
This Court agrees with the state court of appeals that Bies was not "unavoidably prevented from
discovering the facts underlying his claim" during his first post-conviction petition. *See Bies*,
2003 WL 202177, at *1. The state court of appeals correctly held under this analysis that Ohio
Revised Code § 2953.23(A) barred this subclaim. Bies' subclaim, therefore, is barred in this
Court on the basis of *res judicata*. *See Engle v. Isaac*, 456 U.S. 107, 128–29 (1982) (stating that
a petitioner may not raise on federal habeas a federal constitutional right he could not raise in
state court because of procedural default).

Petitioner Bies did not object to the foregoing procedural analysis in his Objections.
(Doc. 171 at 56–57.) Rather, he asked the Court to hold its ruling on the Sixth Claim for Relief
in abeyance as follows:

The United States Supreme Court has granted certiorari and entertained oral
argument on whether a defendant is entitled to effective assistance of counsel in
the post-conviction process when his first opportunity to raise an ineffectiveness
claim is in the post-conviction process. *Martinez v. Ryan*, United States Supreme
Court Case No. 10-1001.

49

> [Petitioner] would request the Court to hold in abeyance its ruling on the Sixth
> Claim until the United States Supreme Court renders its decision in *Martinez*.

(*Id.* at 57.)  Presumably, Bies intended to argue that the ineffectiveness of his counsel in the first

post-conviction proceedings—ineffectiveness for failing to argue this subclaim in the first post-

conviction proceeding—excuses his procedural default.

The Supreme Court recently rendered its holding in *Martinez*.  The Supreme Court held

that, as a matter of equity and in narrowly defined circumstances, "[i]nadequate assistance of

counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural

default of a claim of ineffective assistance at trial."  *Martinez v. Ryan*, No. 10-1001, — S. Ct. —,

2012 WL 912950, at *5, 8, 10 (Mar. 20, 2012).  However, the Court need not determine the

applicability of the narrow *Martinez* holding to this case because Petitioner Bies' subclaim fails

on merits as well.

Magistrate Judge Merz recommended that this subclaim be denied on the merits in the

alternative.  (Doc. 167 at 57–61.)  The AEDPA standard of review contained in 28 U.S.C.

§§ 2254(d)(1) & (2) would not apply because the Ohio courts have not adjudicated this subclaim

on the merits.  "It has long been accepted that a person whose mental condition is such that he

lacks the capacity to understand the nature and object of the proceedings against him, to consult

with counsel, and to assist in preparing his defense may not be subjected to a trial."  *Drope v.

Mo.*, 420 U.S. 162, 171 (1975).  Further, "a defendant must have 'sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as

well as factual understanding of the proceedings against him.'"  *Filiaggi v. Bagley*, 445 F.3d

851, 858 (6th Cir. 2006) (quoting *Dusky v. U.S.*, 362 U.S. 402 (1960)).

The Supreme Court stated the following regarding a competency determination:

> [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any
> prior medical opinion on competence to stand trial are all relevant in determining
> whether further inquiry is required, but [ ] even one of these factors standing
> alone may, in some circumstances, be sufficient.  There are, of course, no fixed or
> immutable signs which invariably indicate the need for further inquiry to
> determine fitness to proceed; the question is often a difficult one in which a wide
> range of manifestations and subtle nuances are implicated.

*Drope*, 420 U.S. at 162.  "Counsel is ineffective for failing to request a competency hearing only

where indications of incompetency are strong and reasonable probability exists that, but for

counsel's deficient performance in this regard, the petitioner would have been found

incompetent to stand trial."  *Smith v. Bobby*, No. 3:09CV470, 2010 WL 749938, at *20 (N.D.

Ohio Feb. 22, 2010).  "When raising an ineffective-assistance-of-counsel claim, it is the

defendant's burden to establish that he or she was prejudiced because he or she was actually

incompetent at the time of trial."  *Stewart v. Morgan*, 232 F. App'x 482, 489 n.3 (6th Cir. 2007).

The Magistrate Judge in the R&R and Petitioner in his Objections thoroughly set forth

the evidence bearing the determination of whether Bies' trial counsel were constitutionally

ineffective when they failed to request a competency hearing.  Bies' diagnosis of mental

retardation is relevant to the competency inquiry.  This evidence was summarized above in the

discussion of the First, Second, and Third Claims for Relief.  As stated earlier, the Supreme

Court has stated that persons with mental retardation have "subaverage intellectual functioning,"

as well as "diminished capacities to understand and process information, to communicate, to

abstract from mistakes and learn from experience, to engage in logical reasoning, to control

impulses, and to understand the reactions of others."  *Atkins*, 536 U.S. at 318.

In the Objections, Petitioner points out that he rendered childlike drawings during his

trial and was not able to read aloud to the jury a two-paragraph statement he had written for the

mitigation phase of trial.  (Tr. 1088.)  Bies also expressed concern about a receiving stolen property charge pending in Indiana and about his legal fees, concerns which seemed misplaced for a person facing a possible death sentence.  (Tr. 1118; Traverse Ex. 74, Doc. 135-3 at 56–57.)  Bies contends that these items should have alerted his counsel as to the need to request a competency hearing.

However, Bies cites to no evidence in the record that he had outbursts or delusional episodes in the courtroom or that he was not cooperative with his attorneys before or during the trial.  During his unsworn statement at mitigation, he testified that he drew pictures during the trial because he "did not understand what was going on," but then he immediately stated that he knew the hearing that day was "[b]asically what [his attorney] just said, just to see what kind of sentence to give [him]."  (Tr. 1085.)  He asked in his written statement for the jury to have "mercy" and stated that he "will stay in jail for life if you will let me."  (Tr. 1088.)  These statements indicate his understanding of the trial proceedings.

In considering the foregoing evidence and arguments, and bearing in mind the presumption that counsel have rendered adequate assistance, *see Strickland*, 466 U.S. at 690, the Court holds that Bies has not met his burden of proving that his trial counsel were ineffective for failing to request a competency hearing.  A determination of mental retardation, alone or in conjunction with a diagnosis of depression, does not always compel a finding of incompetency.  *See*, *e.g.*, *U.S. v. Chapple*, No. 94-5048, 1995 WL 6147, at *2 (6th Cir. Jan. 6, 1995); *Smith*, 2010 WL 749938, at *21.  The *Chapple* case is instructive.  Chapple, the defendant, had an IQ of 74.  1995 WL 6147, at *1.  A clinical psychologist determined that Chapple was able to "independently complet[e] ordinary tasks of everyday life and understand [ ] most simple

52

issues." *Id.* A psychiatrist determined that the defendant had a limited ability to understand what was happening at his competency hearing and would have difficulty assisting his attorneys. *Id.* However, the psychiatrist also determined that the defendant understood the nature of the crime with which he was charged. *Id.* Based on this evidence, the Sixth Circuit upheld a district court determination that the defendant was competent to stand trial. *Id.* at *2.

The evidence regarding Bies is analogous. His IQ at the time of trial was only a few points lower than Chapple's. Like Chapple, he was able to maneuver through daily tasks unassisted. Bies' thought processes appeared simplistic, but he did demonstrate at least a limited understanding the charges and proceedings against him. Bies cooperated with the police in their investigation. He was able to understand and respond to several questions at the court hearing on the motion to suppress his statements to the police. He also prepared a written statement asking for mercy during the mitigation phase of trial, though he was unable to read it aloud. Bies has not identified any instances where he was unable to control himself at trial or unable to respond to his attorneys' inquiries. Accordingly, Bies has not established that there is a reasonable probability that the trial court would have found him to be incompetent or that his trial attorneys were constitutionally ineffective for failing to request a competency hearing.

### 3. Second Subclaim: Defense counsel failed to investigate the constitutionality of Bies' custodial statements.

Bies makes two primary arguments in support of this subclaim. He asserts that his trial counsel should have presented expert testimony at the suppression hearing on the issue of whether his mental limitations made it impossible for him to knowingly and intelligently waive his *Miranda* rights. He also asserts that his trial counsel should have argued at the hearing that the detectives "fed" Bies the facts of the crime to solicit his confession to those facts. Magistrate

Judge Merz concluded that the subclaim is not procedurally defaulted, though the state courts never addressed the claims on the merits.  (Doc. 167 at 62–64.)  The Warden does not object to that determination.

Both of the issues in this subclaim overlap with the issues discussed in the First, Second, and Third Claims for Relief.  The Court concluded in those Claims for Relief that the state court's determination that Bies' confession was voluntarily, knowingly, and intelligently made was not contrary to or an unreasonable determination of federal law.  In so holding, the Court found that Bies' mental retardation did not negate his waiver of his *Miranda* rights.  The Court noted in that analysis that Bies did not present expert medical testimony on the issue of his competence to waive his *Miranda* rights.  This Court has had the benefit of reviewing the expert medical reports.

Although it is a close question, Bies has not established that the trial court would have suppressed his confession had it heard the testimony of mental health experts at the suppression hearing.  Bies' mental retardation, even supported by expert medical testimony, does not render his confession involuntary.  *See Lynch v. Hudson*, No. 2:07-cv-948, 2011 WL 4537890, at *64–67 (S.D. Ohio Sept. 28, 2011) (denying similar claim).  Bies' claim fails because he has not established the necessary element of police over-reaching or coercion.  *See id.* (citing *U.S. v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989)).  There is no evidence of police coercion here.  Bies repeatedly agreed to help the officers and answer questions.  He agreed that his rights had been explained to him.  His answers to the detectives generally were responsive to the questions asked.  The experts who examined Bies prior to trial concluded that his thoughts were sometimes illogical, but that he understood the charges against him and was able to give a coherent account

of the events of the crime.  The Court concludes based on a totality of the circumstances that trial court likely would not have found Bies incompetent to waive his *Miranda* rights even with the presentation of expert medical evidence.  Bies' trial attorneys were not ineffective for failing to raise an issue which would not have been successful.

As to the second subclaim, that his trial attorneys should have argued that the police "fed" Bies the facts of the crime to solicit his confession, Magistrate Judge Merz concluded that claim was procedurally defaulted.  (Doc. 167 at 65.)  Petitioner Bies did not object to the foregoing procedural analysis in his Objections.  Instead, he again asked the Court to hold this subclaim in abeyance pending the Supreme Court decision in *Martinez v. Ryan*.  As set forth above, the Supreme Court recently held in *Martinez* that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  2012 WL 912950, at *5.  The Court need not determine the applicability of the narrow *Martinez* holding to this case because Petitioner Bies' subclaim fails on merits as well.

The detectives' notes indicate that after Bies first told the police that he had only been at the bus station in Cincinnati, the detectives told Bies "more about facts of the invest.  Dates + times and about him being seen with Jr. [Gumm] in the park next to the vacant bldg were [*sic*] Aaron was found at the approx. time Aaron was missing."  (Traverse, Ex. 69, Doc. 135-3 at 32–34.)  The detectives testified that they reviewed facts they knew from their investigation with Bies including how he traveled to Cincinnati and who he was with at the park the night Aaron went missing.  (Tr. 921.)  They also testified that after the walkthrough of the crime scene, they challenged how Bies could have known so many facts about Aaron's murder, the weapons used,

etc. if he had not been directly involved.  (Tr. 868, 928–31.)  The Court does not find this

questioning technique to have violated Bies' rights, even recognizing Bies' mental limitations.

The detectives did not act wrongfully here when they attempt to cut off a suspect's false

statements by disclosing the basis for their belief that his testimony was false.  As such, it was not

ineffective assistance of counsel for Bies' trial attorneys not to focus their suppression argument

on the alleged spoon-feeding of facts.

Accordingly, the Court will deny on the merits this second subclaim of the Sixth Claim for

Relief.

### 4.    Third Subclaim: Defense counsel failed to conduct a meaningful investigation and failed to present evidence at the guilt phase of the trial.

Magistrate Judge Merz concluded that this subclaim also was procedurally defaulted.

(Doc. 167 at 65–66.)  Again, Petitioner Bies did not challenge that determination, but asked the

Court to hold the claim in abeyance until the Supreme Court decided *Martinez v. Ryan*.  Although

the Supreme Court recently issued its decision in *Martinez, see* 2012 WL 912950, at *5, the Court

need not determine the applicability of the narrow *Martinez* holding to this case because

Petitioner Bies' subclaim fails on merits as well.

Bies asserts several issues in this subclaim.  (Doc. 171 at 51–54.)  He again asserts that his

trial attorneys should have more thoroughly challenged his confession to the police, an argument

rejected in the second subclaim above.  He asserts that his counsel should have investigated and

discovered impeachment evidence against Steven Clark, the jailhouse informant, and Dallas

Hayes, Aaron's brother.  The merits of the underlying issues regarding Clark and Hayes were

addressed in both the Fourth Claim for Relief and the Fifth Claim for Relief.  For the reasons

stated therein, the Court finds that the trial attorneys were not ineffective in regards to the

56

investigation and impeachment of Clark and Hayes.

Next, Petitioner Bies asserts that his counsel failed to investigate and present affirmative evidence indicating that Gumm, Bies' separately-tried co-defendant, was the principal killer and more culpable individual. This issue, however, is relevant only to mitigation and sentencing issues. It is moot because Bies has been removed from death row due to his mental retardation.

Finally, Bies asserts that his trial attorneys should have investigated and presented evidence concerning other potential suspects. This issue overlaps with the Fourth Claim for Relief wherein Bies asserted that the State violated his rights by failing to disclose evidence of other suspects in violation of *Brady*. The Court is granting a habeas writ to Bies on the *Brady* claim. However, it does not follow that the Bies' trial attorneys were ineffective for failing to investigate and discover this evidence on their own. Bies has not explained the parameters of the investigation which his attorneys did conduct. (Doc. 93 at 59; Doc. 135 at 113–14; Doc. 171 at 54.) The Court cannot make a determination of the reasonableness of the trial attorneys' investigation without evidence.

Accordingly, this third subclaim fails on the merits.

**5.      Fourth Subclaim: Defense counsel should have requested the appointment of experts to assess his competency and his ability to knowingly and intelligently waive his *Miranda* rights.**

Bies argues in this subclaim that his trial attorneys should have presented expert testimony to challenge his competency to stand trial and to challenge the determination that he knowingly and intelligently waived his *Miranda* rights. This subclaim appears to be duplicative of issues in the first and second subclaim discussed above. To the extent that the Court did not separately address in the first subclaim the contention that Bies' trial attorneys should have presented expert

testimony to challenge Bies' competency to stand trial—as opposed to bringing a general

challenge to competency—that claim is barred by procedural default.  He did not assert that claim

in either of his post-conviction relief petitions.  Additionally, the subclaim fails on the merits for

the reasons discussed above.

### 6.      Conclusion on the Sixth Claim for Relief

The Court will deny the Sixth Claim for Relief.

## E.      Certificate of Appealability

Bies seeks a certificate of appealability ("COA") to the extent that the Court denies the

Claims for Relief in the Third Amended Petition.  The standards for issuing COAs in cases

governed by the AEDPA is set forth by statute.  An appeal may not be taken from a final order in

an AEDPA case unless a certificate of appeal is issued:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an
> appeal may not be taken to the court of appeals from--
>
>  (A) the final order in a habeas corpus proceeding in which the detention
> complained of arises out of process issued by a State court; or
>
>  (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the
> applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which
> specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.  District courts have the authority to issue COAs pursuant to this section.

*Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002).

The United States Supreme Court has explained that where the district court has denied a

constitutional claim on the merits, a COA should issue if the petitioner demonstrates that

"reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The analysis is more complicated if the district court has denied the claim on procedural grounds:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . . . Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted.

*Id.* Ordinarily, courts should determine the procedural issues before the substantive issues. *Id.* at 485.

"[I]ssuance of a COA must not be *pro forma* or a matter of course." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). The petitioner must prove something more than good faith belief in his claims or the mere absence of frivolity. *Id.* at 338. On the other hand, a court should not deny a COA "merely because it believes the applicant will not demonstrate an entitlement to relief." *Id.* at 337.

Magistrate Judge Merz recommended granting a COA as to the Fourth and Sixth Claims for Relief only. (Doc. 173 at 10.) The Court need not issue a COA to Petitioner Bies, however, on the Fourth Claim for Relief to the extent it involves the other suspects subclaim, however, because the Court has determined to grant a writ of habeas corpus for that subclaim. The Warden has not objected to that recommendation to grant the COA as to the remainder of the Fourth Claim for Relief and for the Sixth Claim for Relief, and therefore, the Court may adopt that portion of the R&R and Supp. R&R without further review. *See Thomas v. Arn*, 474 U.S. 140,

145–50 (1985) (upholding Sixth Circuit waiver rule); *Paige v. Bradshaw*, No. 1:05-CV-2618, 2007 WL 3287329, at *1 (N.D. Ohio Nov. 3, 2007) (explaining that a failure to object to a report and recommendation waives any appeal) *report and recommendations adopted by*, 2007 WL 3306626 (N.D. Ohio Nov. 3, 2007).

Magistrate Judge Merz recommended denying a COA as to the First, Second, Third, and Fifth Claims for Relief. (Doc. 173 at 10.) Petitioner Bies has objected to that recommendation and seeks a COA as to those claims. (Doc. 174 at 7.) The First, Second, and Third Claims for Relief were not procedurally defaulted. They involve difficult questions of whether Bies had the mental competency to knowingly, intelligently, and voluntarily waive his *Miranda* rights. The Sixth Circuit has recognized a concern about the voluntariness of a confession when a suspect's mental impairment is known to the police. *See Garner*, 557 F.3d at 264; *Murphy*, 551 F.3d at 513–14. The Court concludes that reasonable jurists could disagree with this Court's conclusion that the Ohio Supreme Court's decision denying these claims was not contrary to or an unreasonable application of federal law. The Court will grant a COA as to the First, Second, and Third Claims for Relief.

As to the Fifth Claim for Relief, the Court has determined that the procedural default of this claim by Petitioner Bies should not be enforced. Nonetheless, the Court agrees with Magistrate Judge Merz that a COA should not issue on this Claim for Relief.

**IV.     CONCLUSION**

For the foregoing reasons, the Third Amended Petition for Writ of Habeas Corpus (doc.

93) is **GRANTED CONDITIONALLY IN PART AND DENIED IN PART**.  Likewise, the

Report and Recommendations (doc. 167) and Supplemental Report and Recommendations (doc.

173) are **ADOPTED IN PART AND OVERRULED IN PART** and Petitioner's Objections to

the R&R (doc. 171) and Objections to the Supp. R&R (doc. 174) are **SUSTAINED IN PART**

**AND OVERRULED IN PART**.  The Third Amended Petition for Writ of Habeas Corpus is

granted conditionally as to the "other suspects" subclaim of the Fourth Claim for Relief only, the

condition being that the State of Ohio conduct a new trial of Petitioner within 180 days from the

date of final judgment in these proceedings.  The case is remanded to the Supreme Court of Ohio

for further proceedings not inconsistent with this Order.

Additionally, the Court grants a certificate of appeal as to the First, Second, and Third

Claims for Relief, the remainder of the Fourth Claim for Relief, and the Sixth Claim for Relief.

IT IS SO ORDERED.


____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

61